ROBBINS GELLER RUDMAN
  & DOWD LLP
PATRICK J. COUGHLIN (111070)
DAVID W. MITCHELL (199706)
ALEXANDRA S. BERNAY (211068)
CARMEN A. MEDICI (248417)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
patc@rgrdlaw.com
davidm@rgrdlaw.com
xanb@rgrdlaw.com
cmedici@rgrdlaw.com

DEVINE GOODMAN RASCO &
  WATTS-FITZGERALD, LLP
JOHN W. DEVINE
LAWRENCE D. GOODMAN
ROBERT J. KUNTZ, JR.
2800 Ponce De Leon Blvd., Suite 1400
Coral Gables, FL  33134
Telephone:  305/374-8200
305/374-8208 (fax)
jdevine@devinegoodman.com
lgoodman@devinegoodman.com
rkuntz@devinegoodman.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| B & R SUPERMARKET, INC., d/b/a MILAM'S MARKET, a Florida corporation, and GROVE LIQUORS LLC, a Florida limited liability company, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiffs,<br><br>        vs.<br><br>VISA, INC., a Delaware corporation; VISA USA, INC., a Delaware corporation; MASTERCARD INTERNATIONAL INCORPORATED; a Delaware corporation; | Case No.<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, VIOLATIONS OF THE CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT AND UNJUST ENRICHMENT<br><br>DEMAND FOR JURY TRIAL |

[Caption continued on following page.]

1  AMERICAN EXPRESS COMPANY, a New )
   York corporation; DISCOVER FINANCIAL )
2  SERVICES, an Illinois corporation; BANK OF )
   AMERICA, N.A., a national banking )
3  association; BARCLAYS BANK )
   DELAWARE, a Delaware corporation; )
4  CAPITAL ONE FINANCIAL )
   CORPORATION, a Delaware corporation; )
5  CHASE BANK USA, NATIONAL )
   ASSOCIATION, a national banking )
6  association; CITIBANK (SOUTH DAKOTA), )
   N.A., a South Dakota bank; CITIBANK, N.A., )
7  a national banking association; PNC BANK, )
   NATIONAL ASSOCIATION, a national )
8  banking association; USAA SAVINGS BANK, )
   a Nevada corporation; U.S. BANCORP )
9  NATIONAL ASSOCIATION, a national )
   banking association; WELLS FARGO BANK, )
10 N.A., a national banking association; EMVCo, )
   LLC, a Delaware limited liability company; )
11 JCB CO. LTD, a Japanese company; and )
   UNIONPAY, a Chinese bank association, )
12                                              )
13                                              )
                        Defendants.             )
14                                              )
15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    B & R Supermarket, Inc., d/b/a Milam's Market, a Florida corporation ("Milam's Market"),

2    and Grove Liquors LLC, a Florida limited liability company ("Grove Liquors"), individually and on

3    behalf of all others similarly situated (collectively, the "Class"), sue Visa, Inc. and Visa USA, Inc.

4    (collectively, "Visa"), MasterCard International Incorporated ("MasterCard"), American Express

5    Company ("American Express") and Discover Financial Services ("Discover") (collectively, the

6    "Networks"); Bank of America, N.A. ("BOA"), Barclays Bank Delaware ("Barclays"), Capital One

7    Financial Corporation ("Capital One"), Chase Bank USA, National Association ("Chase"), Citibank

8    (South Dakota), N.A., Citibank, N.A., PNC Bank, National Association ("PNC"), USAA Savings

9    Bank ("USAA"), U.S. Bancorp National Association ("US Bank") and Wells Fargo Bank,

10   N.A. ("Wells Fargo") (collectively, the "Issuing Banks"); EMVCo, LLC ("EMVCo"); JCB Co. Ltd

11   ("JCB"); and UnionPay ("UnionPay") and state as follows:

12                                   **NATURE OF THE CLAIM**

13        1.    This is a class action suit for violations of the Sherman Antitrust Act, California's

14   Cartwright Act, unjust enrichment, and for other equitable and injunctive relief.

15        2.    For their own benefit, the Networks, the Issuing Banks through EMVCo conspired to

16   shift billions of dollars in liability for fraudulent, faulty and otherwise rejected consumer credit card

17   transactions from themselves to the Class, without consideration to, or meaningful recourse by, those

18   merchants (the "Liability Shift").

19                                         **THE PARTIES**

20        3.    Plaintiff B & R Supermarket, Inc., d/b/a Milam's Market, is a Florida corporation that

21   operates four retail grocery stores in Miami-Dade County.

22        4.    Plaintiff Grove Liquors LLC is a Florida limited liability company operating a retail

23   liquor store in Miami-Dade County.

24        5.    Class members, who bring this class action pursuant to Rules 23(a) and (b)(2) and

25   (b)(3) of the Federal Rules of Civil Procedure, comprise merchants who have been unlawfully

26   subjected to a Liability Shift for the assessment of MasterCard, Visa, Discover, UnionPay, JCB, and

27   American Express credit and charge card chargebacks, despite having purchased EMV-chip-

28   compliant point of sale ("POS") card readers and having otherwise complied with the directives of

---

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT                              - 1 -

1    the Networks and Issuing Banks, during the period from October 1, 2015 until the anticompetitive

2    acts cease.

3           6.    Defendant Visa is a California-based payments technology company, which operates

4    a retail electronic payments network in the United States.  It administers Visa payment programs and

5    its product platform includes consumer credit, consumer debit and cash access, and prepaid and

6    commercial programs.  It provides products and services over a secure payments network to support

7    payment programs offered by its member issuing banks to their customers, including tens of millions

8    of retail consumers.  Visa conducts business throughout the United States, including extensively in

9    the Northern District of California and this Division, where it is headquartered.  Visa is a founding

10   member of EMVCo and has two members, Christina Hulka and Marc Kekicheff, on the EMVCo

11   Board of Managers.  Along with American Express, Discover, JCB, MasterCard and UnionPay, Visa

12   is a co-owner of defendant EMVCo.

13          7.    Defendant MasterCard is a New York-based payments technology company, which

14   operates a retail electronic payments network in the United States.  It administers MasterCard

15   payment programs and its product platform includes consumer credit, consumer debit and cash

16   access, and prepaid and commercial programs.  It provides products and services over a secure

17   payments network to support payment programs offered by its member issuing banks to their

18   customers, including tens of millions of retail consumers.  MasterCard conducts business throughout

19   the United States, including extensively in the Northern District of California.  MasterCard is a co-

20   owner of defendant EMVCo.  MasterCard has a representative, Jonathan Main, on the EMVCo

21   Board of Managers.

22          8.    Defendant American Express is a New York-based payments technology company

23   which issues credit and charge cards and related services and conducts business throughout the

24   United States, including extensively in the Northern District of California, and is a co-owner of

25   defendant EMVCo.  American Express has two representatives, Robert Burns and Sean Conroy, on

26   the EMVCo Board of Managers.

27          9.    Defendant Discover is an Illinois-based financial services company, which issues the

28   Discover card and operates the Discover retail electronic payments network in the United States.  It

administers Discover payment programs and its product platform includes consumer credit cards, and other card services.  It provides products and services over a secure payments network to support payment programs offered by its own and some member issuing banks to their customers, including tens of millions of retail consumers.  Discover conducts business throughout the United States, including extensively in the Northern District of California.  Discover is a co-owner of defendant EMVCo.  Discover has two representatives, David Bibby and Cheryl Mish, on the EMVCo Board of Managers.

10.     Defendant BOA, a national banking association with its principal place of business in Charlotte, North Carolina, issues credit cards throughout the United States, including extensively in the Northern District of California.  It is an issuing bank that, throughout this judicial district, issues General Purpose Cards to individuals and businesses.  As an issuing bank, BOA maintains the line of credit associated with each Visa or MasterCard it issues.  Cardholder transactions made with these cards are processed by the Networks.  BOA is a member of both MasterCard and Visa.  Bank of America Merchant Services is an EMVCo Business Associate.  According to EMVCo's website, "EMVCo Business Associates provide EMVCo with input on strategic business and implementation issues related to the use of the EMV Specifications.  Business Associates serve on the Board of Advisors and, accordingly, advise the EMVCo Executive Committee." According to EMVCo, in addition to receiving a seat on the EMVCo Board of Advisors, Business Associates also gain "networking opportunities with EMVCo executives and other Business Associates" and "[a]dvance access to EMV Specification revisions, draft documents and upcoming meeting materials."

11.     Defendant Barclays is a Delaware corporation, which issues credit cards throughout the United States, including extensively in the Northern District of California.  It is an issuing bank that, throughout this judicial district, issues General Purpose Cards to individuals and businesses.  As an issuing bank, Barclays maintains the line of credit associated with each Visa or MasterCard it issues.  Cardholder transactions made with these cards are processed by the Networks.  Barclays is a member of both MasterCard and Visa.

12.     Defendant Capital One is a Delaware corporation, with its principal place of business in McLean, Virginia, issues credit cards throughout the United States, including extensively in the

1  Northern District of California.  It is an issuing bank that, throughout this judicial district, issues

2  General Purpose Cards to individuals and businesses.  As an issuing bank, Capital One maintains the

3  line of credit associated with each Visa or MasterCard it issues.  Cardholder transactions made with

4  these cards are processed by the Networks.  Capital One is a member of both MasterCard and Visa.

5         13.    Defendant Chase, a national banking association, issues credit cards throughout the

6  United States, including extensively in the Northern District of California.  It is an issuing bank that,

7  throughout this judicial district, issues General Purpose Cards to individuals and businesses.  As an

8  issuing bank, Chase maintains the line of credit associated with each Visa or MasterCard it issues.

