1   ROBBINS GELLER RUDMAN
      & DOWD LLP
2   PATRICK J. COUGHLIN (111070)
    DAVID W. MITCHELL (199706)
3   ALEXANDRA S. BERNAY (211068)
    CARMEN A. MEDICI (248417)
4   ANGEL P. LAU (286196)
    LONNIE A. BROWNE (293171)
5   655 West Broadway, Suite 1900
    San Diego, CA  92101-8498
6   Telephone:  619/231-1058
    619/231-7423 (fax)
7   patc@rgrdlaw.com
    davidm@rgrdlaw.com
8   xanb@rgrdlaw.com
    cmedici@rgrdlaw.com
9   alau@rgrdlaw.com
    lbrowne@rgrdlaw.com
10
    DEVINE GOODMAN RASCO &
11     WATTS-FITZGERALD, LLP
    JOHN W. DEVINE
12  LAWRENCE D. GOODMAN
    ROBERT J. KUNTZ, JR.
13  2800 Ponce De Leon Blvd., Suite 1400
    Coral Gables, FL  33134
14  Telephone:  305/374-8200
    305/374-8208 (fax)
15  jdevine@devinegoodman.com
    lgoodman@devinegoodman.com
16  rkuntz@devinegoodman.com

17  Attorneys for Plaintiffs

18  [Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

19  NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 20  B & R SUPERMARKET, INC., d/b/a MILAM'S MARKET, a Florida corporation, | ) ) | Case No. 3:16-cv-01150-WHA |
| 21  GROVE LIQUORS LLC, a Florida limited liability company, STROUK GROUP LLC, | ) ) | CLASS ACTION |
| 22  d/b/a MONSIEUR MARCEL, RUE21, INC. and PALERO FOOD CORP. and CAGUEYES | ) ) | AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN |
| 23  FOOD CORP., d/b/a FINE FARE SUPERMARKET, Individually and on Behalf | ) ) | ANTITRUST ACT, THE CLAYTON ANTITRUST ACT, CALIFORNIA'S |
| 24  of All Others Similarly Situated, | ) ) | CARTWRIGHT ACT, NEW YORK'S DONNELLY ACT, FLORIDA'S |
| 25                              Plaintiffs, | ) ) | ANTITRUST AND UNFAIR TRADE PRACTICES ACTS AND UNJUST |
| 26         vs. | ) ) | ENRICHMENT |
| 27  VISA, INC., a Delaware corporation; VISA USA, INC., a Delaware corporation; | ) ) ) | |
| 28  [Caption continued on following page.] | ) | DEMAND FOR JURY TRIAL |

1166358_3

1  MASTERCARD INTERNATIONAL                     )
2  INCORPORATED; a Delaware corporation;        )
   AMERICAN EXPRESS COMPANY, a New              )
3  York corporation; DISCOVER FINANCIAL         )
   SERVICES, an Illinois corporation; BANK OF   )
4  AMERICA, N.A., a national banking            )
   association; CAPITAL ONE FINANCIAL           )
5  CORPORATION, a Delaware corporation;         )
   CHASE BANK USA, NATIONAL                     )
6  ASSOCIATION, a national banking              )
   association; CITIBANK (SOUTH DAKOTA),        )
7  N.A., a South Dakota bank; CITIBANK, N.A.,   )
   a national banking association; PNC BANK,    )
8  NATIONAL ASSOCIATION, a national             )
   banking association; U.S. BANK NATIONAL      )
9  ASSOCIATION, a national banking              )
   association; WELLS FARGO BANK, N.A., a       )
10 national banking association; and EMVCo,     )
   LLC, a Delaware limited liability company;   )
11                                              )
                                                )
12                            Defendants.       )
                                                )
13 _____  )

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1166358_3

1

**TABLE OF CONTENTS**

2

**Page**

3    NATURE OF THE CLAIM.................................................................................1

4    THE PARTIES...................................................................................................4

5         Plaintiffs...................................................................................................4

6         Defendants ...............................................................................................9

7    INTRADISTRICT ASSIGNMENT.................................................................14

8    JURISDICTION AND VENUE ......................................................................15

9    BACKGROUND FACTS ................................................................................16

10        Cards and Commerce .............................................................................16

11        Credit Card Mechanics ..........................................................................17

12        Credit Card Technology.........................................................................18

13        Chargebacks ...........................................................................................20

14   THE LIABILITY SHIFT AND THE CERTIFICATION QUAGMIRE.........21

15        The Network Defendants' Rules Implement the Fraud Liability Shift...........21

16        MasterCard's Liability Shift Rules:.......................................................22

17        Visa's Liability Shift Rules:...................................................................23

18        Discover's Liability Shift Rules: ...........................................................25

19        American Express's Liability Shift Rules: .............................................26

20        Defendants' Control Over the Certification Process Enriched Themselves While
21            Damaging Merchants ........................................................................27

         The Liability Shift Was Historically Unprecedented.................................32
22
         The Defendants' Imposition of the Liability Shift in the United States Differed in
23            Key Ways from the Imposition Elsewhere – All of Which Profited
              Defendants ......................................................................................34
24
         American Express Withdrew Its Criticism of EMV After Joining EMVCo ..................37
25
         Additional Liability Shift Differences Around the World..........................39
26
         The Networks Implement Gas Station Readiness Rules – Another Aspect of Their
27            Anti-competitive Agreement –  at the Same Time in the Same Way ..................40

28        Defendants Uniformly Refused to Extend the Liability Shift Deadline .........................41

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA      - i -

1

2                                                                                            **Page**

3

4 Defendants Collective Agreement to Implement Chip-and-Signature Instead of
the More Secure Chip-and-PIN Provides Further Support of a  Collusive
5 Agreement ......................................................................................................41

Measures Announced by the Networks Are Too Little, Too Late ...................................44
6
SIGNIFICANT EVIDENCE OF DEFENDANTS' SCHEME EXISTS ........................................45
7
Defendants Worked in Lockstep to Implement the Liability Shift...................................45
8
Economic Evidence of Defendants' Anticompetitive Conduct .........................................47
9
EMVCo and the SmartCard Alliance Provided Opportunities for Collusion...................50
10
DEFENDANTS' LIABILITY SHIFT DIRECTLY IMPACTS MERCHANTS ........................53
11
Accounting Treatment of Payment Card Network Transactions Demonstrates that
12 Defendants' Liability Shift Directly Impacts Merchants.......................................53

13 Accounting for Chargebacks Demonstrates that Defendants' Liability Shift
Directly Impacts Merchants....................................................................................55
14
The Relationship Between an Acquirer and a Merchant Demonstrates that
15 Defendants' Liability Shift Directly Impacts Merchants.......................................58

16 Acquirers Recognize Merchants Face Liability Under the New Rules .............................59

17 Issuing Banks Recognize the Liability Shift Directly Impacts Merchants .......................62

18 An Example: Milam's Markets and Grove Liquors ...........................................................65

19 RELEVANT MARKET..........................................................................................................69

20 CLASS ACTION ALLEGATIONS ........................................................................................70

21 PLAINTIFFS AND THE CLASS SUFFERED ANTITRUST INJURY ................................72

22 DEFENDANTS HAVE A LONG HISTORY OF ANTICOMPETITIVE CONDUCT .............72

23 Litigation and Investigations in the U.S. and Abroad.......................................................72

24 Governmental Investigations Into Defendants' Conduct Have Begun..............................78

25 MEMBER BANKS CONTINUE TO EXERT CONTROL OVER VISA AND
MASTERCARD .....................................................................................................80
26
The MasterCard IPO ..........................................................................................................81
27
The Visa IPO.......................................................................................................................82
28

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA      - ii -

1

2                                                                                              **Page**

3

        The Effect of the IPOs ...................................................................................82

PRAYER FOR RELIEF .............................................................................................95

JURY DEMAND .........................................................................................................96

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA       - iii -

1    B & R Supermarket, Inc., d/b/a Milam's Market, a Florida corporation ("Milam's

2  Market"), Grove Liquors LLC, a Florida limited liability company ("Grove Liquors"), Strouk

3  Group LLC, d/b/a Monsieur Marcel, a California business ("Monsieur Marcel"), rue21, Inc., a

4  nationwide retailer with operations in 48 states that is headquartered in Pennsylvania ("rue21"),

5  and Palero Food Corp. and Cagueyes Food Corp., d/b/a Fine Fare Supermarket ("Fine Fare"), a

6  New York merchant[1] (collectively, "Plaintiffs"), individually and on behalf of all others similarly

7  situated (collectively, the "Class"), sue Visa, Inc. and Visa USA, Inc. ("Visa"), MasterCard

8  International Incorporated ("MasterCard"), American Express Company ("American Express")

9  and Discover Financial Services ("Discover") (collectively, the "Networks"), Bank of America,

10  N.A. ("BOA"), Capital One Financial Corporation ("Capital One"), Chase Bank USA, National

11  Association ("Chase"), Citibank (South Dakota), N.A., Citibank, N.A., PNC Bank, National

12  Association ("PNC"), U.S. Bank National Association ("US Bank") and Wells Fargo Bank,

13  N.A. ("Wells Fargo") (collectively, the "Issuing Banks"), and EMVCo, LLC ("EMVCo")

14  (collectively "Defendants"), and, on facts known to Plaintiffs, upon investigation by counsel and

15  upon information and belief, Plaintiffs state as follows:

16                            **NATURE OF THE CLAIM**

17    1.    This is a class action suit for violations of the Sherman Antitrust Act, the Clayton

18  Antitrust Act, California's Cartwright Act, New York's Donnelly Act, Florida's Antitrust Act,

19  certain state consumer protection laws, unjust enrichment, and for other equitable and injunctive

20  relief.

21    2.    For their own benefit, Defendants agreed and conspired to shift billions of dollars

22  in liability for fraudulent, counterfeit or otherwise rejected consumer payment-card transactions

23  from themselves to the Class.  Defendants did this by agreeing to a historic change in how fraud

24  costs would be treated through a "Liability Shift."  They agreed to impose on merchants

25  beginning in October 2015 via nearly identical rules, implemented on the same day, costs that for

26  ───────────
[1]   In conjunction with the filing of this Amended Complaint, Monsieur Marcel, rue21 and Fine
27  Fare are, by separate motion, moving to intervene in this action.  As detailed in that motion,
these plaintiffs have unique claims and should be allowed to intervene as of right under Fed. R.
28  Civ. P. 24(a)(2) and 24(b).

1  decades had been borne by the card issuers.  To add further injury, Defendants implemented this

2  Liability Shift while merchants were forced to pay interchange and merchant discount fees,

3  which fees are supposed to cover the cost of fraud.

4        3.      Under Defendants' new regime, liability shifted from the Networks and issuers to

5  merchants for chargebacks from EMV chip-card transactions for failing to use chip enabled

6  terminals, *i.e.*, an EMV-compliant card reader certified to accept chip cards.  After the Liability

7  Shift, nothing changed from the perspective of the card-holding customer, but everything

8  changed for the merchant.  Where before the Liability Shift, Issuing Banks, American Express

9  and Discover mostly bore the loss when a cardholder called to complain about a fraudulent

10  charge, now the Issuing Banks charge back to merchants the funds credited back to the customer

11  from an EMV chip card processed through an uncertified point-of-sale ("POS") terminal.  For

12  millions of merchants, it is impossible to process EMV chip cards because their EMV chip-card

13  capable systems, for which they paid $200 to $1000 per terminal, have not been "certified" by

14  Defendants.

15        4.      Rather than breaking ranks and competing by offering merchants options,

16  Defendants leveraged their enormous market power and all worked together to shift billions of

17  fraud costs onto merchants – merchants Defendants knew had no practical way to avoid these

18  costs.  Again, all of this was done without any break in the interchange or merchant discount rate

19  fees charged to merchants.  In other words, while merchants continued to pay for fraud losses

20  through the interchange and merchant discount rate fees, they also were forced to pay for fraud

21  loss through chargebacks.  The Liability Shift that Defendants imposed in October 2015 upended

22  the traditional scheme that had been in place for decades.  It was unprecedented in the U.S.

23  market.

24        5.      While certain Defendants' rules assert the burden shifts on to the entity with the

25  "least secure system," indicating this could be the acquirer or the merchant, this is a fiction.  All

26  acquirers had to be EMV-compliant by 2013.  Thus, the only player left in the chain of

27  chargebacks that could possibly have a "less secure system" by 2015 was the merchant.  And

28  merchants remain at the mercy of Defendants to get EMV compliant.

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA    - 2 -

6.     As noted above, this shift took place all at once, in October of 2015, a date selected and agreed to by EMVCo, Visa, MasterCard, American Express, Discover and the Issuing Banks, and without any opportunity for merchants like Plaintiffs and the Class members to object or to opt out.  The deadline for the Liability Shift was impossible for the Class members to meet, and the Defendants all **knew** this to be the case.

7.     In shifting to EMV chip cards, Defendants' conduct in the United States has been unique and historically unprecedented in its scope and implementation.  Nowhere else in the world have all four major networks implemented a Liability Shift at the same time and done so without meaningful incentives.  In many parts of the world, the shift to EMV cards has been coupled with offers of reduced interchange fees, extended deadlines or the purchase of necessary terminals or chip card readers.  In the United States, by contrast, no concessions were offered until after Plaintiffs filed suit.  Then, Visa, MasterCard and American Express offered to forgo chargebacks of $25 or less and made an additional change regarding the reuse of counterfeit cards.  But this is only a fraction of the fraud costs (5% or less) associated with the Liability Shift merchants must now shoulder.

8.     Visa and MasterCard take the position that their rules allow the Issuing Banks and acquirers to decide whether or not to implement the Liability Shift.  However, this position bears little resemblance to reality.  None of the issuers to date have refused to implement the Liability Shift.  And as explained in detail below, the acquirers do not account for the potential of absorbing chargebacks for merchants that remain in business.  So the suggestion that the rule **may** not be followed is false.  The Issuing Bank defendants are shifting the fraud liability to merchants, thereby saving billions.  And to do so, the Issuing Banks entered into an illegal agreement with the Networks to implement the Liability Shift.

9.     By the time the Defendants decided to implement EMV technology in the United States, it was clear there was a substantial chance that merchants would be allowed to steer cardholders to cheaper forms of payment or cards with better terms.  This had previously been prevented by various Network rules.  Without agreement on the timing and manner of implementing the Liability Shift, the Networks risked competition from merchants steering

1  transactions to networks without a Liability Shift component, an extended Liability Shift date, a
2  break on fees, equipment or other more favorable terms.  But if the Networks all agreed on a
3  Liability Shift date, they could avoid competition in this area, reap billions in chargebacks,
4  without a loss in market share, and maintain their high interchange fees.  In a truly competitive
5  environment, at least one of these entities would or should have broken ranks and offered
6  merchants a break on any number of terms.  But none did so.

7       10.     At other places around the world, the liability shifts were never made at the same
8  time nor were they made in an identical fashion.  It was only in the United States, where the
9  competitive landscape had begun – for the first time – to shift in favor of merchants that this
10  lock-step implementation occurred.  The challenges to the anti-steering rules made it clear to the
11  Networks that many, if not most, of their protective rules might well disappear.  As a result,
12  when the Networks announced their intention to implement the Liability Shift, the Defendants all
13  agreed that, rather than compete, they would implement the Liability Shift on the same date in
14  the same way across all Networks everywhere in America.

15       11.     Thus, as set forth herein, Defendants used the transition to EMV chip-card
16  technology to combine unlawfully in a coordinated scheme that benefitted them by billions of
17  dollars at the expense of the Class member merchants in violation of federal and state laws.

18                                   **THE PARTIES**
19  **Plaintiffs**

20       12.     Plaintiff Milam's Market, is a Florida corporation that operates four retail grocery
21  stores in Miami-Dade County, Florida.  Milam's Market has boutique grocery stores offering the
22  highest quality products and enhanced customer service.  Like millions of merchants in the
23  United States, Milam's Market sought to comply with the Defendants' Liability Shift and timely
24  spent significant resources purchasing new EMV-capable terminals, which to date are not
25  certified.  Since the Liability Shift, Milam's Market has seen a dramatic increase in total
26  chargebacks, resulting in many thousands of dollars in damages.  As a direct result of
27  Defendants' Liability Shift, Milam's Market has suffered, and continues to suffer, thousands of
28  dollars of chargebacks it would not have borne absent the Liability Shift.  Not only has Milam's

1   Market suffered significant chargebacks from Defendants' anticompetitive scheme, since the

2   imposition of the Liability Shift in October 2015, Milam's Market has seen an exponential

3   increase in chargebacks directly and solely related to the Liability Shift rules.  The company

4   historically had extremely low chargeback rates.  After the Liability Shift was implemented,

5   chargebacks increased to unprecedented levels.

6         13.    Plaintiff Grove Liquors is a Florida limited liability company operating a retail

7   liquor store in Miami-Dade County, Florida.  Grove Liquors is a full-service retail liquor store

8   that also sells a wide variety of wine.  Like millions of merchants in the United States, Grove

9   Liquors sought to comply with the Defendants' Liability Shift and timely spent significant

10   resources purchasing new EMV-capable terminals, which to date are not certified.  Since the

11   Liability Shift, the Company has seen a dramatic increase in total chargebacks, resulting in many

12   thousands of dollars in damages.

13         14.    As a direct result of Defendants' Liability Shift, Grove Liquors has suffered

14   thousands of dollars of chargebacks.  Since the imposition of the Liability Shift in October 2015,

15   Grove Liquors has seen an exponential increase in chargebacks directly traceable to the Liability

16   Shift rules.  The company historically had extremely low chargeback rates.  After the Liability

17   Shift was implemented, however, according to data collected by Grove Liquors, chargebacks

18   increased to unprecedented levels.

19         15.    Milam's Market and Grove Liquors manage their credit card operations together.

20   Their combined increase in chargeback losses since the Liability Shift has been enormous.

21   During the time period from October 1, 2015 to June 30, 2016, Milam's Market and Grove

22   Liquors have been assessed final responsibility by MasterCard, Visa and Discover for 220

23   chargebacks totaling $23,915.42 (plus chargeback fees of $5 for each item, for an additional cost

24   to Milam's Market and Grove Liquors of $1,100 – for a total loss of $25,015.42).  Of these 220

25   chargebacks, 212 were from the Liability Shift and would not have been the merchants'

26   responsibility but for the Liability Shift.  During the same period the prior year, between October

27   1, 2014 and June 30, 2015 – before the Liability Shift – Milam's Market and Grove Liquors were

28   assessed final responsibility by MasterCard, Visa and Discover for only three chargebacks

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA    - 5 -

1   totaling $272.66.  In addition, American Express assessed $2,655.92 in chargebacks during the

2   time period from October 1, 2015 to June 30, 2016, as compared to $377.56 during the same

3   period the prior year, before the Liability Shift.  In total, then, Milam's Market and Grove

4   Liquors have lost – and Issuing Banks have unjustly gained – more than $26,000 in nine months

5   from chargebacks.

6        16.    Plaintiff rue21 is a nationwide retailer with more than 1,100 stores in 48 states.

7   The retailer has 49 stores in California, including several within the Northern District.  It is

8   headquartered in Warrendale, Pennsylvania.   rue21 was founded in 1976, originally as

9   Pennsylvania Fashions, Inc.  The company operates as a specialty retailer of junior girls and

10  young men's apparel and accessories in the United States.  It offers a range of fashion apparel

11  and accessories, including graphic T-shirts, denim, dresses, shirts, hoodies, belts, jewelry,

12  handbags, footwear, intimate apparel and other accessories.  Like millions of merchants in the

13  United States, rue21 sought to comply with Defendants' Liability Shift and timely spent

14  significant resources purchasing new EMV-capable machines, which to date have not been

15  certified.   Since the Liability Shift, the Company has seen a dramatic increase in total

16  chargebacks, resulting in thousands of dollars in damages, including many chargebacks in this

17  District.

18       17.    As a direct result of Defendants' Liability Shift, rue21 has suffered, and continues

19  to suffer, thousands of dollars of chargebacks that would not have been borne by the company

20  had the Liability Shift not occurred.  Not only has rue21 suffered significant chargebacks as a

21  result of Defendants' anticompetitive scheme, since the imposition of the Liability Shift in

22  October 2015, rue21 has seen an exponential increase in chargebacks directly related to the

23  Liability Shift rules.

24       18.    Because rue21 primarily caters to the youth market, the average credit card

25  transaction at the company's stores is under $50.   As such, the company historically had

26  extremely low chargeback rates, as thieves usually engage in fraud at higher dollar volumes.

27  After the Liability Shift was implemented, however, according to data collected by rue21,

28  chargebacks increased to a level the company had never seen before.  EMV-related chargebacks

1   were more than $4,700 in October 2015, more than $10,600 in November 2015, more than

2   $24,700 in December 2015, more than $35,200 in January 2016, more than $48,600 in February

3   2016, more than $62,100 in March 2016 and more than $76,200 in April 2016, the last month for

4   which the company has complete data.  The EMV-related chargebacks rue21 is being saddled

5   with are spiking dramatically, with no end in sight.  These charges are all a direct result of

6   Defendants' imposition of the Liability Shift rules.

7          19.     In each of the 48 states where rue21 operates stores, the company has suffered

8   chargebacks directly related to Defendants' Liability Shift.  The company can determine, by

9   store location, the dollar amount, reason code and total number of chargebacks assessed.  In

10  addition, rue21 is able to determine the Issuing Bank associated with each Liability Shift charge.

11         20.     From October 2015 through April 2016, rue21 was assessed 477 chargebacks

12  under Discover's rule 4866 (Fraud-Chip Card Counterfeit Transaction) code.  During the same

13  period, the company was assessed 225 chargebacks under MasterCard's Reason Code 4870

14  (Chip Liability Shift) and 1080 chargebacks under MasterCard's Reason Code 4871 (Chip/PIN

15  Liability Shift).  The company was assessed 521 Visa Reason Code 62 (counterfeit transaction)

16  chargebacks and 21 Visa Reason Code 81 (Fraudulent Transaction Card Present – Environment)

17  transactions.[2]

18         21.     Plaintiff Monsieur Marcel is a California business based in Los Angeles.

19  Monsieur Marcel has a restaurant operation, specializing in French food, as well as a large retail

20  operation selling cheese, wine, chocolate and many other specialty food products from around

21  the world.  Its main location is in the Los Angeles Farmer's Market, a well-known shopping

22  destination.  Monsieur Marcel suffered significant and unprecedented chargebacks following

23  Defendants' October 2015 Liability Shift.  The company sought to comply with Defendants'

24  edict, timely purchasing new equipment that was supposed to be operational, but was unable, for

25  several months following the Liability Shift, to obtain the required certifications.  Monsieur

26  Marcel accepts Visa, MasterCard and American Express.  It does not take Discover cards.

27  _____

[2]  rue21 accepts American Express payment cards at all of its stores, but it did not have any
28  Liability Shift-related chargebacks during the October 2015 to April 2016 time period.

1         22.    As a direct result of Defendants' Liability Shift, Monsieur Marcel has suffered,

2    and continues to suffer, thousands of dollars of chargebacks that would not have been borne by

3    the company had the Liability Shift not occurred.   Not only has Monsieur Marcel suffered

4    significant chargebacks as a result of Defendants' anticompetitive scheme, since the imposition

5    of the Liability Shift in October 2015, Monsieur Marcel has seen an exponential increase in

6    chargebacks directly related to the Liability Shift rules.

7         23.    Plaintiff Fine Fare operates two full-service grocery stores in the Bronx, New

8    York.   Fine Fare accepts a number of types of payment in its stores, including Visa, MasterCard

9    and Discover.   Fine Fare does not accept American Express and does not have a contract with

10    American Express for card-acceptance services.   Prior to the Liability Shift mandate, Fine Fare

11    sought to upgrade its point of sale terminals at its stores.   It purchased 10 EMV-capable

12    terminals at a cost of approximately $625 each.   While these terminals were physically able to

13    accept chip cards, the machines were not, and to this day are not, EMV certified.   This means

14    that although a customer can dip a chip-card into the terminal, only the card's magnetic strip can

15    in fact be used.

16         24.    Since October 2015, Fine Fare has suffered significant and unprecedented

17    chargebacks directly traceable to the Liability Shift.   In previous years, the company had

18    extremely low chargebacks.   Since the Liability Shift, however, Fine Fare has seen a steady

19    increase in chargebacks.   Fine Fare has disputed the chargebacks and each time has been

20    rebuked.  In a thin margin business like a grocery store, where interchange and other credit-card

21    processing fees already make up one of the largest business expenses, the change in the rules

22    regarding chargebacks has hit Fine Fare especially hard.

23         25.    Class members, who bring this class action pursuant to Rule 23(a), (b)(2) and

24    (b)(3) of the Federal Rules of Civil Procedure, comprise merchants who have been unlawfully

25    subjected to chargebacks on MasterCard, Visa, Discover and/or American Express credit and

26    charge card transactions following Defendants' imposition of the Liability Shift, beginning in

27    October 2015 and continuing until the anticompetitive conduct ceases.

28

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA        - 8 -

**Defendants**

26.     Defendant Visa is a California-based payments technology company, which operates a retail electronic payments network in the United States.  It administers Visa payment programs and its product platform includes consumer credit, consumer debit and cash access, and prepaid and commercial programs.  It provides products and services over a secure payments network to support payment programs offered by its member issuing banks to their customers, including tens of millions of retail consumers.  Visa conducts business throughout the United States, including extensively in this District and Division, where it is headquartered.  Visa is a founding member of EMVCo and has two members, Christina Hulka and Christian Aabye, on the EMVCo Board of Managers.  Along with American Express, Discover, JCB, MasterCard and UnionPay, Visa is a co-owner of defendant EMVCo.

