RAOUL D. KENNEDY (SBN 40892)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue, Suite 1400
Palo Alto, CA 94301
Telephone: (650) 470-4500
Facsimile:  (650) 470-4570
Email:       raoul.kennedy@skadden.com

PETER E. GREENE (admitted *pro hac vice*)
BORIS BERSHTEYN (admitted *pro hac vice*)
EVAN R. KREINER (admitted *pro hac vice*)
HARRY P. KOULOS (SBN 310508)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036
Telephone: (212) 735-3000
Facsimile:  (212) 735-2000
Email:       peter.greene@skadden.com
Email:       boris.bershteyn@skadden.com
Email:       evan.kreiner@skadden.com
Email:       harry.koulos@skadden.com

Attorneys for Defendant

CHASE BANK USA, N.A.

[*ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGES*]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| B & R SUPERMARKET, INC., et al., | ) | Case No. 3:16-cv-01150-WHA |
| | ) | |
| Plaintiffs, | ) | BANK DEFENDANTS' NOTICE OF |
| | ) | MOTION TO DISMISS AMENDED |
| v. | ) | COMPLAINT, MOTION TO DISMISS, |
| | ) | AND MEMORANDUM OF POINTS AND |
| VISA, INC., et al., | ) | AUTHORITIES IN SUPPORT THEREOF |
| | ) | |
| Defendants. | ) | Date:  September 22, 2016 |
| | ) | |
| | ) | Time: 8:00 am |
| | ) | |
| | ) | Place: Courtroom 8, 19th Floor |
| | ) | |
| | ) | Honorable William H. Alsup |

## TABLE OF CONTENTS

NOTICE OF MOTION ........................................................................................................... 1

STATEMENT OF ISSUES TO BE DECIDED ..................................................................... 1

PRELIMINARY STATEMENT ............................................................................................ 2

FACTUAL ALLEGATIONS ................................................................................................. 3

    I.      THE LIABILITY SHIFT ..................................................................... 3

    II.     ALLEGATIONS REGARDING BANK DEFENDANTS ....................................... 5

          A.     EMVCo And Industry Associations ................................................. 5

          B.     The Visa And MasterCard IPOs .................................................... 7

ARGUMENT .......................................................................................................................... 8

    I.      PLAINTIFFS DO NOT PLAUSIBLY ALLEGE THAT BANK DEFENDANTS WERE INVOLVED IN A CONSPIRACY TO RESTRAIN TRADE IN VIOLATION OF THE SHERMAN ACT ............................................. 8

          A.     Participating In EMVCo Or Industry Associations Does Not Plausibly Suggest That Any Bank Defendant Engaged In A Conspiracy ..................................................................................... 9

          B.     Plaintiffs Do Not Plausibly Allege That Bank Defendants Control Visa Or MasterCard ...................................................................... 14

          C.     Plaintiffs' Other Allegations Do Not Involve Bank Defendants ................. 16

    II.     THE STATE LAW CLAIMS AGAINST BANK DEFENDANTS SHOULD BE DISMISSED ...................................................................................... 18

    III.   ALL CLAIMS AGAINST BANK DEFENDANTS SHOULD BE DISMISSED WITH PREJUDICE ................................................................. 20

CONCLUSION .................................................................................................................... 21

## <u>TABLE OF AUTHORITIES</u>

*In re Automotive Refinishing Paint Antitrust Litigation*,
    515 F. Supp. 2d 544 (E.D. Pa. 2007) ................................................................. 18

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................. 8, 9

*Bona Fide Conglomerate, Inc. v. SourceAmerica*,
    No. 14-cv-0751-GPC-DHB, 2014 WL 4162020 (S.D. Cal. Aug. 20, 2014) ....................... 15

*In re California Title Insurance Antitrust Litigation*,
    No. C 08-01341 JSW, 2009 WL 1458025 (N.D. Cal. May 21, 2009) ................................ 10

*In re Citric Acid Litigation*,
    191 F.3d 1090 (9th Cir. 1999) ................................................................................ 10, 13

*Denison v. Citifinancial Servicing, LLC*,
    No. C 16-00432 WHA, 2016 WL 3443380 (N.D. Cal. June 23, 2016) ............................... 20

*In re Graphics Processing Units Antitrust Litigation*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ................................................................ 9, 10, 12

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ......................................................................... *passim*

*Knievel v. ESPN*,
    393 F.3d 1068 (9th Cir. 2005) ................................................................................. 13

*In re Late Fee & Over-Limit Fee Litigation*,
    528 F. Supp. 2d 953 (N.D. Cal. 2007) ................................................................... 10, 17

*McArthur Dairy, LLC v. McCowtree Bros. Dairy, Inc.*,
    No. 09-62033-CIV, 2011 WL 2118701 (S.D. Fla. May 27, 2011) ..................................... 18

*Morris Communications Corp. v. PGA Tour, Inc.*,
    235 F. Supp. 2d 1269 (M.D. Fla. 2002) ..................................................................... 18

*In re Musical Instruments & Equipment Antitrust Litigation*,
    798 F.3d 1186 (9th Cir. 2015) .......................................................................... 8, 9, 17

*In re Optical Disk Drive Antitrust Litigation*,
    No. 10-md-2143 RS, 2014 WL 3378336 (N.D. Cal. July 10, 2014) ...................................... 8

*Oregon Teamster Employers Trust v. Hillsboro Garbage Disposal, Inc.*,
    800 F.3d 1151 (9th Cir. 2015) ................................................................................. 21

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
    939 F. Supp. 2d 1002 (N.D. Cal. 2013) ..................................................................... 18

*Perkins v. LinkedIn Corp.*,
    53 F. Supp. 3d 1190 (N.D. Cal. 2014) ....................................................................... 13

*Prime Healthcare Services v. SEIU*,
    No. 11-CV-02652 JLS (RBB), 2012 WL 3778348 (S.D. Cal. Aug. 30, 2012) ..................... 10

*Romero v. Flowers Bakeries, LLC*,
    No. 14-cv-05189-BLF, 2016 WL 469370 (N.D. Cal. Feb. 8, 2016) .................................... 20

*RxUSA Wholesale, Inc. v. Alcon Laboratories, Inc.*,
    661 F. Supp. 2d 218 (E.D.N.Y. 2009) ................................................................ 18

*Stubhub, Inc. v. Golden State Warriors, LLC*,
    No. C 15-1436 MMC, 2015 WL 6755594 (N.D. Cal. Nov. 5, 2015) ................................. 18

*In re Travel Agent Commission Antitrust Litigation*,
    583 F.3d 896 (6th Cir. 2009) ......................................................................... 10

*United States v. Hom*,
    45 F. Supp. 3d 1175 (N.D. Cal. 2014) ............................................................... 19

*United States v. Visa U.S.A., Inc.*,
    344 F.3d 229 (2d Cir. 2003) ......................................................................... 13

*Vargas v. Wells Fargo Bank, N.A.*,
    No. C 12-02008 WHA, 2012 WL 2931220 (N.D. Cal. July 18, 2012) .............................. 19

*Wilson v. EverBank, N.A.*,
    77 F. Supp. 3d 1202 (S.D. Fla. 2015) ................................................................ 19

1  **NOTICE OF MOTION**

2  TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3       Please take notice that on September 22, 2016, at 8:00 am, or as soon thereafter as

4  the matter may be heard by the Court, at the courtroom of the Honorable William H. Alsup,

5  Courtroom 8, 19th Floor, United States District Court, 450 Golden Gate Avenue, San Francisco,

6  California, Defendants Bank of America, N.A. ("Bank of America"), Capital One Financial

7  Corporation ("Capital One"), Chase Bank USA, National Association ("Chase"), Citibank, N.A.

8  for itself, and as successor in interest to Citibank (South Dakota), N.A. ("Citi"), PNC Bank,

9  National Association ("PNC"), U.S. Bank National Association ("U.S. Bank"), and Wells Fargo

10  Bank, N.A. ("Wells Fargo") (collectively, the "Bank Defendants"), will and hereby do move to

11  dismiss Plaintiffs' amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil

12  Procedure.

13       Bank Defendants seek dismissal with prejudice of all claims against them.

14  **STATEMENT OF ISSUES TO BE DECIDED**

15      1.    Whether the amended complaint plausibly alleges that the Bank Defendants

16  conspired to amend each major payment card network's card-present fraud liability rules and

17  implement these amended rules.

