1  Kenneth A. Gallo (admitted *pro hac vice*)
   KGallo@paulweiss.com
2  Craig A. Benson (admitted *pro hac vice*)
   CBenson@paulweiss.com
3  PAUL, WEISS, RIFKIND, WHARTON &
     GARRISON LLP
4  2001 K Street, NW
5  Washington, DC 20006-1047
   Tel. (202) 223-7300
6  Fax. (202) 223-7420

7
   Stephen E. Taylor (SBN 058452)
8  staylor@tcolaw.com
   Cheryl A. Galvin (SBN 252262)
9  cgalvin@tcolaw.com
   TAYLOR & COMPANY LAW OFFICES, LLP
10 One Ferry Building, Suite 355
   San Francisco, CA 94111
11 Tel. (415) 788-8200
12 Fax. (415) 788-8208

13 Attorneys for Defendant
   MASTERCARD INTERNATIONAL
14 INCORPORATED

15

16 *[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGES]*

17                **UNITED STATES DISTRICT COURT**

18              **NORTHERN DISTRICT OF CALIFORNIA**

19                  **SAN FRANCISCO DIVISION**

20

21 B & R SUPERMARKET, INC., d/b/a          Case No.: 3:16-cv-01150-WHA
22 MILAM'S MARKET;
   and GROVE LIQUORS LLC, Individually and on   **DEFENDANTS AMERICAN**
23 Behalf of All Others Similarly Situated,      **EXPRESS, MASTERCARD, VISA,**
                                                  **AND EMVCO'S NOTICE OF**
24                            Plaintiffs,         **MOTION TO DISMISS AMENDED**
                                                  **COMPLAINT, MOTION TO**
25            vs.                                 **DISMISS, AND MEMORANDUM**
                                                  **OF POINTS AND AUTHORITIES**
26 *[CAPTION CONTINUED ON NEXT PAGE]*            **IN SUPPORT THEREOF**

27

28

VISA, INC.; VISA USA, INC.; MASTERCARD
INTERNATIONAL INCORPORATED;
AMERICAN EXPRESS COMPANY; DISCOVER
FINANCIAL SERVICES; BANK OF AMERICA,
N.A.; CAPITAL ONE FINANCIAL
CORPORATION; CHASE BANK USA,
NATIONAL ASSOCIATION; CITIBANK (SOUTH
DAKOTA), N.A.; CITIBANK, N.A.; PNC BANK,
NATIONAL ASSOCIATION; U.S. BANK
NATIONAL ASSOCIATION; WELLS FARGO
BANK, N.A.; and EMVCo, LLC

                    Defendants.

Date:  September 22, 2016
Time: 8:00 a.m.
Place: Courtroom 8, 19th Floor

Honorable William H. Alsup

# TABLE OF CONTENTS

**Page**

STATEMENT OF ISSUES TO BE DECIDED ........................................................1

PRELIMINARY STATEMENT ...........................................................................1

PLAINTIFFS' ALLEGATIONS ..........................................................................4

ARGUMENT ......................................................................................................8

I.  PLAINTIFFS AGAIN FAIL SUFFICIENTLY TO PLEAD A
    CONSPIRACY TO RESTRAIN TRADE IN VIOLATION OF THE
    SHERMAN ACT. ........................................................................................8

    A.  Plaintiffs' Allegations Of Inter-Network Conspiracy Are
        Insufficient. .......................................................................................9

        1.  Plaintiffs Fail To Plead Direct Evidence Of Conspiracy. ...........9

        2.  Plaintiffs' Circumstantial Evidence Of Conspiracy Is
            Insufficient. ..............................................................................10

    B.  Plaintiffs' Allegations Of Intra-Network Conspiracy Are
        Insufficient. .....................................................................................20

II. PLAINTIFFS' STATE ANTITRUST AND UNFAIR PRACTICES
    CLAIMS FAIL. .........................................................................................22

    A.  Plaintiffs' State Law Claims Fail For The Reasons The Federal
        Claims Fail. ......................................................................................22

    B.  The State Law Claims Also Fail For State-Law Specific
        Deficiencies. ....................................................................................23

    C.  Plaintiffs Cannot Bring State Law Claims On Behalf Of A
        Nationwide Class. ............................................................................24

III. PLAINTIFFS' UNJUST ENRICHMENT CLAIM FAILS. ..............................24

CONCLUSION ....................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AD/SAT, Div. of Skylight, Inc. v. Associated Press,*
181 F.3d 216 (2d Cir. 1999) ................................................................................................3, 21

*AIDS Healthcare Found., Inc. v. Gilead Scis., Inc.,*
No. C 16-00443 WHA, 2016 WL 3648623 (N.D. Cal. July 6, 2016) ....................................22

*All Care Nursing Serv. v. High Tech Staffing Servs.,*
135 F.3d 740 (11th Cir. 1998) ...............................................................................................22

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)........................................................................................................8, 9, 22

*Athena Feminine Techs. Inc. v. Wilkes,*
No. C 10-04868................................................................................................................23

*Bailey v. Avis Budget Grp.,*
No. 12-01486, 2013 WL 183998 (N.D. Cal. Jan. 17, 2013)....................................................25

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) .................................................................................................... *passim*

*In re Cal. Title Ins. Antitrust Litig.,*
No. C 08-01341, 2009 WL 1458025 (N.D. Cal. May 21, 2009) ............................8, 9, 18, 20

*In re Citric Acid Litig.,*
191 F.3d 1090 (9th Cir. 1999) ...............................................................................................18

*Coburn v. Bank of New York Mellon, N.A.,*
No. 2:10-CV-03080 JAM, 2011 WL 1103470 (E.D. Cal. Mar. 22, 2011).............................23

*In re Digital Music Antitrust Litig.,*
812 F. Supp. 2d 390 (S.D.N.Y. 2011)....................................................................................23

*In re Ditropan XL Antitrust Litig.,*
529 F. Supp. 2d 1098 (N.D. Cal. 2007) .................................................................................24

*DM Research, Inc. v. Coll. of Am. Pathologists,*
170 F.3d 53 (1st Cir. 1999)....................................................................................................13

*Eclectic Props. East, LLC v. Marcus & Millichap Co.,*
751 F.3d 990 (9th Cir. 2014) .................................................................................................12

*In re Elevator Antitrust Litig.,*
502 F.3d 47 (2d Cir. 2007)....................................................................................................19

*In re Enron Corp.,*
370 B.R. 583 (Bankr. S.D.N.Y. 2007) ...................................................................................11

- ii -

DEFENDANTS AMERICAN EXPRESS, MASTERCARD, VISA, AND EMVCO'S
MOTION TO DISMISS AMENDED COMPLAINT: Case No. 3:16-cv-1150 (WHA)

*Falk v. Gen. Motors Corp.*,
   496 F. Supp. 2d 1088 (N.D. Cal. 2007) ...................................................................25

*Feitelson v. Google Inc.*,
   80 F. Supp. 3d 1019 (N.D. Cal. 2015) ....................................................................22

*Golden Eagle Distrib. Corp. v. Burroughs Corp.*,
   801 F.2d 1531 (9th Cir. 1986) ...................................................................11, 16

*In re Graphics Processing Units Antitrust Litig.*,
   527 F. Supp. 2d 1011 (N.D. Cal. 2007) ......................................18, 19, 20, 24

*ILWU-PMA Welfare Plan Bd. of Trs. v. Conn. Gen. Life Ins. Co.*,
   No. C 15-02965 WHA, 2015 WL 9300519 (N.D. Cal. Dec. 22, 2015) ................................24

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ...................................................................3, 8, 9, 20

*In re Lithium Ion Batteries Antitrust Litig.*,
   No. 13-MD-2420, 2014 WL 309192 (N.D. Cal. Jan. 21, 2014) .....................................20

*Matsushita Elec. Indus. v. Zenith Radio Corp.*,
   475 U.S. 574 (1968) ...................................................................10

*Mazza v. American Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) ...................................................................24

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ................................................................ *passim*

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*,
   795 F.3d 1124 (9th Cir. 2015) ...................................................................8

*Nat'l Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*,
   596 F. Supp. 1231 (S.D. Fla. 1984) ...................................................................2

*Nat'l Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*,
   779 F.2d 592 (11th Cir. 1986) ...................................................................2, 3

*Pantoja v. Countrywide Home Loans, Inc.*,
   640 F. Supp. 2d 1177 (N.D. Cal. 2009) ...................................................................21

*In re Peerless Sys., Corp. Sec. Litig.*,
   182 F. Supp. 2d 982 (S.D. Cal. 2002) ...................................................................9

*QSGI, Inc. v. IBM Global Fin.*,
   No. 11-80880-CIV, 2012 WL 1150402 (S.D. Fla. Mar. 14, 2012) .....................................22

*United States v. Ragano*,
   476 F.2d 410 (5th Cir. 1973) ...................................................................10

*Romero v. Flowers Bakeries, LLC*,
   No. 14-CV-05189-BLF, 2016 WL 469370 (N.D. Cal. Feb. 8, 2016)......................................24

*RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*,
   661 F. Supp. 2d 218 (E.D.N.Y. 2009) ...................................................................22

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
   801 F.3d 412 (4th Cir. 2015) ................................................18