9  Cardholder transactions made with these cards are processed by the Networks.  Chase is a member

10  of both MasterCard and Visa.  Chase is an EMVCo Business Associate.  According to EMVCo's

11  website, "EMVCo Business Associates provide EMVCo with input on strategic business and

12  implementation issues related to the use of the EMV Specifications.  Business Associates serve on

13  the Board of Advisors and, accordingly, advise the EMVCo Executive Committee."  According to

14  EMVCo, in addition to receiving a seat on the EMVCo Board of Advisors, Business Associates also

15  gain "networking opportunities with EMVCo executives and other Business Associates" and

16  "[a]dvance access to EMV Specification revisions, draft documents and upcoming meeting

17  materials."  Chase is also a Technical Associate of EMVCo.  According to EMVCo's website,

18  EMVCo "Technical Associates have the opportunity to provide input and receive feedback on

19  detailed technical and operational issues connected to the EMV Specifications and related processes.

20  Open to any industry stakeholder with an interest in monitoring the EMV Specifications, this

21  participation type also gives organisations the opportunity to interact regularly with EMVCo's

22  technical Working Groups, offer input to meeting agendas, submit technical contributions to

23  EMVCo for consideration, and gain early access to draft specifications and other technical

24  documents.  Up to five seats on the EMVCo Board of Advisors are reserved for Technical

25  Associates representing distinct market sectors.  Technical Associate representation on the Board of

26  Advisors is determined through an annual election process."

27

28

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT     - 4 -

14.     Defendant Citibank (South Dakota), N.A. is a South Dakota bank with its principal place of business in Sioux Falls, South Dakota.  It is parent company Citigroup's primary banking entity responsible for U.S. credit card activities.

15.     Defendant Citibank, N.A. is a bank with its principal place of business in New York, New York, and is a subsidiary of Citigroup, Inc., a Delaware corporation with its principal place of business in New York, New York.  Citigroup is a member of both Visa and MasterCard.  It engages in interstate commerce.  It is an issuing bank that, throughout this judicial district, issues General Purpose Cards to individuals and businesses.  It also is an acquiring bank that, throughout this judicial district, provides card-acceptance services to class members.

16.     Defendant PNC is a Pennsylvania corporation which issues credit cards throughout the United States, including in the Northern District of California.  It is an issuing bank that, throughout this judicial district, issues General Purpose Cards to individuals and businesses. As an issuing bank, PNC maintains the line of credit associated with each Visa or MasterCard card it issues.  Cardholder transactions made with these cards are processed by the Networks.  PNC is a member of both Visa and MasterCard.

17.     Defendant USAA is a Nevada corporation which issues credit cards throughout the United States, including in the Northern District of California.  It is an issuing bank that, throughout this judicial district, issues General Purpose Cards to individuals and businesses.  As an issuing bank, PNC maintains the line of credit associated with each Visa or MasterCard card it issues.  Cardholder transactions made with these cards are processed by the Networks.  USAA is a member of both Visa and MasterCard.

18.     Minneapolis-based U.S. Bancorp, with $422 billion in assets, is the parent company of defendant US Bank, the fifth largest commercial bank in the United States.  US Bank issues credit cards throughout the United States, including extensively in the Northern District of California.  It is an issuing bank that, throughout this judicial district, issues General Purpose Cards to individuals and businesses.  As an issuing bank, US Bank maintains the line of credit associated with each Visa or MasterCard it issues.  Cardholder transactions made with these cards are processed by the Networks.  US Bank is a member of both MasterCard and Visa.  US Bank is also an EMVCo

1  Business Associate.  According to EMVCo's website, "EMVCo Business Associates provide

2  EMVCo with input on strategic business and implementation issues related to the use of the EMV

3  Specifications.  Business Associates serve on the Board of Advisors and, accordingly, advise the

4  EMVCo Executive Committee."  According to EMVCo, in addition to receiving a seat on the

5  EMVCo Board of Advisors, Business Associates also gain "networking opportunities with EMVCo

6  executives and other Business Associates" and "[a]dvance access to EMV Specification revisions,

7  draft documents and upcoming meeting materials."  US Bank is also a Technical Associate of

8  EMVCo.  According to EMVCo's website, EMVCo "Technical Associates have the opportunity to

9  provide input and receive feedback on detailed technical and operational issues connected to the

10  EMV Specifications and related processes.  Open to any industry stakeholder with an interest in

11  monitoring the EMV Specifications, this participation type also gives organisations the opportunity

12  to interact regularly with EMVCo's technical Working Groups, offer input to meeting agendas,

13  submit technical contributions to EMVCo for consideration, and gain early access to draft

14  specifications and other technical documents.  Up to five seats on the EMVCo Board of Advisors are

15  reserved for Technical Associates representing distinct market sectors.  Technical Associate

16  representation on the Board of Advisors is determined through an annual election process."

17      19.    Defendant Wells Fargo is a San Francisco-based corporation which issues credit cards

18  throughout the United States, including extensively in the Northern District of California.  It is an

19  issuing bank that, throughout this judicial district, issues General Purpose Cards to individuals and

20  businesses.  As an issuing bank, Wells Fargo maintains the line of credit associated with each Visa

21  or MasterCard it issues.  Cardholder transactions made with these cards are processed by the

22  Networks.  Wells Fargo is a member of both MasterCard and Visa.

23      20.    Defendant EMVCo is a Delaware limited liability company overseen by, *inter alia*,

24  the Networks, which, among other things, develops and manages the technical standards by which

25  EMC chip transactions (as defined herein) are processed and maintained.  According to EMVCo's

26  website, American Express, Discover, JCB, UnionPay and Visa "own[s] an equal share of EMVCo

27  and has representatives in the organisation at the management and working group levels.  All

28  decisions are made on a consensus basis among the member organisations."  EMVCo is not simply a

standard-setting entity.  Instead, the organization serves as a means through which defendants here have been able to effectuate their conspiracy.  Moreover, the anticompetitive conduct alleged herein was not conducted as part of EMVCo's standard-setting functions.  The U.S. Supreme Court has long acknowledged that standard-setting organizations "can be rife with opportunities for anticompetitive activity."  *Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 571 (1982); *see also Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 659 (1961).

21.     Defendant JCB is a Japanese company and a credit card issuer and acquirer.  JCB conducts business throughout the United States, including extensively in the Northern District of California.  As of March 2015, JCB had 89.6 million cardholders, including 20 million members outside Japan.  JCB is a co-owner of defendant EMVCo.  JCB has two representatives, Masao Noda and Junya Tanaka, on the EMVCo Board of Managers.

22.     Defendant UnionPay is a Chinese bankcard association established under the approval of the State Council and the People's Bank of China.  At present, the Shanghai-headquartered UnionPay has about 400 domestic and overseas associate members.  UnionPay conducts business throughout the United States, including in the Northern District of California.  UnionPay is a co-owner of defendant EMVCo.  UnionPay has two representatives, Hongliang Xu and Jack Pan, on the EMVCo Board of Managers.

23.     Historically Visa and MasterCard were joint ventures between payment card issuing banks.  This member bank control over Visa and MasterCard allowed card issuers to jointly set rules regarding the operation of the payment card networks.

24.     Over time the joint agreements between the member banks implemented through Visa and MasterCard began to be challenged as violative of the antitrust laws.  *See* below ("Defendants Have a History of Anticompetitive Conduct").  In order to avoid liability, the member banks divested their ownership in Visa and MasterCard through an IPO.  But, by creating clever shareholding agreements, the member banks continue to exercise control over Visa and MasterCard.  For example, although the MasterCard IPO broadened stock ownership, it imposed clear restrictions that make it impossible for the member banks to lose control of the business of MasterCard.  MasterCard's member banks have ensured that they will maintain effective collective control even now that the

1   IPO is completed by imposing limits on stock purchases and retaining certain veto powers over

2   major business decisions.

3   **INTRADISTRICT ASSIGNMENT**

4   25.     A substantial part of the events or omissions which give rise to the claim occurred in

5   San Francisco County and defendant Visa, Inc., who was responsible for a substantial part of the

6   events or omissions, is headquartered in San Mateo County.  As such this action is properly assigned

7   to the San Francisco division of this Court.

8   **JURISDICTION AND VENUE**

9   26.     This Court has jurisdiction over this case pursuant to 28 U.S.C. §1332(d) and the

10  Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1711 *et seq.*, which vests original

11  jurisdiction in the district courts of the United States for any multi-state class action where the

12  aggregate amount in controversy exceeds $5 million and where the citizenship of any member of the

13  Class of plaintiffs is different from that of any defendant.  The $5 million amount in controversy and

14  diverse-citizenship requirements of CAFA are satisfied in this case.

15  27.     Venue is proper in this District pursuant to §12 of the Clayton Act (15 U.S.C. §22),

16  and 28 U.S.C. §1391 (b), (c), and (d), because a substantial part of the events giving rise to

17  plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and

18  commerce discussed below has been carried out in this District, and one or more of the defendants

19  resides in, is licensed to do business in, is doing business in, had agents in, or is found or transacts

20  business in this District.

21  28.     This Court has personal jurisdiction over each of the defendants because, *inter alia*,

22  each defendant: (a) transacted business throughout the United States, including in this District; (b)

23  provided services related to credit cards and/or charge cards throughout the United States, including

24  in this District; (c) had substantial contacts with the United States, including in this District; and/or

25  (d) was engaged in an illegal conspiracy that was directed at and had the intended effect of causing

26  injury to persons residing in, located in, or doing business throughout the United States, including in

27  this District.

28

29.     Defendants engaged in conduct both inside and outside the United States that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

30.     The activities of defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. Defendants' products are sold in the flow of interstate commerce.

31.     The anticompetitive conduct, and its effects on U.S. commerce described herein, proximately caused antitrust injury to plaintiffs and members of the Class in the United States.