27.     Defendant MasterCard is a New York-based payments technology company, which operates a retail electronic payments network in the United States.  It administers MasterCard payment programs and its product platform includes consumer credit, consumer debit and cash access, and prepaid and commercial programs.  It provides products and services over a secure payments network to support payment programs offered by its member issuing banks to their customers, including tens of millions of retail consumers.  MasterCard conducts business throughout the United States, including extensively in this District.  MasterCard is a co-owner of defendant EMVCo.  MasterCard has two representatives, Jonathan Main and Dave Roberts, on the EMVCo Board of Managers.

28.     Defendant American Express is a New York-based payments technology company, which issues credit and charge cards and related services and conducts business throughout the United States, including extensively in this District, and is a co-owner of defendant EMVCo.  American Express has two representatives, Robert Burns and Sean Conroy, on the EMVCo Board of Managers.  Named Plaintiff Milam's Market's claim against American Express has been transferred to the Southern District of New York by virtue of Dkt. No. 282.  Plaintiff Fine Fare is not subject to any contractual restrictions American Express may assert.

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA       - 9 -

29.     Defendant Discover is an Illinois-based financial services company, which issues the Discover card and operates the Discover retail electronic payments network in the United States.  It administers Discover payment programs and its product platform includes consumer credit cards, and other card services.  It provides products and services over a secure payments network to support payment programs offered by its own and some member issuing banks to their customers, including tens of millions of retail consumers.  Discover conducts business throughout the United States, including extensively in this District.  Discover is a co-owner of defendant EMVCo.  Discover has two representatives, David Bibby and Cheryl Mish, on the EMVCo Board of Managers.  Plaintiff Monsieur Marcel does not have any contracts with Discover.

30.     Defendant BOA, a national banking association with its principal place of business in Charlotte, North Carolina, issues credit cards throughout the United States, including extensively in this District.  It is an issuing bank that, throughout this District, issues General Purpose Cards to individuals and businesses.  As an issuing bank, BOA maintains the line of credit associated with each Visa or MasterCard it issues.  Cardholder transactions made with these cards are processed by the Networks.  BOA is a member of both MasterCard and Visa. Bank of America Merchant Services, which is a joint venture between defendant BOA and First Data, is an EMVCo Business Associate.  According to EMVCo's website, "EMVCo Business Associates provide EMVCo with input on strategic business and implementation issues related to the use of the EMV Specifications.  Business Associates serve on the Board of Advisors and, accordingly, advise the EMVCo Executive Committee."  According to EMVCo, in addition to receiving a seat on the EMVCo Board of Advisors, Business Associates also gain "networking opportunities with EMVCo executives and other Business Associates" and "[a]dvance access to EMV Specification revisions, draft documents and upcoming meeting materials."  In 2015, Bank of America Merchant Services ("BAMS") which is a joint venture between Defendant BOA and First Data, was the fourth largest acquirer by volume in the United States.

31.     Defendant Capital One is a Delaware corporation with its principal place of business in McLean, Virginia, which issues credit cards throughout the United States, including

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA      - 10 -

1   extensively in this District.  It is an issuing bank that, throughout this District, issues General

2   Purpose Cards to individuals and businesses.  As an issuing bank, Capital One maintains the line

3   of credit associated with each Visa or MasterCard it issues.  Cardholder transactions made with

4   these cards are processed by the Networks. Capital One is a member of both MasterCard and

5   Visa.  Capital One is also an acquiring bank that provides card acceptance services to Class

6   members in this District and throughout the United States, teaming up with Vantiv, Inc., the third

7   largest acquirer by volume in the United States in 2015, in providing these services to Class

8   members.

9        32.    Defendant Chase, a national banking association, issues credit cards throughout

10  the United States, including extensively in this District.  It is an issuing bank that, throughout this

11  District, issues General Purpose Cards to individuals and businesses.  As an issuing bank, Chase

12  maintains the line of credit associated with each Visa or MasterCard it issues.   Cardholder

13  transactions made with these cards are processed by the Networks.  Chase is a member of both

14  MasterCard and Visa. Chase is an EMVCo Business Associate.   According to EMVCo's

15  website, "EMVCo Business Associates provide EMVCo with input on strategic business and

16  implementation issues related to the use of the EMV Specifications.  Business Associates serve

17  on the Board of Advisors and, accordingly, advise the EMVCo Executive Committee."

18  According to EMVCo, in addition to receiving a seat on the EMVCo Board of Advisors,

19  Business Associates also gain "networking opportunities with EMVCo executives and other

20  Business Associates" and "[a]dvance access to EMV Specification revisions, draft documents

21  and upcoming meeting materials."  Chase is also a Technical Associate of EMVCo.  According

22  to EMVCo's website, EMVCo "Technical Associates have the opportunity to provide input and

23  receive feedback on detailed technical and operational issues connected to the EMV

24  Specifications and related processes."   This participation type also gives organizations the

25  opportunity to interact with EMVCo's technical Working Groups and offer input to meeting

26  agendas, submit technical contributions to EMVCo for consideration, and gain early access to

27  draft specifications and other technical documents.  Chase Commerce Solutions, a division of

28  JPMorgan Chase & Co., the parent of defendant Chase, is an acquiring bank that provides card

1   acceptance services to Class members in this District and throughout the United States.  In 2015,

2   Chase Commerce Solutions was the largest acquirer by volume in the United States.

3       33.    Defendant Citibank (South Dakota), N.A. is a South Dakota bank with its

4   principal place of business in Sioux Falls, South Dakota.  It is parent company Citigroup's

5   primary banking entity responsible for U.S. credit card activities.

6       34.    Defendant Citibank, N.A. is a bank with its principal place of business in New

7   York, New York, and is a subsidiary of Citigroup, a Delaware corporation with its principal

8   place of business in New York, New York.  Citigroup is a member of both Visa and MasterCard.

9   It engages in interstate commerce.  It is an issuing bank that, throughout this District, issues

10   General Purpose Cards to individuals and businesses.  Citibank, N.A.'s subsidiary, Citicorp

11   Payment Services, through its Citi Merchant Services, is an acquiring bank that provides card

12   acceptance services to class members in this judicial district and throughout the United States.

13   Citi Merchant Services is a contractual alliance between Citicorp Payment Services and First

14   Data and, combined, the two were the second largest acquirer by volume in the United States in

15   2015.  Based on volume of Visa and MasterCard transactions, Citi Merchant Services, alone, was

16   the seventh largest acquirer in the United States in 2015.

17       35.    Defendant PNC is a Pennsylvania corporation that issues credit cards throughout

18   the United States, including in this District.  It is an issuing bank that, throughout this judicial

19   district, issues General Purpose Cards to individuals and businesses.  As an issuing bank, PNC

20   maintains the line of credit associated with each Visa or MasterCard it issues.  Cardholder

21   transactions made with these cards are processed by the Networks.  PNC is a member of both

22   Visa and MasterCard.  PNC, through its subsidiary PNC Merchant Services Company, is also an

23   acquiring bank that provides card acceptance services to class members in this judicial district

24   and throughout the United States.  PNC Merchant Services Company is a contractual alliance

25   between PNC and First Data and, in 2015, was the eleventh largest acquirer by volume in the

26   United States.

27       36.    Minneapolis-based U.S. Bancorp is the parent company of defendant US Bank,

28   the fifth largest commercial bank in the United States.  US Bank issues credit cards throughout

1  the United States, including extensively in this District.  It is an issuing bank that, throughout this

2  district, issues General Purpose Cards to individuals and businesses.  As an issuing bank, US

3  Bank maintains the line of credit associated with each Visa or MasterCard it issues.  Cardholder

4  transactions made with these cards are processed by the Networks.  US Bank is a member of

5  both MasterCard and Visa.  US Bank is also an EMVCo Business Associate.  According to

6  EMVCo's website, "EMVCo Business Associates provide EMVCo with input on strategic

7  business and implementation issues related to the use of the EMV Specifications.  Business

8  Associates serve on the Board of Advisors and, accordingly, advise the EMVCo Executive

9  Committee."  According to EMVCo, in addition to receiving a seat on the EMVCo Board of

10  Advisors, Business Associates also gain "networking opportunities with EMVCo executives and

11  other Business Associates" and "[a]dvance access to EMV Specification revisions, draft

12  documents and upcoming meeting materials."  US Bank is also a Technical Associate of

13  EMVCo.  According to EMVCo's website, EMVCo

14        Technical Associates have the opportunity to provide input and receive feedback
      on detailed, technical and operational issues connected to the EMV Specifications
15        and related processes. . . .  [T]his participation type also gives organisations the
      opportunity to interact regularly with EMVCo's technical Working Groups, offer
16        input to meeting agendas, submit technical contributions to EMVCo for
      consideration, and gain early access to draft specifications and other technical
17        documents.

18  US Bank's parent operates the fifth largest acquirer by volume in the United States through its

19  wholly-owned subsidiary Elavon, Inc.

20       37.  Defendant Wells Fargo is a San Francisco-based corporation which issues credit

21  cards throughout the United States, including extensively in this District.  It is an issuing bank

22  that, throughout this District, issues General Purpose Cards to individuals and businesses.  As an

23  issuing bank, Wells Fargo maintains the line of credit associated with each Visa or MasterCard it

24  issues.  Cardholder transactions made with these cards are processed by the Networks.  Wells

25  Fargo is a member of both MasterCard and Visa.  Wells Fargo is also an acquiring bank that

26  provides card acceptance services to Class members in this District and throughout the United

27  States.  In 2015, it was the sixth largest acquirer by volume in the United States.

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA    - 13 -

38.     Defendant EMVCo is a Delaware limited liability company overseen by, *inter alia*, the Networks, which, among other things, develops and manages the technical standards by which EMV chip transactions (as defined herein) are processed and maintained. EMVCo appears to be based out of Foster City, San Mateo County, California, and is therefore within this District and Division. EMVCo's Executive Chairman Mike Matan's mailing address of 901 Metro Center Boulevard appears to be located within Visa's offices, which occupy 900-901 Metro Center Boulevard, Foster City, California 94404.[3]

39.     According to EMVCo's website, American Express, MasterCard, Discover, JCB, UnionPay and Visa "own[]an equal share of EMVCo and ha[ve] representatives in the organisation at the management and working group levels. All decisions are made on a consensus basis among the member organisations." EMVCo is not simply a standard-setting entity. Instead, the organization serves as a means through which Defendants here have been able to effectuate their conspiracy. Moreover, the anticompetitive conduct alleged herein was not conducted as part of EMVCo's standard-setting functions. The Supreme Court has long acknowledged that standard-setting organizations "can be rife with opportunities for anticompetitive activity." *Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 571 (1982); *see also Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 659 (1961).

40.     Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as Defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

**INTRADISTRICT ASSIGNMENT**

41.     A substantial part of the events or omissions which give rise to the claims occurred in San Francisco County and defendants Visa, Inc. and EMVCo, who are responsible

---

[3]    "About Us," Alliance Management, http://www.alliancesmanagement.com/about.html (last visited July 15, 2016).

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA       - 14 -

1  for a substantial part of the events or omissions, are headquartered in San Mateo County.  As

2  such, this action is properly assigned to the San Francisco Division of this Court.

3  **JURISDICTION AND VENUE**

4  42.     This Court has jurisdiction over this case pursuant to 28 U.S.C. §1332(d) and the

5  Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1711, *et seq.*, which vests original

6  jurisdiction in the district courts of the United States for any multi-state class action where the

7  aggregate amount in controversy exceeds $5 million and where the citizenship of any member of

8  the class of plaintiffs is different from that of any defendant.   The $5 million amount in

9  controversy and diverse-citizenship requirements of CAFA are satisfied in this case.

10  43.     Venue is proper in this District pursuant to §12 of the Clayton Act (15 U.S.C.

11  §22), and 28 U.S.C. §1391(b)-(d), because a substantial part of the events giving rise to

12  Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade

13  and commerce discussed below has been carried out in this District, and one or more of the

14  Defendants resides in, is licensed to do business in, is doing business in, had agents in, or is

15  found or transacts business in, this District.

16  44.     This Court has personal jurisdiction over each of the Defendants because, *inter

17  alia*, each of the Defendants: (a) transacted business throughout the United States, including in

18  this District; (b) provided services related to credit cards and/or charge cards throughout the

19  United States, including in this District; (c) had substantial contacts with the United States,

20  including in this District; and/or (d) was engaged in an illegal conspiracy that was directed at and

21  had the intended effect of causing injury to persons residing in, located in, or doing business

22  throughout the United States, including in this District.

23  45.     Defendants engaged in conduct inside the United States that caused direct,

24  substantial and reasonably foreseeable and intended anticompetitive effects upon interstate

25  commerce within the United States.

26  46.     The activities of Defendants and their co-conspirators were within the flow of,

27  were intended to, and did have, a substantial effect on interstate commerce of the United States.

28  Defendants' products and services are sold in the flow of interstate commerce.

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA       - 15 -

47.     The anticompetitive conduct, and its effects on U.S. commerce described herein, proximately caused antitrust injury to Plaintiffs and members of the Class in the United States.

48.     By reason of the unlawful activities alleged herein, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Class.

49.     Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States, including Plaintiffs and members of the Class.

BACKGROUND FACTS

**Cards and Commerce**

50.     The American consumer economy runs on plastic.

51.     Some 230 million adult American consumers hold more than a billion credit and charge cards, which they use to make more than two trillion dollars' worth of purchases each year.  In 2011, 26 billion credit card transactions totaled some $2.1 trillion.

52.     Millions of merchants, in virtually every branch of the economy, rely on accepting credit and charge transactions for their livelihood.  MasterCard and Visa are accepted by about 8 million merchants each, Discover by slightly fewer, and some 4.5 million merchants take American Express.

53.     In 1997, payment card usage accounted for approximately 23% of consumer payments.  By 2011, payment cards accounted for more than twice that proportion of consumer sales – 48%.  During the same period, use of cash and checks declined, from 70% of consumer transactions to 35%.

54.     Although they work the same in many ways when a cardholder makes a purchase, credit and charge cards are different.  A credit card has a revolving line of credit, meaning cardholders are able to spend out of the line of credit using the credit card, and typically have to pay a minimum payment – but are not required to pay the full amount owed – each month.  If the cardholder does not pay off the statement balance, he or she pays interest each month on the unpaid balance of the expended line of credit.  A charge card, on the other hand, does not come

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA          - 16 -

1    with a line of credit and typically does not allow the cardholder to carry a balance, instead charge

2    cards typically require payment of the full amount charged each month.

3        55.    While many American consumers use credit and charge cards for the convenience

4    they offer, there are some transactions – for example, renting a car or a hotel room, or making an

5    online purchase – which are virtually impossible to make without such a card.

6        56.    For American merchants, like those in the Class, accepting credit and charge

7    cards is a prerequisite and necessity for doing business.  Customers expect to be able to use their

8    plastic when they make a purchase and will often choose simply not to do business with a

9    merchant who does not accept a payment card.  *See United States v. Visa U.S.A., Inc.*, 163 F.

10   Supp. 2d 322, 340 (S.D.N.Y. 2001) (merchants must accept credit cards or risk losing business to

11   merchants who do accept them).

12       57.    "Credit-cards are the best business in banking," says Robert Hammer, who runs

13   R.K. Hammer, Inc., a credit-card consulting firm.  According to R.K. Hammer, Inc., credit-card

14   returns on assets, a measure of profitability are expected to hit 4.25% to 4.50% this year for big

15   lenders, compared with 4% in 2015.  In contrast, overall bank returns are roughly 1%.[4]

16   **Credit Card Mechanics**

17       58.    Defendants Visa and MasterCard, while they operate the networks that make

18   transactions on Visa or MasterCard credit cards work, do not issue the cards themselves, or carry

19   the line of credit each card represents.  Instead, banks and other financial institutions, including

20   the Issuing Banks, issue the credit cards.  In the past, defendant American Express only issued

21   charge cards.  In more recent years, American Express began directly issuing credit cards as

22   well.  Defendant Discover operates its own network and mostly issues its cards directly, along

23   with a few issuing banks. Discover acquires most of its transactions itself, but has many

24   merchants who do not have a direct relationship with Discover.

25

26   ───────────────
     [4]    AnnaMaria Andriotis and Robin Sidel, "Balance Due: Credit-Card Debt Nears $1 Trillion as
27   Bank     Push     Plastic,"    *The     Wall     Street     Journal*    (May     20,     2016),
     http://www.wsj.com/articles/balance-due-credit-card-debt-nears-1-trillion-as-banks-push-plastic-
28   1463736600 (last visited July 15, 2016).

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA     - 17 -

59.    In the case of American Express charge cards, American Express is both the issuer and provides the network.  A typical American Express charge card transaction involves three parties: the customer, American Express, and the merchant.

60.    When a consumer uses the card in lieu of cash to make a purchase from a merchant, the merchant is thereafter paid the purchase price (less a "swipe fee") by American Express.  American Express makes its money by charging cardholders membership fees (which vary depending upon the sort of services or perquisites associated with different card types), charging interest on unpaid balances and by charging the swipe fee (which varies depending on the merchant type and transaction type from around 2% to 5% of the cost of the goods or services purchased) paid by the merchant.

61.    A Visa, MasterCard or Discover credit card transaction, on the other hand, may involve as many as five parties: (1) the card-holding customer; (2) the merchant; (3) the "acquiring bank" (which may be owned or controlled by an issuing bank); (4) the issuing bank (which may also have an acquiring bank side of the business) (in the case of most Discover cards that is usually Discover Bank); and (5) the network itself, that is, Visa, MasterCard or Discover.

**Credit Card Technology**

62.    Each credit or charge card bears a unique embossed number, an embossed expiration date and a printed "CVV," or "card verification value," number – often called the "security code."  The embossed number identifies the card as a Visa, MasterCard, Discover or American Express, the issuing bank (for Visa and MasterCard payment cards), the account number and card number within an account, and contains one or more "check digits," random numbers added for security.

63.    Cards also bear a magnetic stripe or magstripe on the back, similar to a piece of audio or computer tape.  The magstripe contains information about the card, including the card number, expiration date and so forth.  When swiped though a card reader – in what is called a "card present" transaction, as opposed to a "card not present" transaction, like an online purchase – the card reader is able to obtain that information from the magstripe and transmit it along the network.  The magnetic stripe on a credit card is encoded with information, including whether

1   the card contains an EMV chip.  For example, a value of 2 or 6 in position 1 of the three-digit

2   service code encoded on the magnetic stripe of a MasterCard card indicates to a magnetic stripe-

3   reading terminal that a chip is present on a payment card.

4          64.     This combination of features allows the various participants in a credit card

5   transaction to share information about the card, all with the aim of speeding the transaction while

6   avoiding fraud and unauthorized charges.

7          65.     In the mid-1990s, credit and charge cards began to be manufactured to include, in

8   addition to the magstripe, a so-called "EMV chip."  This electronic chip – actually a tiny micro-

9   processor – is a more advanced form of electronic data storage than a magstripe.   While

10  magstripes are "static," containing only the information with which they are initially coded,

11  EMV chips are "dynamic," in that the data they contain can be interacted with, altered and

12  updated.  An EMV chip creates a unique electronic signature for each transaction.

13         66.     An EMV chip looks like this:



14
15
16
17
18
19
20

21         67.     EMV cards, because of their dynamic nature, are purported by the Networks to

22  reduce fraud significantly during card present transactions – those where the customer actually

23  produces his card to the merchant at the merchant's POS terminal.  In addition, EMV chips are

24  supposed to be less prone to illicit copying than magstripes.  An EMV-chip-equipped card does

25  nothing to lessen the likelihood of fraud or error in "card not present" transactions, such as those

26  conducted online or over the telephone.

27         68.     There are two kinds of EMV cards – "chip-and-PIN" (personal identification

28  number) cards, where the transaction is authorized by the merchant processing the chip card and

1   the consumer entering a PIN, and "chip-and-signature" cards, where the merchant processes the

2   chip and the consumer signs an electronic signature pad.  The failure to use the more secure chip

3   and PIN system has result in several lawsuits by large merchants against the card networks in

4   recent months.

5   69.   The European Union's version of the EMV system, unlike the standard deployed

6   in the United States, utilizes the chip-and-PIN system, rather than a chip-and-signature system.

7   Chip-and-PIN cards are considered more secure.

8   **Chargebacks**

9   70.   Despite all the security measures associated with credit cards, card transactions

10  still create a possibility of fraud, error or complaint.  Cards may be stolen from their rightful

11  owners and used by a thief to make charges.  A merchant might charge the wrong amount or

12  deliver the wrong, or faulty, goods.  A customer might disclaim a charge he actually did make.

13  In a standard payment card transaction, cardholders are rarely liable for chargebacks due to fraud

14  or counterfeit cards because of consumer protection laws, such as Regulation Z,[5] or because of

15  the zero liability rules that the card Networks sell as part of their suite of services to their

16  consumers.  In fact, merchants help subsidize these fraud protections by paying interchange and

17  other fees imposed when they accept credit cards.

18  71.   For years, however, under most circumstances, across the payment card networks,

19  the issuer was the party most likely to bear the cost for chargebacks when there was a "card

20  present transaction" using either a counterfeit card or stolen card.  Why?  Because merchants

21  covered this loss by paying fees to the Issuing Banks or to American Express and Discover

22  directly.   Under the rules set forth by the Networks, by which, in the case of Visa and

23  MasterCard, its card issuing banks must abide, and which, in the case of American Express and

24

25

---

26  [5]   The Truth in Lending Act ("TILA"), 15 U.S.C. §1601, *et seq.*, was enacted on May 29, 1968,
    as title I of the Consumer Credit Protection Act (Pub. L. No. 90-321, 82 Stat. 146).  The TILA,
27  implemented by Regulation Z (12 C.F.R. §1026), became effective July 1, 1969.  Regulation Z
    protects consumers from liability for unauthorized use of their credit cards.
28

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA      - 20 -

1    Discover, are directly employed, when a cardholder disputed a transaction the issuing bank or

2    network (American Express or Discover) would generally pay the chargeback amount.[6]

3           72.     Before the Liability Shift, instances of fraud or wrongful charges were resolved

4    like this:  When a card-holding customer saw a fraudulent charge on his or her card statement, or

5    wanted to dispute a charge for another reason, the customer contacted the issuing bank.   The

6    telephone numbers and other contact information printed on the back of payment cards go to

7    issuers, not Visa or MasterCard.   As for Defendants American Express and Discover, the calls

8    went directly to those Networks.   From that point, card-holding customers were not liable for

9    most fraudulent or disputed charges.   It was the Issuing Bank, American Express or Discover –

10   their costs substantially defrayed by the interchange fee or merchant discount fee – that would

11   cover and make good the disputed charge.

12              **THE LIABILITY SHIFT AND THE CERTIFICATION QUAGMIRE**

13   **The Network Defendants' Rules**
     **Implement the Fraud Liability Shift**

14

15          73.     In implementing the Liability Shift in the United States, the Networks included an

16   October 2015 effective date for the Liability Shift in their rules and added "reason codes" used

17   for EMV-related chargebacks.   While the Networks use different vernacular and numbering,

18   their rules implementing the Liability Shift are substantially identical across payment networks.

19          74.     The following provides a snapshot of the reason codes:

20

21

22

23

24   ─────────────────────────
     [6]   The Court questioned whether the Uniform Commercial Code ("UCC") applies to Plaintiffs'
25   claims.   Plaintiffs believe that it does not.   Rather, merchant liability is determined contractually
     under the Networks' rules and regulation.   A position paper submitted by the Uniform Law
26   Commission, which alongside the American Law Institute, drafted the UCC, states that "many
     non-consumer aspects of retail payment systems fall outside both the UCC and federal laws and
27   regulations."   In a subsection titled, "Payments Not Governed by the UCC," the Uniform Law
     Commission states that "other than contract law, there is virtually nothing to regulate the relation
28   between a merchant and an issuer, or a merchant card user and an issuer."   Uniform Law
     Commission, POSITION PAPER: PAYMENT SYSTEM REFORM.

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA        - 21 -

| Visa Chargeback Reason Code | MasterCard Chargeback Reason Code | Discover Chargeback Reason Code | American Express Chargeback Reason Code | Rule |
|---|---|---|---|---|
| 62 – Counterfeit | 70 – Chip Liability Shift<br><br>4870 – Chip Card Liability Shift | UA05 – Fraud – Chip Card Counterfeit | F30 – EMV | Merchant without certified EMV terminals liable for chargebacks from fraud-related transaction from EMV chip card |

**MasterCard's Liability Shift Rules:**

75.    MasterCard's December 8, 2015 Chargeback Guide provides at least two reason codes applicable to the Liability Shift: Reason Codes 70 and 4870.  As noted in the Chargeback Guide, the MasterCard Rules manual provides that MasterCard has the sole right to interpret its standards, including those in the Chargeback Guide.

**4.6.5 Message Reason Code 70 – Chip Liability Shift**

The issuer may use message reason code 70 when the cardholder disputed an unauthorized transaction performed with an EMV chip card.

**4.6.5.1 Issuer Chargeback**

The table shown below details the requirements for this message reason code.

**Counterfeit Fraud**

| Counterfeit Fraud | |
|---|---|
| **Chargeback Condition** | All of the following:<br>•      The cardholder contacted the issuer alleging that the transaction was fraudulent.<br>•      Both the issuer and the acquirer are located in a country or region that has adopted a domestic or intraregional chip liability shift, or that participates in the Global Chip Liability Shift Program for interregional transactions as shown in the below tables.<br>•      The transaction was conducted with a counterfeit card at a magnetic stripe reading-only ATM or POS terminal.<br>•      The validly issued card was a hybrid card.<br>•      The fraudulent transaction must be reported to SAFE on or before the date the chargeback is processed. |

\*      \*      \*

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA          - 22

**3.30 Message Reason Code 4870 – Chip Liability Shift**

The following sections describe the proper and improper use of message reason code 4870.