18      2.    Whether Plaintiffs' claims against the Bank Defendants should be dismissed with

19  prejudice.

20

21

22

23

24

25

26

27

28

**PRELIMINARY STATEMENT**

1

2        To plausibly allege a conspiracy, a complaint must "answer the basic questions:

3   who, did what, to whom (or with whom), where, and when?"  *Kendall v. Visa U.S.A., Inc.*, 518

4   F.3d 1042, 1048 (9th Cir. 2008).  Plaintiffs base their claims against the Bank Defendants on the

5   theory that they conspired to amend each major payment card network's fraud liability rules and

6   implement these amended rules—in other words, to cause the so-called "liability shift."  Plaintiffs'

7   allegations do not, however, answer any of *Kendall*'s essential questions regarding the Bank

8   Defendants, and do not plausibly suggest that any Bank Defendant participated in the purported

9   liability shift conspiracy.

10        Instead, the amended complaint makes two sets of allegations involving the Bank

11  Defendants—allegations that are, separately and collectively, inadequate.  First, Plaintiffs allege

12  that the Bank Defendants had the opportunity to join the purported conspiracy because some Bank

13  Defendants participated in industry fora and some participated in advisory groups to EMVCo, a

14  company owned and managed by American Express, Discover, MasterCard, and Visa (collectively,

15  the "Network Defendants") (and two other companies not named as defendants or alleged to be

16  conspirators) that sets specifications for transactions using certain technologies.  It is well settled,

17  however, that mere participation in such industry fora and associations does not plausibly suggest

18  involvement in a conspiracy.  And Plaintiffs do not allege any instance when the liability shift was

19  discussed—much less agreed upon—by any Bank Defendant with others under the auspices of

20  EMVCo or any industry association.

21        Second, Plaintiffs allege that the Bank Defendants "control" MasterCard and Visa

22  because they (and thousands of other banks) owned those networks as joint ventures before

23  MasterCard's initial public offering ("IPO") in 2006 and Visa's IPO in 2008.  But none of the

24  events or decisions at issue here occurred until long after the IPOs, and Plaintiffs' own allegations

25  render claims of ongoing "control" implausible.  In any event, Plaintiffs fail to allege how any of

26  the Bank Defendants could (let alone did) exercise such supposed control to amend or implement

27  either network's fraud liability rules.

28

2

1    Other allegations in the amended complaint demonstrate that each Network

2  Defendant—not any Bank Defendant—controls its own network rules and the implementation of

3  these rules, and that each of the networks would be motivated on its own to amend its fraud

4  liability rules.  (*See, e.g.*, Amended Complaint ("AC"), Doc. 291, at ¶¶ 9-10, 71.)  None of these

5  allegations plausibly suggests that any Bank Defendant conspired to amend any network's fraud

6  liability rules or to delay certification of terminals that comply with the amended rules.  Indeed,

7  even as Plaintiffs contend that each Bank Defendant participated in a conspiracy to adopt and

8  implement the liability shift rules, they also allege that each Bank Defendant has a corporate

9  relationship with an acquirer (*see id.* ¶¶ 30-32, 34-37), and that acquirers complained about the

10  certification process mandated by the Network Defendants (*see id.* ¶ 91).  Those alleged complaints

11  are inconsistent with the supposed conspiracy.

12    After the parties briefed and argued Defendants' motions to dismiss Plaintiffs'

13  original complaint, the Court granted Plaintiffs leave to amend, and directed them to "address the

14  arguments raised in the motions to dismiss and add all reliable and well-pled information to

15  support their claims," including "the specific role" each Defendant played in the alleged liability

16  shift conspiracy, "including decision-making."  (Doc. 281, at 1-2.)  The amended complaint,

17  however, fails to allege any facts plausibly suggesting that any Bank Defendant joined such a

18  conspiracy, much less the specific role of each Bank Defendant and its participation in decision-

19  making related to the liability shift or any other relevant matter.  Because the basis for each of

20  Plaintiffs' claims against the Bank Defendants is that they were members of the alleged liability

21  shift conspiracy, Plaintiffs' claims against the Bank Defendants should be dismissed.  And because

22  Plaintiffs have already been given leave to amend their complaint and "plead their best case" (*id.* at

23  1), the dismissal should be with prejudice.

24    **FACTUAL ALLEGATIONS**

25  **I.    THE LIABILITY SHIFT**

26    The amended complaint makes the following allegations:

27    Each Network Defendant operates a network on which transactions using its brand

28  of payment cards are processed.  (AC ¶¶ 26-29.)  This means that American Express, Discover,

1  MasterCard, and Visa each sets the rules that participants in transactions using its cards must
2  follow.  (*Id.* ¶ 71.)  Payment card transactions involve as many as five parties: (1) the network;
3  (2) the cardholder; (3) the "issuing bank" that issued the cardholder's payment card; (4) the
4  merchant that accepts the cardholder's card as a form of payment; and (5) the "acquiring bank"
5  with which the merchant has contracted to process payment card transactions.  (*Id.* ¶ 61.)
6  American Express and many Discover transactions involve only three parties because American
7  Express and Discover typically issue their own payment cards and act as the acquiring bank.
8  (*Id.* ¶¶ 58-59.)  Visa and MasterCard, on the other hand, rely on other entities to serve as the
9  issuing and acquiring banks.  (*Id.* ¶ 58.)  Each Bank Defendant issues Visa and MasterCard
10  payment cards and has a corporate relationship with an acquiring bank.  (*Id.* ¶¶ 30-32, 34-37.)

11  At different times during 2011 or 2012, each Network Defendant separately
12  announced that it would amend its rules, effective October 1, 2015, to encourage the adoption of
13  EMV cards.  (*Id.* ¶ 143.)  Unlike "swipe" cards that rely on a magnetic stripe to transmit the
14  cardholder's information, EMV cards contain a tiny computer chip, which makes EMV cards much
15  more difficult to counterfeit.  (*Id.* ¶¶ 65, 67.)  Before October 1, 2015, each network's rules
16  provided that the card issuer would ordinarily be liable for card-present fraud, *i.e.* for transactions
17  where a card is swiped or dipped in a payment card terminal by an individual who is not authorized
18  to use that card.  (*Id.* ¶¶ 63, 71-72.)  According to the amended complaint, while each network's
19  amended card-present fraud liability rules differ in certain respects, they have a common feature:
20  They generally impose liability for card-present fraud on the acquiring bank if (1) the counterfeited
21  or stolen card contained an EMV chip <u>and</u> (2) the merchant used a terminal that was not EMV
22  certified.  (*Id.* ¶¶ 74-81.)  Conversely, the amended rules impose liability on the issuing bank if
23  (1) the counterfeited or stolen card did not contain an EMV chip <u>or</u> (2) the merchant used a
24  terminal that was certified to accept EMV cards.  (*Id.*)  These rule changes are collectively referred
25  to as the "liability shift."

26  Plaintiffs allege that merchants' deployment and certification of terminals capable
27  of processing EMV cards has been slow and frustrating.  (*See id.* ¶¶ 86-88.)  Although many
28  merchants purchased EMV-capable terminals before October 1, 2015, many of these terminals

have not been "certified" for EMV processing and therefore process magnetic stripe transactions, but not EMV transactions.  (*Id.* ¶¶ 82, 87, 190.)  The certification process is technologically complex and involves several steps and numerous entities, including the networks, EMVCo, acquiring banks, PIN pad manufacturers, middleware, and individual store systems.  (*Id.* ¶¶ 85, 90(e).)  In addition to the technical complexity, certification for many merchants has been delayed because a large number of merchants attempted to have their equipment certified near the liability shift date, October 1, 2015, which caused a backlog in the certification queue.  (*See id.* ¶ 90(e) (alleging there has been a "fire drill" to replace the software since the liability shift date).)  Plaintiffs allege that no network delayed the date of its liability shift to give its merchants more time to obtain certification.  (*Id.* ¶¶ 7, 119-120.)