*Spirit Locker, Inc. v. EVO Direct, LLC*,
   696 F. Supp. 2d 296 (E.D.N.Y. 2010) ....................................23

*Sprewell v. Golden State Warriors*,
   266 F.3d 979 (9th Cir. 2001) ...................................................8

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
   580 F. Supp. 2d 896 (N.D. Cal. 2008) ....................................24

*Stewart v. Screen Gems-EMI Music, Inc.*,
   81 F. Supp. 3d 938 (N.D. Cal. 2015) ......................................21

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   781 F. Supp. 2d 955 (N.D. Cal. 2011) ....................................24

*Universal Grading Serv. v. eBay, Inc.*,
   No. C-09-2755 RMW, 2012 WL 70644 (N.D. Cal. Jan. 9, 2012).....................15, 16

*WorldHomeCenter.com, Inc. v. Franke Consumer Prods., Inc.*,
   No. 10 CIV. 3205 BSJ, 2011 WL 2565284 (S.D.N.Y. June 22, 2011) .................23

STATUTES

California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*.......................22, 24

California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* ...........22

Florida Antitrust Act, Fla. Stat. Ann. § 542.19.................................................22

Florida Unfair and Deceptive Practices Act, Fla. Stat. Ann. § 501.201, *et seq.*...........22

New York Deceptive Practices Act, N.Y. Gen. Bus. Law §§ 349–350.......................22

New York Donnelly Act, N.Y. Gen. Bus. Law § 340, *et seq.*......................................22

Sherman Antitrust Act, 15 U.S.C. § 1.................................................... *passim*

OTHER AUTHORITIES

Order Denying Motion for Preliminary Injunction and Advancing Date for Case
   Management Conference, Dkt. No. 36,
   *B&R Supermarket, Inc. v. Visa Inc.*,
   No. C 16-01150 WHA (N.D. Cal. Mar. 16, 2016) ................................24

Fed. Trade Comm'n & U.S. Dep't of Justice, *Antitrust Guidelines for
   Collaborations Among Competitors* (Apr. 2000) ................................18

Douglas King, *Chip-and-PIN: Success and Challenges in Reducing Fraud*
   (Fed. Reserve Bank of Atlanta,
   Retail Payments Risk Forum Working Paper, 2012).............................16

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

Please take notice that on September 22, 2016, at 8:00 am, or as soon thereafter as the matter may be heard by the Court, at the courtroom of the Honorable William H. Alsup, Courtroom 8, 19th Floor, United States District Court, 450 Golden Gate Avenue, San Francisco, California, Defendants American Express Company ("American Express"), MasterCard International Incorporated ("MasterCard"), Visa, Inc., Visa USA, Inc. (together, "Visa"), and EMVCo, LLC ("EMVCo"), will and hereby do move to dismiss Plaintiffs' Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## STATEMENT OF ISSUES TO BE DECIDED

1.      Whether Plaintiffs' federal and state antitrust claims should be dismissed with prejudice for failing to plausibly allege an illegal agreement between and/or among Defendants.

2.      Whether Plaintiffs' other state law claims against Defendants should be dismissed with prejudice for failing to state a claim for relief.

## PRELIMINARY STATEMENT

This is Plaintiffs' third attempt to file a complaint that states a claim for relief, and their final chance to "plead their best case."  (Dkt. No. 281 at 1; Declaration of Craig A. Benson ("Benson Decl."), filed concurrently, Ex. 1 (Transcript of June 23, 2016 Hearing) at 54:18–22; 55:4–15, 56:17–20.)  They have failed once again.  Plaintiffs still offer none of the basic evidentiary facts required to state a claim.  They allege no direct evidence of conspiracy, admitting that they cannot identify a single specific meeting, discussion, or other exchange during which any agreement was made among these Defendants.  Nor do they allege any circumstantial evidence from which conspiracy can be inferred.  Even after three tries, their allegations are still so muddled that the exact nature of their conspiracy theory remains unclear, both as to who participated and what was done.

Plaintiffs acknowledge, as they must, that American Express, Discover, MasterCard, and Visa (the "Networks") have brought to market products that consumers find attractive, and that contribute to merchants' business.  (Dkt. No. 291, Amended Complaint ("AC") ¶¶ 50–52 (the "economy runs on plastic"; "230 million adult American consumers hold more than a billion

credit and charge cards, which they use to make more than two trillion dollars' worth of purchases each year"; and "[m]illions of merchants . . . accept[] credit and charge transactions . . . .".) But this was not always the case. At one time, there was no payment card system enabling the volume and breadth of transactions that are commonplace today.

American Express initially expanded the reach of payment cards using a system that Discover later adopted. American Express and Discover operate primarily as "three-party" systems to connect merchants to cardholders, in which the network itself provides the "issuing" function (issuing cards to consumers) and "acquiring" function (acquiring card transactions from merchants). (*See id.* ¶¶ 58–59, 174.)

MasterCard and Visa later launched a different model involving as many as five parties, giving distinct roles for the cardholder's bank (the "issuing" bank) and the merchant's bank (the "acquiring" bank). (*See id.* ¶¶ 58, 61, 168.) For the first time, there was a system in place in which thousands of banks became issuers and acquirers, interacting together over a network in order to offer cardholders a national—and eventually global—payment product. *See, e.g.*, *Nat'l Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*, 596 F. Supp. 1231, 1254 (S.D. Fla. 1984) ("*NaBanco I*"); *see also id.* at 1257. The products the Networks provide today bring millions of consumers convenience and safety on the one hand, and millions of merchants efficiency and assurance on the other. (*See* AC ¶¶ 26–29, 51–52.)

In order for these Networks to operate as integrated entities, they must have rules governing the interactions among the issuing banks and acquiring banks and, indirectly, among the merchants and consumers. *NaBanco I*, 596 F. Supp. at 1253–54; *see also id.* at 1255–56; *Nat'l Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*, 779 F.2d 592, 602 (11th Cir. 1986) ("*NaBanco II*"). Thus, each Network separately created and promulgated rules to, among other things, establish procedures and define how transactions are authorized and settled. For example, because these Networks form global payment systems, they can connect a merchant in San Francisco that has an acquiring bank in New York with a tourist customer from Virginia who has a card issued by a bank in North Carolina. *See NaBanco I*, 596 F. Supp. at 1254. The

Networks' rules facilitate these transactions between and among these parties, who otherwise have no relationship with one another.  *See NaBanco II*, 779 F.2d at 602.

Plaintiffs complain that Defendants have committed an antitrust violation because, in rolling out new technology to reduce fraud, each Network separately changed one of the rules governing its operations in order to encourage prompt adoption of the technology by both merchants and issuing banks.  (*See* AC ¶¶ 73–81.)  Whereas issuing banks once bore the cost for almost all fraudulent credit card transactions, now, unless a merchant successfully implements the new technology, the acquiring bank for the merchant lacking timely adopted fraud-reducing technology bears that cost, and may choose to pass it on to the merchant.  Conversely, unless an issuing bank undertakes the expensive process of converting its cards to include the new chip technology, that issuer retains full responsibility for fraudulent transactions.

This sort of change in a Network's rules, applied by each Network to its participating members, does not give rise to a Section 1 claim under the Sherman Act.  Indeed, even when Visa and MasterCard were joint ventures (which Plaintiffs admit is no longer the case), the Ninth Circuit specifically held that the act of banks joining a Network and abiding by the Network's rules does not itself constitute an "agreement" or "conspiracy" within the meaning of the Sherman Act.  *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008); *see also AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 233–34 (2d Cir. 1999); *NaBanco II*, 779 F.2d at 602, 605.  At bottom, this is the only allegation Plaintiffs make with respect to any *intra*-Network conspiracy.  Such a claim fails as a matter of law.

Plaintiffs' *inter*-Network conspiracy theory, alleged to occur between the Networks through EMVCo, fares no better.  Plaintiffs do not allege any facts—zero—demonstrating that any Network agreed with another Network in advance to implement a shared rule change, or that EMVCo operated as anything other than a standard-setting organization for technological matters (an entirely legitimate function).  And they cannot.  Despite continuing to conspicuously omit specific allegations of the different dates on which each Network announced its rule change, Plaintiffs nevertheless acknowledge, as they must, that those announcements occurred

serially over a two-year period between 2011 and 2012.  (AC ¶¶ 143, 150.)[1]  Plaintiffs also do not allege—because they cannot—that the different Networks adopted liability shifts of the same scope (e.g., covering counterfeit fraud only vs. counterfeit and lost-and-stolen fraud) or the same certification processes as each other.  Lacking actual evidence of agreement, Plaintiffs point to so-called circumstantial evidence that establishes no more than the fact that the rule changes were at least as consistent with independent, parallel action as with conspiracy.  This is fatal to Plaintiffs' inter-Network conspiracy theory as a matter of law.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007).

In essence, Plaintiffs contend that, any time the Networks adopt rules that Plaintiffs do not like, Section 1 of the Sherman Act gives them the power to seek treble damages and embark on extensive and costly discovery simply by asserting that there is a "conspiracy."  This is not only wrong, but bad for consumers and our economy.  In *Twombly*, the Supreme Court recognized that permitting antitrust actions to proceed in the absence of concrete and plausible allegations chills the very procompetitive behavior that antitrust policy encourages.  *Twombly* cautioned that courts may not infer conspiracy from allegations of parallel conduct that could just as well be legitimate independent action.  *Twombly*, 550 U.S. at 554, 557.  That is precisely the case here, where far from being economically irrational other than as a product of some conspiracy, the rule changes at issue are intended to reduce fraud on each Network by incenting the use of better technology.  That conduct should not be burdened with litigation absent concrete, plausible allegations of misconduct.  Here, just like the complaint in *Twombly*, Plaintiffs' Amended Complaint cries "conspiracy" but lacks plausible support.  It should be dismissed.