32.     By reason of the unlawful activities alleged herein, defendants substantially affected commerce throughout the United States, causing injury to plaintiffs and members of the Class.

33.     Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States including plaintiffs and members of the Class.

## BACKGROUND FACTS

**Cards and Commerce**

34.     The American consumer economy runs on plastic.

35.     Some 230 million adult American consumers hold more than a billion credit and charge cards which they use to make more than two trillion dollars of purchases each year – in 2011, 26 billion credit card transactions totaled some $2.1 trillion.

36.     Millions of merchants, in virtually every branch of the economy, rely on accepting credit and charge transactions for their livelihood.  MasterCard and Visa are accepted by about 8 million merchants each, Discover by slightly fewer; and some 4.5 million merchants take American Express.

37.     In 1997, payment card usage accounted for approximately 23% of consumer payments.  By 2011, cards accounted for more than twice that proportion of consumer sales – 48%. During the same period, use of cash and checks declined, from 70% of consumer transactions to 35%.

38.     Although they work the same when a cardholder makes a purchase, credit and charge cards are different: A credit card has a revolving line of credit meaning cardholders are able to spend

1   out of the line of credit using the credit card, and typically have to pay a minimum payment – but are

2   not required to pay the full amount owed – each month.  If the cardholder does not pay off the

3   statement balance, he or she pays interest each month on the unpaid balance of the expended line of

4   credit.  A charge card, on the other hand, does not come with a line of credit and typically does not

5   allow the cardholder to carry a balance, instead charge cards typically require payment of the full

6   amount charged each month.

7          39.    While many American consumers use credit and charge cards for the convenience

8   they offer, there are some transactions – for example, renting a car or a hotel room, or making an

9   online purchase – which are virtually impossible to make without such a card.

10         40.    For American merchants, like those in the Class, accepting credit and charge cards is

11  a prerequisite and necessity for doing business.  Customers expect to be able to use their plastic

12  when they make a purchase and will often choose simply not to do business with a merchant who

13  doesn't accept a card.

14  **Credit Card Mechanics**

15         41.    Defendants Visa and MasterCard, while they operate the networks that make

16  transactions on Visa or MasterCard credit cards work, do not issue the cards themselves, or carry the

17  line of credit each card represents.  Instead, banks and other financial institutions, including the

18  Issuing Banks, issue the credit cards.

19         42.    In the past, defendant American Express only issued charge cards.  In more recent

20  years, American Express began directly issuing credit cards as well.

21         43.    Defendant Discover operates a network of its own.  Its cards are mostly issued

22  directly by Discover, along with a few issuing banks.

23         44.    There are numerous moving parts behind a credit or charge card transaction.

24         45.    In the case of American Express charge cards, American Express is both the issuer

25  and provides the network.  When a consumer uses the card in lieu of cash to make a purchase from a

26  merchant, the merchant is thereafter paid the purchase price (less a "swipe fee") by American

27  Express.  American Express makes its money by charging cardholders membership fees (which vary

28  depending upon the sort of services or perquisites associated with different card types), interest on

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT                - 10 -

1  unpaid balances and by charging the swipe fee (which varies from around 2% to 5% of the cost of

2  the goods or services purchased) paid by the merchant.

3      46.    Accordingly, a typical American Express charge card transaction involves three

4  parties: The customer, American Express and the merchant.

5      47.    A Visa, MasterCard or Discover credit card transaction, on the other hand, involves

6  as many as five parties: (1) the card-holding customer; (2) the merchant; (3) the "acquiring bank";

7  (4) the issuing bank (in the case of most Discover cards that is usually Discover Bank); and (5) the

8  Network itself, that is, Visa, MasterCard or Discover.

9      48.    The acquiring bank is the link between the Network and the merchant that accepts the

10 card for payment.  The issuing bank is the bank, like the Issuing Banks here, that issues the credit

11 card to the customer and which carries the line of credit represented by the card.  The cardholder

12 owes the debt to the issuing bank in the amount of any unpaid balance carried on the card.

13     49.    When the cardholding customer presents a credit card to pay for goods or services,

14 the accepting merchant relays the transaction information to the acquiring bank.  The acquiring bank

15 processes the information and transmits it to the network.  The network relays the information to the

16 issuing bank, which approves the transaction, presuming approval is warranted based on with the

17 cardholder's account status or credit limit.  The approval is conveyed to the acquiring bank, which in

18 turn relays it to the merchant.

19     50.    The issuing bank then transmits to the acquiring bank the amount of the purchase

20 price minus an "interchange fee."  Before paying the merchant, the acquiring bank withholds an

21 additional fee – called the "merchant discount fee" – for its processing services.  Thus, the total

22 amount the merchant receives for the transaction is the purchase price minus the sum of the

23 interchange fee and the merchant discount fee.

24     51.    Interchange fees vary based on factors that include the type of card used and the type

25 of merchant.  Many credit cards provide rewards or cash back to cardholder.  Those rewards or cash

26 back cost money, and thus these cards, referred to in the industry as "premium cards," are associated

27 with higher interchange fees.

28

52.     In general, cardholders can dispute their payment card transactions for various reasons, including claims of fraud.  Cardholders are rarely responsible for these losses, called "chargebacks," which, historically, were born by the issuers, and only rarely by the merchants.

**Credit Card Technology**

53.     Each credit or charge card bears a unique embossed number, an embossed expiration date and a printed "CVV," or "card verification value" number – often called the "security code."

54.     The embossed number identifies the card as a Visa, MasterCard, Discover, American Express, JCB or UnionPay, identifies the type of card, the issuing bank (for Visa and MasterCard payment cards), the account number and card number within an account, and contains one or more "check digits," random numbers added for security.

55.     Cards also bear a magnetic stripe or magstrip on the back, similar to a piece of audio or computer tape.  The magstrip contains information about the card, including the card number, expiration date and so forth.  When swiped though the card reader at the merchant's POS –  in what is called "card present" transaction – the card reader is able to obtain that information from the magstrip and transmit it along the network.

56.     This combination of features allows the various participants in a credit card transaction to share information about the card, all with the aim of speeding the transaction while avoiding fraud and unauthorized charges.

57.     Beginning in the mid-1990s credit and charge cards began to be manufactured to include, in addition to the magstrip, a so-called "EMV chip." This electronic chip – actually a tiny micro-processor – is a more advanced form of electronic data storage than a magstrip.  While magstrips are "static," containing only the information with which they are initially coded, EMV chips are "dynamic," in that the data they contain can be interacted with, altered and updated.  An EMV chip creates a unique electronic signature for each transaction.

58.     EMVCo is jointly owned by Visa, MasterCard, UnionPay, JCB, Discover and American Express.  The EMV standard encompasses specifications, test procedures and compliance processes managed by EMVCo.

59.     The EMV name comes from "Europay, MasterCard and Visa," the companies that in 1994 initiated development of the EMV Specifications.  Europay International SA became part of MasterCard in 2002.  JCB joined EMVCo in 2004, and American Express in 2009.

60.     EMVCo is managed by the Board of Managers, which is comprised of representatives from each of the member payment systems.  Various Working Groups complete EMVCo's work, and "decisions are made on a consensus bases to ensure card infrastructure uniformity."  In 2010, EMVCo launched the EMVCo Associates Programme (EAP), "for key industry stakeholders to provide input to EMVCo's Board of Managers, Executive Committee, and Working Groups."

61.     EMV is the trademark owned by all of the equity owners of EMVCo: American Express, JCB, Discover, MasterCard, UnionPay and Visa.  However, EMV also refers to the various forms of electronic payments that are administered by EMVCo.

62.     An EMV chip looks like this:



63.     Financial institutions in Europe, Latin America, Asia/Pacific and Canada migrated to EMV over the past decade.  Those transitions took years to accomplish and ran into substantial roadblocks along the way.  For example, roll out in Canada began in 2008 and as of 2014, the adoption rate was only at 59.5%, according to statistics provided by EMVCo itself.

64.     The cost of the transition to EMV chip cards in the United States, as borne by merchants who accept the cards (and who, for example, must purchase new POS equipment that can process chip card transactions at a cost of $100 to $600 per machine) is expected to be between $6

1  billion and $8 billion.  Of that amount, 75% is likely to be paid by merchants, making the transition

2  three times as expensive for them as for defendants.

3       65.  EMV cards, because of their dynamic nature, are purported by the Networks to reduce

4  fraud significantly during card present transactions – those where the customer actually produces his

5  card to the merchant at the merchant's POS.  In addition, EMV chips are supposed to be less prone

6  to illicit copying than magstrips.  (Although, an EMV-chip-equipped card does nothing to lessen the

7  likelihood of fraud or error in what are "card not present" transactions, such as those conducted

8  online or over the telephone.)

9       66.  There are two kinds of EMV cards – "chip-and-PIN" (personal identification number)

10  cards, where the transaction is authorized by the merchant processing the chip card and the consumer

11  entering a PIN, and "chip-and-signature" cards, where merchant processes the chip and the consumer

12  signs an electronic signature pad.

13       67.  The European Union's version of the EMV system, unlike the standard deployed in

14  the United States, utilizes the chip-and-PIN system, rather than a chip-and-signature system.  Chip-

15  and-PIN cards are considered more secure.

16       68.  EMV cards have already been widely adopted outside the United States.  Lack of

17  EMV-enabled cards – which are common elsewhere in the world – has been blamed in part for the

18  fact that more than half of the $14 billion in global annual credit card fraud occurs within the United

19  States.

20  **The "Liability Shift" and "Certification"**

21       69.  Despite all the security measures associated with credit cards, with any card

22  transaction, even with EMV chip-enabled cards, there is a possibility of fraud, error or complaint.

23  Cards may be stolen from their rightful owners and used by the thief to make charges.  A merchant

24  might charge the wrong amount or deliver the wrong, or faulty, goods.