**3.30.1 Proper Use of Message Reason Code 4870**

The issuer may use message reason code 4870 for a first chargeback if the following apply.

- The issuer received a cardholder letter stating that neither he, she, or anyone authorized by him or her engaged in the transaction.

- Both the issuer and the acquirer are located in a country or region that has adopted a domestic or intraregional chip liability shift, or that participates in the Global Chip Liability Shift Program for interregional transactions at Level 1 (Chip Liability Shift for Counterfeit Fraud).

- A fraudulent transaction resulted from the use of a counterfeit card at a non-hybrid terminal, or a fraudulent transaction occurred at a hybrid terminal but DE 55 was not present in the Authorization Request/0100 or Financial Transaction Request/0200 message[.]

- The validly-issued card was an EMV chip card.

76.     Despite the references to an acquirer in MasterCard's Reason Codes 70 and 4870, MasterCard acknowledges that the Liability Shift shifted liability from issuers to merchants.  As MasterCard explains: "October 1, 2015 is the Fraud Liability Shift date for cards and POS devices; this date is aligned across all of the major payment brands.  After October 1, 2015, the party that does not support EMV – which can be either the issuer or the merchant – assumes liability for counterfeit card transactions."

**Visa's Liability Shift Rules:**

77.     Under Visa's Core Rules and Visa Product and Service Rules, Reason Code 62 sets forth the conditions for a chargeback.  For card-present transactions where the EMV chip cardholder denies authorizing the transaction, Visa authorizes a chargeback pursuant to the Liability Shift if the transaction did not take place at a Chip-Reading Device (terminal entry capability code was not 5).  The Chargeback Conditions for Reason Code 62 read:

**11.1.14.1  Chargeback Conditions - Reason Code 62**

Table 11-33: Chargeback Conditions - Reason Code 62

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA     - 23 -

| Condition | Chargeback Conditions - Reason Code 62 | Country/ Region |
|---|---|---|
| 2 | The Transaction qualifies for the EMV liability shift, as specified in Section 1.11.1.3, "EMV Liability Shift Participation," and all of the following:<br>• The Transaction was completed with a Counterfeit Card in a Card-Present Environment.<br>• The Cardholder denies authorizing or participating in the Transaction.<br>• The Card is a Chip Card (first digit of the Service Code is 2 or 6).<br>• Either:<br>  - The Transaction did not take place at a Chip-Reading Device (terminal entry capability code was not 5).<br>  - For a Transaction that does not involve a Member in the Visa Europe Territory, the Transaction was Chip-initiated and, if the Transaction was authorized Online, the Acquirer did not transmit the Full-Chip Data to Visa in the Authorization Request. | All |

78.    Despite the references to an acquirer in Visa's Reason Code 62, as Visa states: "On October 1, 2015, in-store counterfeit fraud liability will shift to the party – either the issuing financial institution or the merchant – that has not adopted chip technology. . . .  If the purchase is a counterfeit transaction, the merchant generally holds liability, because the issuer has made the investment in chip technology to make transactions more secure while the merchant did not invest in upgrading to chip."    Additionally, Visa recognizes in other publicly available information that it is merchants who are liable for chargebacks, stating: "Chargeback[s] can be costly for merchants – you could lose both the dollar amount of the transaction as well as the related merchandise, and may also incur internal handling costs."    Visa's "Chargeback Management Guidelines for Visa Merchants" contains "detailed information on the reason codes for the most common types of chargebacks that merchants receive."[7]

---

[7]    "Chargeback Management Guidelines for Visa Merchants," Visa, https://usa.visa. com/dam/ VCOM/download/merchants/chargeback-management-guidelines-for-visa-merchants.pdf    (last visited July 15, 2016).

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA          - 24 -

**Discover's Liability Shift Rules:**

79.     Discover added Reason Code UA05, applicable to card present chip-card transactions where a merchant's POS device did not support EMV technology, to implement the EMV chip card Liability Shift.   As set forth in Discover's October 16, 2015 Dispute Rules Manual:

**5.6.3 UA05 - Fraud - Chip Card Counterfeit Transaction**

The UA05 Reason Code is valid for a Chargeback Request on a Card Sale or Cash Advance involving a Card Account on which a Contact Chip Payment Device was issued and the Issuer or Cardholder alleges that a Counterfeit Card was used to conduct a Card Sale or Cash Advance[.]

**UA05 Reason Code Eligibility Rules**

The UA05 is an immediate Chargeback: support documentation is not required. A Ticket Retrieval Request is not required for Reason Code UA05, but the Issuer may initiate a Ticket Retrieval Request first, then convert it to a Reason Code UA05 Chargeback.

The Issuer must comply with the applicable provisions of the Operating Regulations in regard to fraud.

Each of the following is an example of when the UA05 Reason Code may be assigned to a Dispute:

- The Card Transaction in the U.S., Canada, or Mexico was completed with a Counterfeit Card

- The Card Transaction was a Card Present Card Transaction

- The Cardholder did not approve or participate in the Card Transaction

- A Contact Chip Payment Device was issued on the Card Account but not used to conduct the Card Transaction

The UA05 Reason Code is not valid if any of the following conditions are present:

- The POS Device was enabled to support Chip Card Transactions with EMV technology in accordance with the Program Documents

- Magnetic stripe data was transmitted for the Card Transaction in accordance with the Program Documents and the Card Transaction was identified as Fallback in the Authorization Request

- The Card Transaction was key entered

- The Card Transaction was a Card Not Present Card Sale

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA          - 25 -

| | | |
|---|---|---|
| 1 | • | Track Data in the Authorization Request indicated that the Card Sale was not conducted with a Contact Chip Payment Device as required by the Technical Specifications |
| 2 | | |
| 3 | • | The Card Transaction was a Cash Advance at an ATM |

**Acquirer or Merchant Response Rules**

Acquirers or Merchants may respond to a UA05 Chargeback Request within the applicable timeframes set forth in Section 2.1. Each of the following is an example of compelling evidence an Acquirer or Merchant may submit to Discover in support of a response to a UA05 Dispute Notice:

- • The Merchant's POS Device was enabled to support Chip Card Transactions using EMV technology

- • The Merchant's POS Device completed the Card Transaction using magnetic stripe data and the Card Transaction was identified as Fallback in the Authorization Request

- • The Card Transaction was key entered

- • The Card Transaction was a Card Not Present Card Sale

- • Track Data in the Authorization Request indicated that the Card Sale was not conducted with a Contact Chip Payment Device as required by the Technical Specifications

- • The Card Transaction was a Cash Advance at an ATM

80.    Again, as with the other Networks, Discover required **all** acquirers to be EMV compliant by 2013. Only the merchant could have the less secure system.

**American Express's Liability Shift Rules:**

81.    In its October 2015 Merchant Regulations – U.S., American Express added Reason Codes "EMV counterfeit (F30)" and "EMV Lost / Stolen / Non Received (F31)" to implement the EMV chip card liability shift. These reason codes were not part of American Express's October 2014 Merchant Regulations – U.S. The Reason Codes state:

**11.4.3  Fraud**

| | EMV Counterfeit (F30) |
|---|---|
| Description | The Cardmember denies participation in the Charge and a counterfeit Chip Card was used at a POS System where the Transaction was not processed as a Chip Transaction because either the POS System was not an Enabled Chip and PIN POS System or the Transaction was manually keyed. **Note:** Not applicable to contactless Transactions and Digital Wallet Payments. |

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA    - 26 -

\*      \*      \*

| | EMV Lost / Stolen / Non Received (F31) |
|---|---|
| Description | The Cardmember denies participation in the Charge and Chip Card with PIN capabilities was lost/stolen/non-received and was used at a POS System where the Transaction was not processed as a Chip Card Transaction with PIN validation because either the POS System is not an Enabled Chip and PIN POS System, or, the Transaction was manually keyed. **Note:** Not applicable to contactless Transactions and Digital Wallet Payments, the Charges that qualify under the No Signature/No PIN Program.  (See section 4.18, "no signature/no pin program"). |

**Defendants' Control Over the
Certification Process Enriched
Themselves While Damaging Merchants**

82.     Purchasing new POS card reading terminals and training staff was not enough for merchants to escape the Liability Shift.  In addition, equipment would have to "certified" in a murky, nebulous process that was outside of merchants' control.

83.     In fact, the "certification" process is controlled by the very entities that benefit from the Liability Shift and is yet another means through which Defendants' illegal conduct has been able to flourish.

84.     The Networks and the Issuing Banks that control them have drawn a perfect circle:  The Networks mandated the switch to EMV cards and control when – if ever – a merchant's system will be "certified" to accept them, while the Networks' and/or member issuing banks profit by millions of dollars each month certification is delayed.  Indeed, there is no incentive at all for the Network's issuing banks or the acquirers to certify these systems.  Because once a merchant's system is certified, the issuing bank will once again have to start absorbing the costs of the fraudulent transactions – *although, notably, with those costs still defrayed by the interchange and merchant discount fees that merchants have never been relieved from paying*.

85.     According to a report by the International Retail User Group:  "Certifications are mandatory and unique to each phase of the EMV payment system."   Each step of the certification process involves numerous entities.  "Brand certification involves the card brands

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA      - 27 -

1    and EMVCo"; "PIN pad certification involves PIN pad manufacturers, EMVCo and Acquirers";

2    "Acquirer certification involves PIN pads and Brands"; and "Retail certification involves PIN

3    pad, Middleware, Store Systems, Acquirer and Brands."  Within each of these steps, there are

4    multiple certifications within each basic process, the report notes.  And none of it is within the

5    Class members' control.

6    86.    A House of Representatives' Small Business Committee Staff Report pointed out

7    that "[t]here also is a concern that small businesses that have the new hardware installed may be

8    slow to receive certification."  This concern is borne out by Class members' experience.

9    87.    As a result, Class members such as the Plaintiffs here, could not timely comply

10   with the standard, no matter what they did, because the Defendants and their co-conspirators did

11   not "certify" the new equipment by the deadline – or, indeed, even now.

12   88.    As retailer groups have noted:  "'They installed their equipment by October but

13   are waiting for the card industry to certify their systems.'"   National Retail Federation's

14   spokesman Craig Shearman said:    "'It is unbelievable that Visa and MasterCard would

15   knowingly introduce a flawed product and come back six months later for a fix for it," referring

16   to EMV's initial roll-out.  "'We think they should fix this.'"[8]

17   89.    The National Retail Federation and Forrester Research recently surveyed 56 large

18   and medium size businesses and found that more than half have installed chip card-related

19   equipment but are still waiting for certification.  Of that group, 60% say they have been waiting

20   for more than six months.

21   90.    Worse, the Networks, the Issuing Banks and EMVCo knew from the outset – and

22   the Class members are now learning – that the "certification" process would take years *after* the

23   October 2015 Liability Shift was imposed.  It is widely accepted within the electronic payments

_____

[8]    Eric Guldenstern, "How Card Companies Hope to Get More Merchants on the EMV Train,"
*Credit Union Journal* (June 9, 2016).

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA        - 28 -

1   industry that Defendants knew that the conditions they had set for the Class members were

2   impossible.  Just some examples:

3          (a)     In the first place, Defendants had the example of *every other country that*

4   *has adopted the EMV chip*:  "No country has [ever] achieved anywhere near 100 percent EMV

5   readiness at the time of the liability shift," according to Erik Vlugt, vice president of global

6   product management at VeriFone, a company which actually makes chip-reading equipment and

7   software.

8          (b)     The Strawhecker Group, an electronic payments services provider

9   estimated as early as March 2015 that 34% of U.S. merchants could be ready for the Liability

10  Shift deadline.   And as the deadline drew nearer, the company lowered its estimates.   In

11  September 2015, on the eve of the Liability Shift, the company estimated that only 27% of

12  merchants could be ready.  In February 2016, the Group reported that still only a mere 37% of

13  U.S. merchants were ready to process chip-embedded credit and debit cards.

14         (c)     Gilles Ubaghs, senior analyst of financial services technology at Ovum, an

15  independent analyst and consultancy firm headquartered in London that specialize in global

16  coverage of IT and the telecommunications industries, stated that "[m]any merchants and

17  retailers are totally unprepared for the liability shift to EMV on October 1," and that banks and

18  payment providers had not done enough to educate merchants.

19         (d)     A top industry consultant, Allen Weinberg of Glenbrook Partners – a

20  "payments industry strategy consulting and research firm" *whose clients include card payment*

21  *networks* – warned that "[t]hese POS change projects usually span years, not months.  Many

22  pieces to the EMV puzzle, particularly regarding debit, were not in place in time for the liability

23  shift deadline."   In addition, he said, "[m]any, many, many integrated POS systems (IPOS),

24  especially the electronic cash register software for these systems, were just not ready in time.

25  Even if the software was ahead of the game, they faced long certification queues at many

26  acquirers."

27

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA      - 29 -

1          (e)     Defendants also knew that even providing the software to support EMV

2    cards was a challenge, according to Terry Crowley, CEO of TranSend, a company that

3    manufactures the software to make merchants' equipment work with EMV chip cards.  Crowley

4    said that while software code for card-accepting devices was historically simple enough to be

5    written on the back of a business card, "'now with EMV, that same software wraps around the

6    walls of a room three times . . . hundreds of thousands of lines of code.'"  With the Liability Shift

7    deadline having passed, Crowley says, suddenly there is a "fire drill" to replace all of this simple

8    software, compounded by the facts that the EMV code is hard to write, harder to certify and that

9    few EMV software developers understand the U.S. market.

10         (f)     In September 2015, *Digital Transactions*, a publication devoted to

11   tracking the industry, stated that "few are surprised that EMV certifications are taking longer

12   than traditional POS terminals."

13         91.    Years before the Liability Shift went into effect, many complained about the

14   certification process.  "For the past two years, acquirers and processors have taken aim at the

15   lengthy EMV chip-card certification process as a major stumbling block for U.S. merchants

16   preparing to upgrade from magnetic stripe technology in time to avoid a shift in fraud liability."[9]

17

18         92.    Defendants knew merchants would not be ready in time for the Liability Shift and

19   that merchants would be hit with massive chargebacks.  Reporting on a conference in May 2015,

20   a report noted that "[w]hen the EMV liability shift date for fraud takes effect in October,

21   merchants that are not EMV-compliant can expect to immediately get pounded with card-fraud

22   expenses that card issuers, up to now, have been absorbing, warns Krista Tedder, vice president

23   of risk, fraud and identity verification at MasterCard."

24

25

26   _____
     [9]   David Heun, "Elavon Attacks an EMV Roadblock by Speeding Certification,"
27   PaymentsSource.com (Mar. 11, 2015), http://www.paymentssource.com/news/regulation-
     compliance/elavon-attacks-an-emv-roadblock-by-speeding-certification-3020797-1.html   (last
28   visited July 15, 2016).

93.     The cost of the transition to EMV chip cards in the United States is expected to be between $6 billion and $8 billion.  Of that amount, 75% is likely to be paid by merchants, making the transition three times as expensive for them as for Defendants.

94.     The result has been massively increased costs for chargebacks being laid at the feet of the Class members, while the Issuing Banks have been spared those same costs and the Networks have continued to profit – just as Defendants knew would happen.

95.     Peter Larkin, president and CEO of the Arlington, Virginia-based National Grocers Association, spoke out on behalf of his members on the slow pace of EMV implementation.  The vast majority of members – from single-store operators to regional chains – invested tens of thousands of dollars in new hardware and software well before the October 1 deadline, "'only to be left waiting on a massive backlog in the certification process, which is controlled by the card networks.'"  Larkin wrote that the "'certification process, which is mandated by the card networks, has experienced a number of delays that range from the card networks' late delivery of technical code to other complications slowing the certification process.'"  These delays were not the fault of merchants, "'yet it's the merchant who is facing an onslaught in new chargebacks as well as confusion among consumers who don't understand why they can't use their chip cards at their local supermarket.'"  "'It's time for the card networks and banks to stop passing the buck onto the backs of merchants, but rather they should work together with merchants to further eliminate fraud by issuing credit cards with PINs and work to speed up the EMV certification process,'" Larkin wrote.[10]

96.     Some analysts have noted that the Liability Shift was done in an effort to "offload billions of dollars in annual fraud costs."  The beauty of the plan was that it could be sold as voluntary, secure and customer-friendly, according to Daryl Cornell, CEO of Triton, in an article published June 1, 2016 in ATM Marketplace.  Cornell notes that since the Liability Shift, chargebacks have skyrocketed.  "Six months after the POS liability shift, merchants are feeling

---

[10]   "Holdup at Checkout," *Progressive Grocer*, Vol. 95, Issue 6 (June 2016), http://magazine. progressivegrocer.com/i/689994-jun-2016/177 (last visited July 14, 2016).

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA      - 31

the pain.  According to the Merchant Advisory Group, chargebacks are already running up to $10,000 weekly for smaller merchants and up to $1 million weekly for larger ones." Importantly, "chargeback losses have been magnified by the issuers' decision to retain the magnetic stripe, which facilitates card fraud."  Other sources report that "chargebacks for card-present transactions increased 50% following the liability shift."[11]

**The Liability Shift Was
Historically Unprecedented**

97.    The shift in the liability for chargebacks from issuers to merchants was a historically unprecedented change in the United States, implemented by competitors for no other discernible reason.  This change in the way that chargebacks would be handled was seismic.

- With the Liability Shift, "*[f]or the first time*, merchants that process card-present transactions at point of sale (POS) locations can be liable for losses that are currently borne by card issuers."[12]

- "The liability shift mark[s] the *first time merchants* potentially could be stuck paying chargebacks, a process that banks previously handled."  David Heun, Associate Editor at Payments Source.[13]

- Following the Liability Shift merchants are "for the *first time* facing sizable costs for counterfeit transactions."[14]

- "For the *first time*, issuers will start to recover their counterfeit losses that have been used with the magnetic stripe cards."[15]

---

[11]    Xavier Giandominici, "It Is Possible for Merchants to Accelerate Chip Card Acceptance," PaymentsSource.com (June 16, 2016), http://www.paymentssource.com/news/paythink/it-is-possible-for-merchants-to-accelerate-chip-card-acceptance-3024403-1.html (last visited July 14, 2016).

[12]    PricewaterhouseCoopers, "Are you prepared for the EMV liability shift in October 2015?" (May 2015).

[13]    Stephanie Cho, "Not EMV-Compliant yet? Brace yourself for chargebacks," Fraud Prevention Blog (Dec. 14, 2015), http://blog.fraudfighter.com/not-emv-compliant-yet-brace-yourself-for-chargebacks (last visited July 14, 2016).

[14]    Rob Sidel, "More Chip-Card Headaches, This Time for Merchants," *The Wall Street Journal* (May 7, 2016), http://www.wsj.com/articles/more-chip-card-headaches-this-time-for-merchants-1462613582 (last visited July 14, 2016).

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA    - 32

- "The *liability shift marked the first time* merchants potentially could be stuck paying chargebacks, a process that banks previously handled."[16]

- "Back in 2011, Visa, MasterCard, Discover, American Express and their banking partners agreed on a October 1, 2015, 'liability shift' *that, for the first time, would make merchants liable for any fraudulent charges* that result from using point-of-service readers that can't read chip-enabled cards."[17]

- "A *change* that is putting new credit cards in many Americans' wallets will also *shift billions of dollars of card-fraud liability to retailers* from big banks.[18]

- "Merchants are scrambling to deal Thursday *with the end of a longtime policy* in which financial institutions absorbed the cost of certain fraudulent credit-and-debit card transactions. . . .  Behind the scenes, though, the risks of card fraud are shifting.  Under timetables announced by card networks Visa Inc. and MasterCard Inc., most card issuers starting Thursday are expected to immediately start passing certain fraudulent transaction costs onto retailers that don't have the capability to process the chip-based cards, industry executives said."[19]

98.    Again, this historic shift offered the merchants no break in the fraud fees they were paying to cover these charges that now they were also to bear.  Thus, the Liability Shift is a triple whammy for merchants that have to continue to pay the fraud fees, lose the merchandise sold and suffer the chargeback, sometimes with an added chargeback fee.

---

[15]   "Will EMV Chip cards change the Global Market - CHIP DAY will be on October 1st, 2015 - Will anyone notice?" CHIPandPINUSA.com, http://www.chipandpinusa.com/liability-shift-merchant.html (last visited July 14, 2016).

[16]   David Heun, "Black Friday Was a Crash Course in EMV," PaymentsSource.com (Dec. 1, 2015), http://www.paymentssource.com/news/risk-analytics/black-friday-was-a-crash-course-in-emv-3022909-1.html (last visited July 14, 2016).

[17]   "Everything You Need to Know About EMV Cards," TheStreet.com (Oct. 1, 2015), https://www.thestreet.com/story/13309210/1/everything-you-need-to-know-about-emv-cards.html (last visited July 14, 2016).

[18]   Robin Sidel, "Cost of Credit-Card Fraud Is Set to Shift," *The Wall Street Journal* (Sept. 29, 2015), http://www.wsj.com/articles/card-liability-is-set-to-shift-1443567562 (last visited July 14, 2016).

[19]   *Id.*

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA       - 33

**The Defendants' Imposition of the
Liability Shift in the United States
Differed in Key Ways from the
Imposition Elsewhere – All of
Which Profited Defendants**

99.    Financial institutions in Europe, Latin America, Asia/Pacific and Canada migrated to EMV over the past decade.  Those transitions took years to accomplish and ran into substantial roadblocks along the way.  For example, the roll out in Canada began in 2008, and as of 2014, the adoption rate was only at 59.5%, according to statistics provided by EMVCo itself.

100.    But when similar moves to EMV cards (and a concomitant Liability Shift imposition) were made in other parts of the world, there were key differences between how the change was made elsewhere and how it occurred in the U.S. market.  *First*, unlike the uniform October 2015 shift date here, in other parts of the world, the EMV Liability Shift implementation was staggered.

| Region | VISA LS Effective Date | MasterCard LS Effective Date | America Express LS Effective Date | Discover LS Effective Date |
|---|---|---|---|---|
| Asia/Pacific region | 1/1/2006 (Domestic and Intraregional POS and ATM (except Domestic in China and Japan))<br><br>10/1/2010 (Interregional POS) | 1/1/2006 (Intraregional and Domestic)<br><br>4/19/2013 (Interregional ATM except Australia and New Zealand) | No Known Liability Shift Date ("NKLSD") | NKLSD |
| Australia | 10/2010 (POS)<br><br>4/1/2013 (ATM)<br><br>10/1/2013 (ATM) | 4/2012 (POS)<br><br>4/13/2012 (ATM)<br><br>12/31/2015 (Interregional ATM) | NKLSD | NKLSD |
| Bangladesh | unknown | 10/16/2015 (ATM) | NKLSD | NKLSD |
| Bhutan | unknown | 10/16/2015 (ATM) | NKLSD | NKLSD |

| Region | VISA LS Effective Date | MasterCard LS Effective Date | America Express LS Effective Date | Discover LS Effective Date |
|---|---|---|---|---|
| Canada | 3/31/ 2011 (originally set for 10/1/2010) | 3/31/2011 (originally set for 10/15/2010) (Intraregional and Domestic)<br><br>12/31/2015 (Maestro Interregional POS) | 10/31/2012 | 10/1/2015 |
| European region (all countries in region) | 1/1/2006 (POS)<br><br>7/1/2008 (ATM) | 1/1/2005 (Intraregional and domestic) | NKLSD | NKLSD |
| India | unknown | 10/20/2017 (ATM) | NKLSD | NKLSD |
| Latin America and the Caribbean region | 10/1/2012 (POS (all countries except for Brazil and Mexico))<br><br>10/1/2014 (ATM (all countries except for Brazil and Mexico)) | 1/1/2005 (Intraregional and domestic)<br><br>10/12/2012 (Interregional POS (all countries except Brazil, Columbia, Mexico, Venezuela) and ATM (all countries except Mexico)) | NKLSD | NKLSD |
| Argentina | unknown | 10/16/2015 | NKLSD | NKLSD |
| Brazil | 4/1/2011 (POS)<br><br>10/1/2012 (ATM) | 3/1/2008 (Domestic) 4/15/2011 (Interregional POS) 10/12/2012 (Interregional ATM)<br><br>8/1/2015 (Domestic) | NKLSD | NKLSD |
| Colombia | unknown | 10/1/2008 (Domestic and Intraregional)<br><br>4/15/2011 (Interregional | NKLSD | NKLSD |

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA    - 35

| Region | VISA LS Effective Date | MasterCard LS Effective Date | America Express LS Effective Date | Discover LS Effective Date |
|---|---|---|---|---|
| | | POS)<br><br>10/12/2012 (Interregional) | | |
| Uruguay | unknown | 10/16/2015 | NKLSD | NKLSD |
| Venezuela | unknown | 7/1/2009 (Intraregional and Domestic)<br><br>4/15/2011 (Interregional POS)<br><br>10/12/2012 (Interregional ATM) | NKLSD | NKLSD |
| All other Latin America and the Caribbean region countries except Argentina and Uruguay | unknown | 10/17/2014 | NKLSD | NKLSD |
| Maldives | unknown | 10/16/2015 | NKLSD | NKLSD |
| Mexico | 4/1/2011<br><br>10/1/2012 (Intraregional and Interregional ATM) | 10/2008 (POS)<br>8/1/2011 (Interregional POS)<br><br>9/1/2014 (Interregional ATM) | NKLSD | 10/1/2015 |
| Middle East/Africa region | 1/1/2006 (POS)<br><br>7/1/2008 (ATM) | 1/1/2006 (Intraregional and Domestic) | NKLSD | NKLSD |
| Nepal | unknown | 10/20/2017 | NKLSD | NKLSD |
| New Zealand | 4/13/2013 (ATM) | 4/13/2012 (ATM)<br><br>12/31/2015 (Interregional ATM) | NKLSD | NKLSD |
| Sri Lanka | unknown | 10/16/2015 | NKLSD | NKLSD |
| South Africa | 1/1/2006 (POS) | 1/1/2005 (Intraregional | NKLSD | NKLSD |

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA     - 36 -

| Region | VISA LS Effective Date | MasterCard LS Effective Date | America Express LS Effective Date | Discover LS Effective Date |
|---|---|---|---|---|
| | 7/1/2008 (ATM) | and Domestic) | | |
| United Kingdom | 1/2005 | 1/2005 | 2009 | N/A |

101.    These differing implementation dates demonstrate that Defendants' explanations regarding the purported need to have a single date for implementation are pretext.  Defendants claimed to the Court previously that if each of the networks had picked different dates, "a merchant would be in a state of confusion."  Apr. 21, 2016 Hrg. Tr. at 13:22-24.[20]

102.    It cannot be that merchants in the United States are less sophisticated than those in Canada or Mexico.  Rather, the single date, imposed at the beginning of retailers' busiest quarter, demonstrates concerted action on the part of Defendants.