Plaintiffs filed this suit, alleging that American Express, Discover, MasterCard, and Visa conspired with each other—and with each of the Bank Defendants—to adopt and implement the networks' amended card-present fraud liability rules.  (*See, e.g.*, *id.* ¶¶ 2, 8.)

## II.    ALLEGATIONS REGARDING BANK DEFENDANTS

Plaintiffs allege two sets of facts regarding the Bank Defendants' purported involvement in the alleged conspiracy.  First, Plaintiffs allege that the Bank Defendants had the opportunity to join the liability shift conspiracy, because some Bank Defendants (or joint ventures in which they are engaged) participated in advisory groups to EMVCo (an organization that manages the technical standards for EMV transactions, and is owned and operated by the networks and two nonparties) and some Bank Defendants participated in payment card industry associations.  Second, because the Bank Defendants used to own MasterCard and Visa as joint ventures before each entity's IPO in 2006 and 2008, respectively, Plaintiffs allege that the Bank Defendants control MasterCard and Visa, and were thus responsible for these two networks' card-present fraud liability rule changes that were announced in 2011 and 2012, and took effect in October 2015.

### A.    EMVCo And Industry Associations

EMVCo is owned and managed by the Network Defendants and two foreign payment card networks, and "develops and manages the technical standards by which EMV chip transactions . . . are processed and maintained."  (*Id.* ¶¶ 38, 151-152.)  Plaintiffs allege that two

Bank Defendants—Chase and U.S. Bank—are Business and Technical Associates of EMVCo. (*See id.* ¶¶ 32, 36.) Plaintiffs also allege that Bank of America Merchant Services—a joint venture involving Bank of America—is a Business Associate of EMVCo. (*Id.* ¶ 30.) The remaining Bank Defendants—Capital One, Citi, PNC, and Wells Fargo—are not alleged to play any role in EMVCo, even though Plaintiffs allege it was "a means through which Defendants here have been able to effectuate their conspiracy." (*See id.* ¶¶ 31, 33-35, 37, 39.) Business Associates provide input on "strategic business and implementation issues." (*Id.* ¶ 32.) Technical Associates provide input on "technical and operational issues" related to the technical EMV standards developed by EMVCo. (*Id.*) Business and Technical Associates receive opportunities to "network[]" and "advise" EMVCo executives. (*Id.*) They also receive early access to drafts of technical EMV standards. (*Id.*) These advisory groups are open to other industry participants, including merchants. (*See id.* ¶ 209 n.28.) The amended complaint speculates that EMVCo "provided fertile ground for Defendants to conspire." (*Id.* ¶ 154.) But it does not state when any Bank Defendant became an EMVCo Associate and it contains no allegations about any instance when any aspect of the liability shift was discussed—much less agreed upon—under EMVCo's auspices by any Bank Defendant.

The amended complaint further alleges that four Bank Defendants—Bank of America, Capital One, Chase, and Wells Fargo—were members of the Smart Card Alliance, an industry association that "lead[s] industry discussion on the impact and value of smart cards in the U.S. and Latin America." (*Id.* ¶¶ 154-155.) Employees of these banks allegedly attended multiple trade association conferences that included seminars regarding the transition or potential transition to EMV. (*Id.* ¶¶ 156-157.) One of these conferences was purportedly held May 2 through May 5, 2011. (*Id.* ¶ 156.) Again, the amended complaint contains no allegation that any of the Bank Defendants discussed—let alone agreed upon—any aspect of the liability shift in connection with any Smart Card Alliance activity.

Plaintiffs also allege that all of the Bank Defendants except U.S. Bank were members of another industry association, the EMV Migration Forum, which was created in August 2012. (*Id.* ¶ 158.) The EMV Migration Forum was created to coordinate "the implementation

1   steps required to successfully migrate from magnetic stripe technology to EMV" and "to address

2   issues that require broad cooperation and coordination across many constituents in the payments

3   space in order to successfully introduce secure EMV contact and contactless technology in the

4   United States." (*Id.* ¶¶ 158, 161 (internal quotation marks omitted).)  The EMV Migration Forum

5   has an issuers-only special interest group that meets to discuss topics relevant to issuers, and a

6   Testing and Certification Working Committee "whose stated goal is to discuss the challenges with

7   EMV certification and define approaches for achieving certification to meet the payment brand

8   milestones for fraud Liability Shift." (*Id.* ¶¶ 162-163.)  It is not alleged that the Forum was created

9   before the implementation shift dates were announced at various times in 2011 and 2012. (*Id.*

10  ¶ 143.)  Nor is it alleged when any Defendant joined the Forum or how long it has been a member

11  of it.  As with the Smart Card Alliance and EMVCo, Plaintiffs simply allege that EMV Migration

12  Forum conferences "provid[ed] Defendants further opportunities to collude" (*id.* ¶ 159), but do not

13  allege any occasion when those opportunities were purportedly used.

14      **B.    The Visa And MasterCard IPOs**

15          Prior to 2006, both MasterCard and Visa were "joint ventures between payment

16  card issuing banks." (*Id.* ¶ 271.)  Plaintiffs allege this structure enabled "card issuers to jointly set

17  rules regarding the operation of the payment card networks." (*Id.*)  In May 2006, MasterCard

18  completed an IPO pursuant to which banks divested much of their ownership interest in

19  MasterCard. (*Id.* ¶ 274.)  Following the IPO, the banks could elect no more than 25% of

20  MasterCard's board. (*Id.*)  In March 2008, Visa also completed an IPO pursuant to which banks

21  divested much of their ownership interest in Visa. (*Id.* ¶ 277.)  The amended complaint contains no

22  factual allegations concerning the banks' post-IPO ability or inability to elect members of Visa's

23  board.

24          Notwithstanding the MasterCard and Visa IPOs, and without any additional

25  allegations regarding who in each of these independent companies decides upon network rules, the

26  amended complaint conclusorily argues that "[b]ecause the banks designed and approved the

27  Networks' [pre-IPO] rules and the Networks' restructurings, the Networks' conduct was essentially

28

7

1   unchanged by the restructurings and the IPOs, so that the anticompetitive effects of these ongoing

2   conspiracies continue to harm merchants."  (*Id.* ¶ 279.)

3                                                    ***

4            Based on the above allegations, Plaintiffs bring claims against the Bank Defendants

5   for purported violations of the Sherman Act, of California, Florida, and New York antitrust and

6   deceptive practices laws, and for unjust enrichment.

7                                          **ARGUMENT**

8   **I.    PLAINTIFFS DO NOT PLAUSIBLY ALLEGE THAT BANK DEFENDANTS**
        **WERE INVOLVED IN A CONSPIRACY TO RESTRAIN TRADE IN VIOLATION**
9       **OF THE SHERMAN ACT**

10           To survive a motion to dismiss, a complaint must contain "enough facts to state a

11  claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

12  To state a claim under Section 1 of the Sherman Act, plaintiffs must allege facts plausibly

13  demonstrating: "(1) a contract, combination or conspiracy among two or more persons or distinct

14  business entities; (2) by which the persons or entities intended to harm or restrain trade or

15  commerce . . . ; (3) which actually injures competition."  *Kendall*, 518 F.3d at 1047.