## **PLAINTIFFS' ALLEGATIONS**

This antitrust action claims that Defendants violated competition laws by instituting policies that shifted liability for certain fraudulent payment card transactions from payment card-issuing banks to acquiring banks and, ultimately, merchants—when they were "less secure"

---

[1]    In reality, Visa announced its rule change in August 2011, MasterCard in January 2012, American Express in June 2012, and Discover in November 2012.

DEFENDANTS AMERICAN EXPRESS, MASTERCARD, VISA, AND EMVCO'S
MOTION TO DISMISS AMENDED COMPLAINT: Case No. 3:16-cv-01150 (WHA)

because they had not adopted certified fraud protection technology.  (*See* AC ¶¶ 3, 5, 70–81.)
Any merchant could avoid this liability by timely installing and activating certified EMV chip
technology.  (*See id.*)

Two Florida merchants filed what is their second Amended Complaint[2] on behalf of a
putative nationwide class against payment card networks American Express, Discover,
MasterCard, and Visa; card-issuing banks Bank of America, Capital One, Chase Bank U.S.A.,
Citibank, PNC, U.S. Bank, and Wells Fargo (the "Issuing Banks");[3] and the standard-setting
joint venture EMVCo.  (*Id.* ¶¶ 26–39.)  Three additional merchants— rue21, Monsieur Marcel,
and Fine Fare, based in Pennsylvania, California, and New York, respectively—seek to join this
suit.  (*Id.* ¶¶ 16–24.)  In conclusory fashion, Plaintiffs allege that Defendants conspired to use a
"liability shift" to deflect costs associated with fraudulent transactions from issuing banks to
merchants, and that Plaintiffs have been unable to have their EMV chip-reading equipment
certified because of Defendants' alleged control over the certification process.  (*Id.* ¶¶ 83–84.)
Notably, Plaintiffs do not explain why the Networks each would prefer to undermine their own
processes for reducing the costs of fraud rather than have those processes go smoothly,
regardless of which party ultimately bore financial liability for fraud.

American Express and Discover are called "three-party systems" because they generally
issue their own cards directly to consumers, and also contract directly with merchants.  By
contrast, in the Visa and MasterCard networks—involving five parties—banks play defined,
functional roles:  "issuing banks" have the relationships with consumers, while "acquiring
banks" have the relationships with merchants.  (*See id.* ¶¶ 58–59, 61.)  Issuing banks and
acquiring banks earn fees on transactions.  (*See id*. ¶¶ 166–71.)

When cardholders successfully dispute unauthorized or fraudulent payment card
transactions, the issuing bank credits their account and can (but need not) send a "chargeback"

---

[2]   Plaintiffs already filed an amended complaint seeking to add two new named plaintiffs.  (*See* Dkt. No. 255-2.)  But, despite the Court's prior invitation (Benson Decl. Ex. 2 (Transcript of April 21, 2016 Case Management Conference) at 30:17–19; 32:10–16), Plaintiffs made no changes to their substantive allegations with that first amendment.

[3]   When in uppercase, this defined term refers to the Issuing Bank Defendants only; when lowercase, the phrase refers to issuing banks generally.

through the network to the acquiring bank, crediting the disputed money back; the acquiring bank then may (but need not) pass on the chargeback to the merchant. (*See, e.g.*, *id.* ¶¶ 79, 184.) Chargebacks work similarly with American Express and Discover, except that American Express and Discover themselves serve the issuing and acquiring function for the majority of their transactions, and so chargebacks typically occur directly between those Networks and the merchants. (*See id.* ¶¶ 3, 58–59.) For the Court's reference, Defendants attach a diagram illustrating the operation of a chargeback under Network rules. (*See* Benson Decl. Ex. 3.)

EMV chip technology is "a more advanced form of electronic data storage than a magstripe," the previously prevailing technology used to store electronic information on credit cards in the United States. (*Id.* ¶ 65.) EMVCo, a joint venture among American Express, Discover, MasterCard, and Visa,[4] "develops and manages the technical standards by which EMV chip transactions . . . are processed and maintained." (*Id.* ¶ 38.) Because "EMV chips are 'dynamic'" and "create[] a unique electronic signature for each transaction," they are designed to be superior in preventing fraud relative to magstripes, which are "'static,' containing only the information with which they are initially coded." (*Id.* ¶¶ 65, 67.) EMV cards have been available since the 1990s, and the networks implemented rules to transition to EMV in other markets before the United States. (*Id.* ¶¶ 65, 99, 100.) As part of the transition to EMV technology in other parts of the world, the Networks have used liability shifts. (*See id.* ¶ 100.) In at least four major regions of the world, some Networks used the same date for those liability shifts. (*Id.* ¶¶ 100, 111–12 (Asia/Pacific, Canada, Middle East/Africa, United Kingdom).)

At all times relevant to this lawsuit, the Networks have been publicly traded companies with a majority of (or all) independent directors on their boards. (*See id.* ¶¶ 272–77, 281.) Each Network sets its own rules for the conduct of transactions. Those rules are numerous and voluminous.[5] They include the particular rules regarding responsibility for charges disputed by

---

[4]   JCB and UnionPay are not Defendants but are owners and managers of EMVCo. (*See, e.g.*, *id.* ¶¶ 26, 39.) The barebones claim of a conspiracy involving EMVCo is implausible where two of the six owners and managers of EMVCo are not alleged to have participated in the wrongful conduct.

[5]   For example, MasterCard's publicly available rules and guidelines run to more than 1,400 pages. MasterCard, *Rules Impacting Processors and Merchants*, http://www.mastercard.us/en-us/about-mastercard/what-we-do/rules.html (last visited Aug. 5, 2016).

DEFENDANTS AMERICAN EXPRESS, MASTERCARD, VISA, AND EMVCO'S
MOTION TO DISMISS AMENDED COMPLAINT: Case No. 3:16-cv-01150 (WHA)

and credited back to cardholders, called "chargebacks"—in particular, those relating to the "Liability Shift," which made the "less secure" party liable for chargebacks on certain fraudulent transactions as of October 2015.  (*See id.* ¶¶ 70–81, 184.)  Plaintiffs quote from those rules in their Amended Complaint.  (*See id.* ¶¶ 75–81.)  Each Network implemented those rules to encourage both issuing banks and merchants to make the investments necessary to bring EMV technology into the U.S. payment card system and thereby reduce fraud.  (*See id.* ¶¶ 140–41, 144.)

Although Plaintiffs attempt to tie the Issuing Banks to the Networks' respective decisions, there is no allegation that the Issuing Banks have ever owned or controlled American Express or Discover.  Moreover, Plaintiffs further concede that member banks of Visa and MasterCard divested their historical majority ownership interests when those networks completed their IPOs in 2006 and 2008, respectively.  (*Id.* ¶ 272 & n.29.)

Issuing Banks have issued EMV chip cards to their cardholders at "substantial cost," in the "billions of dollars."  (*See id.* ¶¶ 352–53.)  Some merchants "quickly had their EMV-processing systems 'certified.'"  (*Id.* ¶ 209.)  Others, including Plaintiffs, allegedly have "timely" had chip-reading equipment installed but have not yet had that equipment certified.  (*See id.* ¶¶ 12, 13, 16, 21, 208.)  Plaintiffs allege that Defendants control certification and that the certification process was a "means through which Defendants' illegal conduct has been able to flourish."  (*Id.* ¶ 83.)  But Plaintiffs acknowledge that certification "involves numerous entities," none of which are issuing banks, and only some of which Plaintiffs allege participated in any conspiracy.[6]  (*Id.* ¶ 85.)  The only parties Plaintiffs claim financially benefit from the Liability Shift are issuing banks.  (*See, e.g.*, *id.* ¶¶ 172–79.)  They do not explain why Defendants would prefer merchants remain uncertified rather than be able to run EMV fraud-reducing technology, which would reduce fraud costs for everyone—issuers, acquirers, and merchants alike.  They also do not allege that the Networks have adopted the same certification processes.

---

[6]    Indeed, given the certification status information outlined in Exhibit A to the Amended Complaint, it appears that Plaintiffs may not have encountered the delays they allege had they chosen a different equipment provider or acquirer.  (*Id.* ¶ 211 & Ex. A.)

Plaintiffs contend that, because of the Liability Shift, there is a class of merchants (including clients of acquiring banks not associated with Defendant Issuing Banks) who "are now assuming fraud-related losses" that were "previously incurred by the Issuing Banks." (*Id.* ¶ 357.)  Plaintiffs bring claims under federal and state antitrust laws, state consumer protection laws, and under a theory of unjust enrichment.