25       70.  Typically, when a card-holding customer sees a fraudulent charge on his or her card

26  statement, or wishes to dispute a charge for another reason, the customer contacts his or her issuing

27  bank.  (The telephone numbers and other contact information printed on the back of credit cards go

28  to card issuers, not to the Networks.)

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT      - 14 -

71.     In such cases, the card-holding customer is not usually liable for the fraudulent or unauthorized charge.  Instead, chargebacks are typically absorbed by the issuing banks – who marketed such "fraud protection" to their credit card customers as a core service of their cards – when fraudulent card present transactions occur.

72.     Accordingly, the Class members were not typically liable for the cost of fraudulent charges in card present transactions, except on those occasions where the merchant improperly handled the transaction in some way, such as not obtaining a customer signature.

73.     On the other hand, merchants who accept cards online or in other "card not present" transactions have more frequently had to bear the cost of fraudulent charges.

74.     But the Networks decided that on October 1, 2015 – by fiat of Visa, MasterCard, American Express and the issuing banks, and without any opportunity for merchants like plaintiffs and the Class members to object or to opt out – the system for handling chargebacks for card present transactions would change dramatically.

75.     In what defendants truthfully enough dubbed a "Liability Shift," the issuing banks and the Networks decreed that, as of that October 1, 2015, liability for billions of dollars of card present chargebacks would shift from the issuing banks to the merchants, unless the merchants could satisfy certain conditions – conditions, it would turn out, which were impossible for the Class members to meet and which the Networks, the Issuing Banks and EMVCo *knew* were impossible to meet.

76.     Indeed, it is widely accepted within the electronic payments industry that defendants knew that the conditions they had set for the Class members were impossible. Just some examples:

(a)     In the first place, defendants had the example of *every other country that has adopted the EMV chip*: "No country has [ever] achieved anywhere near 100 percent EMV readiness at the time of the liability shift," according to Erik Vlugt, vice president of global product management at VeriFone, a company which actually makes chip-reading equipment and software.

(b)     The Strawhecker Group, an electronic payments services provider estimated as early as March 2015 that 34% of U.S. merchants could be ready for the Liability Shift deadline.

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT                              - 15 -

1   And as the deadline drew nearer, the company lowered its estimates.  In September 2015, on the eve

2   of the Liability Shift, the company estimated that only 27% of merchants could be ready.

3            (c)      Gilles Ubaghs, senior analyst of financial services technology at Ovum, an

4   independent analyst and consultancy firm headquartered in London, specializing in global coverage

5   of IT and the telecommunications industries, stated that "many merchants and retailers are totally

6   unprepared for the liability shift to EMV on October 1," and that banks and payment providers had

7   not done enough to educate merchants.

8            (d)      A top industry consultant, Allen Weinberg of Glenbrook – a "payments

9   industry strategy consulting and research firm," *whose clients include card payment networks* –

10  warned that "[t]hese POS change projects usually span years, not months.  Many pieces to the EMV

11  puzzle, particularly regarding debit, were not in place in time for the liability shift deadline."  In

12  addition, he said, "[m]any, many, many integrated POS systems (IPOS), especially the electronic

13  cash register software for these systems, were just not ready in time.  Even if the software was ahead

14  of the game, they faced long certification queues at many acquirers."

15           (e)      Defendants also knew that even providing the software to support EMV cards

16  was a challenge, according to Terry Crowley, CEO of TranSend, a company that manufactures the

17  software to make merchants' equipment work with EMV chip card.  Crowley said that while

18  software code for card-accepting devices was historically simple enough to be written on the back of

19  a business card, "now with EMV, that same software wraps around the walls of a room three

20  times . . . hundreds of thousands of lines of code."  With the Liability Shift deadline having passed,

21  Crowley says, suddenly there is a "fire drill" to replace all of this simple software, compounded by

22  the facts that the EMV code is hard to write, harder to certify and that few EMV software developers

23  understand the U.S. market.

24           (f)      In September 2015, Digital Transactions, a publication devoted to tracking the

25  industry, stated that "few are surprised that EMV certifications are taking longer than traditional

26  POS terminals."

27           77.     Despite these obstacles, defendants insisted that the October 1, 2015 Liability Shift

28  occur as to almost all merchants, with no grace period.

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT                                      - 16 -

78.     From the perspective of the relationship between cardholder and issuing bank, nothing changed: The issuing banks continued to market and provide "fraud protection" to cardholders, who were not held liable for fraudulent charges.  But from the perspective of the relationship between the issuing banks and merchants the difference was seismic: the issuing banks would now, in many cases, be able to shift the liability for covering such charges from themselves to Class members.

79.     Merchants who accepted EMV chip cards, but failed to process them through approved POS card readers (*i.e.*, "inserted" the EMV chips cards in the readers as opposed to "swiping" the magnetic strip on the cards) would now be liable for any chargebacks resulting from fraudulent or improper use of the EMV chip cards.

80.     Merchants were not consulted about the change, were not permitted to opt out, were not offered any reduction of the interchange fee, the merchant discount fee, the swipe fee – or any other cost of accepting defendants' credit and charge cards.  This is in contrast to the United Kingdom and Australian markets where merchants were given interchange concessions which helped share the costs of fraud and purchasing and deploying new hardware and software.

81.     Thus, what defendants knew, but Milam's Market, Grove Liquors and the rest of the Class did not and could not know, was that purchasing new POS equipment and training their staff was not going to be enough.  In addition, the equipment would have to "certified" after the fact in a murky, nebulous process that was utterly outside of their control.

82.     Instead, the "certification" process is controlled by the very entities that benefit from the Liability Shift and it is the primary means through which defendants' illegal conduct has been able to flourish.

83.     According to a report by the International Retail User Group: "Certifications are mandatory and unique to each phase of the EMV payment system."  Each step of the certification process involves numerous entities.  "Brand certification involves the card brands and EMVCo"; "PIN pad certification involves PIN pad manufacturers, EMVCo and Acquirers"; "Acquirer certification involves PIN pads and Brands"; and "Retail certification involves PIN pad, Middleware, Store Systems, Acquirer and Brands."  Within each of these steps, there are multiple

1   certifications within each basic process, the report notes.   And none of it is within the Class

2   members' control.

3          84.   A House of Representatives' Small Business Committee Staff Report pointed out that

4   "[t]here also is a concern that small businesses that have the new hardware installed may be slow to

5   receive certification."  This concern is borne out by Class members' experience.

6          85.   As a result, Class members such as the plaintiffs here, could not timely comply with

7   the standard, no matter what they did, because the Defendants refused to, or were unable to, "certify"

8   the new equipment by the deadline – or, indeed, ever.

9          86.   Worse, the Networks, the Issuing Banks and EMVCo knew from the outset – and the

10  Class members are now learning – that the "certification" process would take years *after* the October

11  1, 2015 Liability Shift was imposed.

12         87.   The result has been massively increased costs for chargebacks being laid at the feet of

13  the Class members, while the Issuing Banks have been spared those same costs and the Networks

14  have continued profit – just as defendants knew would happen.

15         88.   According to statistics from the EMV Migration Forum, as of the end of 2015,

16  approximately 400 million EMV chip cards have been issued in the United States, with 675,000

17  merchant locations accepting EMV chip transactions.  But this does not detail how many of these

18  merchants, like the named plaintiffs, tried to become compliant but, because of defendants' actions,

19  are now liable for charges they would not have incurred prior to the Liability Shift.

20         89.   Moreover, there is agreement among some industry analysts that EMV technology

21  may not strengthen a merchant's security, and general reluctance by retailers to switch indicates

22  widespread adoption of EMV in the United States may not occur until 2020.  Defendants knew this

23  information well in advance of the Liability Shift deadline, yet they plowed forward.

24  **An Example: Milam's Markets and Grove Liquors**

25         90.   Taking heed of the representations made by the industry and Visa, MasterCard,

26  Discover and American Express, Milam's Market and Grove Liquors management diligently

27  prepared for the October 1, 2015 Liability Shift.

28

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT                    - 18 -

91.     Working with their acquirer, Worldpay, and their equipment vendor, NCR Corporation, Milam's Market and Grove Liquors expended management effort, training time and considerable costs to update and acquire new POS equipment so that their stores would be able to process the EMV chip cards.

92.     That equipment, NCR's Equinox L5300 card readers, were purchased and installed well prior to the Liability Shift.  These state-of-the-art POS card readers are designed to process EMV chip card transactions.

93.     However, merely having the right equipment in place is not enough for Milam's Market and Grove Liquors to avoid the Liability Shift – without the completion of the so-called "certification," they are still caught by the Liability Shift.

94.     But while very large retailers such as Target, Walmart and others quickly had their EMV-processing systems "certified" – thus sparing them the Liability Shift – the members of the Class are at the mercy of defendants.[1]

95.     Merchants like Milam's Market and Grove Liquors have no control over the "certification" process.  All they can do is request "certification" and wait for it to occur.  And no one can say when that will be.

96.     NCR Corporation has advised that "certification" of the Equinox L5300 was "TBD" – to be determined.  A copy of that notice is attached as Ex. A.

97.     These extended delays for smaller merchants are also no surprise to defendants.  The Congressional Small Business Committee Staff Memo noted that there was from the start "a concern that small businesses that have the new hardware installed may be slow to receive certification." "Most of the Tier I retailers [giants like Target and Walmart] may be able to roll out by October, but across the board, the readiness is not high."

98.     Officials of the National Retail Federation – the world's largest retail trade association – have summed up the situation perfectly: "So the same guys who mandated this for retailers have not resourced it to where they can get retailers certified."

---

[1]     Notably Target and Walmart are both EMVCo Business Associates and Walmart is an EMVCo Technical Associate as well.