**American Express Withdrew
Its Criticism of EMV After
Joining EMVCo**

103.    Prior to acquiring a 25% ownership stake in EMV in 2009, American Express developed its own chip technology and acted independently from Visa and MasterCard.  In fact, American Express was the first credit card company to issue a chip card in the United States with the launch of the Blue card in 1999 without using the EMV technology.  By 2003, American Express issued the Blue card in nine countries.  Indeed, not bound by EMV migration deadlines imposed by Visa and MasterCard, American Express made its own independent decision on a country-by-country basis on the implementation of EMV standards in its card issuances.  There was no Liability Shift implemented by American Express during this early time period.

104.    For the United States, in particular, American Express found the EMV infrastructure cumbersome and saw no positive business case for the company or the industry to implement EMV standards.  American Express's vice president and general manager of advanced payment enterprise development emphatically stated in an interview:

---

[20]    However, everywhere else Liability Shifts were implemented on different dates with concern for "confusion."   Evidence that Defendants have given pretextual explanations for their concerted actions may be viewed as a plus factor.

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA      - 37

The challenge of EMV is you've got to put in a smart card reader, and then you've got to rework all your pipes back to support EMV. I think it's the pipes back that are the drag on EMV. . . .

So, I think we should learn from the EMV experience. . . . I think we'll get better traction faster if we leverage the existing POS infrastructure and don't require merchants and acquirers to redo their whole system. With ExpressPay, we're telling merchants if you agree to participate, I can walk into your store right now with a little mechanical adapter, put down one of our readers, attach it to the POS, and that's it, I'm done.

105. American Express employed similar effortless chip technology in its Blue card. During 2001, in Australia, where EMV-compliant terminals were virtually non-existent at the time, American Express provided chip readers to large retail chains to attach to the POS terminals to facilitate chip-enabled transactions. By 2003, American Express launched the Blue card in nine countries outside of the United States and selectively implemented EMV-compliant chips on the cards issued in Europe.

106. Despite its use of EMV compliant chips in selected countries, American Express remained resistant to widespread EMV migration and liability shift. During the Terrapinn Cards and Payments Australasia Conference in 2007, American Express announced that EMV migration must be mandated by regulators – similar to the European Commission's EMV adoption requirement in the Single European Payments Area within the European Union – or led by acquirers. It further asserted that "[w]e currently do not seek to influence the decision to move to EMV by announcing FLS [Fraud Liability Shift] policy during the early stages of a country's migration."

107. As such, American Express implemented its liability shift policies internationally – if at all – on its own independent schedule and means. In Canada, when Visa and MasterCard imposed a liability shift with initial implementation dates of October 1, 2010 and October 15, 2010, respectively, American Express refrained from announcing any mandate, but simply opted to support merchants, issuers and acquirers in their migration plans for two years before initiating its own policy.

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA      - 38

1

**Additional Liability Shift**
**Differences Around the World**

2

3    108.    When it came to implementation of the Liability Shift in the United States

4    however, most merchants in the United States were not consulted about the change, were not

5    permitted to opt out, were not offered any reduction of the interchange fee, the merchant

6    discount fee, or the swipe fee – or any other cost of accepting Defendants' credit and charge

7    cards.  This stands in sharp contrast to the United Kingdom and Australian markets.  There,

8    merchants were given interchange concessions that helped spread the costs of fraud and

9    purchasing and deploying new hardware and software.

10    109.    In the United Kingdom, acquiring banks owned (and rented to merchants) the

11    majority of POS terminals.  As such, acquiring banks paid the up-front costs of upgrading

12    terminals and increased the rental prices of terminals.

13    110.    In May 2007, the Australian Payment Clearing Association – consisting of the

14    Reserve Bank, banks, credit unions, building societies, and payment organizations in payment

15    clearing systems – initiated the Chip for Australia Implementation Forum and agreed to a gradual

16    roll out over a number of years.  Terminal upgrade costs in Australia were shared between

17    acquirers and merchants.  The card networks in Australia also offered a lower interchange rate

18    for a period of time to subsidize the costs merchants had committed to upgrade their terminals by

19    January 2009.  Due to concerns about merchant and consumer readiness, the card networks then

20    postponed the Liability Shift to 2014.

21    111.    In Canada, Visa responded to merchant requests for postponing the effective date

22    of the Liability Shift from October 1, 2010, "typically the busiest shopping period of the year,"

23    to March 31, 2011:

24
> ***Visa Canada and its Canadian card-issuing financial institutions, in
> response to requests from the merchant community, have assisted merchants by
> postponing the domestic chip liability shift's effective date to March 31, 2011.***
> This date signifies when Canadian merchants become liable for domestic card-
> present fraudulent transactions that may have been avoided by adopting Chip
> technology.  ***Liability involving chip cards used at non-chip devices was
> originally slated to shift on October 1, 2010, but issuers will continue to absorb
> the liability for domestic transactions until March 31, 2011***.

25

26

27

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA       - 39 -

112.   On September 24, 2010, MasterCard extended the timeline for the Liability Shift in Canada from October 15, 2010 to March 31, 2011:

> **Canadian merchants have six additional months to upgrade point-of-sale technology**
>
> TORONTO, September 24, 2010 – In response to Canadian market dynamics, MasterCard Canada today announced a six-month extension for Canadian merchants to migrate to chip-and-PIN point-of-sale technology.
>
> The original timeline of October 15, 2010 is now extended to March 31, 2011, at which time MasterCard® accepting merchants who have not upgraded to chip-enabled point-of-sale terminals will be liable for fraudulent transactions effected at their points-of-sale.
>
> "*While many merchants have already made the investment in migrating to chip, MasterCard heard through on-going dialogue that some merchants need more time to upgrade their point-of-sale terminals to accept chip-enabled cards*," says Oliver Manahan, Vice President, Advanced Payments, MasterCard Canada.  "*In response, MasterCard is extending the timeline to give them more time to make the necessary infrastructure upgrades*."

113.   In the United States, by imposing a deadline they knew merchants could not meet, Defendants knew they were guaranteeing that billions of dollars in chargebacks, which before the Liability Shift would have been borne by the Issuing Banks, would, for an indeterminate but certainly lengthy amount of time, be shifted onto the merchants.  The net result: billions of dollars that stayed on the Issuing Banks' bottom lines.

**The Networks Implement Gas Station
Readiness Rules – Another Aspect of
Their Anti-competitive Agreement –
at the Same Time in the Same Way**

114.   In addition to the agreement regarding the Liability Shift, the Networks also all agreed to impose the same deadline related to imposition of the Liability Shift on gas stations – yet another collusive agreement between Defendants.

115.   As American Express explains it:  "U.S. fuel merchants will have an additional two years, until October 2017, before the FLS [Fraud Liability Shift] takes effect for transactions generated from automated fuel dispensers."

116.   As Discover announced in its "Fraud Liability Shift Policy," "In alignment with U.S. EMV migration timelines, Discover is introducing Fraud Liability Shift . . . Oct. 1, 2017 at automated fuel dispensers."

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA     - 40 -

117.   Visa's announcement regarding fuel sellers was the same.   "Fuel-selling merchants will have an additional two years, until October 1, 2017 before a liability shift takes effect for transactions generated from automated fuel dispensers."

118.   And MasterCard announced the same October 2017 deadline for fuel sellers. "Gasoline retailers have been granted a two year extension given their regulatory environment, and the relatively high cost of replacing or retrofitting the automatic fuel dispenser environment."

**Defendants Uniformly Refused to**
**Extend the Liability Shift Deadline**

119.   Despite these obstacles, Defendants insisted that the October 2015 Liability Shift occur, with no grace period.

120.   At a May 2015 Fraud Summit, Krista Tedder of MasterCard made clear to attendees that "the card brands are not going to delay the liability shift date."   MasterCard's representative was able to speak for the other card brands months before the shift went into effect because these competitors had agreed years earlier that no delays or grace periods would be allowed.[21]   This is contrary to the experience in other countries – such as Canada – where grace periods were implemented and the shift date was pushed to ensure higher compliance rates.

**Defendants Collective Agreement to**
**Implement Chip-and-Signature Instead**
**of the More Secure Chip-and-PIN**
**Provides Further Support of a**
**Collusive Agreement**

121.   Additionally, unlike the imposition of the Liability Shift in other countries, in the United States, Defendants agreed to the less secure chip-and-signature form of verification, as opposed to the more secure chip-and-PIN, widely used throughout the world.   They did so because chip-and-signature transactions carry a higher interchange fee, which results in significantly more revenue to the payment card networks (particularly Visa and MasterCard).

---

[21]   "October Fraud Surprise for Retailers?," The Fraud Blog with Tracy Kitten, Bank Info Security, ISMG Network (May 21, 2015), http://www.bankinfosecurity.com/blogs/october-fraud-surprise-for-retailers-p-1861 (last visited July 15, 2016).

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA        - 41

122.    Card issuers benefited from the imposition of the Liability Shift at a time when merchants were entering into their busiest time of year and at a time when it was well known that the certification process was a complete failure.  This resulted in higher levels of chargebacks and chargeback fees and the Networks benefitted with the imposition of chip-and-signature as instead of chip-and-PIN.  Thus, each participant in the conspiracy maximized its economic benefit, all at the expense of merchants, who have little choice but to accept Defendants' cards.

123.    The universal decision by Visa, MasterCard, American Express and Discover, announced as part of the Liability Shift, that each network would adopt chip-and-signature rather than the more secure chip-and-PIN verification is indicative of their anticompetitive collusion. Defendants agreed to this less secure system because implementation of chip-and-signature results in transactions being routed through more costly networks, controlled by Defendants.

124.    Regulators, numerous studies and even Visa and MasterCard agree that chip-and-PIN verification provides far greater security than signature authentication.

125.    For example, in the United Kingdom, a public-private partnership (heavily supported by the U.K. government, Visa and MasterCard) promoted PIN verification with the slogan "I ♥ PIN."  By 2006, 99.8% of chip transactions in the United Kingdom were PIN-verified.

126.    A working paper prepared by a Federal Reserve Bank of Atlanta payments specialist concluded: "EMV chip-and-PIN has been highly successful [in] reducing domestic fraud in the UK."  Visa itself credited the mandatory PIN with the significant decline in U.K. fraud: "The decline in Lost/Stolen and NRI [Not Received as Issued] fraud in the United Kingdom . . . is considered by Visa to be substantially, if not entirely, attributable to mandatory PIN@POS."

127.    The Visa Europe website for a time promoted the superiority of PIN verification on chip cards – it listed "Benefits of chip" such as "Increases customer confidence" ("Chip cards are harder to counterfeit and PINs help prevent fraud involving lost and stolen cards, which makes for more secure payment"), "Faster payment" ("Chip technology, especially when combined with PIN, helps to speed up service, cut queues, and reduce lost sales"), and "Fewer

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA      - 42

1   disputes" ("Chip, especially when used with PIN, helps reduce fraudulent and disputed

2   payments, saving you time and money on the administration around such payments").

3       128.   Canada similarly moved to a chip-and-PIN standard.  Visa Canada announced its

4   commitment to chip-and-PIN in June 2003 and shifted liability for certain fraudulent transactions

5   in March 2011.

6       129.   Visa Canada's website touted the "Benefits of Chip & PIN," saying chip-and-PIN

7   brought "a new level of cardholder security and convenience."  Visa Canada explained:

8   "Because your Personal Identification Number (PIN) replaces your signature, the transaction is

9   more secure."  The chip-and-PIN combination also brings "[i]ncreased security against

10  counterfeiting and skimming," because "[a] lost or stolen Chip card cannot be used to complete a

11  transaction without its corresponding PIN.  This technology virtually eliminates the ability to

12  copy the contents of the chip to another card."  Visa Canada argued that another benefit of PIN

13  verification was "[g]reater convenience and ease of use," because "PIN entry replaces the need

14  to sign a receipt."

15      130.   As Visa and MasterCard told the Australian Competition and Consumer

16  Commission in a 2013 joint submission: "Requiring the use of a Personal Identification Number

17  rather than permitting signature as a means of customer authentication for all, or almost all,

18  transactions . . . is a proven method of reducing card fraud."

19      131.   So all the Defendants know to a certainty that chip-and-PIN is far more secure, far

20  more effective at reducing fraud, than is chip-and-signature verification.  But Defendants have

21  stated in this action that the central reason for adopting EMV chip cards and imposing the

22  Liability Shift was to increase security and reduce fraud.[22]  Yet they implemented the less-secure

23  system and imposed draconian means to do so.  Why?  ***Because Defendants profit more when***

24  ***consumers use the less secure chip-and-signature technology***.

25

26  _____

   [22]  Dkt. No. 231-1 at 11 (arguing Defendants sought to "move to superior fraud protection

27  technology"); *see also* Apr. 21, 2016 Hrg. Tr. at 16:7-8 (Defendants argued that MasterCard's
motivation was to reduce fraud by stating, "We're going to do the same thing because we want to

28  get fraud out of this system.")

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA   - 43 -

132.    Now, when customers insert a chip-based debit card into a new terminal, the EMV terminal specifications – established by the Networks through EMVCo, and whose adoption is required in order for merchants to certify compliance with EMV – are designed stealthily to steer customers away from PIN options toward the Network's signature debit products.

133.    The reason for the push to signature as opposed to PIN relates to how transactions are routed across networks.  If a cardholder enters a PIN to verify his or her identify, then the transaction is routed across a PIN debit network, while if the cardholder signs, the transaction is routed across a signature network.   Debit cards typically have the functionality to route transactions across PIN or signature networks.  The network over which a transaction is routed determines the interchange fee charged to merchants.   The interchange fee on signature transactions is markedly higher than the fee on PIN transactions.

134.    Senator Richard Durbin, in a letter to EMVCo, noted that he was "troubled" by EMVCo's refusal to take a position on chip-and-PIN technology.

> This refusal is inexplicable given the well-documented benefits of PIN authentication in reducing lost and-stolen card fraud and given EMVCo's statement in its 2015 "Issuer and Application Security Guidelines" that PIN use "remains an important tool for protecting against lost and stolen fraud."
>
> I am concerned that EMVCo's controlling networks, most of whom have fiercely advocated against PINs because of their financial stake in signature transactions, may be preventing EMVCo from stating a clear position on the benefits of PIN.

**Measures Announced by the
Networks Are Too Little, Too Late**

135.    After the filing of Plaintiffs' complaint, in what is plainly an admission, the Networks announced some changes to the EMV Liability Shift rules.  As with the Liability Shift itself, the announced changes were basically identical.  In mid-June 2016, Visa, acknowledging that there was a problem in the way the Liability Shift was put in place in the United States, announced a change in its policies.  First, it announced that beginning July 22, 2016, merchants will not be responsible for counterfeit fraud chargebacks that are less than $25.  Visa asserts this covers 40% of the Liability Shift chargebacks but it *only* covers 5% of the total chargebacks in

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA        - 44 -

1  dollars.  Additionally the network announced that beginning in October 2016, it will limit to 10
2  the number of counterfeit fraud transactions that issuers can charge back to merchants on a single
3  card account.  These concessions, coming too late for many merchants, are set to expire in April
4  2018. MasterCard, "[f]ollowing a similar move from Visa last week," also announced changes to
5  its certification process.

6      136.    American Express on June 22, 2016 announced the same changes.  Just like Visa,
7  American Express announced that its concessions would last only until April 2018.   These
8  changes to the Liability Shift further demonstrate that imposing a grace period, or making other
9  changes to the system, are well within the ability of the Networks to do at the flip of a switch.

10     137.    James Wester, a payment industry analyst with research group IDC, said the latest
11  moves by the card companies are an "acknowledgement that there have been issues up and down
12  the line with the EMV transition."

13     138.    Again, these minor concessions cover about 40% of the number of fraudulent
14  transactions and account for only 5% of the total value of fraudulent transactions at issue under
15  the Liability Shift.  In other words, merchants are still footing 95% of the bill.

16        **SIGNIFICANT EVIDENCE OF DEFENDANTS' SCHEME EXISTS**

17  **Defendants Worked in Lockstep**
18  **to Implement the Liability Shift**

19     139.    Analysts have described the agreement between the Networks and banks to
20  impose the Liability Shift.  For example, Jason Notte of TheStreet.com wrote: "Back in 2011,
21  Visa, MasterCard, Discover, American Express and their banking partners agreed on a October
22  1, 2015, 'liability shift' that, for the first time, would make merchants liable for any fraudulent
23  charges that result from using point-of-service readers that can't read chip-enabled cards."

24     140.    This is in line with other Defendants' public statements that admit that they
25  worked together to implement the Liability Shift.  For example, in materials from Discover, the
26  network states: "To encourage the timely adoption of EMV, the leading payment networks
27  initiated an EMV Fraud Liability Shift that took effect in October 2015."  The same document
28  makes clear that this was a significant change from prior practice.  "Before October 2015, if a

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA        - 45 -

1   lost, stolen or counterfeit card was used at POS, the issuer bore the responsibility for the

2   fraudulent activity in most cases.  Effective October 2015, these guidelines changed as a result of

3   the EMV Fraud Liability Shift."

4          141.    In fact, Charlie Scharf, the CEO of Visa Inc., told analysts in March 2014 that

5   Defendants worked together to implement the Liability Shift:

6          Historically, the way we would have done something is we would have decided
           what should be done, what was best and we would just say, okay, we are going to
7          put a rule out. And literally people would get like the Visa memorandums saying
           they have decided that you need to move towards EMV by a certain date or else.
8          And the approach that we have taken, and we have done this along with the other
           networks, is to try and get the – not to try – we have gotten the acquirers in a
9          room, the merchants in a room, the issuers in a room, the trade groups in a room
           and we are all trying to work together towards getting much more specific about
10         what we all want to get done by when so that we, the industry, define much more
           broadly than we ever defined it before is actually solving our own problems and
11         making sure that our products are still the best products that exist out there.

12   Maybe a few large merchants who were part of EMVCo and were immediately able to get

13   certified were involved in meetings, but none of the Plaintiffs or the Class involved in this action

14   were invited to that room.

15         142.    In a white paper issued by BAMS prior to the Liability Shift, BAMS noted that

16   "the four major networks in the U.S. (Visa, MasterCard, American Express and Discover) have

17   published rule changes to promote the move to EMV® in the United States."  In the same paper,

18   BAMS admitted that once the Liability Shift went into effect, issuers would have little incentive

19   to monitor accounts for fraud.  And why would they since the costs of such fraud would now be

20   borne by merchants?  "As banks issue EMV cards, the burden of any of these disputes may fall

21   more on merchants.  Whereas merchants had come to rely on the bank's authorization of a

22   transaction, after the EMV liability shift, the bank has a reduced incentive to monitor for

23   potential counterfeit fraud where a chip card is presented to a merchant who is not EMV-

24   enabled."

25         143.    The EMV Migration Forum referred to the Liability Shift decision in a release

26   touting its services:

27         Chip implementation was initiated in the U.S. market in 2011 and 2012 when
           American Express, Discover, MasterCard and Visa announced their roadmaps for
28         supporting a chip-based payments infrastructure.  Acquirer processor readiness

1      mandates to support EMV were established for 2013, with liability shifts for
2      managing fraud risk in a face-to-face environment set for 2015.

3   What this means is that as of 2013 every acquirer that wanted to continue in business had to be

4   ready by 2013.  So the only party with the "less secure" form of EMV technology, the term used

5   by the Networks to shift liability, would be the merchants.

6          144.   As American Express explained to its merchants in an April 2013 EMV FAQ

7   Guide, "American Express has fraud liability shift rules and other chargeback-related policies.

8   These policies will be expanded to the U.S. once the U.S. fraud liability shift policies are

9   implemented."  In the same guide in response to the question: "What are the consequences for

10  U.S. merchants for non-compliance for EMV transactions?"  American Express noted, "Effective

11  October 2015, American Express will institute a Fraud Liability Shift (FLS) policy to transfer

12  liability for certain types of fraudulent transactions away from the party that has the most secure

13  EMV technology.  A merchant could be subjected to increased fraud exposure for failing to

14  adopt EMV technology."

15         145.   As American Express stated:   "After October, responsibility for counterfeit

16  transactions transfers to merchants that have not upgraded to EMV-compliant hardware.  While

17  that date, imposed by the payment networks, has long been viewed as a tipping point for

18  merchant adoption, many retailers still lack general awareness as it approaches."

19         146.   Thus, the evidence – both direct and circumstantial – of Defendants' collusion in

20  this affair is manifold.  This much is public knowledge right now.  What Plaintiffs cannot yet

21  know, but what discovery in this matter will reveal, and what the fact finder here will ultimately

22  have at its disposal, are the precise internal workings of the combination.  The meetings,

23  memoranda, minutes and correspondence Defendants do not share publicly – but which they will

24  have to reveal in discovery – will tell the story in even greater detail.

**Economic Evidence of Defendants'**
25  **Anticompetitive Conduct**

26         147.   At the time the Defendants decided to implement the Liability Shift in the United

27  States, the payment card industry was facing certain unique pressures that had not existed

28  previously.  Specifically, at or around the time that the decision was made to implement the

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA      - 47 -

1   Liability Shift in the United States, for the first time, the Networks – first Visa and MasterCard

2   and later American Express, were being targeted by the U.S. federal government, governments

3   around the world, and by private litigants over certain rules which forbade merchants who

4   accepted payment cards from steering customers from one form of payment to another.  Under

5   these rules, merchants could not suggest to customers that they use cards which carried lower

6   interchange fees (like non-rewards cards), cards from other, cheaper, brands, or cash.

7   148.   Also under scrutiny at this time were rules of the Networks that forbade

8   merchants from adding any surcharge to offset the cost of accepting higher priced cards.  In the

9   Summer of 2011, the government announced a settlement with Visa and MasterCard (of a case

10   filed in October 2010) while at the same time it also announced that it would be headed to trial

11   against American Express to challenge the network's anti-discrimination rules, which prohibited

12   merchants from discouraging customers from using high-cost American Express cards and

13   disallowed merchants from pushing customers to use lower-cost alternatives.  Federal legislation,

14   referred to as the Durbin Amendment, prohibited networks from restricting a merchant's right

15   from discounting cards as a steering mechanism.[23]

16   149.   Against this backdrop of the Networks knowing that merchants would soon be

17   allowed to steer cardholders from one brand to cheaper alternatives, the U.S. Liability Shift was

18   born.  With the anti-steering rules facing imminent threat from government settlements and

19   private lawsuits, the Networks knew merchants would soon be allowed to push cardholder

20   customers from expensive cards to less expensive forms of payment.  If the anti-steering rules

21   were eliminated and one network was to offer an incentive to merchants to accept its brand of

22   cards, as one would expect in a normally functioning competitive marketplace, that network

23   would take market share from the other networks.

24   150.   By the time the Networks had decided to implement EMV technology in the

25   United States, it was clear to them there was a substantial chance that merchants would be

26   allowed to steer cardholders to cheaper forms of payment or cards from networks that had not

27
_____

[23]   *Debit Card Interchange Fees and Routing*, 76 Fed. Reg. 43394 (July 20, 2011) (to be
28   codified at 12 C.F.R. §235).

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA        - 48 -

1    imposed a Liability Shift.  Without agreement among themselves on the timing and manner of

2    implementation of the Liability Shift, the Networks risked competition from each other in the

3    form of competing on the Liability Shift and lower fees to the merchant.  But if the Networks all

4    agreed on the Liability Shift and the manner of implementation, they could capture the

5    chargebacks without competing and maintain their fees at the same or higher levels.  This would

6    be done without fear of one network undercutting another network in the name of competition.

7    In a truly competitive environment, one of these entities would have broken ranks and offered

8    merchants a break in terms of the Liability Shift, the deadline for the Liability Shift, a break in

9    fraud fees or other incentives to that effect.  But not a single concession was granted.  At other

10   places around the world, the shifts for all four Networks were never made at the same time nor

11   were they made in an identical fashion.  It was only in the United States, where the competitive

12   landscape had begun – for the first time – to shift in favor of the merchants, that this lock-step

13   implementation occurred.  The challenges to the anti-steering rules made it clear to the Networks

14   that many, if not most, of their protective rules might well disappear.  As a result, when the

15   Networks announced in 2011 and 2012 their intention to implement the Liability Shift, each

16   network, rather than compete, agreed and conspired illegally to implement the Liability Shift and

17   implement it on the same date.  Without the protection of the above anti-steering rules, the

18   Networks knew merchants would steer away from their network if they alone implemented a

19   Liability Shift.  This is a major plus factor.[24]  None of the Networks chose to compete in an arena

20   of natural competition, *i.e.*, announce a move to chip cards, perhaps provide a reduction in fees

21   as occurred overseas or perhaps announce that their network was not implementing a Liability

22   Shift, at least not until the majority of merchants were ready and certified.

23

24

25

26   _____
     [24]    The basic concept behind this plus factor is that if the Defendants have engaged in conduct –
27   together as they have here – that would further the interests of the conspiracy, but would be
     against each defendant's interest if acting separately, *i.e.* because if the merchants ability to steer,
28   the concerted actions taken by the Defendants are circumstantial proof of conspiracy.