16           To plausibly allege an antitrust conspiracy, a complaint must "answer the basic

17  questions: who, did what, to whom (or with whom), where, and when."  *Id.* at 1048; *see also*

18  *Twombly*, 550 U.S. at 556 (plausible conspiracy allegation "requires a complaint with enough

19  factual matter (taken as true) to suggest that an agreement was made").  Factual allegations

20  couched as legal conclusions (*e.g.*, that defendants conspired) need not be accepted as true, *see*

21  *Twombly*, 550 U.S. at 553-56, and allegations that "are no more consistent with an illegal

22  agreement than with rational and competitive business strategies, independently adopted by

23  firms . . . are insufficient" to plausibly allege a conspiracy, *In re Musical Instruments & Equip.*

24  *Antitrust Litig.*, 798 F.3d 1186, 1189 (9th Cir. 2015) (citing *Twombly*, 550 U.S. at 557).  Moreover,

25  the complaint must "include allegations specific to each defendant alleging that defendant's role in

26  the alleged conspiracy, and must make allegations that plausibly suggest that each Defendant

27  participated in the conspiracy."  *In re Optical Disk Drive Antitrust Litig.*, No. 10-md-2143 RS,

28  2014 WL 3378336, at *4 (N.D. Cal. July 10, 2014) (internal quotation marks and citation omitted).

                                                    8

1    None of Plaintiffs' factual allegations, either individually or in the aggregate,

2  plausibly suggests that any Bank Defendant participated in the alleged liability shift conspiracy.

3  Nor do they demonstrate the "specific role" any Bank Defendant played in the alleged conspiracy.

4    **A.   Participating In EMVCo Or Industry Associations Does Not Plausibly Suggest
        That Any Bank Defendant Engaged In A Conspiracy**

5

6    Plaintiffs cannot plead a conspiracy involving the Bank Defendants by alleging that

7  EMVCo, the Smart Card Alliance, and/or the EMV Migration Forum provided the Bank

8  Defendants—who were not even all members of any of these organizations—merely with "the

9  opportunity to collude."[1]  (AC ¶¶ 151-164.)  It is well settled that common membership in a trade

10  association or standard-setting organization does not plausibly suggest that the members colluded.

11  *See Twombly*, 550 U.S. at 567 n.12; *Kendall*, 518 F.3d at 1048.  On the contrary, "[a]ttendance at

12  industry trade shows and events is presumed legitimate and is not a basis from which to infer a

13  conspiracy."  *In re Graphics Processing Units Antitrust Litig.* ("*GPU*"), 527 F. Supp. 2d 1011,

14  1023 (N.D. Cal. 2007) (Alsup, J.); *see also Musical Instruments*, 798 F.3d at 1196 ("[M]ere

15  participation in trade-organization meetings where information is exchanged and strategies are

16  advocated does not suggest an illegal agreement.").

17    For instance, in *GPU*, this Court granted a motion to dismiss a Sherman Act Section

18  1 claim where the allegations of conspiracy were based, in part, on industry meetings that occurred

19  prior to two firms' purportedly collusive product releases.  *GPU*, 527 F. Supp. 2d at 1020, 1023-25.

20  While the complaint alleged that industry conferences provided defendants with the opportunity to

21  conspire, it did not allege that the firms' employees "ever met and agreed to fix prices" during

22  these conferences.  *Id.* at 1024.  And, because "defendants attended up to nine of the same trade

23  events in the same year . . . [i]t is almost axiomatic that a product release would fall within a few

24  months of one trade meeting or another," so the timing of product releases shortly after industry

25

26    [1]    Plaintiffs previously portrayed EMVCo as the principal mechanism through which
      the alleged conspiracy was effectuated.  (*See* Doc. 258, at 1 ("Defendants, working through the

27  structure of EMVCo, agreed together to implement this unprecedented change.").)  But not any
      more:  The amended complaint now characterizes EMVCo as little more than an opportunity for

28  the Bank Defendants to conspire.  This belated backpedaling merely highlights the paucity of
      factual allegations against the Bank Defendants.

9

1   conferences did not suggest a conspiracy.  *Id.* at 1023.  Rather, "[a]t most, [plaintiffs] have

2   suggested that defendants' employees and executives attended the same meetings, and thereafter,

3   defendants engaged in parallel behavior that could be explained by each firm acting in their own

4   self-interest."  *Id.* at 1024.  Accordingly, the mere opportunity to conspire did not plausibly suggest

5   that the *GPU* defendants' attendance at trade shows and conferences was part of a conspiracy.  *See*

6   *id.*; *see also In re Citric Acid Litig.*, 191 F.3d 1090, 1103 (9th Cir. 1999) (meetings at which

7   competitors had an opportunity to conspire do not tend to exclude the possibility of legitimate

8   activity); *Prime Healthcare Servs. v. SEIU*, No. 11-cv-02652 JLS (RBB), 2012 WL 3778348, at

9   *4-5 (S.D. Cal. Aug. 30, 2012) (dismissing Section 1 claim because plaintiff "merely identifies the

10   purported objective of the alleged conspiracy, and the benefits [defendants] allegedly derive from

11   their supposed agreement," reasoning that allegations of "opportunity or motive to conspire [do

12   not] rationally support an inference of an illegal agreement"); *In re Cal. Title Ins. Antitrust Litig.*,

13   No. 08-cv-1341-JSW, 2009 WL 1458025, at *4-6, 8-9 (N.D. Cal. May 21, 2009) (dismissing

14   Section 1 claim where plaintiffs alleged only an opportunity to conspire because of membership in

15   rate setting organizations, a motive to conspire, and a concentrated market with significant barriers

16   to entry); *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 963 (N.D. Cal. 2007)

17   (dismissing Section 1 claim where plaintiffs alleged "defendants' membership in the Visa and

18   MasterCard networks, their relationships with third-party processors and consultants that did

19   business with many industry participants, and their membership in industry-wide trade

20   associations, provided opportunities for them to communicate and agree to fix prices"), *aff'd on*

21   *other grounds*, 741 F.3d 1022 (9th Cir. 2014); *accord, e.g., In re Travel Agent Comm'n Antitrust*

22   *Litig.*, 583 F.3d 896, 905, 911 (6th Cir. 2009) ("[A] mere opportunity to conspire does not,

23   standing alone, plausibly suggest an illegal agreement . . . .").

24            The same holds true here.  In attempting to plead that Bank Defendants conspired

25   (*see* AC ¶¶ 154, 159), Plaintiffs merely allege that some Bank Defendants (or joint ventures in

26   which they were involved) participated in EMVCo as Business and/or Technical Associates, that

27   some Bank Defendants attended industry conferences presented by the Smart Card Alliance, and

28   that some Bank Defendants were members of the EMV Migration Forum.  But Plaintiffs do not

1   make any allegations that would suggest that any Bank Defendant entered into agreements

2   regarding the liability shift or merchant certification during or in connection with any EMVCo

3   Associates meeting or any industry conference.  Plaintiffs conspicuously do not allege that any

4   Bank Defendant conferred with any other Bank or Network Defendant during any meeting or

5   conference, much less reached an agreement that the networks would alter their card-present fraud

6   liability rules or delay merchant certification.

7           Regarding the Smart Card Alliance, Plaintiffs list the names and generic titles of

8   certain Bank Defendants' employees who purportedly attended the Smart Card Alliance conference

9   in May 2011 (*id.* ¶ 156), but they do not allege any fact that would render it plausible that these

10  employees entered into the purported conspiracy on behalf of their employers.  Further, that some

11  networks allegedly announced their card-present fraud liability rule changes at some unspecified

12  time after one Smart Card Alliance conference took place in 2011 (*id.*) hardly qualifies as unusual,

13  *see GPU*, 527 F. Supp. 2d at 1023, and no inferences of conspiracy can thereby arise.

14          Similarly, Plaintiffs do not allege any facts from which one could reasonably infer

15  that the Bank Defendants who were EMVCo Business and/or Technical Associates used their

16  participation for collusive purposes.  (*See* AC ¶¶ 141, 151-154.)  Plaintiffs do not allege that the

17  Bank Defendants involved with EMVCo commenced their supposed associations with EMVCo

18  before any liability shift-related decisions (including the initial alleged decision to amend the

19  networks' rules) were made.  Nor do Plaintiffs allege what the Technical and Business Associates

20  discussed, either among themselves or with the networks that own and manage EMVCo.  Nor do

21  Plaintiffs allege that any Associate provided any advice or assurances to EMVCo.  Moreover,

22  Plaintiffs' own allegations state that "'other [non-network] stakeholders [such as issuers do not] . . .

23  have a meaningful vote in EMVCo's decision-making and standard-setting process'" (*id.* ¶ 266

24  (quoting Senator Dick Durbin); *see also id.* ¶ 263), undermining the plausibility of EMVCo

25  facilitating a conspiracy among any (much less all) of the Bank Defendants (most of whom—

26  Capital One, Citi, PNC, and Wells Fargo—are not alleged to have had any contact with EMVCo).

27  And merchants' participation as Technical and Business Associates (*see id.* ¶ 209 n.28) further

28  renders implausible Plaintiffs' theory that the Bank Defendants (again, a majority of them not

11

1  alleged to be participants) used these groups to hatch and implement a purportedly <u>anti-merchant</u>

2  conspiracy.