## **ARGUMENT**

### I.   **PLAINTIFFS AGAIN FAIL SUFFICIENTLY TO PLEAD A CONSPIRACY TO RESTRAIN TRADE IN VIOLATION OF THE SHERMAN ACT.**

To allege a conspiracy, a complaint must "answer the basic questions: who, did what, to whom (or with whom), where, and when?"  *Kendall*, 518 F.3d at 1048.  A plaintiff must plead "enough facts to state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 570, and raise "more than a sheer possibility that a defendant has acted unlawfully," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Conclusory allegations need not be accepted as true and cannot themselves state a claim.  *See Twombly*, 550 U.S. at 555–57; *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  Rather, a plaintiff must allege "evidentiary facts which, if true, will prove the elements" of the claim.  *In re Cal. Title Ins. Antitrust Litig.*, No. C 08-01341, 2009 WL 1458025, at *4 (N.D. Cal. May 21, 2009) (quoting *Kendall*, 518 F.3d at 1047 (internal quotation marks omitted)).

"Because § 1 of the Sherman Act does not prohibit all unreasonable restraints of trade but only restraints effected by a contract, combination or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Twombly*, 550 U.S. at 553 (internal citations and alterations omitted); *Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1129–30 (9th Cir. 2015).  Accordingly, a plaintiff must assert either factual allegations of "direct evidence" of an agreement, or else "circumstantial evidence" that would plausibly permit an inference of conspiracy.  *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015).  A complaint may not lump defendants together, but instead "must allege that each individual defendant joined the conspiracy and played some role in it."  *Cal. Title*, 2009

WL 1458025, at *7.  Even on their third attempt, Plaintiffs' allegations fail to establish an agreement—whether among Networks (inter-Network) or between Issuing Banks and Visa and MasterCard (intra-Network).

### A.     Plaintiffs' Allegations Of Inter-Network Conspiracy Are Insufficient.

#### 1.     Plaintiffs Fail To Plead Direct Evidence Of Conspiracy.

Despite the benefit of Defendants' extensive briefing on the issues and oral argument on the questions, Plaintiffs have still failed to allege any of the evidentiary facts required in this Circuit to state a claim—who agreed with whom, when they agreed, and how the alleged conspiracy was carried out.  *See Kendall*, 518 F.3d at 1048.  Plaintiffs' allegations do not contain direct evidence of an agreement among the Networks.  Instead, Plaintiffs still rely on assertions that are merely conclusory and thus insufficient to demonstrate that Defendants entered into any unlawful agreement.[7]  *See Iqbal*, 556 U.S. at 678.  Indeed, Plaintiffs **admit** that they cannot point to any meeting, discussion, or correspondence in which any agreement occurred, or any materials reflecting such an agreement.  (AC ¶ 146.)  Plaintiffs still do not even plead basic information about when each Network announced its liability shift, though they now concede that the announcements occurred over a two-year period "in 2011 and 2012."  (*Id.* ¶¶ 143, 150); *see Musical Instruments*, 798 F.3d at 1196 (allegations of conduct spread over time does not raise the specter of collusion).

Plaintiffs identify a single after-the-fact characterization by a third party that there was an agreement (*id.* ¶ 139), and statements by certain Defendants or related entities, taken out of context, that Plaintiffs suggest imply improper coordination (*id.* ¶¶ 140–45).  But these allegations fall far short of what would be required to state a claim.  The former—an after-the-fact statement from an uninvolved third party who does not purport to have any non-public information on the subject—is a textbook example of a conclusory allegation.  *See In re Peerless Sys., Corp. Sec. Litig.*, 182 F. Supp. 2d 982, 994–95 (S.D. Cal. 2002) (public report making

---

[7]     *See, e.g.*, AC ¶¶ 2, 4, 6, 8, 10, 11 (Defendants conspired regarding Liability Shift details); *id.* ¶ 39 (conspiracy effectuated through EMVCo); *id.* ¶ 40 (participation of "unknown" and unnamed co-conspirators);  *id.* ¶¶ 83, 84 (Defendants control certification process); *id.* ¶¶ 272, 276 (Issuing Banks control Visa and MasterCard post IPO).

conclusory statements, without demonstrating their reliability, not enough to support complaint). The latter are all statements made well after the Networks had separately announced their liability shifts, merely describing how and why the Networks actually **implemented** the shifts. To the extent the statements refer to coordination at all, it is not secret coordination among the alleged co-conspirators in this case, but rather public "coordination" that occurred across the entire industry, **including merchants**.  (AC ¶ 141 ("[W]e have gotten the acquirers in a room, the merchants in a room, the issuers in a room, the trade groups in a room and we are all trying to work together . . . so that we, the industry, . . . mak[e] sure that our products are still the best products that exist out there.").)  None of the statements shows any improper agreement or secret knowledge on the part of Defendants in advance of the Networks' respective announcements.

Plaintiffs also make only one allegation against EMVCo:  that EMVCo denied involvement on its website for the first time after Plaintiffs' initial Complaint was filed.  (*Id.* ¶ 153.)  This is not evidence of conspiracy.  A denial of alleged misconduct, especially after a lawsuit has been filed, is "in no sense an admission."  *United States v. Ragano*, 476 F.2d 410, 415 (5th Cir. 1973).

2.     Plaintiffs' Circumstantial Evidence Of Conspiracy Is Insufficient.

The circumstantial evidence Plaintiffs offer equally shows that each Network had an independent incentive to transition to EMV technology in the manner it did.  "Conduct that is as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy."  *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1968); *see also Twombly*, 550 U.S. at 545–46 (emphasizing "need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement").  It is thus fatal to Plaintiffs' claims that even the circumstantial facts they allege are still at least as consistent with permissible competition as they are with conspiracy.

Notably, Plaintiffs appear to have trimmed their allegations this time around—apparently to obscure the legitimate, independent reasons that each Network had to implement its liability shift and to do so on a common timetable.  For instance, Plaintiffs alleged in their initial Complaint that "[l]ack of EMV-enabled cards—which are common elsewhere in the world—has

been blamed in part for the fact that more than half of the $14 billion in global annual credit card fraud occurs within the United States."  (Dkt. No. 1 ¶ 68.)  They had also alleged that there was "general reluctance" among "retailers to switch [to EMV technology]."  (*Id.* ¶ 89.)  Both of these allegations suggest a legitimate reason to incent retailers to switch to EMV technology. Plaintiffs have eliminated those allegations from their Amended Complaint.  This is improper pleading.  *See In re Enron Corp.*, 370 B.R. 583, 597–98 (Bankr. S.D.N.Y. 2007) (in erasing prior allegations, plaintiff merely sought to "manipulate the pleading by omitting the allegations that defeat its claim" (internal alterations and quotation marks omitted)); *Golden Eagle Distrib. Corp. v. Burroughs Corp.*, 801 F.2d 1531, 1539 (9th Cir. 1986).

But these omissions do not change the result.  Even after adding more than 60 pages and almost 200 paragraphs, Plaintiffs still fail adequately to allege that Defendants' conduct was more consistent with conspiracy than with rational, independent business motivations, including the need to employ some incentive to encourage merchants to adopt technology to reduce fraud in the United States.

> a.  *Plaintiffs' Purported Evidence Is No More Consistent With Conspiracy Than With Independent, Parallel Conduct.*

As Defendants showed in prior briefing on the initial Complaint, each Network had its own independent incentive to adopt EMV technology on a set deadline that coincided with those of other Networks, such that "there was just no need for joint encouragement" for Defendants to act in parallel.  (Dkt. No. 262 at 3–5 (citing *Twombly*, 550 U.S. at 566).)  Selecting a common effective date to shift liability was in each Network's independent interest:  once one Network decided on and publicly announced its liability shift, every other Network knew that October 2015 was the time by which merchants would already be seeking to comply with EMV requirements.  Each Network could plausibly believe that selecting the same date would increase efficiency and ease the transition for merchants accepting multiple card brands, especially given that merchants would benefit from consistent point-of-sale procedures and back office processes to support all cards in the same manner.  (*See id.* at 4.)  And each Network would also have

1  known that, if it failed to implement EMV technology on the timeline chosen by its competitors,

2  its system would be less secure—and therefore more vulnerable to fraud.  (*See id.* at 4–5.)

3      Plaintiffs' allegations continue to reflect this.  Plaintiffs continue to acknowledge that the

4  "dynamic nature" of EMV chip technology "reduce[s] fraud significantly," is "less prone to

5  illicit copying," and is therefore a more secure form of payment than the traditional magstripe

6  technology.  (*See* Dkt. No. 1 ¶¶ 57, 65; AC ¶¶ 65, 67, 127.)  That superior protection gives each

7  Network a plausible, independent motivation to shift to technology that would better protect its

8  payment card brand and transactions on its system.  To reduce fraud on its system, each Network

9  had an incentive to facilitate and encourage adoption of EMV technology—not deliberately

10  delay certification.  The Amended Complaint acknowledges additional procompetitive reasons

11  for Networks to urge a transition to EMV technology—namely, that it "helps to speed up service,

12  cut queues, and reduce lost sales."  (*Id.* ¶ 127.)

13      Thus, Plaintiffs' allegations "are no more consistent with an illegal agreement than with

14  rational and competitive business strategies, independently adopted by firms acting within an

15  interdependent market."  *Musical Instruments*, 798 F.3d at 1189; *see also Eclectic Props. East,*

16  *LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014) ("[C]ourts must also consider

17  an 'obvious alternative explanation' for defendant's behavior.").  Unilaterally pursuing a course

18  of action—even with the expectation that others will follow suit—is not an antitrust violation.