1    99. Meanwhile, defendants have downplayed these obvious troubles.  One representative

2 for MasterCard claimed that all a merchant needs to do to activate an EMV terminal was to "contact

3 their acquirer or payment services provider or terminal manufacturer to find out how to do so."

4 American Express likewise downplayed issues telling merchants that "to help avoid the liability

5 [shift]," all they would need to do is "work with your processor or terminal provider today to

6 upgrade to chip card technology."  American Express further told merchants "[t]o upgrade, contact

7 your payment processor or terminal provider and tell them you'd like to start accepting chip cards.

8 They'll provide you with a chip-enabled system and guide you through each step.  Before you know

9 it, your upgraded system will be up and running."

10    100. Of course, plaintiff Milam's Market did just that and to this day, despite following

11 every requirement to become EMV compliant, Milam's Market is suffering damages as a result of

12 defendants' delays and refusals to properly certify the technology plaintiff was assured would be

13 compliant.

14    101. The damages are substantial.  Milam's Market and Grove Liquors are being "charged-

15 back" for supposedly fraudulent transactions that, in the past, would have been borne by the Issuing

16 Banks.

17    102. Illustrative is a "Notification of Chargeback" dated January 4, 2016.  The chargeback

18 concerns a $17.99 Visa transaction that occurred on December 13, 2015, which Milam's Market

19 requested be reversed, and the related Denial of Chargeback Reversal dated January 26, 2016.

20 Copies of the documents are attached as Ex. B.

21    103. As stated on the Denial of Chargeback Reversal, the reason for this cost to be

22 assessed to Milam's Market for a "Counterfeit Transaction" was that "[t]he bank [*i.e.*, the issuing

23 bank] stated the EMV chip card was processed.  The transaction was not processed through a chip

24 reader terminal, therefore the chargeback will stand."  Ex. B.

25    104. In other words, Milam's Market has to bear this cost thanks to the "Liability Shift,"

26 despite everything it has done to comply with defendants' edicts.

27    105. Worse, besides the base value of the transaction, Milam's Market and Grove Liquors

28 must also pay a "chargeback fee" of five dollars, a fee assessed against the merchant each time it is

1  made liable for a chargeback by MasterCard and Visa.  For some merchants, these fees are as high as
2  $30 per incident.

3      106.    Accordingly, in this single, illustrative instance, Milam's Market was assessed a total
4  of $22.99 which, before the "Liability Shift," it would not have had to pay.  Instead, before the
5  "Liability Shift," the issuing bank would have born the $17.99 chargeback – a cost the issuing bank
6  is now spared.

7      107.    Tellingly, nothing Milam's Market could have done – short of making the business-
8  crippling decision to stop accepting Visa cards – could have prevented this outcome.  Indeed, the
9  expenditures it made in an effort to comply with defendants' new EMV chip regime have all been
10  for naught, as defendants have failed to conduct the very "certification" required.

11     108.    Milam's Market and Grove Liquors has been made liable for chargebacks under the
12  Liability Shift for Discover and American Express charges as well.  *See, e.g.*, Ex. C, evidencing two
13  Discover chargebacks of $140.47 and $44.98, respectively; *see also* Ex. D, evidencing an American
14  Express chargeback for $155.12 – all attributable to processing EMV chip cards.

15     109.    The two exemplar Discover chargebacks both are expressly denominated as follows
16  in each relevant "Notification of Chargeback":

17          UA05 Fraud – Chip Card Counterfeit Transaction

18          Definition: The UA05 reason code is valid for a chargeback on a card present
           card sale or cash advance involving a chip card and the issuer or cardholder alleges
19          that a counterfeit card was used to conduct a card sale or cash advance and ***the
           merchant's POS device did not support and use EMV technology***.
20
   Ex. C.
21
       110.    The truth is, however, that Milam's Market's POS equipment ***did*** support and use
22
   EMV chip technology when the two charged-back fraudulent purchases were made.  The store was
23
   only subject to this "liability" shift because defendants had failed to "certify" that equipment.
24
       111.    Likewise, the American Express chargebacks are attributed to cause code "Fraud
25
   F30."  This is the fraud code reserved for fraud on an EMV chip card.  Ex. D.
26
       112.    The increase in such losses since the Liability Shift has been substantial.  For
27
   example, according to Worldpay, during the time period of October 1, 2015 to February 15, 2016,
28

1   Milam's Market and Grove Liquors have been assessed final responsibility by MasterCard and Visa

2   for 88 chargebacks totaling $9,196.22 (plus chargeback $5 fees for each item, for an additional cost

3   to Milam's Market and Grove Liquors of $440 – for a total loss of $9,636.22).  During the same

4   period the prior year, between October 1, 2014 and February 15, 2015 – before the Liability Shift –

5   Milam's Market and Grove Liquors were assessed final responsibility by MasterCard and Visa for

6   only four chargebacks.

7          113.   Add to that the more than $700 in American Express chargebacks in February alone

8   and the nearly $200 in Discover chargebacks and the result is that, because of the Liability Shift that

9   they could not avoid despite their diligence and expenditure, Milam's Market and Grove Liquors

10  have lost – and Issuing Banks have unjustly gained – some ten thousand dollars in four and a half

11  months.

12         114.   The amount of similar chargebacks for which the Class members have been made to

13  pay as a result of the Liability Shift is enormous, and certainly runs into billions of dollars – with the

14  Issuing Banks having been enriched by the same amount.

15         115.   In exchange for this newly bestowed, unavoidable liability, Milam's Market, Grove

16  Liquors and the Class members have received . . . ***nothing***.  Interchange fees, which defendants have

17  said exist in part to pay for fraud, are still paid for by the merchant, and have not decreased.  The

18  Liability Shift was unilaterally imposed to the benefit of defendants, with no compensation,

19  consultation or consideration of any kind made to the Class members.

20                                    **RELEVANT MARKET**

21         116.   There exists a relevant market, the product dimension of which is no broader than

22  General Purpose Cards (both credit and charge cards).  *United States v. Visa U.S.A., Inc.*, 163 F.

23  Supp. 2d 322, 335 (S.D.N.Y. 2001).  The geographic dimension of this market is the United States

24  ("General Purpose Card Market").  *Id.* at 339-40.  Cash and checks are not substitutes for payment

25  cards, and the rules shifting liability to merchants from the Issuing Banks apply in the United States

26  and its territories.

27

28

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT                          - 22 -

117.    Together, the card-issuing defendants possess market power over the market for General Purpose Cards, collectively accounting for roughly 75% of the transactions in the General Purpose Card Market.

118.    There exists a relevant market, the product dimension of which is no broader than General Purpose Card Network Services. *Visa*, 163 F. Supp. 2d at 338.  The geographic dimension of this market is the United States ("General Purpose Card Network Services Market").  General Purpose Card networks provide the infrastructure and mechanisms through which general purpose card transactions are conducted, including the authorization, settlement and clearance of transactions.

119.    Visa, MasterCard and American Express separately, and the owners of EMVCo collectively, possess market power over the market for General Purpose Card Network Services, collectively having nearly 100% of the General Purpose Card Network Services Market.

120.    The shift in liability from the card issuers to the merchants is not attributable to increases in the level of costs associated with the operations of the networks.

121.    There is virtually no elasticity of demand.  Merchants have no choice but to continue to accept General Purpose Cards.  *See Visa*, 163 F. Supp. 2d at 340 (noting that merchants must accept Visa and MasterCard or else risk losing business to merchants who do accept them).  Because of defendants' collusion and market power, a small but significant increase in the costs of providing General Purpose Card Network Services would not result in the loss of business.

122.    There are significant barriers to entry in the General Purpose Card Network Services Market. Because of these barriers, the only successful market entrant since the 1960's has been Discover, which was introduced by Sears and benefited from its extensive network of stores, its extensive base of customers who carried Sears' store card, and its relationship with Dean Witter. New entry into the General Purpose Card Network Services Market would cost more than 1 billion dollars and would involve a "'chicken-and-egg' problem of developing a merchant acceptance network without an initial network of cardholders who, in turn, are needed to induce merchants to accept the system's cards in the first place." *Visa*, 163 F. Supp. 2d at 342.

1

**CLASS ACTION ALLEGATIONS**

2       123.    Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(2) and

3   (b)(3) of the Federal Rules of Civil Procedure on behalf of all Class members, defined as those

4   merchants who have been unlawfully subjected to the so-called Liability Shift for the assessment of

5   MasterCard, Visa, Discover and American Express credit and charge card chargebacks, despite

6   having purchased EMV-chip-compliant POS card readers and having otherwise complied with the

7   directives of the Networks and Issuing Banks, for the period from October 1, 2015 until the present

8   (the "Class").

9       124.    The Class consists of merchants located throughout the United States.  While

10  plaintiffs do not know the exact number of the members of the Class, plaintiffs believe there are (at

11  least) hundreds of thousands of members in the Class, thus the members of the Class are so

12  numerous that joinder of all Class members is completely impracticable, if not impossible.  The

13  exact number of the Class members is not presently known, but can be determined through

14  appropriate discovery.

15      125.    Plaintiffs will fairly and adequately protect the interests of the members of the Class

16  and have retained counsel competent and experienced in class actions, antitrust and financial

17  services litigation.

18      126.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the

19  claims of the other members of the Class.  Plaintiffs' interests are coincident with, and not

20  antagonistic to, those of the other members of the Class.

21      127.    Plaintiffs have no interests that are adverse or antagonistic to those of the Class.

22      128.    A class action is superior to other available methods for the fair and efficient

23  adjudication of this controversy.  Because the damages suffered by many individual Class members

24  may be relatively small, the expense and burden of individual litigation make it virtually impossible

25  for the Class members to individually seek redress for the wrongful conduct alleged in this

26  Complaint.

27

28

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT                         - 24 -

1    129.    The prosecution of separate actions by individual members of the Class would create

2    a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for

3    defendants.