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA      - 49 -

**EMVCo and the SmartCard Alliance**
**Provided Opportunities for Collusion**

151.    EMVCo is jointly owned by Visa, MasterCard, UnionPay, JCB, Discover and American Express.   The EMV name comes from "Europay, MasterCard and Visa," the companies that in 1994 initiated development of the EMV Specifications.   Europay International SA became part of MasterCard in 2002.   American Express joined EMVCo in 2009.

152.    EMVCo is managed by the Board of Managers, which is comprised of representatives from each of the member payment systems.   Various Working Groups complete EMVCo's work, and "decisions are made on a consensus bases."   In 2010, EMVCo launched the EMVCo Associates Programme, "for key industry stakeholders to provide input to EMVCo's Board of Managers, Executive Committee, and Working Groups."

153.    In an obvious attempt to cover up its involvement and create post-hoc justifications for its actions, the EMVCo website was changed shortly after Plaintiffs' originally filed this suit on March 8, 2016.   EMVCo added language to its site where, for the ***first time***, it disclaimed responsibility for implementing the Liability Shift dates or having involvement in "implementation mandates."   The website change is evident by comparing an older saved version of the website to the current iteration available online.   At some time between April 16, 2016 (the date a cached version of the site was captured) and June 21, 2016, the EMVCo website was modified to add a new link to a page titled "Operating Principles" where suddenly EMVCo denies participating in the Liability Shift.

154.    But despite its post-hoc website edits, EMVCo and its associated entities provided fertile ground for Defendants to conspire.   Defendants had the opportunity to collude through payment card associations such as the Smart Card Alliance.   The Alliance describes itself as "the single industry voice for smart card technology, leading industry discussion on the impact and value of smart cards in the U.S. and Latin America."

155.    In 2011, Visa, MasterCard, Discover and BOA were on the Smart Card Alliance's Leadership Council.   American Express, Capital One, Chase and Wells Fargo were Smart Card

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA      - 50 -

1   Alliance General Members.  Visa's Simon Hurry, MasterCard's Oliver Manahan, and BOA's

2   Matt Calman were members of the Smart Card Alliance's board in 2011.

3         156.   Just prior to the Networks' announcement of the Liability Shift, the Smart Card

4   Alliance held a May 2, 2011 through May 5, 2011 meeting in Chicago, Illinois, whose theme

5   was "The Roadmap to EMV Payments and Secure ID," to discuss, among other topics, EMV

6   implementation in the United States, including the ramifications of the Durbin Amendment.  One

7   topic of presentation included a panel titled, "What Will Trigger The US Payments Industry to

8   Migrate to EMV and What Model Will Emerge?"  The 2011 Smart Card Alliance Conference

9   highlighted that it was a great networking opportunity where industry leaders could meet "in a

10  social setting to share cutting edge information" and where smart card implementers could meet

11  in informal breakout sessions.  Attendance at this conference included the following individuals:

12      • **Visa**: Byrne, Brian, Chair EMVCo Board of Managers; Hurry, Simon, Senior Business Leader; Lai, Chackan, Senior Business Leader, Authentication; Savka, Erica, Emerging Products; Thaw, Sandy, Senior Business Leader.

14      • **MasterCard**: Ebel, Edward, VP/Account Leader; Feinberg, Jeremy, VP, Technology Account Management; Horsma, Bengt, VP Product Development; Lund, Lam Van, Business Leader, US Product Delivery; Mackenzie, Laura, VP, Senior Business Leader; Manahan, Oliver, VP, Advanced Payments; Nolan, Dean, Vice President; Pretzer, Susan, Senior Account Manager.

18      • **American Express**:  Andrea, Phillip, EMV Product Manager; Baptista, Bartholomew, Senior Marketing Manager; Davaris, JoAnn, Director Industry Standards.

20      • **Discover**:  Bernard, Troy, Sr. Business Leader, Emerging Technology; Chakrabarty, Soumya, Project Manager; Greene, Jacob, Manager – Zip Contactless; Horton, Thomas, Manager; Julian, Ryan, Manager; Kawiecki, Denise, Project Manager; Lynn, Sandra, Senior Manager; Magsombol, Gina, Project Manager; Munteanu, Andra, Project Manager; Owenson, Jeff, Project Manager; Smith, Elinor, Project Manager; Topolski, Jamie Mark, Manage.

24      • **BOA**: Bartoo, Debbie, Senior Vice President.

25      • **Capital One**: Davis, John, Sr. Manager.

26      • **JP Morgan Chase**: Ciavarro, Chris, Prepaid Product Management; Lock, James, Vice President; Smith, Jenifer, Business Product Manager; Taylor, Jonathan, VP.

28      • **Wells Fargo**: Schindewolf, Eric, VP Product Development.

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA      - 51

157.    While the specific attendees of prior years' meetings are available only to members of the Smart Card Alliance and therefore not publicly accessible, similar conferences were held in prior years, including, for example, the Smart Card Alliance 2010 Annual Conference, held in the Marriott Camelback Inn Resort & Spa, Scottsdale, Arizona.

158.    The Smart Card Alliance also created the EMV Migration Forum in August 2012 to further support "the coordination of the implementation steps required to successfully migrate from magnetic stripe technology" to EMV.   All of the Networks are members of the EMV Migration Forum and had employees on the Steering Committee: Carolyn Balfany, MasterCard; Karen Czack, American Express; Simon Hurry, Visa; and Ellie Smith, Discover.   Wells Fargo and Chase also had the following employees on the Steering Committee: Jesse Lee, Wells Fargo; Matthew Connelly, Chase.   BOA, Capital One, Chase, Citibank, PNC, Wells Fargo are all members of the EMV Migration Forum.   Defendants all publicly stressed the need for industry "alignment" and the importance of "collaborating" with "industry partners" through the Smart Card Alliance.

159.    The EMV Migration Forum held additional conferences providing Defendants further opportunities to collude.   A September 2012 meeting of the EMV Migration Forum was held at MasterCard's headquarters in Purchase, New York, to discuss, among other matters, "What are payment brands doing to prepare customers for EMV?  How will merchants get ready to accept EMV debit, credit and prepaid cards?  What do issuers need to consider before issuing EMV cards?"

160.    In December 2012, the EMV Migration Forum met at Visa's headquarters in Foster City, California.

161.    The EMV Migration Forum is an industry group created by the Smart Card Alliance ostensibly to "address issues that require broad cooperation and coordination across many constituents in the payments space in order to successfully introduce secure EMV contact and contactless technology in the United States."   The members of the EMV Migration Forum include: Visa, MasterCard Worldwide, American Express, Discover, Bank of America, Capital One, JP Morgan Chase, PNC Bank and Wells Fargo among others.

162.   The EMV Migration Forum notes that it has a special interest group ("SIG") just for issuers.   According to the EMV, these "SIGs meet at EMV Migration Forum in-person meetings and gather members into 'birds-of-a-feather' sessions to discuss topics relevant to SIG participants."   There is no indication that any measures exist to ensure compliance with antitrust laws.

163.   There is also a special committee – the Testing and Certification Working Committee – whose stated goal is "to discuss the challenges with EMV certification and define approaches for achieving certification to meet the payment brand milestones for fraud Liability Shift."   According to information available online, the working committee meets weekly or biweekly through teleconferences and web conferences to work on agreed-upon objectives.

164.   Apart from working groups, the EMV Migration Forum "meets in quarterly face-to-face meetings to discuss and address points which require some level of industry cooperation and/or coordination."

**DEFENDANTS' LIABILITY SHIFT DIRECTLY IMPACTS MERCHANTS**

**Accounting Treatment of Payment Card Network Transactions Demonstrates that Defendants' Liability Shift Directly Impacts Merchants**

165.   In order to understand the accounting for chargebacks and how transactions flow over the Networks, the processing of and accounting for interchange fees is instructive.

166.   In several other litigations pending in the United States and around the world, Issuing Banks and Visa and MasterCard have attempted to avoid antitrust liability by presenting the fiction that certain types of fees they charge merchants are actually paid by acquiring banks. For years, the Issuing Banks and Visa and MasterCard have argued that interchange fees[25] are charged to the acquiring bank who can then choose whether to "pass through" the charge to merchants.   However, in reality, when a merchant accepts a Visa or MasterCard General Purpose Payment Card as payment for a transaction, that merchant pays the interchange fee associated

---

[25]   Interchange fees or "swipe fees" are fees charged by the issuing bank to the merchant for accepting payment cards.

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA          - 53

1    with that transaction directly.  That is because the Issuing Bank directly deducts the interchange

2    fee from the net transaction amount it passes through to the merchant, before it even sends the

3    purchase amount to the acquiring bank.

4        167.    Not surprisingly, Issuing Banks account for interchange fees as revenue, while

5    merchants account for them as an expense.  In contrast, acquiring banks do not account for

6    interchange fees as revenue nor an expense.

7        168.    The following illustration shows how the acquiring bank accounts for the amounts

8    due from the Issuing Bank:



24   United States Government Accountability Office Report, "Example of a Typical Credit Card

25   Purchase Transaction Showing How Interchange Fees Paid by Merchants Are Allocated."

26       169.    The fees detailed above are taken out of the total amount of the transaction

27   between the cardholder and merchant.  In both substance and form, the merchant pays all fees,

28   including the interchange fee, which is collected by the issuer.  As indicated in the diagram

1    above, merchants do not make payments for the services provided by the card system in a typical

2    fashion – they do not receive a standard bill for services.  Instead, each party deducts its fee as

3    the funds flow through the system.

4        170.    The Issuing Banks record interchange fees as revenue on their books and records.

5    Typically, Issuing Banks report these fees as noninterest income as opposed to interest income

6    (revenue) generated through lending activities.  With respect to interchange fees received, for

7    example, Capital One in its 10-K for the fiscal year ended December 31, 2014 states that it

8    "recognize[s] interchange income as earned at the time of purchase."  *See also* BOA 10-K for the

9    fiscal year ended December 31, 2015, at 147 ("Interchange . . . and other miscellaneous fees,

10   which are recorded as revenue when earned.").

11       171.    A number of the largest acquirers are involved in multiple lines of business so the

12   methods used to account for their interchange fees as acquirers are not always publicly available.

13   acquiring banks, however, account for revenue **net** of interchange.  First Data, a joint partner of a

14   division of defendant BOA, for example, states under components of revenue in its 10-K for the

15   year ended December 31, 2015, "Global Business Solutions revenue is presented *net of*

16   *interchange fees*-and assessments but includes reimbursable PIN debit fees and other, which is

17   also included as an expense."  *Id.* at 35; *see also id.* at 64 ("In the case of client contracts that the

18   Company owns and manages, revenue is comprised of fees charged to the client, net of

19   interchange and assessments charged by the credit card associations, and is recognized at the

20   time the client accepts a point of sale transaction.").  Other publicly filing acquirers similarly

21   account for revenue net of interchange (*i.e.*, acquirers do not have interchange revenue).  *See,*

22   *e.g.*, Global Payments Form 10-K (May 31, 2015) at 30, 54; Heartland Payment Services Form

23   10-K (Dec. 31, 2014) at 39-41; iPayment, Inc. Form 10-K (Dec. 31, 2013) at 4, 34-35, 62-63.

24   **Accounting for Chargebacks Demonstrates**
     **that Defendants' Liability Shift Directly**
25   **Impacts Merchants**

26       172.    As it relates to Liability Shift chargebacks, a similar, but even more deceitful

27   fiction is advanced.  Reference to the public filings of various acquiring entities reveals that

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA     - 55 -

1   acquiring banks account for chargebacks as being the liability of the merchants, who directly pay

2   chargebacks to Issuing Banks.

3       173.   Just as they pay interchange fees, so too merchants are the entities responsible for

4   paying Liability Shift chargebacks.  When a merchant accepts a Visa or MasterCard card as

5   payment for a transaction, and that transaction is later challenged and is charged back by the

6   Issuing Bank (usually on a future billing statement), the Issuing Bank relays a message to the

7   acquirer who instantly and automatically debits that money from the ***merchant's*** account.  As

8   First Data described it in its 10-K for the year ended December 31, 2015 ("First Data 2015 10-

9   K"): "With respect to the merchant acquiring business, our merchant clients . . . have the liability

10  for any charges properly reversed by the cardholder." *Id.* at 52.  No changes were occasioned in

11  this accounting treatment for chargebacks by any of the acquirers.

12      174.   This does not apply to the majority of American Express and Discover

13  transactions, they have a three-party system.  For those American Express and Discover

14  relationships where there is an acquiring bank, however, the process in the previous paragraph

15  applies.

16      175.   Tellingly, for accounting purposes, acquiring banks net-settle chargebacks,

17  meaning they are not treated as income, nor as an expense.  Chargebacks are treated as expenses

18  by merchants, while Issuing Banks adjust their books upward when they collect the chargeback

19  money from a merchant.  Real-world evidence confirms acquirers understand that chargebacks

20  are paid by merchants.  If chargebacks were ever considered to be held by an acquiring bank, the

21  acquirer would have to maintain enormous loss reserves on its balance sheets.  But the amounts

22  it reserves for potential loss are extremely small compared to the total dollar volume processed

23  by acquirers.

24      176.   Using acquirer First Data as an example, the only area where chargebacks are

25  mentioned from a financial standpoint is a reserve fund to insure against chargeback amounts the

26  company is unable to charge merchants because of business closure, bankruptcy, etc.  The

27  amount First Data reported for it and the various joint-venture acquiring alliances in reserves at

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA     - 56 -

1    the end of 2015 was $26 million, a very small amount compared to chargebacks incurred on

2    $1.885 trillion in sales processed.  First Data 2015 10-K at 53.

3        177.   And Global Payments, another large acquirer, noted in its 10-K for the fiscal year

4    ended May 31, 2015 (at 30, 54) that while its processed volume for direct merchant acquiring for

5    the years ended May 31, 2015, 2014 and 2013 was $207.2 billion, $201.2 billion, and $192.8

6    billion, respectively, for these same periods, the provision for merchant losses was only $4.9

7    million, $8.7 million, and $9.5 million, respectively.  As a percentage of processed volume, these

8    charges represent infinitesimal percentages, namely, 0.0024%, 0.0043%, and 0.0049%,

9    respectively, during the corresponding periods.   Thus, only a miniscule reserve was held.

10   Information from other processors supports this view as well.  And again, no change in this

11   accounting treatment by acquirers occurred with the Liability Shift.

12       178.   Visa and MasterCard recognize in their publicly available information that it is

13   merchants who are liable for chargebacks.  *See* for example https://www.mastercard.us/en-us/

14   merchants/get-support/merchant-learning-center.html and http://www.mastercard.com/elearning/

15   top_ten/story.html ("The Merchant's Guide to Chargebacks"); *see also* https://usa.visa.com/

16   support/small-business/dispute-resolution.html ("Chargeback[s] can be costly for merchants –

17   you could lose both the dollar amount of the transaction as well as the related merchandise, and

18   may also incur internal handling costs"); https://usa.visa.com/dam/VCOM/download/merchants/

19   chargeback-management-guidelines-for-visa-merchants.pdf         ("Chargeback     Management

20   Guidelines for Visa Merchants," which "Contains detailed information on the reason codes for

21   the most common types of chargebacks that merchants receive").

22       179.   Because Acquirers do not treat chargebacks as either income nor as expenses,

23   they do not have any incentive to sue an Issuing Bank, maybe their own bank, for a dispute

24   relating to a chargeback.

25

26

27

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA      - 57 -

**The Relationship Between an Acquirer
and a Merchant Demonstrates that
Defendants' Liability Shift Directly
Impacts Merchants**

180.    In an acquirer/merchant relationship, pursuant to an agreement, merchants share one or more bank accounts with their acquirer, where the acquirer acts as the agent for the merchant in interactions with the Issuing Bank.   A frequent arrangement has three bank accounts: (i) the settlement account, an account where money initially comes from the issuing bank; (ii) a current account, where money is transferred from the settlement account; and (iii) a reserve account.  All of these accounts belong to the merchant, and the payments to and from are subject to certain contractual conditions.  None of these accounts or funds are treated as money owed to the acquiring banks.

181.    Pursuant to the agreement with the acquiring bank, when a charge is made, the Issuing Bank sends money to the acquiring bank which is deposited in the bank account held by the acquirer as an agent for the merchant.  When a Chargeback is assessed by an Issuing Bank, the acquiring bank deducts the chargeback from amounts to be credited to the merchant's settlement account with the acquiring bank.  Though there is almost always more money in the merchant's settlement account as a result of charges than chargebacks, the acquirer may also have a reserve fund it holds on behalf of and that is funded by the merchant, which provides the acquirer with additional collateral should the acquirer insist on protecting itself from further chargebacks or other contingencies.

182.    Put another way, barring bankruptcy or some other failure of a merchant, the acquiring bank is never at risk of being liable for a chargeback;[26] and the merchant immediately feels the pain of the entirety of the cost of the chargeback as a debit to their bank account. Again, the acquiring bank, which may well be the same as the Issuing Bank, does not have any incentive to sue the Issuing Bank for a chargeback.

---

[26]   Further as noted above at ¶¶180-181, *supra*, the acquiring bank can require a merchant to establish cash collateral in the form of a reserve account to further protect the acquiring bank from any loss.  This is why the reserves acquiring banks establish for potential losses are infinitesimally small compared to the dollar volume of transactions they process.  *See* ¶¶175-177, *supra*.

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA          - 58

183.   Additionally, because acquiring banks are by rule members of Visa and MasterCard and must follow their rules (and many acquirers are owned by Issuing Banks), acquirers have no incentive and would not sue Visa and MasterCard and the member banks for problems relating to chargebacks.  Merchants, as the party without a direct relationship to Visa and MasterCard and as the parties that are losing money, are the only party in the card system who would sue an Issuing Bank for an improper chargeback.  And even though a merchant may have a direct relationship with American Express or Discover, there is often no separate issuer or acquirer to be concerned about.

184.   As discussed above, to be an issuing bank member of Visa or MasterCard, Visa and MasterCard and the issuing bank agree to follow Visa and MasterCard rules.   Though chargebacks are allegedly discretionary under the rules, issuing banks, as well as American Express and Discover have automated procedures in place to assess merchants' chargebacks when a chip card is fraudulently used at a merchant.  In practice, issuing banks and Discover and American Express rarely, if ever, fail to send a chargeback fraudulent chip card usage to the merchant.  The experience of the named plaintiffs confirms this.

**Acquirers Recognize Merchants
Face Liability Under the New Rules**

185.   Acquirers recognize that under the Liability Shift, merchants became liable for charges that issuers previously covered.  For example, each of the top ten acquirers, according to the Nilson Report have acknowledged that merchants would be liable under the Liability Shift for chargebacks that previously accrued to issuers.

186.   Chase Commerce Solutions, the largest acquirer by volume in the United States, recognized that after the Liability Shift, merchants would bear the costs for chargebacks if a chip-card transaction occurred on a non-certified EMV terminal, stating:  "In fact, the major payment brands (including MasterCard, Visa, Discover and American Express) are planning a 'liability shift' where merchants without EMV-enabled terminals will be responsible for point-of-sale fraud losses that could have been prevented with chip technology accepting systems."

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA      - 59

1      187.    First Data, the second largest acquirer by volume in the United States, recognized

2  that after the Liability Shift, merchants would bear the costs for chargebacks if a chip-card

3  transaction occurred on a non-certified EMV terminal, stating:  "The liability shift to the entity

4  with the lesser technology will begin October 2015.  If the card is EMV and the merchant is not,

5  the liability will shift to the merchant."

6      188.    Vantiv, the third largest acquirer by volume in the United States, recognized that

7  after the Liability Shift, merchants would bear the costs for chargebacks.  "In October 2015, the

8  rollout of EMV in the US reaches a major milestone.  This is when liability for fraudulent

9  payments will shift to merchants who are unable to process EMV transactions when a chip card

10  is presented for payment."

11      189.    BAMS, the fourth-ranking acquirer by volume in the United States, recognized

12  that after the Liability Shift, merchants would bear the costs for chargebacks if a chip-card

13  transaction occurred on a non-certified EMV terminal, stating:  "All of the card organizations

14  have chosen October 1, 2015, as the date when liability for counterfeit fraudulent transactions

15  will shift to the merchant if the merchant has not adopted POS solutions that are capable of

16  processing EMV chip cards."

17      190.    Elavon, the fifth largest acquirer by volume in the United States, recognized that

18  after the Liability Shift, merchants would bear the costs for chargebacks if a chip-card

19  transaction occurred on a non-certified EMV terminal, stating:  "A non-compliant merchant is

20  liable for fraud that occurs on any chip card used on a magnetic swipe terminal."

21      191.    Wells Fargo Merchant Services, the sixth largest acquirer by volume in the United

22  States, recognized that after the Liability Shift, merchants would bear the costs for chargebacks if

23  a chip-card transaction occurred on a non-certified EMV terminal.  Ann Cripps, VP, Product

24  Management Manager, Wells Fargo Merchant Services, recognized that after October 2015,

25  merchants would bear the liability for sales made on non-EMV certified equipment:  "The

26  individual networks (Visa, MasterCard, Discover and American Express) announced a liability

27  shift in the United States for October 2015.  This shifts the financial liability for counterfeit fraud

28

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA      - 60 -

1    to the merchant and away from the card issuer, if EMV equipment is not present at the time of

2    sale."

3        192.    Global Payments, the seventh largest acquirer by volume in the United States,

4    recognized that after the Liability Shift, merchants would bear the costs for chargebacks if a

5    chip-card transaction occurred on a non-certified EMV terminal, stating:  "[A]fter the date

6    mandated by each respective payment network (the network's 'Liability Shift Date'), liability

7    arising from transactions made with fraudulent cards (counterfeit, lost and stolen, NRI (not

8    received as issued), or other) will be the merchant's responsibility if such merchant has not

9    converted its point-of-sale equipment to be chip-enabled."

10        193.    Heartland Payment Services, the eighth largest acquirer by volume in the United

11   States, recognized that after the Liability Shift, merchants would bear the costs for chargebacks if

12   a chip-card transaction occurred on a non-certified EMV terminal, stating:  "Since October 2015,

13   merchants without an EMV-compatible terminal or POS system are responsible for chargebacks

14   and fraudulent card acceptance."  Heartland Payment Systems has also stated: "The card brands

15   have instituted a liability shift for fraudulent transactions that occur at the point of purchase

16   beginning in October 2015 . . . ."

17       194.    Worldpay, the ninth largest acquirer by volume in the United States, recognized

18   that after the Liability Shift, merchants would bear the costs for chargebacks if a chip-card

19   transaction occurred on a non-certified EMV terminal, stating:  "Counterfeit liability shifts to

20   merchants if a Non-EMV-enabled POS device is used for a card-present EMV chip

21   transaction . . . ."   Worldpay has also described the implications of the liability shift for

22   merchants as follows:

23

24

25

26

27

28

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA        - 61 -

1

**What does the financial liability shift mean and how will that affect my business?**

2

3

Beginning October 1, 2015, the major card networks agreed to shift financial responsibility for losses due to counterfeit card-present card fraud to the party using the least secure technology.  Merchants that want to avoid this liability should implement EMV chip technology in their point-of-sale (POS) devices before the deadline.

4

5

6

195.    And as announced by the Networks, if an acquirer wanted to remain an acquirer, it had to be EMV compliant by 2013.[27]

7

8

196.    TransFirst, the tenth largest acquirer by volume in the United States, recognized that after the Liability Shift, merchants would bear the costs for chargebacks if a chip-card transaction occurred on a non-certified EMV terminal, stating:

9

10

11

Currently, most card-present counterfeit card losses are the responsibility of the bank that issued the card.  However, on October 1, 2015 the card companies are changing the rules.

12

\*       \*       \*

13

14

What merchants need to understand is that the provider will pass any such loss onto the merchant if the merchant did not have equipment capable of processing the EMV information.

15

16

197.    Citi Merchant Services recognized that after the Liability Shift, merchants would bear the costs for chargebacks if a chip-card transaction occurred on a non-certified EMV terminal, stating: "Starting October 1, 2015, merchants who still accept magnetic-stripe cards with their POS devices will assume liability for any fraud resulting from those transactions.  The exception is for merchants using automated fuel dispensers; liability shifts to them in 2017."

17

18

19

20

**Issuing Banks Recognize the Liability Shift Directly Impacts Merchants**

21

22

198.    Defendant Chase, its parent and other related entities, all understood the impact of the Liability Shift on merchants:

23

24

25

---

[27]    This leaves only the merchant with the possibility of having "less secure" technology.  For example, Visa announced in 2011 that "Visa will require U.S. acquirer processors and sub-processor service providers to be able to support merchant acceptance of chip transactions no later than April 1, 2013."  Visa Press Release, "Visa Announces Plans to Accelerate Chip Migration and Adoption of Mobile Payments" (Aug. 9, 2011), https://usa.visa.com/about-visa/newsroom/press-releases. releaseId.1594598.html (last visited July 15, 2016).

26

27

28

1
2
3
4

> [A]s of October 2015, Visa, MasterCard, American Express and Discover will shift liability for credit card-present chargebacks to US merchants – meaning, if you're not using a chip card acceptance device, you can be held liable for the amount of a fraudulent transaction.  Specifically, the liability for a fraudulent transaction will pass to the party that is not EMV-compliant, whether merchant or issuer.