3         The allegations regarding the EMV Migration Forum are likewise entirely lacking

4  facts suggesting collusion regarding networks' decisions to adopt a "liability shift."  (*Id.* ¶¶ 158-

5  164.)  The EMV Migration Forum holds conferences addressing topics related to EMV technology,

6  but is distinct from EMVCo itself, which allegedly makes decisions about EMV specifications.

7  (*Compare id.* ¶¶ 151-152, *with id.* ¶¶ 158-159.)  And it is not alleged that the EMV Migration

8  Forum as a whole, let alone any of its members, had any decision-making role with respect to the

9  adoption or continuation of the liability shift.  Indeed, the EMV Migration Forum was not even

10 formed until August 2012 (*id.* ¶ 158), *i.e.* <u>after</u> the first networks had announced changes to their

11 card-present fraud liability rules (*id.* ¶¶ 143, 156), and even as described, it was concerned with

12 technical issues regarding the previously announced transitions (*see id.* ¶¶ 158, 161, 163).

13        Differences among the Bank Defendants in their alleged participation in these three

14 organizations further undercuts Plaintiffs' assertion that these organizations were used to facilitate

15 a conspiracy.  U.S. Bank, for instance, is alleged to have participated in EMVCo's advisory bodies,

16 but is not alleged to have participated in either of the other two cited industry associations.

17 Plaintiffs thus have not alleged that U.S. Bank had any interactions with Citi, Capital One, PNC, or

18 Wells Fargo, who were not members of EMVCo.  Similarly, Citi and PNC are not alleged to have

19 participated in any industry association except for the EMV Migration Forum, and are not alleged

20 to have any role in that association's leadership or decision-making.  And, as discussed previously,

21 the EMV Migration Forum did not form until after the first networks had announced their rule

22 changes, thus undermining any suggestion that Citi or PNC could have been involved in a

23 conspiracy to adopt these rules.

24        Indeed, if anything, the reasons to dismiss Plaintiffs' amended complaint are more

25 compelling than in *GPU* and other opportunity-to-collude cases, where at least all the defendants

26 were alleged to be members of the same associations and present at the same meetings.  *See GPU*,

27 527 F. Supp. 2d at 1014 (alleging "executives and employees from [the alleged conspirators]

28 attended some of the same industry meetings and conferences").  Here, by contrast, Plaintiffs hope

1  to state a claim against the Bank Defendants on the theory that each of them was part of <u>some</u>

2  industry group, even if not the same one.  Nor do Plaintiffs purport to place all the Bank

3  Defendants together at any one meeting, much less one that occurred before the first network

4  announced it would amend its card-present fraud liability rules.  *See In re Citric Acid Litig.*, 191

5  F.3d at 1097 (no reasonable inference of conspiracy when the defendant did not attend the industry

6  meetings where the conspiracy allegedly occurred).

7        Moreover, the allegations lodged against the Bank Defendants in the amended

8  complaint apply equally to dozens, if not hundreds, of other banks <u>not</u> named as defendants—

9  further highlighting their implausibility.  For example, numerous banks not named as defendants—

10  as well as merchants supposedly victimized by the conspiracy—are members of the same industry

11  groups where the conspiracy supposedly was hatched.  *See, e.g.*, EMV Migration Forum,

12  http://www.emv-connection.com/emv-migration-forum/ (last visited Aug. 2, 2016) ("The EMV

13  Migration Forum currently has more than 170 members [*sic*] companies, including global

14  payments networks, financial institutions, merchants, processors, acquirers, domestic debit

15  networks, industry associations and industry suppliers.").[2]  In addition, thousands of issuing banks

16  shared the same purported conspiratorial motive—namely, to receive the financial benefit of the

17  liability shift.  *See United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 237 (2d Cir. 2003) ("At the

18  issuing level, approximately twenty thousand banks that issue Visa and MasterCard cards to

19  customers compete with one another and with Amex and Discover.").[3]  Yet, for unstated reasons,

20  Plaintiffs name only a handful of the banks as conspirators.

21

---

22     [2]     The Court may consider this page of the EMV Migration Forum's website because
23  the amended complaint quotes portions of this page (*see* AC ¶¶ 161, 164) and thus incorporates by
   reference the entire page, *see Knievel v. ESPN*, 393 F.3d 1068, 1076-77 (9th Cir. 2005) (complaint
24  that attached photograph from a website incorporated webpages necessary to navigate to webpage
   with the photograph); *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1204-05 (N.D. Cal. 2014)
25  (complaint that cited LinkedIn profile webpage incorporated the full webpage).

26     [3]     Plaintiffs also allege that the Banks Defendants are in the acquiring business.  (AC
   ¶¶ 30-32, 34-37.)  But they never explain how this allegation supports their conspiracy claim as to
27  the Bank Defendants.  Notably, Plaintiffs identify several large acquirers that are neither named as
   defendants nor accused of participating in the alleged conspiracy.  (*See id.* ¶¶ 192-194, 196, 206
28  (Global Payments, Heartland Payment Services, Worldpay (the acquirer for named Plaintiffs
   Milam's Market and Grove Liquors), and TransFirst).)  Plaintiffs have not alleged that any of these

13

1       In any event, Plaintiffs' allegations regarding Bank Defendants' participation in

2 these organizations are consistent with independent competitive business behavior—which should

3 dispose of those allegations under *Twombly*. The transition from magnetic stripes to EMV chips

4 was of facially apparent interest to participants in the payment card industry, including major card-

5 issuing banks. In light of EMV technology's complexity and the many actors required for EMV

6 transactions, communication concerning the technical aspects of the transition to EMV would be

7 expected and consistent with competition. (*See id.* ¶¶ 141, 158.) Participating in industry

8 associations that discuss this transition (such as the Smart Card Alliance and the EMV Migration

9 Forum) and/or in groups that provide input to the body that establishes EMV's technical standards

10 (EMVCo) thus does not support an inference that any Bank Defendant was involved in an illicit

11 conspiracy.

12      **B.**    **Plaintiffs Do Not Plausibly Allege That Bank Defendants Control Visa Or MasterCard**

13

14       Plaintiffs' allegations regarding the governance structures of Visa and MasterCard

15 fare no better. Plaintiffs assert that, even after the Visa and MasterCard IPOs, Bank Defendants

16 "continue to exert control over Visa and MasterCard," and any rule adopted by Visa or

17 MasterCard, including their amended card-present fraud liability rules, is thus a result of a

18 conspiracy involving banks. (*See id.* at 80, ¶¶ 272, 279.) Even had Plaintiffs plausibly alleged that

19 Bank Defendants "control" the Visa and MasterCard boards—and they have not—the Ninth Circuit

20 has rejected this theory of conspiratorial liability. And, in any event, Plaintiffs' own allegations

21 render it implausible that Bank Defendants control either Visa or MasterCard, and Plaintiffs do not

22 allege how or whether Bank Defendants used their purported control to change any network's card-

23 present fraud liability rules.

24       In *Kendall*, the Ninth Circuit rejected a similar argument about bank control of Visa

25 and MasterCard in the context of those networks' rules regarding network interchange fees that

26 were set when banks owned the networks as joint ventures. The court reasoned that without

27

28 non-defendant acquirers acted any differently with respect to the acquiring business than those acquirers with a corporate relationship to the Bank Defendants.