19  *Twombly*, 550 U.S. at 553–54; *Musical Instruments*, 798 F.3d at 1193.

20      Plaintiffs have added new allegations that relate to (a) the control over the certification

21  process supposedly possessed by the Networks and EMVCo, (b) the hypothetical prospect of

22  merchants steering transactions to Networks that had not implemented a liability shift, (c) the

23  Networks' decisions not to offer interchange discounts to encourage merchant adoption of EMV

24  technology, and (d) the Networks' decisions not to use chip-and-PIN verification in the United

25  States.  None makes a conspiracy more plausible than independent parallel conduct.

26      **Even if the Networks and EMVCo did control certification (they do not), their**

27  **interest is in facilitating rather than impeding it.**  Plaintiffs suggest that Defendants delayed

28  the certification process in order to "offload" fraud liability from Issuing Banks to merchants.

(*Id.* ¶ 84.)  But Plaintiffs allege no facts to establish that, once the Networks each decided to adopt a liability shift, any Defendant had an incentive to delay certification rather than have it proceed smoothly.  For one, they allege no benefit to EMVCo or to Visa and MasterCard (the first two Networks to announce their rule changes) from delayed certification, because none of those Defendants pays the costs of chargebacks due to fraud.  (*Id.* ¶ 113.)  The issuing or acquiring banks bear that liability.  And it makes no sense for EMVCo to block certification, as its *raison d'etre* is to develop and manage the technical standards by which EMV transactions are processed.[8]  (*Id.* ¶ 38.)

Plaintiffs also offer no plausible basis to infer any net benefit to the issuers from having merchants remain uncertified.  There is no dispute that EMV technology is more secure and more effective at reducing fraud than magstripe technology.  (*Id.* ¶¶ 65, 67.)  Hence, any plausible theory of benefit to the issuers must recognize that fraud will decrease with the use of EMV technology.  Nothing in the Amended Complaint supports an inference that any Defendant would be better off having merchants remain uncertified—resulting in constant or increasing levels of fraud in the system—than having merchants get certified—resulting in less fraud in the system.

Even assuming Plaintiffs had provided a plausible theory as to why Defendants would rather impede certification than facilitate it, Plaintiffs allege in only the most conclusory fashion that Defendants effectuated the claimed conspiracy through their control over the certification process.  (*Id.* ¶¶ 83, 84, 94, 96.)  Tellingly, Plaintiffs have not alleged any facts to suggest that any Defendants—let alone all of them—knowingly or deliberately delayed the process of certifying merchant chip-reading equipment.  Rather, Plaintiffs allege that the certification process is complex and involves numerous entities (including many not named as Defendants).  (*Id.* ¶ 85.)  And Plaintiffs' allegations that there were "substantial roadblocks" in other countries to adopt EMV technology (*id.* ¶ 99)—despite no allegations or evidence of conspiracy to block

---

[8]   *See DM Research, Inc. v. Coll. of Am. Pathologists*, 170 F.3d 53, 55-56 (1st Cir. 1999) (affirming dismissal, finding it implausible that a private, standard-setting body and an organization of medical professionals would have any reason to agree "to adopt a faulty standard" that effectively banned the use of plaintiff's products).

1 certifications in those countries—renders even less plausible the claim that conspiracy caused the

2 delays in the United States.[9]

3    **The alleged possibility of steering did not create a need for Networks to reach**

4 **agreement on the Liability Shift.**  Plaintiffs speculate that the prospect of steering—the ability

5 of a merchant to direct or otherwise incent a customer to use forms of payment less expensive for

6 the merchant to accept—made it necessary for the Networks to coordinate unlawfully.  (AC ¶¶ 9,

7 149–50.)  This theory suffers from two fundamental flaws.

8    *First*, while Plaintiffs hypothesize the possibility of steering, nowhere do they allege facts

9 indicating that this possibility loomed so large as to have made a Network's decision to adopt a

10 liability shift uneconomic in the absence of collusion.  Notably, they make no allegations that

11 steering has taken place in any market where liability shifts occurred on different dates—even in

12 countries where regulations prohibit Networks from enforcing contractual restrictions on

13 steering.  (*See id.* ¶ 100.)  And Plaintiffs allege no facts suggesting that any Network would have

14 found the supposed opportunity to capitalize on a temporary increase in volume sufficiently

15 attractive to outweigh the costs of greater exposure to fraud attendant with those less secure, non-

16 EMV transactions.

17    *Second*, Plaintiffs speculate that, *if* the Networks all agreed on the Liability Shift, they

18 could neutralize whatever threat of steering existed and "capture the chargebacks without

19 competing."  (*Id.* ¶ 150.)  But Visa and MasterCard do not "capture" chargebacks at all; those are

20 matters as between their issuing and acquiring banks.  (*See id.* ¶ 113.)  Perhaps even more

21 fundamentally, entirely innocent conduct could lead to the same result—i.e., if each Network

22 acted independently in adopting a liability shift but expected that, given the advantages of the

23

24 [9] Similarly conclusory is Plaintiffs' allegation that Defendants knew "***from the outset*** . . . that
the 'certification' process would take years after the October 2015 Liability Shift was imposed."
25 (*Id.* ¶ 90 (emphasis added).)  Plaintiffs cite only ***post hoc*** commentary about difficulties that
arose after the Networks decided on and announced their respective liability shifts, none of
26 which says the Networks believed the time allotted would be insufficient from the outset.  (*See
id.* ¶ 86 (Oct. 2015), ¶ 88 (June 2016), ¶ 89 ("recently surveyed"), ¶ 90(a) (Feb. 2016), ¶ 90(b)
27 (March 2015, Feb. 2016), ¶ 90(c) (Sept. 2015), ¶ 90(d) (Feb. 2016), ¶ 90(e) (Feb. 2016), ¶ 90(f)
(Sept. 2015), ¶ 91 (March 2015), ¶ 92 (May 2015), ¶ 95 (June 2016).)  In any event, the issue is
28 not whether Defendants knew that some merchants may face difficulties in the transition and
certification process, but whether there was an agreement to shift and to block certification.

1   new technology, other Networks would assess the facts similarly and take similar action.

2   Conscious parallelism is not actionable collusion.  *See Twombly*, 550 U.S. at 553–54; *Musical*

3   *Instruments*, 798 F.3d at 1193.  But Plaintiffs' allegations show nothing more.

4          **There are rational, independent reasons for Networks not to have offered**

5   **interchange concessions.**  Plaintiffs also suggest that a Network, acting unilaterally, would have

6   competed by offering interchange reductions to merchants to encourage them to adopt EMV

7   technology.  (*See, e.g.*, AC ¶¶ 108–10.)  But they provide no factual allegations to support this

8   inference.  Any hypothesized "interchange reductions" would have economic consequences for

9   the Networks.  They would directly reduce the revenues of American Express and Discover.

10  They would make Visa and MasterCard less attractive to issuing banks, which, in turn, would

11  reduce the number of transactions on their networks.  Plaintiffs allege no facts to support an

12  inference that the benefits about which they speculate would outweigh these costs.

13         Plaintiffs also fail to acknowledge that each Network had an independent motivation not

14  to offer such concessions—and also reason to believe that its competitors, based on their own

15  independent assessment of the facts, would take similar action.  Plaintiffs themselves allege that

16  it would have been a "business-crippling decision [for a merchant] to stop accepting Visa cards."

17  (*Id.* ¶ 221.)  On Plaintiffs' own allegations, it thus would be unlikely that merchants would have

18  refused to accept Visa cards even if other Networks had offered interchange or other

19  concessions.  Why then would a competing Network offer a discount to incent EMV adoption if

20  all Networks would benefit from that adoption and merchants would continue to accept Visa

21  anyway?  And why would Visa offer a discount in any event?  Circumstantial conspiracy claims

22  do not become factually sufficient merely because a plaintiff is able to hypothesize alternative

23  courses of action.  *See Universal Grading Serv. v. eBay, Inc.*, No. C-09-2755 RMW, 2012 WL

24  70644, at *6 (N.D. Cal. Jan. 9, 2012) ("[F]irms must have broad discretion to make decisions

25  based on their judgments of what is best for them and [those] business judgments should not be

26  second-guessed."), *aff'd*, 563 F. App'x 571 (9th Cir. 2014).

27         **There are rational, independent reasons for Networks not to have chosen chip-and-**

28  **PIN.**  Plaintiffs also suggest that the Liability Shift was the product of agreement, not parallel

action, because Networks all adopted "the less secure chip-and-signature form of verification [for debit card transactions], as opposed to the more secure chip-and-PIN, widely used throughout the world." (AC ¶ 121.)  According to Plaintiffs, the Networks emphasized chip-and-signature because "chip-and-signature transactions carry a higher interchange fee, which results in significantly more revenue to the payment card networks." (*Id.*)  This argument, which is based only on conclusory allegations, fails for at least two reasons.  *First*, it fails on the economics.  Plaintiffs do not, and cannot, allege that the Networks (particularly Visa or MasterCard) actually earn the interchange fees.[10]  Those fees are paid to the issuing banks.  (*Id.* ¶ 168.)  Even if the Networks did actually earn the interchange fees, Plaintiffs' allegation that each Network earns more from signature than PIN would show that each had an independent economic interest to adopt chip-and-signature.  This pleading failure alone is sufficient to dispose of these allegations.