4    130.    Common questions of law and fact exist as to all members of the Class and

5    predominate over any questions solely affecting any individual members of the Class.  This is

6    particularly true given the nature of defendants' conspiracy, which was generally applicable to all the

7    Class members, thereby making appropriate relief with respect to the Class as a whole.  Such

8    questions of law and fact common to the Class include, but are not limited to:

9                (a)    whether defendants and their co-conspirators engaged in a combination and

10   conspiracy among themselves to institute the October 1, 2015 Liability Shift while knowing that, for

11   millions of merchants, compliance with the nebulous and uncertain certification requirements would

12   be impossible, thus subjecting the Class to charges which would not have been borne by the Class

13   without the Liability Shift;

14               (b)    the identity of the participants of the alleged conspiracy;

15               (c)    the duration of the alleged conspiracy and the acts carried out by defendants

16   and their co-conspirators in furtherance of the conspiracy;

17               (d)    whether the alleged conspiracy violated the Sherman Antitrust Act or

18   California's Cartwright Act;

19               (e)    whether defendants and their co-conspirators fraudulently concealed the

20   conspiracy's existence from plaintiffs and the members of the Class;

21               (f)    the appropriate injunctive and related equitable relief for the Class; and

22               (g)    the appropriate Class-wide measure of damages for the Class.

23                    **PLAINTIFFS AND THE CLASS SUFFERED ANTITRUST INJURY**

24   131.    By reason of the alleged violations of the antitrust laws, plaintiffs and the members of

25   the Class have sustained injury to their businesses or property, having paid certain chargebacks that

26   they would not have paid in the absence of defendants' illegal contract, combination or conspiracy,

27   and, as a result, have suffered damages in an amount presently undetermined.  This is an antitrust

28   injury of the type that the antitrust laws were meant to punish and prevent.

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT                          - 25 -

**DEFENDANTS HAVE A HISTORY OF ANTICOMPETITIVE CONDUCT**

132.   In 1998, the Antitrust Division of the U.S. Department of Justice ("DOJ") sued Visa and MasterCard, alleging that the joint governance of the two networks and certain rules that prevented banks from issuing cards on competitive networks (the "exclusionary rules") violated §1 of the Sherman Act.  After a 34-day trial the court found the exclusionary rules violated the antitrust laws, and that decision was affirmed by the Second Circuit.  *Visa*, 163 F. Supp. 2d 322.  The court found that the Visa and MasterCard Networks, together with their Member Banks, implemented and enforced illegal exclusionary agreements requiring any U.S. bank that issued Visa or MasterCard General Purpose Cards to refuse to issue American Express and Discover cards.  *Id.* at 405-06.

133.   The court concluded that the "exclusionary rules undeniably reduce output and harm consumer welfare," that Visa and MasterCard had "offered no persuasive procompetitive justification for them," that "the Member Banks agreed not to compete by means of offering American Express and Discover branded cards," that "[s]uch an agreement constitutes an unreasonable horizontal restraint [that] cannot be permitted," and that "these rules constitute agreements that unreasonably restrain interstate commerce in violation of Section 1 of the Sherman Act."  *Id.*

134.   In affirming the court's "comprehensive and careful opinion," *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 234 (2d Cir. 2003), the United States Court of Appeals for the Second Circuit underscored the crucial role played by the member banks in agreeing to, and abiding by, the Visa and MasterCard versions of the exclusionary rules:

> Visa U.S.A. and MasterCard, however, are not single entities; they are consortiums of competitors.  They are owned and effectively operated by some 20,000 banks, which compete with one another in the issuance of payment cards and the acquiring of merchants' transactions.  These 20,000 banks set the policies of Visa U.S.A. and MasterCard.  These competitors have agreed to abide by a restrictive exclusivity provision to the effect that in order to share the benefits of their association by having the right to issue Visa or MasterCard cards, they must agree not to compete by issuing cards of American Express or Discover.  The restrictive provision is a horizontal restraint adopted by 20,000 competitors."

*Id.* at 242.  Thus, "the restraint imposed by the consortium members [the member banks] is on themselves.  Each has agreed not to compete with the others in a manner which the consortium considers harmful to its combined interests."  *Id.*

135.    That same year, this Court granted partial summary judgment in a class action brought by merchants against Visa and MasterCard, challenging the networks' "Honor-All- Cards" rules that required all merchants that accepted Visa and MasterCard-branded credit cards to also accept the networks' offline-debit cards.  In that decision, the Court concluded that Visa possessed market power in the credit-card and debit-card markets as a matter of law.  And while the Court did not make the same conclusion as a matter of law with respect to MasterCard, it did note the existence of evidence that would support a finding of market power for MasterCard, such as its high market shares in the credit-card and debit-card markets, evidence of collusion between it and Visa, and the fact that merchants had not switched to other forms of payment even in the face of frequent and significant increases in interchange fees.  *In re Visa Check/MasterMoney Antitrust Litig.*, No. 96-cv-5238, 2003 WL 1712568, at *3-*4 (E.D.N.Y. Apr. 1, 2003).  On the eve of trial in *Visa Check*, Visa and MasterCard settled with the merchant class, agreeing to abolish the challenged portion of the "Honor-All-Cards" rule, to reduce interchange fees for offline-debit cards and to pay the merchant class approximately $3 billion over ten years.

136.    Beyond the domestic threats to MasterCard's anticompetitive collaboration with its member banks, competition and regulatory authorities in many jurisdictions around the globe have concluded that Visa and MasterCard's collectively fixed uniform schedule of fees and other restraints are anticompetitive and illegal.

137.    For example, the European Commission ("E.C.") ruled on December 19, 2007 that MasterCard's cross-border interchange fee violates Article 81(1) of the E.C.  Treaty, its counterpart to §1 of the Sherman Antitrust Act.

138.    In its 241-page decision, the E.C. rejected the arguments that MasterCard's restructuring absolved them of continuing antitrust liability[2] and that the relevant product market is broader than payment cards.[3]

---

[2]    European Commission, Commission Decision of December 19, 2007 Relating to a Proceeding Under Article 81 of the EC Treaty and Article 53 of the EEA Agreement COMP/34.579; COMP 36.518; COMP 58.580, http://ec.europa.eu/competition/antitrust/cases/dec_docs/34579/34579_1889_2.pdf ("E.C. Decision") at 102-106.

[3]    *Id.* at 77-90.

139.     Similarly, in 2005 the antitrust-enforcement body in the United Kingdom, the Office of Fair Trading ("OFT"), concluded after a four-year investigation that MasterCard's domestic interchange fees violated the U.K. equivalent to §1 of the Sherman Antitrust Act.[4]  In reaching that conclusion, the OFT found that MasterCard had market power in the relevant markets for payment-card issuance, acquiring and a "wholesale" market.[5]

140.     As to American Express, the DOJ and 17 state attorneys general went to trial against American Express during the summer of 2014.  That trial focused on credit card "swipe fees" which generate over $50 billion annually for credit card networks.  In 2015, the court overseeing the action in the U.S. District Court for the Eastern District of New York found in favor of the DOJ's lawsuit claiming that American Express' rules for merchants violate antitrust laws.

141.     Many of the defendants have also been the subject of civil antitrust actions related to payment cards, including *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, No. 05-md-1720, pending in the Eastern District of New York, where Defendants were charged by a nationwide class of merchants with a massive conspiracy between the Member Banks and Visa and MasterCard related to interchange fees and acceptance rules.  Defendants in that action agreed to a settlement of more than $5 billion as well as to agreement requiring significant changes to rules affecting merchants.

## COUNT I

### Violation of §§1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§1 and 3 Agreement Restraining Trade

142.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

143.     Defendants, and their co-conspirators, entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of §§1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§1

---

[4]    *See* Decision of the Office of Fair Trading of September 6, 2008: Investigation of the multilateral interchange fees provided for in the UK domestic rules of MasterCard UK Members Forum Limited (formerly known as MasterCard/Europay UK Limited) (No. CA98/05/05), http://webarchive. nationalarchives.gov.uk/20140402142426/http://www.oft.gov.uk/shared_oft/ca98_public_register/decisions/mastercard.pdf ("U.K. OFT Decision").

[5]    U.K. OFT Decision at 50-52.

1   and 3.  The conspiracy consisted of a continuing agreement, understanding, or concerted action

2   between and among defendants and their co-conspirators in furtherance of which defendants agreed

3   to shift the liability of fraudulent payment card transactions from the card-issuing banks to

4   merchants.

5        144.    Defendants' unlawful conduct was through mutual understandings, combinations or

6   agreements by, between, and among defendants and other unnamed co-conspirators.  Defendants'

7   conspiracy is a per se violation of the Sherman Antitrust Act and is, in any event, an unreasonable

8   and unlawful restraint of trade.

9        145.    There is no legitimate business justification for, or procompetitive benefits caused by,

10  defendants' unreasonable restraint of trade.  Any ostensible procompetitive benefit was pretextual or

11  could have been achieved by less restrictive means.

12       146.    Defendants' conspiracy, and the resulting impact on the prices of credit card

13  acceptance occurred in and affected interstate commerce and commerce in and between the

14  Territories of the United States.

15       147.    As a direct, intended, foreseeable, and proximate result of defendants' conspiracy and

16  overt acts taken in furtherance thereof, plaintiffs and each member of the Class have suffered injury

17  to their business or property.  Plaintiffs' and each Class member's damages are directly attributable

18  to defendants' conduct, which resulted in all Class members paying for fraudulent payment card

19  transactions and associated fees during the class period they would not have otherwise paid for but-

20  for defendants' agreement.