And this party in practice would almost always be the merchant, not the issuer:

5
6
7
8

> "Visa, MasterCard, American Express and Discover will shift more of the liability for charges to merchants.  Today, if a merchant swipes a physical card that appears to be valid and gets an approval, the merchant is usually not liable if the transaction proves to be fraudulent.  Once the rules change, merchants will often be liable if they accept a chip card by swiping the magnetic stripe instead . . . ."

9
10

As Chase explained, "[t]he term 'Liability Shift' refers to the change in who bears the chargeback related cost of fraudulent transactions."

11
12
13
14
15

199.    As with the other Defendants, Citibank, N.A. understood that its acquiring-side subsidiary would not be liable for fraudulent credit card transactions under the Liability Shift. As Citi Merchant Services explained, "[s]tarting October 1, 2015, merchants who still accept magnetic-stripe cards with their POS devices will assume liability for any fraud resulting from those transactions."

16
17
18
19
20
21
22
23

200.    US Bank understood that it would avoid liability for many fraudulent credit card transactions, which it previously bore, as a result of the Liability Shift, and that merchants, not acquiring banks, would be liable for these transactions instead.  For example, in providing "Chip Card FAQs for Program Administrators," US Bank explained, "in October 2015, the major card networks (Visa, MasterCard, American Express and Discover) will shift liability for counterfeit card present fraud to the party that does not support chip cards (either the issuer or the merchant)."  In other words, "[i]f a chip-enabled card is presented to a merchant that has not adopted chip card terminals, the merchant will be liable for any counterfeit card fraud."

24
25
26
27
28

201.    BOA and BAMS made clear who would bear the responsibility for fraudulent credit card transactions under the Liability Shift, explaining in "Five EMV Myths Debunked" that "[l]iability for certain fraudulent credit and debit card charges shifts from the card issuer to merchants that haven't upgraded to EMV technology, and are unable to process chip card transactions."  This fact sheet continued, explaining that "[t]hose charges were previously

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA      - 63

1   covered by the issuing bank."  This refrain was repeated over and over again by BOA and

2   BAMS.  In BAMS's "EMV FAQ" flyer, the answer to the question "What's coming and when?"

3   is simple and straightforward:  "All of the card organizations have chosen October 1, 2015, as

4   the date when liability for counterfeit fraudulent transactions will shift to the merchant if the

5   merchant has not adopted POS solutions that are capable of processing EMV chip cards."  And

6   "the penalty for electing not to support EMV":  "If a dual interface or chip card is presented to a

7   merchant who has not adopted an EMV terminal, the liability for counterfeit fraud will shift from

8   the issuer to the merchant."  In another document entitled "How to Prepare for EMV," BAMS

9   explains:

10      [S]tarting in October 2015, any face-to-face counterfeit fraud losses would be the
        responsibility of the party that had the least secure authentication capability, with
11      EMV being the most secure card standard.  This is referred to as the "liability
        shift."  Thus, if a merchant's POS device could not recognize a card issued with a
12      chip, the fraud loss would be charged to the merchant.

13      202.    PNC understood that liability would shift to merchants and not acquirers in

14   October 2015, explaining to its Visa cardholders that:

15      Starting in October 2015, financial liability for card-present counterfeit card
        losses will shift from the card-issuing banks to merchants if merchants receive
16      EMV-enabled cards (chip cards) but have not yet installed EMV-capable
        terminals.

17
     Making no mention of acquirers, the explanation continued, "[t]his Liability Shift will apply to
18
     all merchants."  In another instance, PNC stated:
19
        Issuers will be liable for counterfeit card transactions which occur at chip-enabled
20      POS terminals with a card that does not have an EMV chip; similarly merchant
        processors will be liable for counterfeit card transactions which occur with a chip
21      card at payment terminals that do not support EMV chip transactions.

22   PNC Merchant Services adopted similar descriptions of the Liability Shift and the affected

23   parties, never suggesting that it or any other acquirer would be liable for fraudulent credit card

24   transactions under the new regime.

25      203.    Wells Fargo has described the Liability Shift as "the date when a card issuer or

26   merchant that does not support EMV chip card technology will assume liability for any

27   fraudulent point-of-sale card transactions."

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA      - 64 -

**An Example: Milam's Markets and**
**Grove Liquors**

204.   The Defendants' anticompetitive conduct has cost merchants billions. Despite their far reaching efforts and expenditures to attempt to become chip-card compliant, millions of merchants find themselves – through no fault of their own – subject to the ravages of the Liability Shift.

205.   Taking heed of the representations made by the Defendants, Milam's Market and Grove Liquors management diligently prepared for the October 1, 2015 Liability Shift.

206.   Working with their acquirer, Worldpay, and their equipment vendor, NCR Corporation, Milam's Market and Grove Liquors expended management effort, training time and considerable costs to update and acquire new POS equipment so that their stores would be able to process the EMV chip cards and so they could be ready for the Liability Shift.

207.   The equipment, NCR's Equinox L5300 card readers, was purchased and installed well prior to the Liability Shift.  These state-of-the-art POS card readers are designed to process EMV chip-card transactions.

208.   However, merely having the right equipment in place was not enough for Milam's Market and Grove Liquors to avoid the Liability Shift – without the completion of the so-called "certification," they are still caught by the Liability Shift.

209.   While some very large retailers such as Target, Walmart and others quickly had their EMV-processing systems "certified" – thus sparing them the Liability Shift – the members of the Class are at the mercy of Defendants.[28]

210.   Merchants like Milam's Market and Grove Liquors have no control over the "certification" process.  All they can do is request "certification" and wait for it to occur.  And no one can say when that will be.

211.   NCR Corporation has advised that "certification" of the Equinox L5300 was "TBD" – to be determined.  A copy of that notice is attached as Ex. A.

---

[28]   Notably, Target and Walmart are both EMVCo Business Associates and Walmart is an EMVCo Technical Associate as well.

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA   - 65

1    212.    These extended delays for smaller merchants are also no surprise to Defendants.

2    A House of Representatives Small Business Committee Staff Memorandum noted that there was

3    from the start "a concern that small businesses that have the new hardware installed may be slow

4    to receive certification."  "'Most of the Tier I retailers [giants like Target and Walmart] may be

5    able to roll out by October, but across the board, the readiness is not high.'"

6    213.    Officials of the National Retail Federation – the world's largest retail trade

7    association – have summed up the situation perfectly: "'So the same guys who mandated this for

8    retailers have not resourced it to where they can get retailers certified.'"

9    214.    Meanwhile, defendants have downplayed these obvious troubles.    One

10   representative for MasterCard claimed that all a merchant needs to do to activate an EMV

11   terminal is to "'contact their acquirer or payment services provider or terminal manufacturer to

12   find out how to do so.'"  American Express likewise downplayed issues, telling merchants that

13   "to help avoid [the] liability [shift]," all they would need to do is "work with your processor or

14   terminal provider today to upgrade to chip card technology."  American Express  further told

15   merchants that "[t]o upgrade, contact your payment processor or terminal provider and tell them

16   you'd like to start accepting chip cards.  They'll provide you with a chip-enabled system and

17   guide you through each step.  Before you know it, your upgraded system will be up and

18   running."

19   215.    Yet, contrary to the Networks' claims, Milam's Market and Grove Liquors did

20   everything they were supposed to and to this day, despite following every requirement to become

21   EMV compliant, Milam's Market and Grove Liquors are suffering damages as a result of

22   Defendants' delays and refusals to properly certify the technology Plaintiffs were assured would

23   be compliant.

24   216.    The damages are substantial.  Milam's Market and Grove Liquors are being

25   "charged-back" for supposedly fraudulent transactions that, in the past, would have been borne

26   by the Issuing Banks.  The following two examples are chargebacks and denials from Visa and

27   MasterCard:

28

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA      - 66 -

1        (a)      Attached as Exhibit B-1 is a "Notification of Chargeback," dated January

2  4, 2016, from Visa regarding a $91.17 a transaction which occurred on November 13, 2015.

3  Milam's Market challenged the chargeback.  On or about February 1, 2016, Milam's Market

4  received the Denial of Chargeback Reversal for that transaction.  Ex. B-2.

5        (b)      Attached as Exhibit B-3 is a "Notification of Chargeback," dated February

6  5, 2016, from MasterCard regarding a $108.97 transaction which occurred on December 29,

7  2015.  Milam's Market challenged the chargeback.  On or about March 7, 2016, Milam's Market

8  received the Denial of Chargeback Reversal for that transaction.  Ex. B-4.

9     217.   As stated on the Denials of Chargeback Reversal, the reason for this cost to be

10  assessed to Milam's Market was for a "Counterfeit Transaction" in the Visa example and "Chip

11  Liability Shift" for the MasterCard example.  The Visa Denial says: "The [issuing] bank stated

12  the EMV chip card was processed.  The transaction was not processed through a chip reader

13  terminal, therefore the chargeback will stand."  The MasterCard Denial says: "The [issuing] bank

14  states this . . . EMV card and the transaction was not processed using chip reader terminal.

15  Cardholder states fraudulent transaction."  *See* Exs. B-2 and B-4.

16     218.   In other words, Milam's Market has to bear these costs thanks to the Liability

17  Shift, despite everything it has done to comply with Defendants' edicts.

18     219.   Worse, besides the base value of the transaction, Milam's Market and Grove

19  Liquors must also pay a "chargeback fee" of five dollars, a fee assessed against the merchant

20  each time it is made liable for a chargeback by MasterCard and Visa.  For some merchants, these

21  fees are as high as $30 per incident.

22     220.   Accordingly, in these two examples, Milam's Market was assessed a total of

23  $200.14 which, before the Liability Shift, it would not have had to pay.  Instead, before the

24  Liability Shift, the Issuing Banks would have borne the $200.14 in chargebacks – a cost the

25  Issuing Banks are now spared.

26     221.   Tellingly, nothing Milam's Market could have done – short of making the

27  business-crippling decision to stop accepting Visa cards – could have prevented this outcome.

28

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA   - 67 -

1   Indeed, the expenditures it made in an effort to comply with Defendants' new EMV chip regime

2   have all been for naught, as Defendants have failed to conduct the very "certification" required.

3       222.   Milam's Market and Grove Liquors has been made liable for chargebacks under

4   the Liability Shift for Discover and American Express charges as well.  *See, e.g.*, Ex. C

5   (evidencing two Discover chargebacks of $140.47 and $44.98, respectively); *see also* Ex. D

6   (evidencing an American Express chargeback for $155.12 – all attributable to processing EMV

7   chip cards).

8       223.   The two exemplar Discover chargebacks both are expressly denominated as

9   follows in each relevant "Notification of Chargeback":

10          UA05 Fraud – Chip Card Counterfeit Transaction

11          Definition: The UA05 reason code is valid for a chargeback on a card
            present card sale or cash advance involving a chip card and the issuer or
12          cardholder alleges that a counterfeit card was used to conduct a card sale or cash
            advance and ***the merchant's POS device did not support and use EMV***
13          ***technology***.

14   Ex. C (emphasis added).

15      224.   The truth is, however, that Milam's Market's POS equipment ***did*** support and use

16   EMV chip technology when the two charged-back fraudulent purchases were made.  The store

17   was subject to this Liability Shift because Defendants had failed to "certify" that equipment.

18      225.   Likewise, the American Express chargebacks are attributed to cause code "Fraud

19   F30."  This is the fraud code reserved for fraud on an EMV chip card.  Ex. D.  For the nine

20   month period of October 1, 2015 to June 30, 2016, Milam's Market and Grove Liquors (who

21   track and manage chargebacks together) have been assessed final responsibility by MasterCard,

22   Visa, and Discover for 220 chargebacks totaling $23,915.42 (plus chargeback fees of $5 for each

23   item, for an additional cost to Milam's Market and Grove Liquors of $1,100 – for a total loss of

24   $25,015.42).

25      226.   Of these 220 chargebacks, 212 (*i.e.*, more than 96%) were directly and solely

26   related to the Liability Shift and would not previously have been the merchants' responsibility.

27      227.   During the same period the prior year, between October 1, 2014 and June 30,

28   2015 – before the Liability Shift – Milam's Market and Grove Liquors were assessed final

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA      - 68

1  responsibility by MasterCard, Visa, and Discover for only three chargebacks totaling $272.66.

2  In addition, American Express assessed $2,655.92 in chargebacks during the time period of

3  October 1, 2015 to June 30, 2016, as compared to $377.56 during the same period the prior year,

4  before the Liability Shift.

5      228.    In total then, Milam's Markets and Grove Liquors have lost – and Issuing Banks

6  have unjustly gained – over $26,000 in nine months.

7      229.    The amount of similar chargebacks for which the Class members have been made

8  to pay as a result of the Liability Shift is enormous, and certainly runs into billions of dollars –

9  with the Issuing Banks having been enriched by the same amount.

10     230.    In exchange for this newly bestowed, unavoidable liability, Milam's Market,

11 Grove Liquors and the Class members have received . . . ***nothing***.   Interchange fees, which

12 Defendants have said exist in part to pay for fraud, are still paid for by the merchant, and have

13 not decreased.  The Liability Shift was unilaterally imposed to the benefit of Defendants, with no

14 compensation, consultation or consideration of any kind made to the Class members.

15                              **RELEVANT MARKET**

16     231.    There exists a relevant market, the product dimension of which is no broader than

17 General Purpose Cards (both credit and charge cards).  *Visa*, 163 F. Supp. 2d at 335.  The

18 geographic dimension of this market is the United States ("General Purpose Card Market").  *Id.*

19 at 339-40.  Cash and checks are not substitutes for payment cards, and the rules shifting liability

20 to merchants from the Issuing Banks apply in the United States and its territories.

21     232.    Together, the card-issuing defendants possess market power over the market for

22 General Purpose Cards, collectively accounting for roughly 75% of the transactions in the

23 General Purpose Card Market.

24     233.    There exists a relevant market, the product dimension of which is no broader than

25 General Purpose Card Network Services.  *Visa*, 163 F. Supp. 2d at 338.  The geographic

26 dimension of this market is the United States ("General Purpose Card Network Services

27 Market").  General Purpose Card networks provide the infrastructure and mechanisms through

28

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA      - 69 -

1 which general purpose card transactions are conducted, including the authorization, settlement

2 and clearance of transactions.

3       234.   Visa, MasterCard and American Express separately, and the owners of EMVCo

4 collectively, possess market power over the market for General Purpose Card Network Services,

5 collectively having nearly 100% of the General Purpose Card Network Services Market.

6       235.   The shift in liability from the card issuers to the merchants is not attributable to

7 increases in the level of costs associated with the operations of the networks.

8       236.   There is virtually no elasticity of demand.  Merchants have no choice but to

9 continue to accept General Purpose Cards.  *See Visa*, 163 F. Supp. 2d at 340 (noting that

10 merchants must accept credit cards or else risk losing business to merchants who do accept

11 them).  Because of Defendants' collusion and market power, a small but significant increase in

12 the costs of providing General Purpose Card Network Services would not result in the loss of

13 business.

14       237.   There are significant barriers to entry in the General Purpose Card Network

15 Services Market.  Because of these barriers, the only successful market entrant since the 1960s

16 has been Discover, which was introduced by Sears and benefited from its extensive network of

17 stores, its extensive base of customers who carried Sears store cards, and its relationship with

18 Dean Witter.  New entry into the General Purpose Card Network Services Market would cost

19 more than $1 billion and would involve a "'chicken-and-egg' problem of developing a merchant

20 acceptance network without an initial network of cardholders who, in turn, are needed to induce

21 merchants to accept the system's cards in the first place." *Visa*, 163 F. Supp. 2d at 342.

22                       **CLASS ACTION ALLEGATIONS**

23       238.   Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(2) and

24 (b)(3) of the Federal Rules of Civil Procedure on behalf of all Class members, defined as those

25 merchants who have been unlawfully subjected to the so-called Liability Shift for the assessment

26 of MasterCard, Visa, Discover and/or American Express credit and charge card chargebacks,

27 from October 2015 until the anticompetitive conduct ceases (the "Class").

28

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA   - 70

1    239.    Further potential subclasses are detailed below in relation to Plaintiffs' state law

2    claims.

3    240.    The Class consists of merchants located throughout the United States.   While

4    Plaintiffs do not know the exact number of the members of the Class, Plaintiffs believe there are

5    (at least) hundreds of thousands if not millions of members in the Class, thus the members of the

6    Class are so numerous that joinder of all Class members is completely impracticable, if not

7    impossible.  The exact number of Class members is not presently known, but can be determined

8    through appropriate discovery.

9    241.    Plaintiffs will fairly and adequately protect the interests of the members of the

10   Class and have retained counsel competent and experienced in class actions, antitrust and

11   financial services litigation.

12   242.    Plaintiffs' claims arise out of the same common course of conduct giving rise to

13   the claims of the other members of the Class.  Plaintiffs' interests are coincident with, and not

14   antagonistic to, those of the other members of the Class.

15   243.    Plaintiffs have no interests that are adverse or antagonistic to those of the Class.

16   244.    A class action is superior to other available methods for the fair and efficient

17   adjudication of this controversy.   Because the damages suffered by many individual Class

18   members may be relatively small, the expense and burden of individual litigation make it

19   virtually impossible for the Class members to individually seek redress for the wrongful conduct

20   alleged in this Complaint.

21   245.    The prosecution of separate actions by individual members of the Class would

22   create a risk of inconsistent or varying adjudications, establishing incompatible standards of

23   conduct for Defendants.

24   246.    Common questions of law and fact exist as to all members of the Class and

25   predominate over any questions solely affecting any individual members of the Class.  This is

26   particularly true given the nature of Defendants' conspiracy, which was generally applicable to

27   all the Class members, thereby making appropriate relief with respect to the Class as a whole.

28   Such questions of law and fact common to the Class include, but are not limited to:

1    (a)    whether Defendants and their co-conspirators engaged in a combination

2    and conspiracy among themselves to institute the October 2015 Liability Shift while knowing

3    that, for millions of merchants, compliance with the nebulous and uncertain certification

4    requirements would be impossible, thus subjecting the Class to charges which would not have

5    been borne by the Class without the Liability Shift;

6    (b)    the identity of the participants of the alleged conspiracy;

7    (c)    the duration of the alleged conspiracy and the acts carried out by

8    Defendants and their co-conspirators in furtherance of the conspiracy;

9    (d)    whether the alleged conspiracy violated the Sherman Antitrust Act, the

10    Clayton Act, California's Cartwright Act, the Donnelly Act and/or the consumer protection laws

11    of Florida, California and/or New York;

12    (e)    whether Defendants and their co-conspirators fraudulently concealed the

13    conspiracy's existence from Plaintiffs and the members of the Class;

14    (f)    the appropriate injunctive and related equitable relief for the Class; and

15    (g)    the appropriate Class-wide measure of damages for the Class.

16    **PLAINTIFFS AND THE CLASS SUFFERED ANTITRUST INJURY**

17    247.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the

18    members of the Class have sustained injury to their businesses or property, having paid certain

19    chargebacks that they would not have paid in the absence of Defendants' illegal contract,

20    combination or conspiracy, and, as a result, have suffered damages in an amount presently

21    undetermined.  This is an antitrust injury of the type that the antitrust laws were meant to punish

22    and prevent.

23    **DEFENDANTS HAVE A LONG HISTORY OF ANTICOMPETITIVE CONDUCT**

24    **Litigation and Investigations**
**in the U.S. and Abroad**

25

26    248.    In 1998, the United States Department of Justice brought a civil enforcement

27    action against Visa and MasterCard challenging the organizational structure of the two payment

28    networks and the networks' rules.  *Visa U.S.A., Inc.*, 344 F.3d 229.  Following a 34-day bench

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA      - 72

1     trial, the district court found Visa's and MasterCard's "exclusionary" or "exclusivity" rules,

2     which prohibited members of the networks (the banks) from issuing the cards of competitors

3     (such as Discover and American Express) violated §1 of the Sherman Act. *Visa U.S.A.*, 163 F.

4     Supp. 2d. 322. At the time, Visa and MasterCard were organized as joint ventures owned and

5     controlled by their member banks.

6         249.    Specifically, the court held Visa U.S.A.'s By-law 2.10(e) and MasterCard's

7     Competitive Programs Policy weaken competition and harmed consumers by: (1) limiting output

8     of American Express and Discover cards in the United States; (2) restricting the competitive

9     strength of American Express and Discover by restraining their merchant acceptance levels and

10     their ability to develop and distribute new features such as smart cards; (3) effectively

11     foreclosing American Express or Discover from competing to issue off-line debit cards, which

12     soon will be linked to credit card functions on a single smart card; and (4) depriving consumers

13     of the ability to obtain credit cards that combine the unique features of their preferred bank with

14     any of four network brands, each of which has different qualities, characteristics, features, and

15     reputations.

16         250.    In 2000, various large and small merchants, as well as certain trade associations,

17     brought an antitrust class action against Visa and MasterCard alleging that their "honor all cards"

18     policy created a tying arrangement in violation of §1 of the Sherman Act. The policy required a

19     merchant accepting a defendants' credit card to also accept their debit card. *In re*

20     *VisaCheck/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001). The merchants also

21     brought claims under §2 of the Sherman Act, arguing that Visa and MasterCard were attempting

22     to monopolize the debit card services market. *In re VisaCheck/MasterMoney Antitrust Litig.*,

23     No. 96-CV-5238 (JG), 2003 U.S. Dist. LEXIS 4965, at *5-*6 (E.D.N.Y. Apr. 1, 2003). This

24     long-running litigation eventually settled for more than $3 billion and resulted in Visa and

25     MasterCard changing certain rules regarding the "honor all cards" policy.

26         251.    In 2004, American Express sued Visa, MasterCard and many of the networks'

27     member banks in the Southern District of New York under §1 of the Sherman Act for conduct

28     condemned in *United States v. Visa U.S.A., Inc.*, discussed above. *See* Complaint, *American*

1   *Express Travel Related Services Co., Inc. v. Visa U.S.A., Inc.*, No. 04 cv 08967 (S.D.N.Y.).  In

2   the 2004 case, American Express alleged that the networks and the member banks worked

3   together to adopt exclusionary rules which harmed American Express.  Visa eventually settled

4   with American Express in November 2007 for $2.25 billion and MasterCard reached a settlement

5   with American Express in June 2008 for $1.8 billion.  The settlements also covered the claims

6   against the member bank defendants.  Neither MasterCard nor Visa acknowledged any

7   wrongdoing.

8         252.  Internationally, the various card networks have also been subject to extensive

9   scrutiny.  In 2007, MasterCard was the subject of a significant ruling by the European Union

10   related to its cross-border interchange fees.  *See* European Commission Decision (Dec. 19,

11   2007).  That case found MasterCard's rules restricted competition.  Later, in 2013, the European

12   Commission opened another investigation into MasterCard's business practices and issued a

13   Statement of Objections in July 2015 outlining its view that the company had breached European

14   antitrust rules by setting artificially high minimum prices for processing certain transactions.

15   Press Release re European Commission Statement of Objections to MasterCard (July 9, 2015).

16   Visa has also been subject to action by the European Union.  *See* Press Release re Supplementary

17   Statement of Objections to Visa (July 31, 2012).  In 2014, the European Union rendered legally

18   binding certain commitments offered by Visa Europe to cut certain interchange fees.

19   Proceedings against Visa Inc. in relation to certain international inter-bank fees is continuing.

20   *See* Summary of Commission Decision (Feb. 26, 2014); *see also* "Competition enforcement in

21   the payment card market," European Commission, http://ec.europa.eu/competition/sectors/

22   financial_services/enforcement_en.html (last visited July 15, 2016).

23         253.  In 2005, large and small merchants, along with trade associations, brought suit

24   against Visa, MasterCard and various member banks, challenging under the antitrust laws

25   various aspects of the networks' rules, including the default interchange rules, as well as

26   numerous so called anti-steering restraints.  Judge Gleeson in the Eastern District of New York

27   was assigned the actions, which were consolidated as *In re Payment Card Interchange Fee and

28   Merchant Discount Antitrust Litigation*, No. 05-md-1720 (E.D.N.Y.) ("Interchange litigation").

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA   - 74 -

1    The anti-steering restraints were a package of rules which worked together to prohibit merchants

2    from using certain price signals at the point of sale to steer customers to less costly forms of

3    payment.   After extensive litigation, including more than 400 depositions, the production and

4    review of more than 80 million pages of documents, as well as numerous expert depositions and

5    expert reports, the case settled for more than $7 billion in cash (which was reduced to about

6    $5.25 billion after accounting for opt outs) and reforms to defendants' rules.   On June 30, 2016,

7    the settlement was overturned by the Second Circuit, but the rule changes that came about as a

8    result of the litigation both prior to the settlement as part of the government's action (as detailed

9    below) as well as during the nearly three-year period the settlement was pending were

10   significant.

11          254.    Plaintiffs challenged a number of rules that "work together to prevent inter-brand

12   competition between each network's cards at the point of sale." *Interchange* litigation, slip op. at

13   32 (Dec. 13, 2013).  As Judge Gleeson explained:

14          If a customer presents a Visa card for payment, the Honor-all-Cards rule requires
             the merchant to accept it (unless the merchant chooses not to accept ***any*** Visa
15          credit cards, an unlikely option given their ubiquity).   The no-surcharge rule
             further prohibits the merchant from steering the customer to a competing
16          MasterCard credit card with a lower interchange rate by surcharging the higher-
             priced Visa card.   The allegedly supracompetitive interchange rate on the Visa
17          card is hidden by the combined effects of the rules and the merchant is forced to
             pay it.
18
19   *Id*. (emphasis in original).   The change in the rules as a result of the settlement was significant.

20   "The ability to surcharge allows merchants to recoup the higher acceptance costs of the

21   expensive cards.   It allows them to steer customers to less costly cards or to other payment

22   mechanisms, decreasing their card-acceptance costs.   It allows market forces to operate on the

23   previously invisible (to customers) array of interchange fees, and will exert downward pressure

24   on those fees by injecting a form of competition the current rules have prohibited." *Id*. at 33.