1    additional allegations suggesting that a Visa or MasterCard rule was the result of a conspiracy

2    between members of Visa or MasterCard, "participation on the association's board of directors is

3    not enough" to plausibly allege a conspiracy. *Kendall*, 518 F.3d at 1048.  Accordingly, the

4    allegation that "each Bank defendant participates in the management of and has a proprietary

5    interest in the Consortiums" did not plausibly suggest that bank defendants were involved in a

6    purported conspiracy to set network rules. *Id*; *see also id.* ("[M]erely charging, adopting or

7    following the fees set by [MasterCard and Visa] is insufficient as a matter of law to constitute a

8    violation of Section 1 of the Sherman Act."); *Bona Fide Conglomerate, Inc. v. SourceAmerica*, No.

9    14-cv-0751-GPC-DHB, 2014 WL 4162020, at *12 (S.D. Cal. Aug. 20, 2014) ("Allegations of an

10   institutional structure that could possibly be used in a way that violates the Sherman Act fall short

11   of alleging that or how the Board of Directors members plausibly abused a conspiratorial

12   institutional structure.").  *Kendall* thus makes clear that Plaintiffs cannot plausibly allege a

13   conspiracy involving the Bank Defendants by merely alleging that the Bank Defendants "control"

14   Visa or MasterCard.

15          In any event, Plaintiffs' allegations are inconsistent with the proposition that the

16   Bank Defendants control Visa or MasterCard.  The Bank Defendants can elect no more than 25%

17   of the MasterCard board, and Plaintiffs do not allege whether the Bank Defendants can elect any

18   members of the Visa board.  (*See* AC ¶¶ 274, 277.)  Moreover, alleging that issuing banks have

19   control over Visa and MasterCard, as Plaintiffs conclusorily do, is inconsistent with Plaintiffs'

20   acknowledgement that acquirers complained about the certification process that the networks

21   mandated.  (*See id.* ¶¶ 91, 95.)  After all, Plaintiffs allege that each Bank Defendant has a corporate

22   relationship with an acquirer (*see id.* ¶¶ 30-32, 34-37), and Plaintiffs fail to explain why the Bank

23   Defendants would cause the networks they supposedly control to implement changes against the

24   interests of entities with which they have a corporate relationship.

25          Nor can Plaintiffs state a conspiracy claim by quoting at length from European

26   tribunal decisions assessing whether a MasterCard rule adopted <u>before</u> the MasterCard IPO and

27   supposedly <u>perpetuated</u> after the IPO was the result of an "association of undertakings"—a

28   European legal term that Plaintiffs neither define nor compare with a Sherman Act "conspiracy"—

15

1   involving banks.  (*Id.* ¶¶ 280-284.)  The card-present fraud liability rules at issue in this case were a

2   <u>change</u> from earlier rules and were first announced many years <u>after</u> MasterCard, like Visa, ceased

3   being an association owned by banks—five years after the MasterCard IPO and three years after

4   the Visa IPO—and took effect another three or four years <u>later</u>.  There is, moreover, no allegation

5   that the banks agreed to the IPOs so that MasterCard or Visa would amend its card-present fraud

6   liability rules several years later.[4]  Thus, the European decisions that Plaintiffs quote are inapposite.

7            Finally, Plaintiffs allege no facts about the process by which either Visa or

8   MasterCard reviews or amends its rules.  (*See, e.g., id.* ¶ 135 (alleging Visa and MasterCard made

9   some changes to their card-present fraud liability rules, without any reference to any Bank

10  Defendant's involvement in those changes).)  They do not allege, for instance, who in these

11  organizations decides to amend the rules, or whether the boards generally have any role in this

12  process—much less any role in the rule amendments actually at issue here.  In other words,

13  Plaintiffs do not allege how banks' current role in these organizations, whatever that role may be,

14  had anything to do with the adoption of "liability shift" rules by Visa and MasterCard.  Once again,

15  the answers to "who, did what, to whom (or with whom), where, and when?" are simply missing.

16  And, because "[e]ven participation on [Visa's or MasterCard's] board of directors is not enough by

17  itself" to allege a conspiracy, *Kendall*, 518 F.3d at 1048, this defect alone renders Plaintiffs'

18  "control" theory insufficient to plausibly allege a conspiracy involving the Bank Defendants.

19       **C.    Plaintiffs' Other Allegations Do Not Involve Bank Defendants**

20           The amended complaint contains numerous new allegations related to the Network

21  Defendants.  (*See* AC ¶¶ 99-134, 139-145, 147-150.)  These new allegations—like the allegations

22  of the original complaint—do not plausibly allege a conspiracy among the Network Defendants for

23  the reasons stated in their briefs, much less a conspiracy involving the Bank Defendants.

24           If anything, Plaintiffs' new allegations demonstrate that each of the Network

25  Defendants would have been motivated to engage in the purported liability shift for its own benefit

26  _____

27      [4]    Under Plaintiffs' theory, any post-IPO action taken by MasterCard or Visa would
    constitute a conspiracy among the <u>thousands</u> of banks—not just those named as defendants in this
    action—that previously owned the networks as joint ventures and continue to issue MasterCard or

28  Visa payment cards.  This cannot be so.  *Cf. Kendall*, 518 F.3d at 1048.

BANK DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT     CASE NO. 3:16-CV-01150-WHA

1  and that the networks were the only entities that could amend and implement their own rules.  (*See*

2  *id.* ¶¶ 9-10, 73-81, 149-150; *see also id.* ¶¶ 135-137.)  Specifically, Plaintiffs allege that the

3  networks' fraud liability rules should be a basis of competition among the <u>networks</u> for merchant

4  acceptance.  (*See, e.g.*, *id.* ¶ 9 ("Without agreement on the timing and manner of implementing the

5  Liability Shift, the Networks risked competition from merchants steering transactions to networks

6  without a Liability Shift component, an extended Liability Shift date, a break on fees, equipment or

7  other more favorable terms."); *see also id.* ¶¶ 10, 149-150.)  Plaintiffs also assert that the networks

8  "mandated" the certification process (*id.* ¶ 95) without alleging that the Bank Defendants,

9  individually or collectively, played any role in issuing that purported mandate, and while also

10 alleging that the Bank Defendants are not among the "numerous entities" involved in merchant

11 certification (*id.* ¶ 85).  Indeed, Plaintiffs allege that acquirers, some of whom purportedly are

12 affiliated with the Bank Defendants, complained about the certification process that the networks

13 mandated.  (*Id.* ¶ 91.)  None of this gives rise to an inference of a conspiracy involving the Bank

14 Defendants.

15        At bottom, Plaintiffs hypothesize that the liability shift benefits issuing banks and

16 disadvantages merchants, so the issuing banks must have been complicit in the purported liability

17 shift conspiracy.  But that is not enough to plausibly allege a conspiracy involving the Bank

18 Defendants.  *See Musical Instruments*, 798 F.3d at 1194 ("[C]ommon motive does not suggest an

19 agreement."); *Kendall*, 518 F.3d at 1048 ("[M]erely charging, adopting or following the fees set by

20 [Visa and MasterCard] is insufficient as a matter of law to constitute a violation of Section 1 of the

21 Sherman Act."); *In re Late Fee*, 528 F. Supp. 2d at 964 ("'[M]otivation to enter a conspiracy is

22 never enough' to show an agreement." (quoting VI Philip E. Areeda & Herbert Hovenkamp,

23 *Antitrust Law* ¶ 1411, at 68 (2d ed. 2003))).  Accordingly, Plaintiffs' Sherman Act claim against

24 the Bank Defendants should be dismissed.

25

26

27

28

BANK DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT        CASE NO. 3:16-CV-01150-WHA

1 **II.      THE STATE LAW CLAIMS AGAINST BANK DEFENDANTS SHOULD BE**
2 **DISMISSED**

3           Plaintiffs' other claims allege that the Bank Defendants violated various state laws

4 based on their purported participation in the liability shift conspiracy.  These claims should also be

5 dismissed.