*Second*, interchange fee or not, nothing about the fact that the Networks chose, in the United States, to adopt chip-and-signature verification makes it more plausible that they did so by agreement than by independent action.  In reality, Plaintiffs know that signature cards are, and have historically been, much more prevalent than PIN in the United States.  (*See* Douglas King, *Chip-and-PIN: Success and Challenges in Reducing Fraud* 22–23 (Fed. Reserve Bank of Atlanta, Retail Payments Risk Forum Working Paper, 2012) (cited at AC ¶ 126).)  That alone provides a completely independent, benign reason for the Networks to continue using signature verification rather than try to convert the market to PIN.  *See Golden Eagle*, 801 F.2d at 1539.  Again, absent a showing of irrationality, strategic business decisions like these are not to be second guessed simply because they are made in parallel.  *Universal Grading*, 2012 WL 70644, at *6.  Plaintiffs concede that EMV chip-and-signature technology is more secure than magstripe technology.  (*See* AC ¶¶ 65, 67.)  Defendants were free to implement the best security they believed could be achieved in the United States, given the circumstances in the U.S. market.

---

[10]   American Express and Discover would have minimal incentive to enter into the agreement Plaintiffs envision, as they issue only limited—or no—debit card products. (*Id.* ¶¶ 28–29.)

Companies are not bound to engage in any specific action, especially if the selected course is entirely rational.

> b.   *Plaintiffs' Alleged "Plus Factors" Do Not Turn Parallel Conduct Into Unlawful Agreement.*

Plaintiffs do not adequately plead any of the "plus factors" the Ninth Circuit has required to distinguish "permissible parallel conduct from impermissible conspiracy." *Musical Instruments*, 798 F.3d at 1194. Taken both "in turn and cumulatively," *id.*, Plaintiffs' purported plus factors do not support an inference of conspiracy.

**Historical precedent for change.** Plaintiffs assert that the Liability Shift was "historically unprecedented" (AC ¶ 97), but their own Amended Complaint belies that assertion. There is no dispute that numerous other regions have previously adopted EMV technology, and have done so using a liability shift. (*Id.* ¶¶ 90(a), 100, 108–12.) Plaintiffs themselves provide a chart that, though incomplete, identifies 22 times that liability shifts have been used in the industry to implement an EMV migration. (*Id.* ¶ 100.) Saying that the Liability Shift is new "in the United States" or quoting articles reporting on the Liability Shift used "for the first time" in the United States (*id.* ¶ 97) merely states the obvious—that the U.S. market had not transitioned to EMV before, and it would now do so—using a mechanism well-recognized in the industry. If anything, these allegations cut against an inference of conspiracy.

Instead, Plaintiffs attempt to manufacture a historically unprecedented move by suggesting that every aspect of the U.S. Liability Shift should have been identical to those used in other regions. Not only is this not the legal standard, but it also ignores the relevant industry experience. In fact, Plaintiffs' allegations about the liability shift in Canada reveal that, when Visa and MasterCard originally set *different* effective dates, they experienced "substantial roadblocks" to compliance. (*Id.* ¶¶ 99–100.) Subsequently, Visa extended its deadline to March 31, 2011, and MasterCard followed with an extension to the *same* date. (*Id.* ¶¶ 111–12.) And in three other major world regions, Visa and MasterCard implemented liability shifts effective at the same time. (*Id.* ¶ 100 (Asia/Pacific, Middle East/Africa, United Kingdom).) That the

1    Networks here each implemented a liability shift incorporating their prior experiences does not

2    support an inference of conspiracy.

3    **Trade organization membership and meetings.**  Nor does common membership in a

4    trade association like Smart Card Alliance or the EMV Migration Forum, or in a standard-setting

5    organization like EMVCo, plausibly suggest conspiracy.  Plaintiffs admit these allegations

6    establish nothing more than the "opportunity to collude" (*id.* at ¶¶ 154, 159), which is

7    insufficient as a matter of law.  *Musical Instruments*, 798 F.3d at 1196 (participation in trade

8    organization meetings does not suggest illegal agreement); *In re Citric Acid Litig.*, 191 F.3d

9    1090, 1103 (9th Cir. 1999); *Cal. Title*, 2009 WL 1458025, at *5–6 ("[O]pportunity, without

10   more, is not a plausible basis to suggest a conspiracy."); *In re Graphics Processing Units*

11   *Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (Alsup, J.).  This is because such

12   organizations provide significant procompetitive benefits.  *See Citric Acid*, 191 F.3d at 1098

13   (trade associations "provid[e] information to industry members, conduct[] research to further the

14   goals of the industry, and promot[e] demand for products and services"); *SD3, LLC v. Black &*

15   *Decker (U.S.) Inc.*, 801 F.3d 412, 435 (4th Cir. 2015) (standard-setting organizations have

16   "decidedly procompetitive effects by encouraging greater product interoperability, generating

17   network effects, and building incentives to innovate" (internal quotation marks omitted)); Fed.

18   Trade Comm'n & U.S. Dep't of Justice, *Antitrust Guidelines for Collaborations Among*

19   *Competitors* at 6 (Apr. 2000) ("[C]onsumers may benefit from competitor collaborations" such

20   as "joint ventures, trade or professional associations, . . . or strategic alliances.").

21   Plaintiffs allege no evidentiary facts to suggest that EMVCo was anything other than a

22   standard-setting body, or that anything improper occurred at any EMVCo, Smart Card Alliance,

23   or EMV Migration Forum meeting.  On the contrary, Plaintiffs acknowledge that each trade

24   group was a collaboration between and among various industry participants.  (*See, e.g.*, AC ¶ 141

25   (EMVCo was open to merchants), ¶ 154 (Smart Card Alliance is "the single industry voice for

26   smart card technology, leading industry discussion on the impact and value of smart cards in the

27   U.S. and Latin America"), ¶ 161 ("EMV Migration Forum is an industry group created . . . to

28   address issues that require broad cooperation and coordination across many constituents in the

1  payments space").)  And Plaintiffs' allegations about a Smart Card Alliance conference and

2  panel discussion on EMV (*id.* ¶ 156) are nothing more than "remarks at open panel discussions

3  attended by many people at trade shows," which "cannot reasonably constitute the terms of an

4  illegal agreement."  *Musical Instruments*, 798 F.3d at 1191.  Participation in these industry

5  organizations does not support an inference of conspiracy.

6          **Prior litigations and Sen. Durbin's correspondence.**  Plaintiffs' allegations regarding

7  Defendants' supposed "history of anticompetitive conduct" fail to make it plausible that the

8  conduct at issue is more likely the result of a conspiracy than of parallel action.  (AC ¶¶ 248–70.)

9  The prior litigations Plaintiffs cite involved entirely different conduct—including conduct

10 allegedly *adverse* to purported co-conspirators here.[11]  The outcomes do not render plausible the

11 allegations as to the Liability Shift and certification process in *this* case.  *See In re Elevator*

12 *Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) ("Without an adequate allegation of facts linking

13 transactions in Europe to transactions and effects here, plaintiffs' conclusory allegations do not

14 'nudge[ their] claims across the line from conceivable to plausible.'" (quoting *Twombly*)).

15         Even a formal government investigation would not be a plus factor.  *See Musical*

16 *Instruments*, 798 F.3d at 1196 (FTC Act and Sherman Act involve different analyses, so no plus

17 factor for FTC investigation of trade association); *Graphics Processing*, 527 F. Supp. 2d at 1024

18 (Alsup, J.) (ongoing DOJ investigation "carries no weight in pleading an antitrust conspiracy

19 claim" because "[i]t is unknown whether the investigation will result in indictments or nothing at

20 all.").  A single Senator's correspondence about the pace of the EMV transition does not make

21 the claimed conspiracy plausible.[12]

22

23

24 [11]  *See, e.g.*, *id.* ¶¶ 248–49, 251 (alleging Visa and MasterCard conspired against, and were sued
    by, American Express and Discover); *id.* ¶ 250 (alleging Visa and MasterCard "tied" credit and
25 debit offerings); *id.* ¶¶ 252–254 (alleging Visa and MasterCard and member banks conspired to
    set default interchange rates); *id.* ¶¶ 147–50, 257–59 (alleging that various Visa, MasterCard, and
26 American Express rules not at issue here violate antitrust laws).  The Durbin Amendment,
    enacted in 2010, likewise bears no relation to the conduct at issue here.  (*See id.* ¶ 256.)
27 [12]  Notably, Senator Durbin's letters do not suggest that EMVCo was the vehicle for a
    conspiracy to delay or obstruct certification.  Senator Durbin (incorrectly) finds fault with
28 EMVCo in other respects, such as flaws in technology and the certification process generally.
    (*Id.* ¶¶ 267, 270.)