21       148.    Plaintiffs' and the Class's injuries are of the type the antitrust laws were designed to

22  prevent, and flow from that which makes defendants' conduct unlawful.

23       149.    Plaintiffs and the Class are entitled to treble damages, attorneys' fees, reasonable

24  expenses, and cost of suit for the violations of the Sherman Antitrust Act.

25                                      **COUNT II**

26                          **Violations of the Cartwright Act**

27       150.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though

28  fully set forth herein.

151.    The acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code §16700 *et seq.*

152.    The conspiracy consisted of a continuing agreement, understanding, or concerted action between and among defendants and their co-conspirators in furtherance of which defendants agreed to shift the liability of fraudulent payment card transactions from the card-issuing banks to merchants.

153.    It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California, the purchasers reside in California, some defendants have their principal place of business in California, and because overt acts in furtherance of the conspiracy and wrongful charges flowing from those acts occurred in California.

154.    Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between, and among defendants and other unnamed co-conspirators.  Defendants' conspiracy is a per se violation of the Cartwright Act and is, in any event, an unreasonable and unlawful restraint of trade.

155.    There is no legitimate business justification for, or procompetitive benefits caused by, defendants' unreasonable restraint of trade.  Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

156.    As a direct, intended, foreseeable, and proximate result of defendants' conspiracy and overt acts taken in furtherance thereof, plaintiffs and each member of the Class have suffered injury to their business or property.  Plaintiffs' and each Class member's damages are directly attributable to defendants' conduct, which resulted in all Class members paying for fraudulent payment card transactions and associated fees during the class period they would not have otherwise paid for but-for defendants' agreement.

157.    Plaintiffs' and the Class's injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes defendants' conduct unlawful.

158.    Plaintiffs and the Class are entitled to treble damages, attorneys' fees, reasonable expenses, and cost of suit for the violations of the Cartwright Act.

## COUNT III

### Unjust Enrichment

159.   Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

160.   In an effort to recoup the billions of dollars required to issue new chip-enabled cards, defendants, through the Networks EMVCo, conspired and agreed to shift the burden for fraudulent transactions from the defendant Issuing Banks to the Class members for transactions involving chip-enabled cards – even in cases where the merchants, such as plaintiffs here, purchased and installed chip-enabled readers before October 1, 2015.

161.   To deal with the substantial costs to implement chip cards, defendants conspired to and changed the benefit/liability scheme of the card payment system by shifting the liability to the Class members for fraudulent transactions knowing that the EMV system would not be fully operational on October 1, 2015.

162.   Defendants knew that the verification process would not be fully operational by October 1, 2015, but implemented the Liability Shift knowing that merchants who purchased and installed equipment would be bearing the cost of the Liability Shift for fraudulent transactions even after they purchased and timely installed approved EMV chip-reading equipment.

163.   Nevertheless, defendants set October 1, 2015 as the Liability Shift Date, without any consideration or benefit to the plaintiffs.  Instead, since October 1, 2015, defendants have received a direct benefit from the Class members as a result of the detrimental liability shift to the Class.

164.   The defendant Issuing Banks market to their customers fraud protection, namely that the cardholders will not be financially responsible if their cards are lost, stolen or used fraudulently.

165.   As a result of their inequitable conduct, the defendant Issuing Banks have been unjustly enriched by the Class members, who are now assuming fraud-related losses; losses that were previously incurred by the defendant Issuing Banks.

166.   Defendant Issuing Banks have accepted and retained the benefit conferred on them by plaintiffs and the Class members as a result of the liability shift.

167.    In light of defendants' conduct, it is inequitable for the defendant Issuing Banks to retain the benefit of the Liability Shift – the shifting of fraud-related losses to the Class members – without paying the value to the plaintiffs and Class members.

168.    Because of the acts of defendants and their co-conspirators as alleged herein, defendants have been unjustly enriched at the expense of plaintiffs and the Class.

169.    Plaintiffs and the Class seek restitution of the direct benefit they have provided to defendants and all monies of which they were unfairly and improperly deprived, as described herein.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and the Class, pray that the Court:

A.    Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3), and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Class, and declare plaintiffs B & R Supermarket, Inc. d/b/a Milam's Market and Grove Liquors LLC, as named representatives of the Class;

B.    Conduct expedited discovery proceedings leading to a prompt trial on the merits before a jury on all claims and defenses;

C.    Enter joint and several judgments against defendants and in favor of plaintiffs and the Class;

D.    Award the Class damages (*i.e.*, three times overcharges) in an amount to be determined at trial, plus interest in accordance with law;

E.    Award plaintiffs and the Class their costs of suit, including reasonable attorneys' fees as provided by law;

F.    Order that defendants, their directors, officers, employees, agents, successors, members, and all persons in active concert and participation with them be enjoined and restrained from, in any manner, directly or indirectly, committing any additional violations of the law as alleged herein; and

G.    Award such further and additional relief as is necessary to correct for the anticompetitive market effects caused by defendants' unlawful conduct, as the Court may deem just and proper under the circumstances.

1

**JURY DEMAND**

2

Plaintiffs seek trial by jury of all matters so triable.

3

DATED:  March 8, 2016

ROBBINS GELLER RUDMAN
   & DOWD LLP

4

PATRICK J. COUGHLIN
DAVID W. MITCHELL

5

ALEXANDRA S. BERNAY
CARMEN A. MEDICI

6

7

*s/ Patrick J. Coughlin*

8

PATRICK J. COUGHLIN

9

655 West Broadway, Suite 1900

10

San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

11

12

DEVINE GOODMAN RASCO &
   WATTS-FITZGERALD, LLP
JOHN W. DEVINE

13

LAWRENCE D. GOODMAN
ROBERT J. KUNTZ, JR.

14

2800 Ponce De Leon Blvd., Suite 1400
Coral Gables, FL  33134

15

Telephone:  305/374-8200
305/374-8208 (fax)

16

Attorneys for Plaintiffs

17

18

I:\Admin\CptDraft\Antitrust\Operative - Cpt Chip Card Antitrust.docx

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT

# EXHIBIT A

# CONNECTED PAYMENTS

## EMV Certification Update: January 14, 2016

Dear Valued Connected Payments Customer:

The NCR Connected Payments and EMV® (Europay, MasterCard, and Visa) Liability Shift teams continue to work with all necessary third parties to certify solutions for use in the field with the NCR Connected Payments solution.

The chart below details the updated targeted certification dates for EMV solutions.

For more information regarding EMV, including a NCR whitepaper detailing implementation procedures and other FAQs, please click here to be directed to the Connected Payments Portal.

| EMV Certifications | First Data Concord H&C | First Data Rapid Connect | First Data ATL-105 | Vantiv Tandem | WorldPay | Chase | Elavon |
|---|---|---|---|---|---|---|---|
| VeriFone Mx915, Mx925 | Certified | Certified | Jan 22, 2016 | Certified | Certified | Certified | Certified |
| VeriFone TAVE/VSP Mx915, Mx925 | Certified | n/a | n/a | n/a | TBD | n/a | n/a |
| VeriFone Mx850, 860, 870, 880 | Certified | Certified | Jan 22, 2016 | Certified | Jan 29, 2016 | Certified | Certified |
| VeriFone TAVE/VSP Mx850, 860, 870, 880 | TBD | n/a | n/a | n/a | TBD | n/a | n/a |
| VeriFone e335 (for Mobile) | Mar 11, 2016 | Mar 11, 2016 | n/a | n/a | n/a | n/a | n/a |
| Equinox L5200, L5300 | Jan 29, 2015 | Roadmap 2016 | Feb 5, 2016 | Jan 29, 2016 | TBD | Jan 29, 2016 | Feb 5, 2016 |
| Ingenico iSC250, iSC480 | Jan 29, 2015 | Roadmap 2016 | TBD | Certified | Mar 4, 2016 | TBD | TBD |



© 2015 NCR Corporation - All rights reserved. NCR Corporation 3097 Satellite Blvd. Duluth, GA 30096. NCR respects your privacy.



To unsubscribe,  click here.

# EXHIBIT B

 worldpay

January 04, 2016


0003428213

3027 

**Respond By: 01/14/2016**

MARIE DIXON
B & R SUPERMARKET, INC
11 N ROYAL POINCIANA BLVD STE 100
MIAMI SPRINGS FL 33166-4423

## NOTIFICATION OF CHARGEBACK

A chargeback debit has been processed to your account via ACH for the below transaction under the following Visa regulation:

### Counterfeit Transaction

Definition: The card issuer received a complaint from the cardholder claiming that he or she did not authorize or participate in the transaction.

| | | | |
|---|---|---|---|
| Cardholder Account Nbr: | 478200******2425 | Terminal ID: | LK453985 |
| Reference Number: | 24224435348101032302346 | | |
| Transaction Date: | 12/13/2015 | Batch Nbr: | 213315 |
| Transaction Amount: | $17.99 | Batch Amount: | |
| Chargeback Amount: | $17.99 | Sequence Nbr: | 1077 |
| Invoice Number: | 03534692 | POS Entry Mode: | Swiped |
| Device ID: | 3-0003 | CVM Code: | |

### MOST COMMON CAUSES FOR CHARGEBACK:

❖ The merchant failed to compare the first four digits of the embossed account number on the card with the preprinted digits below the embossed number for a card present transaction.

❖ The merchant received an authorization without transmission of the the required data.

### POSSIBLE REMEDIES TO REFUTE THE CHARGEBACK:

❖ If the POS entry mode stated above is a "90" provide a copy of the signed sales receipt.

Please fax your supporting documentation along with a copy of this notification to the fax number provided below before 01/14/2016.