25          255.    Additionally, while the Interchange litigation was pending, there were "significant

26   developments" in the payment card industry, some of which were "attributable in whole or in

27   part" to the case itself.   Most notably, the structures of Visa and MasterCard changed from a

28   consortium of competitor banks into publicly traded companies, although the banks still play a

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA        - 75 -

1  significant role in the direction and implementation of the networks' rules as discussed *infra* at

2  ¶¶271-284.

3  256.  Federal legislation called the Durbin Amendment was enacted in 2010.  This

4  legislation removed certain restrictions on discounting credit and debit cards at the network level.

5  The Durbin Amendment, which affects payment card networks and issuers with some

6  limitations, makes it so that those networks "can no longer prohibit merchants from discounting

7  their cards."  *Interchange* litigation, slip op. at 5.  Under the Durbin Amendment, the Federal

8  Reserve Board issued regulations that set the maximum permissible interchange fee that an

9  issuer may receive for an electronic debit transaction and set rules related to how transactions

10  could be routed.  *Id.*

11  257.  In 2010, the Department of Justice, assisted by information plaintiffs developed in

12  the Interchange litigation, filed lawsuits against Visa, MasterCard and American Express

13  charging them with anticompetitive conduct.  *See* Complaint, *United States v. American Express*

14  *Co.*, No. 1:10-CV-4496-NGG-CLP (E.D.N.Y.).  In the government's complaint, the Department

15  of Justice, along with the Attorneys General of several states, charged Visa, MasterCard and

16  American Express with violations of Section 1 of the Sherman Act.  The complaint, filed in the

17  Eastern District of New York, charged the networks with imposing on merchants "certain rules,

18  policies, and practices ('Merchant Restraints') that insulated Defendants from competition."  *Id.*,

19  ¶2.  The complaint further charged that the restraints "impede merchants from promoting or

20  encouraging the use of a competing credit or charge card with lower card acceptance fees."  *Id.*

21  Each defendant's vertical Merchant Restraints are directly aimed at restraining horizontal

22  interbrand competition. Visa and MasterCard acceded to entry of a consent decree on July 20,

23  2011.  *See American Express Co.*, slip op. (July 20, 2011).  The consent decree prohibited Visa

24  and MasterCard from enforcing certain rules that prohibit merchants from encouraging

25  customers to pay with a competing credit card or with cash, checks or debit cards.  The consent

26  decree also restricts rules that prohibit merchants from promoting a particular type of payment

27  through customer discounts, rebates, or free goods and services.  Also limited were MasterCard's

28  and Visa's rules requiring that banks' contracts with merchants contain provisions preventing

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA      - 76 -

1    vendors from discouraging the use of a Visa or MasterCard subject to higher interchange fees.

2    The consent decree also barred the defendants from imposing any rules or agreements restraining

3    merchants from encouraging customers to pay with a competing credit card or with cash, checks

4    or debit cards.

5         258.   While Visa and MasterCard entered into the consent decree, American Express

6    decided to litigate against the government.  That case, tried before Judge Garaufis in the Eastern

7    District of New York in a seven-week bench trial during the Summer of 2014, resulted in a 150-

8    page Order finding American Express liable for antitrust violations related to certain of its rules.

9    *See American Express Co.*, slip op. (Feb. 19, 2015).  The court noted that the payment card

10   market is "highly concentrated and distorted by a history of antitrust violations."  *Id*. at 4.

11   Defendants are well accustomed to conspiring across the entire marketplace in ways that benefit

12   them at the cost and to the detriment of merchants like the named Plaintiffs and Class members

13   here. Given the degree to which they have colluded in the past, given the extent to which their

14   own public statements have admitted to combination here, and given even their recent

15   coordinated efforts to ever-so-slightly ameliorate the damage they have done, Defendants'

16   alternate explanations of their conduct are due little credence.  The key provisions at issue in the

17   government's case against American Express were its so-called Non-Discrimination Provisions

18   ("NDPs").  These rules, formulated to control the manner in which merchants were allowed to

19   treat American Express cardholders, limited merchants' ability to "steer" cardholders to other,

20   potentially lower cost, forms of payment.  *See id.* at 23-32 (discussing the NDPs).  These rules

21   forbid merchants from, for example, criticizing the card or trying to dissuade a customer from

22   using one.  *See id.* at 25.

23        259.   In practice, the court found "the NDPs operate to block Amex-accepting

24   merchants from encouraging their customers to use any credit or charge card other than an

25   American Express card, even where that card is less expensive for the merchant to accept."  *Id.* at

26   29.  The court further found that the "challenged restraints have impaired the competitive process

27   in the network services market, rendering low-price business models untenable, stunting

28   innovation, and resulting in higher prices for merchants and their consumers."  *Id*. at 98.

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA   - 77 -

**Governmental Investigations Into
Defendants' Conduct Have Begun**

260.    Defendants' actions have drawn the scrutiny of Senator Richard Durbin.   The Senator has begun to inquire into the EMV migration and the Liability Shift, and he has raised many of the same issues raised in this complaint.

261.    Two weeks after Plaintiffs filed this litigation, Senator Durbin wrote to the Chairman of EMVCo's executive committee seeking information "about EMVCo, its governance, its operations, and the impact its specifications may have on competition and choice between electronic payment networks."   Senator Durbin sought answers to a number of questions and expressed concern regarding the lack of any "meaningful decision making authority in the development of . . . specifications or certification processes" by other stakeholders in the electronic payment system, other than the "six giant networks" that own EMVCo.

262.    Senator Durbin also requested information regarding whether EMVCo monitors market data regarding the number of card transactions handled by each U.S. card network before October 1, 2015 and after that date.   Brian Byrne, Chair of EMVCo Board of Managers, stated that: "EMVCo engages an independent contractor to collect global data from EMVCo's members regarding the EMV card transactions they process in their respective regions."   He further stated: "[O]n a regular basis, EMVCo publishes the aggregate percentage of all card-present transactions processed by EMVCo members that are EMV transactions on a rolling twelve-month basis."   For the period July 2014-June 2015 the figure in the United States was 0.26%.   From October 2014-September 2015 the figure was 0.61% and from January 2015-December 2015 the figure was 1.90%.   Despite the decision to implement less secure, more profitable chip-and-signature systems, Mr. Byrne also stated that EMVCo "does not have a position on chip-and-PIN."

263.    Following receipt of that letter, Senator Durbin wrote again to EMVCo on May 11, 2016.  Senator Durbin noted that the "lack of diverse stakeholder representation in EMVCo's governance structure raises serious concerns that EMVCo is not sufficiently focused on making chip card technology work as well as it should for the benefit of consumers and non-network

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA      - 78

1   stakeholders."   He further noted that EMVCo seemed to fall short of meeting the standards

2   required of a standards setting entity.

> [T]he process of establishing EMV specifications is opaque, stakeholder participation is limited, decision-making is dominated and exclusively controlled by only six companies, EMVCo standards have been technologically inadequate and their implementation has caused chaos in the U.S. market, and consensus has been lacking.  These shortcomings are particularly troubling when we are dealing with a standard-setting entity in an area as fundamental to the U.S. economy as electronic payments.

264.   Senator Durbin also noted that while EMVCo's letter stated that "EMV was designed to reduce fraud at retail store locations," unsurprisingly, the 2015 transition to EMV in the United States has been plagued by problems that have burdened retailers and consumers and hampered EMVCo's goal of reducing fraud.  For example, many merchants that have purchased EMV card reader technology have been unable to use it because of backlogs in the EMV certification process.  "These were predictable problems, but it appears that these problems either were not recognized or were not viewed as a priority by EMVCo and its controlling networks."

265.   Senator Durbin also expressed concern regarding the chip-card statistics provided by EMVCo.  "The fact that only 1.9% of U.S. card transactions in 2015 ended up using EMV chip technology indicates either that the market was not remotely prepared for the EMV transition or that there were problems with the technology (or both)."

266.   Senator Durbin further noted that "it appears that EMVCo is currently run by the big card networks for the big card networks.  It is time for other stakeholders besides giant card networks to have a meaningful vote in EMVCo's decision-making and standard-setting process."

267.   On the same day that Senator Durbin wrote his follow up letter to EMVCo, he also wrote to the Chair of the Federal Trade Commission ("FTC") seeking information related to the EMV certification process.   He expressed concern that "problems and delays in the certification process are imposing costly burdens on small- and medium-sized businesses and leaving consumers' card transactions vulnerable to fraud.  I urge the FTC to examine how flaws and delays in the certification process can be addressed so that businesses and consumers can be better protected from these harms."

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA   - 79

268.   He noted that it had been seven months since the payment card networks had implemented the Liability Shift where "any merchant that did not use a card's chip for conducting transactions would bear the cost if a fraudulent transaction occurred with the card."

269.   Durbin's letter explained: "Many small- and medium-sized businesses have spent significant amounts of money upgrading their checkout counter terminals and software systems to accept EMV chip cards, but so far have been unable to actually use those systems because of lengthy delays in getting the hardware and software certified for use."

270.   The letter continued:

> The EMV certification process is opaque and confusing, with each card network requiring its payment processors and equipment providers to test and certify a merchant's hardware and software for compliance with network-specific requirements that are largely derived from EMVCo specifications. The certification process can last for months, yet some of the technical requirements were not even made available until shortly before the October 2015 shift to EMV technology. Payment processors and other providers have been slow to conduct certifications for small- and medium-sized merchants; so far only a fraction of merchants who have sought certifications have been able to obtain them, and the merchants who have been stuck in the certification queue are at increased risk of being victimized by fraud because of their inability to use their chip readers.

Senator Durbin then asked a series of questions related whether the FTC has or plans to examine the certification process.  To date, the FTC's responses are not available.

### MEMBER BANKS CONTINUE TO EXERT CONTROL OVER VISA AND MASTERCARD

271.   Historically Visa and MasterCard were joint ventures between payment card issuing banks.  This member bank control over Visa and MasterCard allowed card issuers to jointly set rules regarding the operation of the payment card networks.

272.   Over time, the joint agreements between the member banks implemented through Visa and MasterCard began to be challenged as violative of the antitrust laws.  ¶¶248-259, *supra* ("Defendants Have a History of Anticompetitive Conduct").  In an attempt to avoid future antitrust liability, the member banks divested their ownership in Visa and MasterCard through initial public offerings ("IPO").[29]  But, by using their pre-IPO control over Visa and MasterCard,

---

[29]   *See, e.g.*, MasterCard Incorporated (Amendment No. 8 to Form S-1 Registration Statement) (May 23, 2006) at 72-73 (noting that MasterCard had "faced heightened regulatory scrutiny and legal challenges in recent years"); Visa, Inc. (Amendment No. 5 to Form S-4 Registration

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA           - 80

1   through clever shareholding agreements, the member banks continue to exercise control over

2   Visa and MasterCard, and continue not to compete in important areas.

3        273.   They implemented this agreement by structuring the IPOs so that while the

4   corporate form changed, the way in which the businesses operated did not.   Pre-IPO, the

5   networks and member/owner banks made joint decisions about the operations of the networks

6   through their governing boards and through their ownership of Visa and MasterCard. They

7   agreed to rules regarding liability for fraudulent transactions, the default interchange fees the

8   card-issuing banks would receive when a card was swiped, and legion other rules. Post-IPO,

9   coordination continued.

10  **The MasterCard IPO**

11       274.   On May 22, 2006, MasterCard completed its IPO, which sold a partial interest in

12  MasterCard to public investors.   Through the IPO and related agreements, the surviving entity

13  acquired certain of its member banks' ownership and control rights in MasterCard by redeeming

14  and reclassifying stock previously held by the member banks into non-voting "Class B" shares in

15  post-IPO, MasterCard.   In addition, the member banks each received a single "Class M" share

16  that allowed them to elect up to 25% of the post-IPO MasterCard board and gave them veto

17  power over certain of post-IPO MasterCard's decisions.   Post-IPO, MasterCard financed this

18  acquisition by selling into the public "Class A" shares, which represented a 49% equity interest

19  in post-IPO MasterCard.   The Class B shares that are held by the member banks constitute 41%

20  of the equity interest in post-IPO MasterCard.   A newly created MasterCard Foundation was

21  given a 10% equity share in post-IPO MasterCard.

22       275.   Leading up to and at the time of the IPO, MasterCard and its member banks

23  (including certain defendants here) executed several related agreements, which ensured the banks

24  would retain significant control over post-IPO MasterCard's competitive decisions and prevent

25  post-IPO MasterCard from becoming a legitimate competitor to the banks' and Visa's market

26  Statement) at 54 (Sept. 13, 2007) (Lehman Brother's opinion to Visa International's board was
27  that one of "the strategic benefits of the restructuring to the Visa enterprise as a whole and to
    each of its component entities" was "managing potential antitrust and other litigation
28  exposure.").

power in the relevant market.   For example, MasterCard and its member banks enacted a restriction that limited any one shareholder or group of shareholders from acquiring more than a 15% equity interest in post-IPO MasterCard.

276.   Through the IPO, MasterCard and its member banks intended to preserve its ability to impose rules on MasterCard, the other banks and merchants without being subject to the proscriptions of §1 of the Sherman Act.

**The Visa IPO**

277.   On March 19, 2008, Visa completed its own IPO. Under a series of transactions that culminated in the IPO, Visa U.S.A., Visa International, Visa Canada, and Inovant became subsidiaries of a Delaware corporation known as Visa Inc.  After the subsidiaries were unified in Visa Inc., the stock was acquired in the former members of each subsidiary.   Once the restructuring was completed, Visa Inc. conducted an IPO of over 400,000,000 shares of Class A common stock.   This process was essentially the acquisition by Visa Inc. of certain member banks' ownership rights in Visa through the redemption and reclassification of approximately 270 million shares of Visa stock previously held by the member banks in the form of Class B and Class C common stock. Members of Visa U.S.A. acquired Class B common stock; other banks received Class C common stock.

**The Effect of the IPOs**

278.   The IPOs increased the effectiveness of Defendants' decision making and market power by consolidating and coordinating communications between the supposed competitors. Visa and MasterCard's economists opined in 1993 – well before these IPOs were being considered – that "[t]here would be far less competition in this industry if Visa and MasterCard had chosen to operate as single companies."  David S. Evans & Richard L. Schmalensee, *The Economics of the Payment Card Industry* 103 (1993).

279.   As part of the corporate reorganizations leading to their respective IPOs, the member banks reaffirmed and effectively readopted each network's rules, including rules related to liability for fraudulent transactions.  Because the banks designed and approved the Networks' rules and the Networks' restructurings, the Networks' conduct was essentially unchanged by the

1   restructurings and the IPOs, so that the anticompetitive effects of these ongoing conspiracies

2   continue to harm merchants.  Visa, MasterCard and the member banks understood before the

3   IPOs were consummated that, if Visa and MasterCard maintained the cartels' basic rules and

4   structures, no bank would break rank and compete for merchant acceptance.  That is precisely

5   what happened.

6          280.   Government antitrust enforcers agree that these IPOs were changes merely in

7   corporate form, not substantive conduct.  In 2007, the European Commission's Competition

8   Directorate issued a written determination that MasterCard's members had simply agreed to

9   appoint MasterCard as their cartel manager to act in their collective best interest:

10          MasterCard's viewpoint that the IPO . . . had changed the organisation's
            governance so fundamentally that any decision of MasterCard Incorporated's
11          Global Board no longer qualifies as [a] decision of an association [of its member
            banks] but rather as [a] "unilateral" act which each member bank bilaterally
12          agrees to abide by, cannot be accepted.

13                              *        *        *

14          MasterCard's member banks shaped and eventually approved the IPO in order to
            perpetuate the MIF [Multilateral Interchange Fee—the rule at issue in this matter]
15          as part of the business model in a form that they perceived to be less exposed to
            antitrust scrutiny.  Contrary to MasterCard's argument, the aim of avoiding
16          exposure to antitrust risks due to the MasterCard MIF was a clear driving force
            behind the IPO.  Rather than modifying the business model to bring it in line with
17          EU competition law, the banks chose to change the governance of their co-
            ordination specifically for antitrust sensitive decision making.  The member banks
18          effectively "*outsourced*" this decision making to a new management body and
            made sure that their direct influence . . . would be limited to minority rights.
19          However, the banks also agreed to the IPO . . . . after MasterCard's management
            assured them that the banks' interests will continue to be preserved under a new
20          'enhanced customer approach' and via the local input of the banks in the decision
            making.
21
                   *It cannot be doubted that in approving the IPO and thereby delegating
22          the decision making powers for the MIF to the new independent Global Board,
            the member banks legitimately expected and therefore agreed that this Board
23          would henceforth set the MIF in a manner that is in their common interests*.

24   European Commission Decision, ¶¶357, 378-379 (emphasis added).

25          281.   The fact that a majority of MasterCard's post-IPO directors were "independent"

26   did not change the role of MasterCard as the "outsourced" pricing agent and manager of the

27   members' cartel:

28

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA          - 83 -

1

2

3

4

> The circumstance that members of the Global Board are "independent" within the meaning of the NYSE criteria . . . is not a decisive question for there to be an association of undertakings. As an organisation's members entrust decision making power to a common body with the expectations that the body's subsequent coordination of their competitive behavior will occur in the interest of the members, the independence of such body is no obstacle to qualifying its decisions as decision[s] of an association of undertakings.

5   *Id.*, ¶381.

6       282.    Even after the IPO, the "decisions of [MasterCard's] management bodies are still

7   binding upon [its] members and no bank can participate in the card activities of [MasterCard]

8   without complying in all respects with [MasterCard's rules]." *Id.*, ¶352. The Commission also

9   found that the post-IPO MasterCard entity coordinates "the market behavior of the organisation's

10   members banks." *Id.*, ¶355.

11       283.    In May 2012, the European General Court affirmed the Commission's

12   conclusions:

13

14

15

16

> [T]he Commission was legitimately entitled to take the view, in essence, that despite the changes brought about by MasterCard's IPO, the MasterCard payment organisation had continued to be an institutionalised form of coordination of the conduct of the banks. Consequently, the Commission was fully entitled to characterize as decisions by an association of undertakings the decisions taken by the bodies of the MasterCard payment organisation in determining the MIF.

17   *MasterCard, Inc. and Others v. European Commission*, No. T-111/08, ¶259 (May 24, 2012).

18   "[W]ith regard to merchants, what [MasterCard and its member banks] sought [post-IPO] is

19   essentially the maximum threshold of their tolerance to the price of card transactions." *Id.*, ¶257.

20       284.    In September 2014, the European Court of Justice — Europe's top court —

21   likewise upheld the European Commission's decision:

22

23

24

25

26

> [T]he General Court considered the existence of a commonality of interests to be relevant in this instance not only on the basis of a theoretical concurrence of the banks' interests and those of MasterCard, but also having taken into account, in its definitive assessment of the facts, specific factual circumstances . . . including . . . the fact that it was undisputed that MasterCard was acting in the interests of the banks before the IPO; secondly . . . the developments after the IPO which indicate that that organisation is, in reality, continuing to take into account concrete banks' interests in setting the level of the MIF; and thirdly . . . the fact that the interests of MasterCard's shareholders do not conflict with those of the banks.

27

> *         *         *

28

> In those circumstances, it was open to the General Court to find . . . that both the banks' residual decision-making powers after the IPO on matters other

> than the MIF, and the commonality of interests between MasterCard and the banks, were both relevant and sufficient for purposes of assessing whether, after the IPO, MasterCard could still be considered to be an 'association of undertakings', within the meaning of Article 81 EC.
>
> [T]he undertakings in question pursued, over several years, the same objective of joint regulation of the market within the framework of the same organisation, albeit under different forms.

*MasterCard, Inc. and Others v. European Commission*, No. C-382/12 P, ¶¶71, 72, 76 (Sept. 11, 2014).  In July 2015, the European Commission sent an additional Statement of Objections to MasterCard, the result of a two-year investigation started in April 2013, outlining the Commission's view that certain additional categories of interchange fees and rules limit competition and lead to excessive interchange fees.  A similar investigation by the European Commission as to Visa is ongoing.

## COUNT I

**Violation of §§1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§1 and 3, Agreement Restraining Trade**

285.   Plaintiffs hereby incorporate paragraphs 1 through 284 as though fully set forth herein.

286.   Defendants, and their co-conspirators, entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of §§1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§1 and 3.  The conspiracy consisted of a continuing agreement, understanding, or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants agreed to shift the liability of fraudulent payment card transactions from the card-issuing banks to merchants.

287.   Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between, and among Defendants and other unnamed co-conspirators.  Defendants' conspiracy is a per se violation of the Sherman Antitrust Act and is, in any event, an unreasonable and unlawful restraint of trade.

288.   There is no legitimate business justification for, or procompetitive benefit caused by, Defendants' unreasonable restraint of trade.  Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA         - 85

1  289.   Defendants' conspiracy, and the resulting impact on the prices of credit card

2  acceptance, occurred in and affected interstate commerce and commerce in and between the

3  Territories of the United States.

4  290.   As a direct, intended, foreseeable, and proximate result of Defendants' conspiracy

5  and overt acts taken in furtherance thereof, Plaintiffs and each member of the Class have suffered

6  injury to their business or property.  Plaintiffs' and each Class member's damages are directly

7  attributable to Defendants' conduct, which resulted in all Class members paying for fraudulent

8  payment card transactions and associated fees during the relevant period that they would not

9  have otherwise paid for, but for Defendants' agreement.

10  291.   Plaintiffs' and the Class's injuries are of the type the antitrust laws were designed

11  to prevent, and flow from that which makes Defendants' conduct unlawful.

12  292.   Plaintiffs and the Class are entitled to treble damages, attorneys' fees, reasonable

13  expenses, and cost of suit for the violations of the Sherman Antitrust Act.

14  ### COUNT II

15  **Violations of the Cartwright Act, Cal. Bus. & Prof. Code §16700, *et seq.***

16  293.   Plaintiffs hereby incorporate paragraphs 1 through 284 as though fully set forth

17  herein.

18  294.   The acts and practices detailed above violate the Cartwright Act, Cal. Bus. &

19  Prof. Code §16700, *et seq.*

20  295.   Plaintiffs bring this claim on behalf of a nationwide class.   Alternatively,

21  Plaintiffs bring this claim on behalf of a class of California merchants

22  296.   The conspiracy consisted of a continuing agreement, understanding, or concerted

23  action between and among Defendants and their co-conspirators in furtherance of which

24  Defendants agreed to shift the liability of fraudulent payment card transactions from the card-

25  issuing banks to merchants.

26  297.   It is appropriate to bring this action under the Cartwright Act because many of the

27  illegal agreements were made in California, many Plaintiffs reside in California, named plaintiff

28  Monsieur Marcel resides in California and named plaintiff rue21 has significant business

operations in the state, some Defendants have their principal place of business in California, and because overt acts in furtherance of the conspiracy and wrongful charges flowing from those acts occurred in California.

298.   Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between, and among Defendants and other unnamed co-conspirators. Defendants' conspiracy is a per se violation of the Cartwright Act and is, in any event, an unreasonable and unlawful restraint of trade.

299.   There is no legitimate business justification for, or procompetitive benefit caused by Defendants' unreasonable restraint of trade.   Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

300.   As a direct, intended, foreseeable, and proximate result of Defendants' conspiracy and overt acts taken in furtherance thereof, Plaintiffs and each member of the Class have suffered injury to their business or property.  Plaintiffs' and each Class member's damages are directly attributable to Defendants' conduct, which resulted in all Class members paying for fraudulent payment card transactions and associated fees during the relevant period that they would not have otherwise paid for, but for Defendants' agreement.

301.   Plaintiffs' and the Class's injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

302.   Plaintiffs and the Class are entitled to treble damages, attorneys' fees, reasonable expenses, and cost of suit for the violations of the Cartwright Act.

## COUNT III

### Violations of the Florida Antitrust Act, Fla. Stat. Ann. §542.19, *et seq.*

303.   Plaintiffs hereby incorporate paragraphs 1 through 284 as though fully set forth herein.

304.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the Florida Antitrust Act, Fla. Stat. Ann. §542.19, *et seq.*

305.   The acts and practices detailed above violate the Florida Antitrust Act, Fla. Stat. Ann. §542.19, *et seq.*

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA     - 87 -

1    306.    Plaintiff brings this claim on behalf of a class of Florida merchants.

2    307.    The conspiracy herein consisted of a continuing agreement, understanding, or

3    concerted action between and among Defendants and their co-conspirators in furtherance of

4    which Defendants agreed to shift the liability of fraudulent payment card transactions from the

5    card-issuing banks to merchants.

6    308.    It is appropriate to bring this action under the Florida Antitrust Act, Fla. Stat.

7    Ann. §542.19, *et seq.*, because named plaintiffs Milam's Market, Grove Liquors, and rue21 have

8    significant business operations in the state and, like other Florida merchants, directly paid

9    chargebacks in Florida as a result of Defendants' wrongdoing that they would not have paid but

10   for Defendants' acts. Overt acts in furtherance of the conspiracy and wrongful charges flowing

11   from those acts occurred in Florida and Defendants do business in Florida.

12   309.    Defendants' unlawful conduct was through mutual understandings, combinations

13   or agreements by, between, and among Defendants and other unnamed co-conspirators.

14   310.    There is no legitimate business justification for, or procompetitive benefit caused

15   by Defendants' unreasonable restraint of trade.   Any ostensible procompetitive benefit was

16   pretextual or could have been achieved by less restrictive means.