6           Plaintiffs allege that the Bank Defendants violated the state laws at issue in Counts 2

7 through 7, and are liable on the basis of unjust enrichment, Count 8, because they participated in

8 the same purported liability shift conspiracy alleged to give rise to Plaintiffs' Sherman Act claim in

9 Count 1.  (*See* AC ¶¶ 296 (Cartwright Act), 307 (Florida Antitrust Act), 318 (Florida Deceptive

10 and Unfair Trade Practices Act), 328 (Donnelly Act), 342 (New York Deceptive Acts and Practices

11 Claim), 346-347 (California Unfair Competition Law Claim), 352-353 (unjust enrichment).)

12           Because, as detailed above, Plaintiffs do not plausibly allege that the Bank

13 Defendants participated in the purported conspiracy, these claims—which Plaintiffs base on such

14 participation—should be dismissed.  *See Stubhub, Inc. v. Golden State Warriors, LLC*, No. C 15-

15 1436 MMC, 2015 WL 6755594, at *4 (N.D. Cal. Nov. 5, 2015) (dismissing Cartwright Act claim

16 "based entirely on the same conduct alleged in support of [plaintiff's] Sherman Act claims" for the

17 same reasons as the Sherman Act claims); *Orchard Supply Hardware LLC v. Home Depot USA,*

18 *Inc.*, 939 F. Supp. 2d 1002, 1011 (N.D. Cal. 2013) (dismissing California Unfair Competition claim

19 for the same reasons plaintiff failed to state a viable violation of the Sherman and Cartwright Acts);

20 *McArthur Dairy, LLC v. McCowtree Bros. Dairy, Inc.*, No. 09-62033-CIV, 2011 WL 2118701, at

21 *9-10 (S.D. Fla. May 27, 2011) (dismissing Florida antitrust claims for the same reasons Sherman

22 Act claims were dismissed); *RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*, 661 F. Supp. 2d 218, 234

23 (E.D.N.Y. 2009) ("Because Plaintiff's federal antitrust claims have been dismissed, Plaintiff's

24 claims under [New York's] Donnelly Act are dismissed as well."), *aff'd*, 391 F. App'x 59 (2d Cir.

25 2010); *In re Auto. Refinishing Paint Antitrust Litig.*, 515 F. Supp. 2d 544, 555-56 (E.D. Pa. 2007)

26 (dismissing New York Deceptive Acts and Practices claim because, among other reasons, the

27 statute requires acts of "deception or misrepresentation" in addition to anticompetitive conduct);

28 *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 235 F. Supp. 2d 1269, 1286-87 (M.D. Fla. 2002)

18

1   (dismissing claims under the Florida Deceptive and Unfair Trade Practices Act because the Court

2   "found no violation of antitrust law and [plaintiff] asserts no other basis for a claim under

3   FDUTPA"), *aff'd*, 364 F.3d 1288 (11th Cir. 2004).

4           Plaintiffs' Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") claim

5   should be dismissed for the additional, independent reason that, "[b]y its express terms, FDUTPA

6   does not apply to banks or savings and loan associations regulated by federal agencies," *Wilson v.*

7   *EverBank, N.A.*, 77 F. Supp. 3d 1202, 1221 (S.D. Fla. 2015) (citing Fla. Stat. § 501.212(4)(c))

8   (internal quotation marks and alterations omitted), and each Bank Defendant is regulated by a

9   federal agency, *see* U.S. Dep't of the Treasury, Office of the Comptroller of the Currency, List of

10  National Banks & Federal Branches & Agencies (June 30, 2016),

11  http://www.occ.treas.gov/topics/licensing/national-bank-lists/index-active-bank-lists.html (last

12  accessed Aug. 3, 2016) (listing Bank of America, Chase, Citi, PNC, U.S. Bank, and Wells Fargo as

13  national banks "regulated by the Office of the Comptroller of the Currency"); Bd. of Governors of

14  the Fed. Reserve Sys., Fin. Holding Cos. (July 20, 2016),

15  https://www.federalreserve.gov/bankinforeg/fhc.htm (last accessed Aug. 3, 2016) (listing Capital

16  One as a financial holding company regulated by the Federal Reserve).[5]

17          Plaintiffs' FDUTPA, New York Deceptive Acts and Practices, and California Unfair

18  Competition Law claims should also be dismissed for the additional, independent reasons stated in

19  Parts II.B and C of the Motion to Dismiss Amended Complaint filed on behalf of MasterCard, et al.

20  (the "MasterCard Motion").[6]

21  _____

22      [5]     The Court may take judicial notice of publications available on government
    agencies' websites, because content published on "government websites . . . [is] 'capable of
23  accurate and ready determination by resort to sources whose accuracy cannot reasonably be
    questioned.'" *Vargas v. Wells Fargo Bank N.A.*, No. C 12-02008 WHA, 2012 WL 2931220, at *7
24  (N.D. Cal. July 18, 2012) (Alsup, J.) (quoting Fed. R. Evid. 201); *see also United States v. Hom*, 45
    F. Supp. 3d 1175, 1181 (N.D. Cal. 2014) (Alsup, J.) (taking judicial notice of government website
25  to confirm that certain entities are foreign entities), *aff'd in part, and rev'd in part on other
    grounds*, No. 14-16214, 2016 WL 3997266 (9th Cir. July 26, 2016).

26      [6]     The Bank Defendants incorporate the MasterCard Motion's arguments on these
    points for the sake of judicial efficiency.  The Bank Defendants would make substantively identical
27  arguments as those made in the MasterCard Motion and adding the 1.5 pages of argument on these
    points already contained in the MasterCard Motion to this brief would not cause this brief to
28  exceed the 25-page limit.

1    And, finally, the unjust enrichment claim should be dismissed for the additional,

2 independent reason that Plaintiffs fail to allege under which state's laws the claim arises.  *See*

3 *Romero v. Flowers Bakeries, LLC*, No. 14-cv-05189-BLF, 2016 WL 469370, at *12 (N.D. Cal.

4 Feb. 8, 2016) ("[D]ue to variance among state laws, failure to allege which state law governs a

5 common law claim is grounds for dismissal.").  Indeed, in their opposition to the first round of

6 motions to dismiss, Plaintiffs conceded that this is grounds for dismissing the unjust enrichment

7 claim.  (*See* Doc. 258, at 21-22.)  And despite the Court's admonition to "address the arguments

8 raised in the motions to dismiss" (Doc. 281, at 1), Plaintiffs did not correct this deficiency in the

9 amended complaint.

10  **III.    ALL CLAIMS AGAINST BANK DEFENDANTS SHOULD BE DISMISSED WITH
             PREJUDICE**

11

12    Plaintiffs have now had two opportunities to amend.  At the initial case management

13 conference, after Plaintiffs had the benefit of reviewing Defendants' opening briefs on the motions

14 to dismiss the original complaint, the Court invited Plaintiffs to add factual allegations.  Instead of

15 doing so, Plaintiffs merely added two new plaintiffs to a proposed amended complaint.  (Doc. 255-

16 2.)  At oral argument, following full briefing on the motions to dismiss, Plaintiffs requested leave

17 to file a further amended complaint.  The Court granted that request with instructions for Plaintiffs

18 to "plead their best case."  (Doc. 281, at 1-2; *see also* Doc. 283, at 54-55.)

19    Plaintiffs' "best case" is not nearly good enough to withstand dismissal.  For the

20 reasons set forth above, the amended complaint does not plausibly allege that the Bank Defendants

21 conspired with the various networks in connection with each network's decision to adopt a

22 "liability shift," and all claims against the Bank Defendants should be dismissed.  Moreover, the

23 core arguments of this brief were raised in the earlier motions to dismiss.  (Doc. 228, at 1-3; Doc.