**Market characteristics.**  Plaintiffs' allegations of market share and barriers to entry also cannot support an inference of conspiracy.  (*See id.* ¶¶ 231–37.)  *Twombly* made clear that an allegedly "concentrated market" does not make parallel conduct more plausibly the result of a conspiracy than independent action.  550 U.S. at 550 n.1, 553 (90% or more market power insufficient to suggest conspiracy); *see also Graphics Processing*, 527 F. Supp. 2d at 1023 n.6 (no plus factors despite allegation of concentrated market); *Cal. Title*, 2009 WL 1458025, at *1, *4 (no plus factors even where defendants allegedly accounted for 96% of market and plaintiffs alleged barriers to entry).  A plaintiff must place market concentration allegations in a context that suggests a preceding agreement.  Plaintiffs here have failed to do so.[13]

**Pretextual explanations.**  In a footnote, Plaintiffs label as "pretextual" Defendants' explanations of the business reasons for implementing their liability shifts on a common date. (AC ¶ 101 & n.20.)  As discussed above, Defendants had abundant independent reasons for choosing a common date.  The Amended Complaint does not adequately allege any pretext or untruthfulness—*i.e.*, "public, putatively false statements."  *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420, 2014 WL 309192, at *16 (N.D. Cal. Jan. 21, 2014).  In any case, it is hardly pretextual for each of the Networks reasonably to fear that different effective dates for the Liability Shift would risk confusion among merchants or make them relatively less secure and more vulnerable to fraud; indeed, Plaintiffs' allegations about the liability shift in Canada (where the date ultimately used by Visa and MasterCard was the same) suggest that each Network would see value in using a common date from the outset.  (AC ¶¶ 99, 111–12.)

## B.   Plaintiffs' Allegations Of Intra-Network Conspiracy Are Insufficient.

Plaintiffs' attempt to plead an intra-Network conspiracy between the Issuing Banks and certain Networks also fails.  The Ninth Circuit has held that simply joining or owning a proprietary interest in a payment card association, participating in its governance, and agreeing to abide by credit card network rules does not amount to conspiracy.  *Kendall*, 518 F.3d at 1048 ("[C]harging, adopting or following the fees set by a [Network] is insufficient as a matter of law"

---

[13]   Plaintiffs also allege that "[t]here is virtually no elasticity of demand" in the alleged relevant market.  (AC ¶ 236.)  Research has not disclosed any authority from the Ninth Circuit recognizing demand inelasticity as a plus factor.

to make out § 1 violation); *see also Musical Instruments*, 798 F.3d at 1196 (participation in an organization or association insufficient to allege agreement under Sherman Act).  To avoid deterring collaboration that yields procompetitive benefits, other Circuits have similarly declined to subject business association members to liability based solely on a member's participation in the association's activities.  *See, e.g.*, *AD/SAT*, 181 F.3d at 234.  Plaintiffs' intra-Network conspiracy theory relies on their allegations that the Issuing Banks are members of Visa and MasterCard and followed their rules, and that the Networks are members of EMVCo and participated in its governance.  These allegations are insufficient to establish conspiracy as a matter of law.[14]

Plaintiffs have failed sufficiently to allege that the Issuing Banks control Visa and MasterCard such that they can control any rule changes.  And, despite alleging certain corporate relationships between the Issuing Banks and acquiring banks, Plaintiffs make no allegations that the acquiring banks (or any issuing bank, for that matter) played any role in any Network's decision to shift liability.[15]  Plaintiffs have not sufficiently pled an intra-Network conspiracy.

*        *        *

It is this Court's province to enforce pleading standards to filter out the kind of conclusory and unsubstantiated claims advanced in lawsuits such as this.  *Twombly*, 550 U.S. at 558.  Plaintiffs here have not alleged any evidentiary facts that make their conspiracy claim plausible.  Because all the evidence is just as, if not more, consistent with independent, rational business strategies, Plaintiffs' antitrust claims must be dismissed.  *See id.* at 554–56.

---

[14]    For the same reasons, Plaintiffs' allegations that certain Issuing Banks participate in EMVCo, the Smart Card Alliance, and/or the EMV Migration Forum do not make plausible any conspiracy arising through those industry bodies.

[15]    Although irrelevant, given the absence of any facts showing either issuer or acquirer involvement in Network decision-making, Plaintiffs' attempts to suggest issuer control of acquiring banks are also themselves convoluted and strained.  The joint ventures and subsidiary and parent structures Plaintiffs allege (*id.* ¶¶ 30–32, 34–36) do not support an inference that the Issuing Banks themselves function as, or with an eye to the interest of, acquiring banks.  *See, e.g.*, *Pantoja v. Countrywide Home Loans, Inc.*, 640 F. Supp. 2d 1177, 1192 (N.D. Cal. 2009) ("It is the general rule that a parent corporation and its subsidiary will be treated as separate legal entities."); *cf. Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 960 (N.D. Cal. 2015) (plaintiffs must plead "such a unity of interest and ownership that the separate personalities of the two corporations no longer exist" in order to disregard corporate separation).

1    It remains unacceptable for Plaintiffs to press for discovery.  (AC ¶ 146.)  Rule 8 of the

2    Federal Rules of Civil Procedure "does not unlock the doors of discovery for a plaintiff armed

3    with nothing more than conclusions."  *Iqbal*, 556 U.S. at 678–79.  This is particularly true in a

4    case like this, involving an industry producing enormous procompetitive benefits, where

5    innovation would be deterred, a Network's rules with issuing banks are necessary and

6    appropriate, and costs of discovery would be "potentially enormous."  *Twombly*, 550 U.S. at 559.

7    **II.    PLAINTIFFS' STATE ANTITRUST AND UNFAIR PRACTICES CLAIMS FAIL.**

8        **A.    Plaintiffs' State Law Claims Fail For The Reasons The Federal Claims Fail.**

9        Plaintiffs bring six claims under the state laws of California, New York, and Florida,

10   based on the same allegations of a purported conspiracy that Plaintiffs use to support their

11   Sherman Act claim.[16]  Each of these claims should be dismissed for several independent reasons,

12   but, as a threshold matter, all of the claims should be dismissed because they are based on the

13   same inadequate allegations discussed above.  *See, e.g.*, *AIDS Healthcare Found., Inc. v. Gilead*

14   *Scis., Inc.*, No. C 16-00443 WHA, 2016 WL 3648623, at *8 (N.D. Cal. July 6, 2016) (Alsup, J.)

15   (because Sherman Act claims fail, Cartwright Act claims, which "mirror [] claims under the

16   Sherman Act," also fail); *Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1034 (N.D. Cal. 2015)

17   ("Plaintiffs' UCL claim based on 'unfair' competition rises and falls with their Sherman Act

18   claims."); *All Care Nursing Serv. v. High Tech Staffing Servs.,* 135 F.3d 740, 745 n.116 (11th

19   Cir. 1998) ("Federal and Florida antitrust laws are analyzed under the same rules and case

20   law."); *QSGI, Inc. v. IBM Global Fin.*, No. 11-80880-CIV, 2012 WL 1150402, at *4 (S.D. Fla.

21   Mar. 14, 2012) ("When . . . a plaintiff's FDUTPA claim is based on the same allegations as its

22   antitrust claim, failure to establish a violation of the antitrust law is sufficient to conclude that the

23   plaintiff has also failed to state a FDUTPA claim."); *RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*,

24   661 F. Supp. 2d 218, 234 (E.D.N.Y. 2009) ("Because Plaintiff's federal antitrust claims have

25   been dismissed, Plaintiff's claims under the Donnelly Act are dismissed as well."), *aff'd*, 391 F.

---

[16]   California's Cartwright Act (Cal. Bus. & Prof. Code §16700), California's Unfair
Competition Law "UCL" (Cal. Bus. & Prof. Code §17200, *et seq.*), New York's Donnelly Act
(N.Y. Gen. Bus. Law § 340, *et seq.*), New York's Deceptive Practices Act (N.Y. Gen. Bus. Law
§§ 349–350), the Florida Antitrust Act (Fla. Stat. Ann. § 542.19), and the Florida Unfair and
Deceptive Practices Act "FDUTPA" (Fla. Stat. Ann. § 501.201, *et seq.*).

App'x 59 (2d Cir. 2010); *WorldHomeCenter.com, Inc. v. Franke Consumer Prods., Inc.*, No. 10 CIV. 3205 BSJ, 2011 WL 2565284, at \*7 (S.D.N.Y. June 22, 2011) (allegations of "mere anticompetitive conduct will not suffice" to make out behavior deceptive to consumers). Because Plaintiffs' claims fail under the Sherman Act, claims under these statutes also fail.

### B.    The State Law Claims Also Fail For State-Law Specific Deficiencies.

As merchants, Plaintiffs fall outside the state consumer-protection statutes' scope.  They are neither consumers nor competitors of the Defendants, and they allege no harm to consumers. In fact, the Liability Shift is meant to *protect* consumers by reducing fraud.

Plaintiffs' New York Deceptive Acts and Practices claim fails because the purportedly unlawful conduct alleged by Plaintiffs is not consumer-oriented, which is required to form the basis of a § 349 claim or § 350 claim.  *See Spirit Locker, Inc. v. EVO Direct, LLC*, 696 F. Supp. 2d 296, 303 (E.D.N.Y. 2010) (plaintiff failed "to meet the threshold requirement of consumer orientation" in asserting § 349 claim against credit card processor, because "businesses cannot be consumers for this purpose"); *see also In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 410 (S.D.N.Y. 2011) ("[A]nticompetitive conduct that is not premised on consumer deception is not within the ambit of the statute").