WorldPay Chargeback Department
TOLL FREE FAX NUMBER: 1-866-834-5965

If you have any questions regarding this chargeback notification, please call the Chargeback Department at 1-800-859-5965 option 8.

 worldpay

January 26, 2016


0003426213

788 

MARIE DIXON
B & R SUPERMARKET, INC
11 N ROYAL POINCIANA BLVD STE 100
MIAMI SPRINGS FL 33166-4423

## DENIAL OF CHARGEBACK REVERSAL

The request to reverse the chargeback for the transaction detailed below has been denied.

| | |
|---|---|
| Cardholder Account Nbr: 478200******2425 | Terminal ID: LK453985 |
| Reference Number: 24224435348101032302346 | |
| Transaction Date: 12/13/2015 | Batch Nbr: 213315 |
| Transaction Amount: $17.99 | Batch Amount: |
| Chargeback Amount: $17.99 | Sequence Nbr: 1077 |
| Invoice Number: 03534692 | POS Entry Mode: Swiped |
| Device ID: 3-0003 | CVM Code: |
| Chargeback Reason: Counterfeit Transaction | |

WorldPay as your processor is obligated to follow the rules and regulations of the Mastercard and Visa Association. The denial for the request was based on the following information:

The bank stated the EMV chip card was processed. The transaction was not processed through a chip reader terminal, therefore the chargeback will stand.

If you have any questions regarding this chargeback notification, please call the Chargeback Department at 1-800-859-5965 option 8.

# EXHIBIT C



February 25, 2016

Marie Dixon
B & R Supermarket, Inc                                    Respond By: 03/07/2016
11 N Royal Poinciana Blvd Ste100
Miami Springs FL 33166

## NOTIFICATION OF CHARGEBACK

A chargeback debit has been processed to your account via ACH for the below transaction under the following Discover regulation:

### UA05 Fraud-Chip Card Counterfeit Transaction

Definition: The UA05 reason code is valid for a chargeback on a card present card sale or cash advance involving a chip card and the issuer or cardholder alleges that a counterfeit card was used to conduct a card sale or cash advance and the merchant's POS device did not support and use EMV technology.

| | |
|---|---|
| Cardholder Name: | Exception Ref #: 3612631 |
| Cardholder Account Nbr: 601149******2814 | Terminal ID: LK453985 |
| Reference Number: 26100166012161027352055 | |
| Transaction Date: 01/11/2016 | Batch Nbr: 111344 |
| Transaction Amount: $140.47 | Batch Amount: |
| Chargeback Amount: $140.47 | Sequence Nbr: 1150 |
| Invoice Number: 08298262 | POS Entry Mode: Swiped |
| Device ID: 8-0008 | |

In order for WorldPay to assist you in refuting this case, please provide all requested information:

Please fax your supporting documentation along with a copy of this notification to the fax number provided below before 03/07/2016.

WorldPay Chargeback Department
**TOLL FREE FAX NUMBER: 1-866-562-8672**

If you have any questions regarding this chargeback notification, please call the Chargeback Department at 1-800-859-5965 option 8.



February 25, 2016

Marie Dixon
B & R Supermarket, Inc
11 N Royal Poinciana Blvd Ste100
Miami Springs FL 33166

Respond By: 03/07/2016

## NOTIFICATION OF CHARGEBACK

A chargeback debit has been processed to your account via ACH for the below transaction under the following Discover regulation:

### UA05 Fraud-Chip Card Counterfeit Transaction

Definition: The UA05 reason code is valid for a chargeback on a card present card sale or cash advance involving a chip card and the issuer or cardholder alleges that a counterfeit card was used to conduct a card sale or cash advance and the merchant's POS device did not support and use EMV technology.

| | |
|---|---|
| Cardholder Name: | Exception Ref #: 3612654 |
| Cardholder Account Nbr: 601149******2814 | Terminal ID: LK453885 |
| Reference Number: 26100186006102010832557 | |
| Transaction Date: 01/05/2016 | Batch Nbr: 105338 |
| Transaction Amount: $44.98 | Batch Amount: |
| Chargeback Amount: $44.98 | Sequence Nbr: 357 |
| Invoice Number: 08287251 | POS Entry Mode: Swiped |
| Device ID: 8-0006 | |

In order for WorldPay to assist you in refuting this case, please provide all requested information:

Please fax your supporting documentation along with a copy of this notification to the fax number provided below before 03/07/2016.

WorldPay Chargeback Department
**TOLL FREE FAX NUMBER: 1-866-562-8672**

If you have any questions regarding this chargeback notification, please call the Chargeback Department at 1-800-859-5965 option 8.

# EXHIBIT D

American Express: Disputes

https://www209.americanexpress.com/merchant/services/disputes?lo...

milam's market # 4
Phone number: 305-884-4870
Fax number: 305-884-5590
Pages including cover:

Subject: Respond for PP91642

Reason:

Additional comments:

support is being fax

Fax to: 623-444-3003
Mail to: PO BOX 981541 EL PASO, TX 79998

American Express: Disputes                    https://www209.americanexpress.com/merchant/services/disputes?lo...

## Chargeback details

Fraud Liability Shift - Counterfeit

Additional Information:  MILAM'S MARKETS 208310591 3059451890

| | |
|---|---|
| **Disputed amount** | **0.00** |
| **Chargeback amount** | **-155.12** |
| **Charge amount** | 155.12 |

| | | | |
|---|---|---|---|
| Case number | PP91842 | Status | Please respond |
| Date received | 1/2/2016 | Reply by | 1/22/2016 |
| Days Left | 19 | Reply By - Days Left | 01/22/2016-19 |
| Responded on | N/A | Case type | Fraud |
| Reason | Fraud | Reason Code | F30 |
| Card Number at transaction | | Charge amount | 155.12 |
| Dispute Amount | 0.00 | Resolution | N/A |
| | | Submitting location ID | N/A |
| | | Payee location ID | N/A |
| Charge reference number | 208310591 | Airline ticket number | N/A |
| Adjustment number | 779671 | Adjustment date | 1/1/2016 |
| Chargeback amount | -155.12 | Settlement date | 1/4/2016 |
| Settlement amount | | Response code | N/A |
| Reason and Code | Fraud-F30 | Amount | -155.12 |
| Dispute Type | CB | Industry location number | 542929603582239 |
| Terminal ID | N/A | SE Tracking number | N/A |
| SE Reference number | N/A | SOC Amount | 0.00 |
| SOC Date | N/A | First Presentment Amount | 0.00 |
| Acquirer Reference number | N/A | Microfilm Sequence Code | N/A |
| Inland Chargeback Code | N/A | Case Update date | N/A |
| Resolution Code | N/A | Inquiry Initials | N/A |
| Chargeback Initials | N/A | | |

| | | | |
|---|---|---|---|
| Card Number | | Tracking number | N/A |
| Card Number | | Case type | FRAUD |
| Card Number at transaction | | Charge date | 12/8/2015 |
| Assured Reservation | N/A | Merchandise type | N/A |
| Reservation cancellation | N/A | Return location | N/A |
| Reservation cancellation date | N/A | Return name | N/A |
| Cancellation zone | N/A | Return date | N/A |
| Reservation name | N/A | Type of return | N/A |
| Reservation location | N/A | Return reason | N/A |
| Reservation date | N/A | Credit received | N/A |
| Cancellation date | N/A | Card deposit | N/A |
| Cancellation number | N/A | Reference number | 208310591 |
| ROC invoice number | N/A | Dept code | XX2948A |
| Transaction number | N/A | Passenger name | N/A |
| Passenger first name | N/A | Passenger middle name | N/A |
| Passenger last name | N/A | SE process | 542 |

1 of 2                                                          1/3/2016 7:36 AM

01/04/2016  13:03    3059458223        MILANS #4      PP91642    PAGE 01/02

Printed on 01-04-2016

Milans Market # 4 - Electronic Journal Transaction Report

Page 1

Transaction: 07716269 *** ONLINE ***
Cashier: 414 Margue M                                        Date: 12-08-15 Time: 20:27:06
                                                            Lane: 07

| 000000000007616145 | MOET NECTAR ROSE | 1 | $65.99 | T1 | Scanned Unit |
| 000000000000007616209 | MOET NECTAR ROSE | 1 | $65.99 | T1 | Scanned Unit |
| 000000000000060071 | FERRERO ROCHER | 1 | $4.99 | T1 | Scanned Unit |

Item Sub Total        $146.97
Total Time Disc. Taken  $0.00
Sub Total             $146.97
Tax One               $10.15
Tax Two               $0.00
Tax Three             $0.00
Transaction Total     $158.12                           Item Count: 3

American Express      $155.12      Acct # 00003731661XXXX1003

Additional Receipt Data

Customer Number # 000000000000
Customer Restriction Approved - Compared to Birthdate: 12-08-94    Origin: ScanMaster
                                                    Verification ID: 00000000000000000000
Statistical Data

Transaction Started at : 12-08-2015 20:27:06          Total Ringing Time    : 00:00:14
Transaction Finished at: 12-08-2015 20:27:35          Total Tender Time     : 00:00:15
Total Transaction Time : 00:00:29                     Effective Scan Rate   : 290.00 items per minute
Idle Time between Sales: 00:00:19                     Scanned entries       : 3
                                                      Keyed entries         : 0
                                                      Open department entries: 0

---

01/04/2016  13:03    3059458223        MILANS #4                        PAGE 02/02

Milan's Market #4
17100 Collins Avenue
Sunny Isle, Fl 33160

ScanMaster Electronic Journal Signature Image
01/04/2016  08:29 AM

| Store | Reg | Cashier | Transaction | Date | Time | Customer | Sale Total |
| 0004 | 07 | 414 | 07716269 | 12-08-15 | 20:27:06 | 00000000000 | $155.12 |

Tender
American Express       Account #           Exp    Transit    Check #    Amount
                                                                        $155.12
Service Description
Groceries              Authorization #
                       560951