17   311.    As a direct, intended, foreseeable, and proximate result of Defendants' conspiracy

18   and overt acts taken in furtherance thereof, Plaintiffs and each member of the Class have suffered

19   injury to their business or property.  This injury is distinct and palpable and each member of the

20   Class possesses an interest in the outcome of the controversy. Plaintiffs' and each Class

21   member's damages are directly attributable to Defendants' conduct, which resulted in all Class

22   members paying for fraudulent payment card transactions and associated fees during the relevant

23   period that they would not have otherwise paid for, but for Defendants' agreement.

24   312.    During the Class Period, Defendants' illegal conduct substantially affected

25   Florida commerce. Plaintiffs are merchants with businesses in Florida who have suffered distinct

26   and traceable injuries to their businesses in Florida as the direct result of Defendants' unlawful

27   collusion, which has caused Plaintiffs to pay higher chargebacks on credit card transactions than

28   they would have paid absent Defendants' anti-competitive agreements

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA      - 88 -

313.   Plaintiffs' and the Class's injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

314.   Plaintiffs and the Class seek all forms of relief available under the Florida Antitrust Act, Fla. Stat. Ann. §542.19, *et seq.*

### COUNT IV

**Violations of the Florida Deceptive and Unfair Trade Practices Act,
Fla. Stat. Ann. §501.201, *et seq.***

315.   Plaintiffs hereby incorporate paragraphs 1 through 284 as though fully set forth herein.

316.   Plaintiffs bring claims under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. Ann. §501.201, *et seq.*, on behalf of a class of Florida merchants.

317.   FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. Ann. §501.202.

318.   The conspiracy alleged, which consisted of a continuing agreement, understanding, or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants agreed to shift the liability of fraudulent payment card transactions from the card-issuing banks to merchants is the type of practice which FDUTPA prohibits.

319.   It is appropriate to bring this action under the FDUTPA because many of the illegal chargebacks occurred in Florida, many Plaintiffs reside in Florida, named plaintiffs Milam's Market, Grove Liquors and rue21 are Florida Consumers as defined by the FDUTPA.

320.   Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between, and among Defendants and other unnamed co-conspirators was an unreasonable and unlawful restraint of trade.

321.   As a direct, intended, foreseeable, and proximate result of Defendants' conspiracy and overt acts taken in furtherance thereof, Plaintiffs and each member of the Class have suffered injury to their business or property.  Plaintiffs' and each Class member's damages are directly

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA     - 89

attributable to Defendants' conduct, which resulted in all Class members paying for fraudulent payment card transactions and associated fees during the relevant period that they would not have otherwise paid for, but for Defendants' agreement.

322.   Plaintiffs and the Class are entitled to damages, attorneys' fees, reasonable expenses, and cost of suit for the violations of the FDUTPA.

<h2 style="text-align:center">COUNT V</h2>

**Violation of New York's Donnelly Act, N.Y. Gen. Bus. Law §340, *et seq*.**

323.   Plaintiffs hereby incorporate paragraphs 1 through 284 as though fully set forth herein.

324.   Defendants have entered into an unlawful agreement in restraint of trade in violation of New York's Donnelly Act, N.Y. Gen. Bus. Law §340, *et seq*.

325.   The acts and practices detailed above violate NY Gen. Bus. Law §340, *et seq*.

326.   Plaintiffs bring this claim on behalf of a nationwide class.   Alternatively, Plaintiffs bring this claim on behalf of a class of New York merchants.

327.   Under N.Y. Gen. Bus. Law §340, *et seq*., Plaintiffs may bring claims as direct or indirect purchasers.  Plaintiffs bring their action as direct purchasers on behalf of a class of similarly situated merchants; however, if the Court determines that Plaintiffs are indirect purchasers whose claims for damages under federal law are barred by *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), Plaintiffs plead this count in the alternative as indirect purchasers on behalf of a class of similarly situated merchants under N.Y. Gen. Bus. Law §340, *et seq*.

328.   The conspiracy herein consisted of a continuing agreement, understanding, or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants agreed to shift the liability of fraudulent payment card transactions from the card-issuing banks to merchants.

329.   It is appropriate to bring this action under N.Y. Gen. Bus. Law §340, *et seq*. because named plaintiffs Fine Fare and rue21 have significant business operations in the state and, like other New York merchants, paid chargebacks in New York as a result of Defendants' wrongdoing that they would not have paid, but for Defendants' acts. Overt acts in furtherance of

1 the conspiracy and wrongful charges flowing from those acts occurred in New York and

2 Defendants do business in New York and some Defendants are headquartered in New York.

3     330.    Defendants' unlawful conduct was through mutual understandings, combinations,

4 or agreements by, between, and among Defendants and other unnamed co-conspirators.

5     331.    There is no legitimate business justification for, or procompetitive benefit caused

6 by, Defendants' unreasonable restraint of trade.  Any ostensibly procompetitive benefit was

7 pretextual or could have been achieved by less restrictive means.

8     332.    As a direct, intended, foreseeable, and proximate result of Defendants' conspiracy

9 and overt acts taken in furtherance thereof, Plaintiffs and each member of the Class have suffered

10 injury to their business or property.  This injury is distinct and palpable and each member of the

11 Class possesses an interest in the outcome of the controversy.  Plaintiffs' and each Class

12 member's damages are directly attributable to Defendants' conduct, which resulted in all Class

13 members paying for fraudulent payment card transactions and associated fees during the Class

14 period that they would not have otherwise paid for absent Defendants' agreement.

15     333.    During the Class Period, Defendants' illegal conduct substantially affected New

16 York commerce.  Plaintiffs and members of the Class are merchants with businesses in New

17 York who have suffered distinct and traceable injuries to their businesses in New York as the

18 direct result of Defendants' unlawful collusion, which has caused Plaintiffs to pay higher

19 chargebacks on credit card transactions than they would have paid absent Defendants' anti-

20 competitive agreements

21     334.    Plaintiffs' and the Class's injuries are of the type the antitrust laws were designed

22 to prevent, and flow from that which makes Defendants' conduct unlawful.

23     335.    Plaintiffs and the Class seek all forms of relief available under N.Y. Gen. Bus.

24 Law §340, *et seq.*, including treble damages, costs and reasonable attorneys' fees under N.Y.

25 Gen. Bus. Law §340(5).

26     336.    Plaintiffs have complied with the notice requirements of New York's Donnelly

27 Act by sending a letter alerting the state's Attorney General of this action.  N.Y. Gen. Bus. Law

28 §340, *et seq.*

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA   - 91

1

<b>COUNT VI</b>

2

<b>Deceptive Acts and Practices Claim Under N.Y. Gen. Bus. Law §§349-350</b>

3      337.    Plaintiffs hereby incorporate paragraphs 1 through 284 as though fully set forth

4  herein.

5      338.    Plaintiffs bring this claim under New York's Deceptive Acts and Practices

6  Statute, N.Y. Gen. Bus. Law §§349-350, to enjoin, and recover all damages that resulted from,

7  Defendants' acts in violation of N.Y. Gen. Bus. Law §349.

8      339.    Plaintiffs Fine Fare, rue21 and the members of the Class have standing to bring

9  this action under New York's Deceptive Acts and Practices statute because they have been

10  harmed and suffered injury in New York during the relevant period as a result of the Liability

11  Shift.

12      340.    In formulating and carrying out the alleged agreement, understanding and

13  conspiracy, Defendants and their co-conspirators did those things that they combined and

14  conspired to do, including but not limited to, the acts, practices and course of conduct set forth

15  herein, and these acts constitute deceptive acts and practices in violation of NY Gen. Bus. Law

16  §349.

17      341.    Defendants' conspiracy had the following effects, among others: (a) competition

18  in the General Purpose Card Market in New York during the relevant period was restrained,

19  suppressed, and/or eliminated; (b) the cost to Plaintiffs and members of the Class for

20  chargebacks was illegally shifted onto Plaintiffs in New York during the relevant period; and (c)

21  Plaintiffs and members of the Class who accepted Defendants' credit and charge cards in New

22  York during the relevant period have been deprived of the benefits of free and open competition.

23      342.    As a direct and proximate result of Defendants' anti-competitive conduct,

24  Plaintiffs and members of the Class have been injured in their business or property by paying for

25  chargebacks as a result of Defendants' illegal agreement.   These are fees Plaintiffs would not

26  have paid in the absence of the conspiracy.

27

28

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA      - 92

343.     The anti-competitive behavior, as described above, is unfair, unconscionable, unlawful, and fraudulent, and in any event it is a violation of the policy or spirit of the New York Deceptive Acts and Practices statute.

## COUNT VII

**Unfair Competition Claim Under Cal. Bus. & Prof. Code §17200,** *et seq.*

344.     Plaintiffs hereby incorporate paragraphs 1 through 284 as though fully set forth herein.

345.     Plaintiffs bring this claim under Cal. Bus. & Prof. Code §§17203 and 17204 to enjoin, and obtain restitution and disgorgement of all monetary gains that resulted from, acts that violated Cal. Bus. & Prof. Code §17200, *et seq.*, commonly known as the UCL.

346.     Plaintiffs Monsieur Marcel and rue21 and the members of the Class have standing to bring this action under the UCL because they have been harmed and suffered injury in California during the relevant period as a result of the Liability Shift.

347.     In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to, the acts, practices and course of conduct set forth herein, and these acts constitute unfair competition in violation of the UCL.

348.     Defendants' conspiracy had the following effects, among others: (a) competition in the General Purpose Card Market in California during the relevant period was restrained, suppressed, and/or eliminated; (b) the cost to Plaintiffs and members of the Class for chargebacks was illegal and shifted to Plaintiffs; and (c) Plaintiffs and members of the Class in California during the relevant period have been deprived of the benefits of free and open competition.

349.     As a direct and proximate result of Defendants' anti-competitive conduct, Plaintiffs and members of the Class have been injured in their business or property by paying for chargebacks as a result of Defendants' illegal agreement during the relevant period.  These are fees Plaintiffs and the Class would not have paid in the absence of the conspiracy.

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA      - 93 -

1    350.    The anti-competitive behavior, as described above, is unfair, unconscionable,

2 unlawful, and fraudulent, and in any event it is a violation of the policy or spirit of the UCL.

3                                          **COUNT VIII**

4                                      **Unjust Enrichment**

5    351.    Plaintiffs hereby incorporate paragraphs 1 through 284 as though fully set forth

6 herein.

7    352.    In an effort to recoup the billions of dollars required to issue new chip-enabled

8 cards, Defendants, through the Networks and EMVCo, conspired and agreed to shift the burden

9 for fraudulent transactions from the Issuing Banks to the Class members for transactions

10 involving chip-enabled cards – even in cases where the merchants, such as Plaintiffs here,

11 purchased and installed chip-enabled readers before October 2015.

12    353.    To deal with the substantial costs to implement chip cards, Defendants conspired

13 to and changed the benefit/liability scheme of the card payment system by shifting the liability to

14 the Class members for fraudulent transactions knowing that the EMV system would not be fully

15 operational on October 2015.

16    354.    Defendants knew that the verification process would not be fully operational by

17 October 2015, but implemented the Liability Shift knowing that merchants who purchased and

18 installed equipment would be bearing the cost of the Liability Shift for fraudulent transactions

19 even after they purchased and timely installed approved EMV chip-reading equipment.

20    355.    Nevertheless, Defendants set October 2015 as the Liability Shift date, without any

21 consideration or benefit to the Plaintiffs.  Instead, since October 2015, Defendants have received

22 a direct benefit from Plaintiffs and the Class members as a result of the detrimental Liability

23 Shift to Plaintiffs and the Class.

24    356.    The Issuing Banks market to their customers fraud protection, namely that the

25 cardholders will not be financially responsible if their cards are lost, stolen or used fraudulently.

26    357.    As a result of their inequitable conduct, the Issuing Banks have been unjustly

27 enriched by the Class members, who are now assuming fraud-related losses; losses that were

28 previously incurred by the Issuing Banks.

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA     - 94 -

1   358.   Issuing Banks have accepted and retained the benefit conferred on them by

2   Plaintiffs and the Class members as a result of the liability shift.

3   359.   In light of Defendants' conduct, it is inequitable for the Issuing Banks to retain

4   the benefits of the Liability Shift – the shifting of fraud-related losses to the Class members –

5   without paying for the value to the Plaintiffs and Class members.

6   360.   Because of the acts of Defendants and their co-conspirators as alleged herein,

7   Defendants have been unjustly enriched at the expense of Plaintiffs and the Class and it would be

8   inequitable for them to retain these benefits.

9   361.   Plaintiffs and the Class seek restitution of the direct benefit they have provided to

10   Defendants and all monies of which they were unfairly and improperly deprived, as described

11   herein.

12   **PRAYER FOR RELIEF**

13   WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray that the Court:

14   A.   Determine that this action may be maintained as a class action pursuant to Fed. R.

15   Civ. P. 23(a), (b)(2) and (b)(3), and direct that reasonable notice of this action, as provided by

16   Fed. R. Civ. P. 23(c)(2), be given to the Class, and declare plaintiffs Milam's Market, Grove

17   Liquors, Monsieur Marcel, Fine Fare and rue21 as named representatives of the Class;

18   B.   Conduct expedited discovery proceedings leading to a prompt trial on the merits

19   before a jury on all claims and defenses;

20   C.   Enter joint and several judgments against Defendants and in favor of Plaintiffs

21   and the Class;

22   D.   Award Plaintiffs and the Class damages (*i.e.*, three times overcharges) in an

23   amount to be determined at trial, plus interest in accordance with law;

24   E.   Award Plaintiffs and the Class their costs of suit, including reasonable attorneys'

25   fees as provided by law;

26   F.   Order that Defendants, their directors, officers, employees, agents, successors,

27   members, and all persons in active concert and participation with them be enjoined and

28

1  restrained from, in any manner, directly or indirectly, committing any additional violations of the

2  law as alleged herein; and

3       G.      Award such further and additional relief as is necessary to correct for the anti-

4  competitive market effects caused by Defendants' unlawful conduct, as the Court may deem just

5  and proper under the circumstances.

6                              **JURY DEMAND**

7       Plaintiffs seek trial by jury of all matters so triable.

8  DATED: July 15, 2016                    ROBBINS GELLER RUDMAN
                                              & DOWD LLP
9                                          PATRICK J. COUGHLIN
                                           DAVID W. MITCHELL
10                                         ALEXANDRA S. BERNAY
                                           CARMEN A. MEDICI
11                                         ANGEL P. LAU
                                           LONNIE A. BROWNE
12

13                                                s/ Patrick J. Coughlin
14                                          PATRICK J. COUGHLIN

15                                         655 West Broadway, Suite 1900
                                           San Diego, CA  92101-8498
16                                         Telephone:  619/231-1058
                                           619/231-7423 (fax)
17
                                           ROBBINS GELLER RUDMAN
18                                           & DOWD LLP
                                           ARMEN ZOHRABIAN
19                                         Post Montgomery Center
                                           One Montgomery Street, Suite 1800
20                                         San Francisco, CA  94104
                                           Telephone:  415/288-4545
21                                         415/288-4534 (fax)

22                                         ROBBINS GELLER RUDMAN
                                             & DOWD LLP
23                                         RANDI D. BANDMAN
                                           120 East Palmetto Park Road, Suite 500
24                                         Boca Raton, FL  33432
                                           Telephone:  561/750-3000
25                                         561/750-3364 (fax)

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEVINE GOODMAN RASCO &
  WATTS-FITZGERALD, LLP
JOHN W. DEVINE
LAWRENCE D. GOODMAN
ROBERT J. KUNTZ, JR.
2800 Ponce De Leon Blvd., Suite 1400
Coral Gables, FL  33134
Telephone:  305/374-8200
305/374-8208 (fax)

Attorneys for Plaintiffs

1166358_3

AMENDED COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, CALIFORNIA'S CARTWRIGHT ACT, ETC. - 3:16-cv-01150-WHA      - 97 -

1

<u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on July 15, 2016, I authorized the electronic filing of the foregoing

3

with the Clerk of the Court using the CM/ECF system which will send notification of such filing

4

to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify

5

that I caused to be mailed the foregoing document or paper via the United States Postal Service

6

to the non-CM/ECF participants indicated on the attached Manual Notice List.

7

I certify under penalty of perjury under the laws of the United States of America that the

8

foregoing is true and correct.  Executed on July 15, 2016.

9

 s/ Patrick J. Coughlin

Patrick J. Coughlin

10

11

ROBBINS GELLER RUDMAN
    & DOWD LLP

655 West Broadway, Suite 1900

12

San Diego, CA  92101-8498

Telephone:  619/231-1058

13

619/231-7423 (fax)

14

E-mail:        patc@rgrdlaw.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1166358_3

**Mailing Information for a Case 3:16-cv-01150-WHA B & R Supermarket, Inc., et al v. Visa, Inc. et al**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Mikael A. Abye**
  mabye@shearman.com,ron.cheatham@shearman.com,bhunter@shearman.com

- **Courtney Bedell Averbach**
  caverbach@reedsmith.com,courtney-averbach-3429@ecf.pacerpro.com,reed-smith-2312@ecf.pacerpro.com

- **Scott D. Baker**
  sbaker@reedsmith.com,cmosqueda@reedsmith.com,etaglang@reedsmith.com,cshanahan@reedsmith.com,scott-baker-8371@ecf.pacerpro.com,drothschild@reedsmith.com,cristi-shanahan-4367@ecf.pacerpro.com,reed-smith-2312@ecf.pacerpro.com

- **Randi D. Bandman**
  randib@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **John Eliot Beerbower**
  jbeerbower@hunton.com

- **Paul Belonick**
  pbelonick@sidley.com,sfefilingnotice@sidley.com,jhiwa@sidley.com,sfdocket@sidley.com

- **Craig A Benson**
  CBenson@paulweiss.com,wmcauliffe@paulweiss.com,mao_fednational@paulweiss.com

- **Jane Petersen Bentrott**
  jbentrott@mofo.com

- **Alexandra Senya Bernay**
  xanb@rgrdlaw.com,E_File_SD@rgrdlaw.com,jkusy@rgrdlaw.com,AZohrabian@rgrdlaw.com

- **Boris Bershteyn**
  boris.bershteyn@skadden.com

- **Daniel I Booker**
  dbooker@reedsmith.com,dalioto@reedsmith.com

- **Andrew Baldwin Brantingham**
  brantingham.andrew@dorsey.com,hanson.katheryn@dorsey.com

- **Lonnie Anthony Browne**
  LBrowne@rgrdlaw.com

- **Brian Calandra**
  brian.calandra@shearman.com

- **Melissa Colon-Bosolet**
  mcolon-bosolet@sidley.com,nyefiling@sidley.com

- **Erica M Connolly**
  erica.connolly@aporter.com,terry.metasavage@aporter.com,sfcalendar@aporter.com

- **Dana Lynn Cook-Milligan**
  dlcook@winston.com

- **Patrick J. Coughlin**
  PatC@rgrdlaw.com,SusanM@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Ethan Craig**
  ecraig@btlaw.com

- **John William Devine**
  jdevine@devinegoodman.com

- **William Yates Durbin**
  WDurbin@paulweiss.com,fvella@paulweiss.com,cyang@paulweiss.com,abaniel-stark@paulweiss.com

- **Howard Feller**
  hfeller@mcguirewoods.com

- **Tiffani B Figueroa**
  TFigueroa@mofo.com

- **Natalie Anne Fleming Nolen**
  nflemingnolen@mofo.com

- **Kenneth A. Gallo**
  kgallo@paulweiss.com,mlaramie@paulweiss.com

- **Cheryl Ann Galvin**
  cgalvin@tcolaw.com

- **Lawrence Dean Goodman**
  lgoodman@devinegoodman.com,alopez@devinegoodman.com,smallet@devinegoodman.com

- **David F. Graham**
  dgraham@sidley.com,efilingnotice@sidley.com

- **Peter E Greene**
  peter.greene@skadden.com

- **Alexander Guney**
  alexander.guney@sedgwicklaw.com

- **D. Bruce Hoffman**
  bhoffman@hunton.com,acordero@hunton.com

- **Peter K. Huston**
  phuston@sidley.com,jhiwa@sidley.com,sfdocket@sidley.com,hebalogi@sidley.com

- **Susan S. Joo**

sjoo@hunton.com,jocampo@hunton.com

- **J. Brent Justus**
  bjustus@mcguirewoods.com

- **Raoul Dion Kennedy**
  raoul.kennedy@skadden.com,alissa.turnipseed@skadden.com,james.schaefer@skadden.com,sarah.wood@skadden.com

- **Benjamin Klebanoff**
  benjamin.klebanoff@shearman.com

- **Leslie Kostyshak**
  lkostyshak@hunton.com,jbeerbower@hunton.com

- **Harry P Koulos**
  harry.koulos@skadden.com

- **Evan R Kreiner**
  evan.kreiner@skadden.com

- **Robert J Kuntz , Jr**
  rkuntz@devinegoodman.com,vcerra@devinegoodman.com

- **Mark P. Ladner**
  mladner@mofo.com,nflemingnolen@mofo.com,stice@mofo.com,docketny@mofo.com

- **Alexandra Eve Laks**
  alaks@mofo.com,ggerrish@mofo.com

- **Angel Puimei Lau**
  alau@rgrdlaw.com,tdevries@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Richard Qiguang Liu**
  liu.richard@dorsey.com,buresh.cassie@dorsey.com

- **Bradley Robert Love**
  bradley.love@btlaw.com,deb.adams@btlaw.com

- **Casey Erin Lucier**
  clucier@mcguirewoods.com

- **Martha Corcoran Luemers**
  eFilingPA@dorsey.com,luemers.martha@dorsey.com,hobbs.wendy@dorsey.com

- **Michelle Ann Mantine**
  mmantine@reedsmith.com,michelle-mantine-7250@ecf.pacerpro.com,dsharp@reedsmith.com,docketingecf@reedsmith.com,reed-smith-2312@ecf.pacerpro.com,jeremy.feinstein@pnc.com,sament@reedsmith.com

- **Sharon D. Mayo**
  sharon.mayo@aporter.com,robert.culhane@aporter.com,Joanna.Lee@aporter.com,Emily.Clark@aporter.com,sfcalendar@aporter.com,Jill.Hernandez@aporter.com

- **Carmen Anthony Medici**
  cmedici@rgrdlaw.com,slandry@rgrdlaw.com,E_File_SD@rgrdlaw.com,ckopko@rgrdlaw.com

- **Sean D. Meenan**
  smeenan@winston.com,lschuh@winston.com,recordssf@winston.com,pacercourtfile@winston.com,docketsf@winston.com,lpearce@winston.com

- **Mark R Merley**
  Mark.Merley@APORTER.COM

- **Kendall Millard**
  kmillard@btlaw.com,kristin.johnson@btlaw.com,lroberts@btlaw.com

- **Michael B. Miller**
  mbmiller@mofo.com,docketny@mofo.com

- **David W. Mitchell**
  davidm@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Joseph Laurence Motto**
  JMotto@winston.com,ahodgson@winston.com

- **Dennis Francis Murphy**
  dennis.murphy@sedgwicklaw.com

- **Benjamin Robert Nagin**
  bnagin@sidley.com,nyefiling@sidley.com

- **Karen C Otto**
  karen.otto@aporter.com

- **Elizabeth P Papez**
  epapez@winston.com

- **Jenifer Ellen Parsigian**
  jparsigian@winston.com,hhammon@winston.com,docketsf@winston.com

- **Angela Maryssa Porter**
  porter.angela@dorsey.com,vallant.tammy@dorsey.com

- **David Carlyle Powell**
  dpowell@mcguirewoods.com,ladocket@mcguirewoods.com,usdocket@mcguirewoods.com,shorne@mcguirewoods.com,izabala@mcguirewoods.com,mbetti@mcguirewoods.com,mdylak@mcguirewoods.com

- **Penelope Athene Preovolos**
  ppreovolos@mofo.com,lroiz@mofo.com

- **Roya Rahmanpour**
  roya.rahmanpour@btlaw.com,marjory.dingwall@btlaw.com,jerod.williams@btlaw.com

- **Alicia M Raines**
  araines@btlaw.com,pflynn@btlaw.com

- **Frederick Matthew Ralph**
  ralph.matthew@dorsey.com,stilson.jaime@dorsey.com,fairbairn.mary@dorsey.com,Kelly.Laurie@dorsey.com

- **Paul Jeffrey Riehle**

- **Paul Jeffrey Riehle**
  paul.riehle@sedgwicklaw.com,SDMAcalendaring@sedgwicklaw.com,phyllis.flynn@sedgwicklaw.com

- **Patrick David Robbins**
  probbins@shearman.com,rcheatham@shearman.com

- **Lauren Kelley Ross**
  lross@cravath.com,mao@cravath.com

- **Conor Michael Shaffer**
  cshaffer@reedsmith.com

- **Ashley Lynn Shively**
  ashively@reedsmith.com,dkelley@reedsmith.com

- **Ryan A Shores**
  rshores@hunton.com,gjenkins@hunton.com

- **Robert Yale Sperling**
  rsperling@winston.com

- **James Patrick Tallon**
  jtallon@shearman.com,iwiener@shearman.com

- **Stephen E. Taylor**
  staylor@tcolaw.com,cdunbar@tcolaw.com

- **Robert John Vizas**
  robert.vizas@aporter.com,marie.zambrano@aporter.com,SFCalendar@aporter.com

- **Jamie Danielle Wells**
  jwells@mcguirewoods.com,ladocket@mcguirewoods.com,dmolakides@mcguirewoods.com

- **Rowan D. Wilson**
  rwilson@cravath.com,mao@cravath.com,kkaplan@cravath.com

- **Jennifer Michelle Wong**
  jennifer.wong@sidley.com,nyefiling@sidley.com

- **Catherine M Yang**
  CYang@paulweiss.com,mao_fednational@paulweiss.com

- **Armen Zohrabian**
  AZohrabian@rgrdlaw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)