24 231-1, at 1-16; Doc. 261, at 1-4; Doc. 262, at 1-9.)  Because Plaintiffs have now repeatedly failed

25 to cure previously identified deficiencies regarding the Bank Defendants, their claims should be

26 dismissed with prejudice.  *See Denison v. Citifinancial Servicing, LLC*, No. C 16-00432 WHA,

27 2016 WL 3443380, at *1 (N.D. Cal. June 23, 2016) (Alsup, J.) ("[L]eave to amend should be freely

28 given absent undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies, futility

20

1  of amendment, and prejudice to the opposing party." (citing *Foman v. Davis*, 371 U.S. 178, 182

2  (1962))); *see also Or. Teamster Emp'rs Tr. v. Hillsboro Garbage Disposal, Inc.*, 800 F.3d 1151,

3  1161 (9th Cir. 2015) (affirming dismissal with prejudice when plaintiff was "given two

4  opportunities to amend its complaint").

5  ## CONCLUSION

6         For the foregoing reasons, the Bank Defendants respectfully request that the Court

7  dismiss all claims against them with prejudice.

8

9  DATED: August 5, 2016               SKADDEN, ARPS, SLATE, MEAGHER &
                                    FLOM, LLP

10

11                        By:    /s/ Raoul D. Kennedy
                            Raoul D. Kennedy (SBN 40892)

12                              525 University Avenue, Suite 1400
                            Palo Alto, California 94301

13                              Telephone: (650) 470-4500
                            Facsimile:  (650) 470-4570

14                              Peter E. Greene (admitted *pro hac vice*)
                            Boris Bershteyn (admitted *pro hac vice*)

15                              Evan R. Kreiner (admitted *pro hac vice*)
                            Harry P. Koulos  (SBN 310508)

16                              Four Times Square
                            New York, NY 10036

17                              Telephone: (212) 735-3000
                            Facsimile: (212) 735-2000

18

19                              Attorneys for Defendant CHASE BANK USA,
                            N.A

20

21

22

23

24

25

26

27

28

BANK DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT     CASE NO. 3:16-CV-01150-WHA

Dated:  August 5, 2016

MORRISON & FOERSTER LLP

By: ___/s/ Penelope A. Preovolos___
Penelope A. Preovolos (SBN 87607)
425 Market Street
San Francisco, CA 94105
Telephone: 415.268.7000
Facsimile: 415.276.7187
Email: PPreovolos@mofo.com

Mark. P. Ladner (admitted *pro hac vice*)
Michael B. Miller (admitted *pro hac vice*)
Natalie Fleming Nolen (admitted *pro hac vice*)
250 West 55th Street
New York, New York 10019
Telephone: 212.468.8000
Facsimile: 212.468.7900
mladner@mofo.com
mbmiller@mofo.com
nflemingnolen@mofo.com

Attorneys for Defendant
BANK OF AMERICA, N.A.

Dated: August 5, 2016

DORSEY & WHITNEY LLP

By: ___/s/ F. Matthew Ralph___
F. Matthew Ralph (admitted *pro hac vice*)
Email: ralph.matthew@dorsey.com
Andrew Brantingham (admitted *pro hac vice*)
Email: brantingham.andrew@dorsey.com
Angela Porter (admitted *pro hac vice*)
Email: porter.angela@dorsey.com
Richard Q. Liu (SBN 308050)
Email: liu.richard@dorsey.com
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
Telephone: 612.340.2600
Facsimile: 612.340.2868

Martha C. Luemers (SBN 104658)
Email: luemers.martha@dorsey.com
305 Lytton Avenue
Palo Alto, CA 94301
Telephone: 650.857.1717
Facsimile: 650.857.1288

Attorneys for Defendant
U.S. BANK NATIONAL ASSOCIATION

1  Dated: August 5, 2016        HUNTON & WILLIAMS LLP

2        By: ___/s/ D. Bruce Hoffman_____

3        Susan S. Joo (SBN  260369)
   Hunton & Williams LLP
   575 Market Street, Suite 3700
4        San Francisco, CA 94105
   Telephone: 415.975.3700
5        Facsimile: 415.975.3701
   sjoo@hunton.com

6

7        D. Bruce Hoffman (DC Bar No. 495385)
   (admitted *pro hac vice*)
   Ryan Shores (DC Bar No. 500031)
8        (admitted *pro hac vice*)
   Leslie Kostyshak (DC Bar No. 1005462)
9        (admitted *pro hac vice*)
   Hunton & Williams LLP
10        2200 Pennsylvania Ave. NW
   Washington, DC 20037
11        Telephone: 202.955.1500
   Facsimile: 202.778.2201
12        bhoffman@hunton.com
   rshores@hunton.com
13        lkostyshak@hunton.com

14        Attorneys for Defendant
   CAPITAL ONE FINANCIAL CORPORATION

15

16  Dated: August 5, 2016        SIDLEY AUSTIN LLP

17        By: ___/s/ Benjamin R. Nagin_____

18        Peter K. Huston (SBN 150058)
   555 California Street, Suite 2000
   San Francisco, CA 94104
19        Telephone: 415.772.1200
   Facsimile: 415.772.7400
20        Email: phuston@sidley.com

21        David Graham (admitted *pro hac vice*)
   dgraham@sidley.com
22        One South Dearborn
   Chicago, IL 60603
23        Telephone: 312.853.7000
   Facsimile: 312.853.7036

24

25        Benjamin R. Nagin (admitted *pro hac vice*)
   Melissa Colón-Bosolet (admitted *pro hac vice*)
   bnagin@sidley.com
26        mcolon-bosolet@sidley.com
   787 Seventh Avenue
27        New York, New York 10019
   Telephone: 212.839.5300
28        Facsimile: 212.839.5599

23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Attorneys for Defendant
CITIBANK, N.A. for itself and as successor in
interest to CITIBANK (SOUTH DAKOTA),
N.A.

Dated: August 5, 2016            MCGUIREWOODS LLP

By:   /s/ David C. Powell
        David C. Powell (SBN 129781)
        Jamie D. Wells (SBN 290827)
        505 Sansome Street, Suite 700
        San Francisco, CA 94111
        Telephone: 415/844-1970
        415/844-1912 (fax)
        dpowell@mcguirewoods.com
        jwells@mcguirewoods.com

        Howard Feller (admitted *pro hac vice*)
        J. Brent Justus (admitted *pro hac vice*)
        Casey E. Lucier (admitted *pro hac vice*)
        800 E. Canal Street, Gateway Plaza
        Richmond, VA 23219
        Telephone: 804/775-1000
        804/775-1061 (fax)
        hfeller@mcguirewoods.com
        bjustus@mcguirewoods.com
        clucier@mcguirewoods.com

        Attorneys for Defendant
        WELLS FARGO BANK, N.A.

Dated: August 5, 2016            REED SMITH LLP

By: /s/ Daniel I. Booker
        Daniel I. Booker (admitted *pro hac vice*)
        dbooker@reedsmith.com
        Michelle A. Mantine (admitted *pro hac vice*)
        mmantine@reedsmith.com
        Conor M. Shaffer (admitted *pro hac vice*)
        cshaffer@reedsmith.com
        Courtney B. Averbach (admitted *pro hac vice*)
        caverbach@reedsmith.com
        225 Fifth Avenue
        Pittsburgh, PA 15222
        Telephone: 412.288.3131
        Facsimile: 412.288.3063

        Scott D. Baker (SBN 84923)
        Ashley L. Shively (SBN 264912)
        sbaker@reedsmith.com

24

BANK DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT        CASE NO. 3:16-CV-01150-WHA

ashively@reedsmith.com
101 Second Street
Suite 1800
San Francisco, CA 94105-3659
Telephone:  415-543-8700
Fax:  415-391-8269

Attorneys for Defendant
PNC BANK, NATIONAL ASSOCIATION

## **ATTESTATION**

I, Raoul D. Kennedy, am the ECF user whose ID and password are being used to file the above BANK DEFENDANTS' NOTICE OF MOTION TO DISMISS AMENDED COMPLAINT, MOTION TO DISMISS, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF.  In compliance with Local Civil Rule 5-1(i)(3), I hereby attest that each counsel listed as a signatory above has concurred in this filing.

/s/ Raoul D. Kennedy

BANK DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT        CASE NO. 3:16-CV-01150-WHA