Plaintiffs' allegations under California's UCL are too conclusory to state a claim. Plaintiffs purport to bring claims under each of the UCL's three prongs—the "unlawful," "unfair," and "fraudulent" prongs.  (*See* AC ¶ 350.)  "Different legal standards and pleading requirements apply to each prong," and Plaintiffs' claim under the fraudulent prong "must be pled with particularity under Rule 9(b)."  *Athena Feminine Techs. Inc. v. Wilkes*, No. C 10-04868 SBA, 2011 WL 4079927, at \*9 (N.D. Cal. Sept. 13, 2011).  Here, Plaintiffs' allegations that Defendants' conduct was unlawful, unfair, and fraudulent—without explanation or facts to support their contentions—"are precisely the type of fact-barren, conclusory pleading that the Supreme Court has held is insufficient under Rule 8."  *Id.* (citing *Iqbal*, 556 U.S. at 678); *see also Coburn v. Bank of New York Mellon, N.A.*, No. 2:10-CV-03080 JAM, 2011 WL 1103470, at \*5 (E.D. Cal. Mar. 22, 2011) ("Plaintiff's allegation that Defendants' acts constitute unlawful,

1   unfair, and fraudulent business practices is a conclusory statement devoid of facts and it fails to

2   meet heightened, or even standard, pleading requirements.").

3        The Court should therefore dismiss all of Plaintiffs' state law claims.

4        **C.    Plaintiffs Cannot Bring State Law Claims On Behalf Of A Nationwide Class.**

5        While Plaintiffs seek to bring claims only on behalf of a class of Florida merchants for

6   their Florida state-law claims, Plaintiffs seek a nationwide class for their California and New

7   York State law claims.[17]   This is impermissible.  *See Mazza v. American Honda Motor Co.*, 666

8   F.3d 581, 594 (9th Cir. 2012) ("[E]ach class member's consumer protection claim should be

9   governed by the consumer protection laws of the jurisdiction in which the transaction took

10  place.").

11  **III.    PLAINTIFFS' UNJUST ENRICHMENT CLAIM FAILS.**

12       The Amended Complaint does nothing to save Plaintiffs' unjust enrichment claim.  Just

13  like in the initial Complaint, Plaintiffs fail to identify which state's common law supports their

14  claim.  When a plaintiff brings an unjust enrichment claim on behalf of a nationwide class but

15  fails to identify the state law underlying the claim, a court "cannot assess whether the claim has

16  been adequately pled."  *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F.

17  Supp. 2d 896, 910 (N.D. Cal. 2008).[18]   This deficiency is fatal to the unjust enrichment claim.

18       More fundamentally, there is no independent unjust enrichment claim in California.  *See*

19  *ILWU-PMA Welfare Plan Bd. of Trs. v. Conn. Gen. Life Ins. Co.*, No. C 15-02965 WHA, 2015

20

---

21  [17]   Plaintiffs, two merchants from Florida, do not allege that they were injured in California or
    New York, and therefore do not have standing to bring claims under New York or California

22  state law.  *See* Order Denying Motion for Preliminary Injunction and Advancing Date for Case
    Management Conference at 3, *B&R Supermarket, Inc. v. Visa Inc.*, No. C 16-01150 WHA (N.D.

23  Cal. Mar. 16, 2016) (Dkt. No. 36) (noting that "a Florida business is unlikely to have any claim
    for relief under California's Cartwright Act"); *Graphics Processing*, 527 F. Supp. 2d at 1026–27

24  (Alsup, J.) (dismissing non-California state antitrust claims brought under laws of states in which
    class representatives did not reside and in which an injury did not occur).  Plaintiffs' motion for

25  the intervention of additional plaintiffs is pending.
    [18]   Other courts have dismissed claims in similar circumstances. *See, e.g.*, *In re Ditropan XL*

26  *Antitrust Litig.*, 529 F. Supp. 2d 1098, 1101 (N.D. Cal. 2007) (stating that plaintiff's "ability to
    plead a claim for unjust enrichment may vary from state to state, and unless and until [the

27  plaintiff] clarifies under what state law it is moving, neither Defendants nor the Court can
    address whether the claim or claims have been adequately plead [sic].");  *Romero v. Flowers*

28  *Bakeries, LLC*, No. 14-CV-05189-BLF, 2016 WL 469370, at *12 (N.D. Cal. Feb. 8, 2016); *In re*
    *TFT-LCD (Flat Panel) Antitrust Litig.*, 781 F. Supp. 2d 955, 966 (N.D. Cal. 2011).

WL 9300519, at *11. (N.D. Cal. Dec. 22, 2015) (Alsup, J.) ("Unjust enrichment is not a cause of action or even a remedy, but rather a general principle, underlying various legal doctrines and remedies.  It is synonymous with restitution.") (internal quotation marks and alteration omitted); *see also Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1099 (N.D. Cal. 2007) (Alsup, J.) (remedies available for the violations alleged under the CLRA and UCL meant there would "be no occasion for resort to unjust enrichment").

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiffs' Amended Complaint with prejudice.  The Court directed Plaintiffs to "plead their best case."  (Dkt. No. 281 at 1.)  Their best case fails to state a claim, and further amendment would be futile.  *See Bailey v. Avis Budget Grp.*, No. 12-01486, 2013 WL 183998, at *3 (N.D. Cal. Jan. 17, 2013).

Dated:  August 5, 2016                    Respectfully submitted,


                                          PAUL, WEISS, RIFKIND, WHARTON &
                                             GARRISON LLP


                                          By:   */s/ Kenneth A. Gallo*
                                             Kenneth A. Gallo (admitted *pro hac vice*)
                                             Craig A. Benson (admitted *pro hac vice*)
                                             William Y. Durbin (admitted *pro hac vice*)
                                             Catherine M. Yang (admitted *pro hac vice*)

                                             2001 K Street, NW
                                             Washington, DC 20006-1047
                                             Telephone: 202.223.7300
                                             Facsimile: 202.223.7420
                                             KGallo@paulweiss.com
                                             CBenson@paulweiss.com
                                             WDurbin@paulweiss.com
                                             CYang@paulweiss.com

                                             Stephen E. Taylor (SBN 058452)
                                             Cheryl A. Galvin (SBN 252262)
                                             TAYLOR & COMPANY LAW
                                             OFFICES, LLP
                                             One Ferry Building, Suite 355
                                             San Francisco, CA 94111
                                             Telephone: 415.788.8200
                                             Facsimile: 415.788.8208
                                             staylor@tcolaw.com
                                             cgalvin@tcolaw.com

                                             Attorneys for Defendant
                                             MASTERCARD INTERNATIONAL
                                             INCORPORATED


Dated:  August 5, 2016                    ARNOLD & PORTER LLP

                                          By:   */s/ Robert J. Vizas*
                                             Robert J. Vizas
                                             robert.vizas@aporter.com
                                             Sharon D. Mayo
                                             sharon.mayo@aporter.com
                                             Erica M. Connolly
                                             erica.connolly@aporter.com

Three Embarcadero Center, Tenth Floor
San Francisco, CA 94111-4024
Telephone: 415.471.3100
Facsimile: 415.471.3400

Mark R. Merley (admitted *pro hac vice*)
mark.merley@aporter.com
Karen C. Otto (admitted *pro hac vice*)
karen.otto@aporter.com
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
Telephone: 202.942.5000
Facsimile: 202.942.5999

Attorneys for Defendants
VISA INC. and VISA U.S.A. INC.

Dated:  August 5, 2016               CRAVATH, SWAINE & MOORE LLP

                                     By:   */s/ Rowan D. Wilson*
                                           Rowan D. Wilson
                                           Lauren K. Ross
                                           Worldwide Plaza
                                           825 Eighth Avenue
                                           New York, NY 10019-7475
                                           Telephone: 212.474.1000
                                           Facsimile: 212.474.3700
                                           Email: rwilson@cravath.com
                                           Email: lross@cravath.com

                                     Attorneys for Defendant
                                     AMERICAN EXPRESS COMPANY

Dated:  August 5, 2016               SEDGWICK LLP

                                     By:   */s/ Paul Riehle*
                                           Paul Riehle (SBN 115119)
                                           paul.riehle@sedgwicklaw.com
                                           333 Bush Street, 30th Floor
                                           San Francisco, CA 94104
                                           Telephone: 415.781.7900
                                           Facsimile: 415.781.2635

                                     Attorneys for Defendant
                                     EMVCo, LLC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>ATTESTATION</u>**

I, Kenneth A. Gallo, am the ECF user whose ID and password are being used to file the above DEFENDANTS AMERICAN EXPRESS, MASTERCARD, VISA, AND EMVCO'S MOTION TO DISMISS AMENDED COMPLAINT.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that each listed counsel above has concurred in this filing.

*/s/ Kenneth A. Gallo*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of San Francisco, State of California.  My business address is One Ferry Building, Suite 355, San Francisco, California 94111.

On August 5, 2016, I served true and correct copies of the foregoing **DEFENDANTS AMERICAN EXPRESS, MASTERCARD, VISA, AND EMVCO'S NOTICE OF MOTION TO DISMISS AMENDED COMPLAINT, MOTION TO DISMISS, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** by CAND/ECF transmission on all parties so registered to receive electronic service in the above-captioned action.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on August 5, 2016, at San Francisco, California.

_____
Stefanie E. Chow