1  ROBBINS GELLER RUDMAN
   & DOWD LLP
2  PATRICK J. COUGHLIN (111070)
DAVID W. MITCHELL (199706)
3  ALEXANDRA S. BERNAY (211068)
CARMEN A. MEDICI (248417)
4  ANGEL P. LAU (286196)
LONNIE A. BROWNE (293171)
5  655 West Broadway, Suite 1900
San Diego, CA 92101-8498
6  Telephone: 619/231-1058
619/231-7423 (fax)
7  patc@rgrdlaw.com
davidm@rgrdlaw.com
8  xanb@rgrdlaw.com
cmedici@rgrdlaw.com
9  alau@rgrdlaw.com
lbrowne@rgrdlaw.com
10
DEVINE GOODMAN RASCO &
11    WATTS-FITZGERALD, LLP
JOHN W. DEVINE
12  LAWRENCE D. GOODMAN
ROBERT J. KUNTZ, JR.
13  2800 Ponce De Leon Blvd., Suite 1400
Coral Gables, FL 33134
14  Telephone: 305/374-8200
305/374-8208 (fax)
15  jdevine@devinegoodman.com
lgoodman@devinegoodman.com
16  rkuntz@devinegoodman.com

17  Attorneys for Plaintiffs

18  [Additional counsel appear on signature page.]

   UNITED STATES DISTRICT COURT
19
   NORTHERN DISTRICT OF CALIFORNIA
20

| | |
|---|---|
| 21 B & R SUPERMARKET, INC., d/b/a MILAM'S MARKET, a Florida corporation, et al., Individually and on Behalf of All Others 22 Similarly Situated,                   )<br>)<br>)<br>)<br>)<br>) | Case No. 3:16-cv-01150-WHA<br><br>CLASS ACTION |

B & R SUPERMARKET, INC., d/b/a
MILAM'S MARKET, a Florida corporation, et
al., Individually and on Behalf of All Others
Similarly Situated,

23                     Plaintiffs,

24       vs.

25  VISA, INC., a Delaware corporation, et al.,

26                 Defendants.

Case No. 3:16-cv-01150-WHA

CLASS ACTION

PLAINTIFFS' OMNIBUS OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

DATE:    September 22, 2016
TIME:    8:00 a.m.
CTRM:   8, 19th Floor
JUDGE:  Hon. William Alsup

27

28

1178913_1

# TABLE OF CONTENTS

**Page**

I.    STATEMENT OF ISSUES TO BE DECIDED ................................................1

II.   ARGUMENT ...................................................................................................1

    A.    Introduction.........................................................................................1

    B.    Legal Standard ....................................................................................3

    C.    Relevant Facts .....................................................................................5

        1.    The Liability Shift Was Historically Unprecedented...................7

        2.    An Agreement Between Defendants Was Necessary to Maintain Market Share and Avoid Competitive Concessions Risked by Steering in the Wake of Antitrust Attacks on the Networks' Anti-Steering Rules .............................................................................9

        3.    Issuing Banks' Control Over Networks.....................................10

        4.    The *Quid Pro Quo* Between the Networks and the Issuing Banks Suggests an Agreement to Implement the Liability Shift.........................11

        5.    The High-Level of Interfirm Communication Enabled Through EMVCo, the Smart Card Alliance and the EMV Migration Forum Suggest a Preceding Agreement .................................................12

        6.    Defendants Are Part of an Industry Conducive to Conspiring .................13

        7.    Defendants' History of Anticompetitive Conduct Weighs in Favor of the Plausibility of a Collusive Agreement............................................14

    D.    Viewed Together the Complaint's Allegations Are Highly Plausible and Defendants' Arguments to the Contrary Fail.........................................15

        1.    The Network Defendants' Arguments Are Inapt........................15

        2.    Allegations Against the Bank Defendants Are More than Sufficient........23

            a.    The Banks' Arguments Regarding Membership in EMVCo and Trade Associations Are Unpersuasive .....................................23

            b.    Allegations of Continued Control of the Networks by the Banks Are Sufficient.................................................................27

            c.    The Banks Cannot Escape Liability by Arguing Others Were More Involved .....................................................................29

        3.    Discover's Arguments Are Nonsensical, Duplicative and Irrelevant........30

            a.    Discover Has Waived Any Right to Compel Arbitration .............30

1

2                                                                                                    **Page**

3

4              b.      The Court Must Strike Discover's Improper Argument
                       Regarding Other Complaints Neither Referred to nor
5                      Relied upon by Plaintiffs ................................................31

6              c.      Discover's Arguments Strain Credulity and Misstate the
                       Facts ..............................................................................33

7              d.      Discover's Antitrust Injury and Causation Arguments are
                       Bizarre and Incorrect....................................................35

8      E.    Plaintiffs Adequately Allege State Law Claims ................................37

9            1.        Plaintiffs' New York Deceptive Acts and Practices Claim Falls
10                     Within the Scope of N.Y. Gen. Bus. L. §§349-350 ...................37

11           2.        Plaintiffs Have Adequately Pled a Claim Under California's Unfair
                       Competition Law .........................................................................37

12           3.        Plaintiffs' Claim Against the Bank Defendants and Discover Under
13                     the Florida Deceptive and Unfair Trade Practices Act Is Valid ...............38

14           4.        Plaintiffs Have Adequately Pled Claims Under State Antitrust
                       Laws.............................................................................................39

15     F.    The Complaint States a Claim for Unjust Enrichment ..........................40

16     G.    Leave to Amend and/or Discovery Should be Allowed ........................40

17 III.  CONCLUSION.............................................................................................41

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS - 3:16-cv-01150-WHA                                                                                          - ii

1

<b>TABLE OF AUTHORITIES</b>

2
                                                                                          **Page**

3   **CASES**

4   *AD/SAT v. AP,*
5        181 F.3d 216 (2d Cir. 1999) .................................................................16

6   *Allied Tube & Conduit Corp. v. Indian Head,*
         486 U.S. 492 (1988) ...........................................................................25
7
    *Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.,*
8        456 U.S. 556 (1982) ......................................................................13, 25

9   *AmerisourceBergen Corp. v. Dialysist W., Inc.,*
         465 F.3d 946 (9th Cir. 2006) ..............................................................41
10
    *Ashcroft v. Iqbal,*
11       556 U.S. 662 (2009) ...........................................................................15

12  *Associated Gen. Contractors v. Cal. State Council of Carpenters,*
         459 U.S. 519 (1983) ...........................................................................35
13
    *Astiana v. Hain Celestial Grp., Inc.,*
14       783 F.3d 753 (9th Cir. 2015) ..............................................................40

15  *Athena Feminine Techs. Inc. v. Wilkes,*
         No. C 10-04868 SBA, 2011 WL 4079927
16       (N.D. Cal. Sept. 13, 2011) ..................................................................38

17  *Atl. Richfield Co. v. USA Petroleum Co.,*
         495 U.S. 328 (1990) ...........................................................................36
18
    *Bell Atl. Corp. v. Twombly,*
19       550 U.S. 544 (2007) ..................................................................... *passim*

20  *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n.,*
         620 F.2d 1360 (9th Cir. 1980) ............................................................35
21
    *Bona Fide Conglomerate, Inc. v. SourceAmerica,*
22       No. 14CV0751-GPC-DHB, 2014 WL 4162020
         (S.D. Cal. Aug. 20, 2014) ...................................................................28
23
    *Bowe v. Pub. Storage,*
24       106 F. Supp. 3d 1252 (S.D. Fla. 2015) ...............................................39

25  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
         429 U.S. 477 (1977) ...........................................................................35

26

27

28

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS - 3:16-cv-
01150-WHA                                                                              - iii -

1

2                                                                                           **Page**

3

4    *Christie v. Bank of Am., N.A.*,
         No. 8:13-cv-1371-T-23TBM, 2014 WL 5285987
5        (M.D. Fla. Oct. 15, 2014) ................................................................................39

6    *Coburn v. Bank of New York Mellon, N.A.*,
         No. 2:10-CV-03080 JAM-KJN, 2011 WL 1103470
7        (E.D. Cal. Mar. 22, 2011) ..............................................................................38

8    *Fenerjian v. Nong Shim Co.*,
         No. 13-cv-04115-WHO, 2015 U.S. Dist. LEXIS 43258
9        (N.D. Cal. Mar. 30, 2015) ..............................................................................40

10   *Golden Eagle Distrib. Corp. v. Burroughs Corp*,
         801 F.2d 1531 (9th Cir. 1986) ........................................................................21
11

12   *Harara v. LandAmerica Fin. Grp., Inc.*,
         No. C 07-03999 WHA, 2007 U.S. Dist. LEXIS 77307
13       (N.D. Cal. Oct. 9, 2007) ................................................................................33

14   *Hargrave v. Univ. of Wash.*,
         No. C14-0376JLR, 2014 U.S. Dist. LEXIS 80952
15       (W.D. Wash. June 12, 2014) ..........................................................................15

16   *Horizons Int'l v. Baldridge*,
         624 F. Supp. 1560 (E.D. Penn. 1986),
17       *rev'd on other grounds*, 811 F.2d 154 (3d Cir. 1987) ..............................14, 19

18   *Hosp. Corp. of Am. v. FTC*,
         807 F.2d 1381 (7th Cir. 1986) ........................................................................14
19

20   *Houck v. Substitute Tr. Servs.*,
         791 F.3d 473 (4th Cir. 2015) ..........................................................................15
21

22   *Illinois Brick Co. v. Illinois*,
         431 U.S. 720 (1977) ....................................................................................3, 29
23

24   *Illumina, Inc. v. Ariosa Diagnostics, Inc.*,
         No. C 14-01921 SI, 2014 U.S. Dist. LEXIS 109531
         (N.D. Cal. Aug. 7, 2014) ................................................................................31
25

26   *Imperial Irrigation Dist. v. Cal. Indep. Sys. Operator Corp.*,
         No. 15-CV-1576-AJB-RBB, 2016 WL 4087302
27       (S.D. Cal. Aug. 1, 2016) ................................................................................38

28

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS - 3:16-cv-
01150-WHA
                                                                                          - iv -

1

2                                                                          **Page**

3

*In re Animation Workers Antitrust Litig.*,
     123 F. Supp. 3d 1175 (N.D. Cal. 2015) ........................................................35

*In re ATM Fee Antitrust Litig.*,
     686 F.3d 741 (9th Cir. 2012) ......................................................................36

*In re Bare Escentuals, Inc. Sec. Litig.*,
     745 F. Supp. 2d 1052 (N.D. Cal. 2010) ........................................................31

*In re Cal. Title Ins. Antitrust Litig.*,
     No. C 08-01341 JSW, 2009 WL 1458025
     (N.D. Cal. May 21, 2009) ............................................................................26

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
     738 F. Supp. 2d 1011 (N.D. Cal. 2010) ..........................................................3

*In re Citric Acid Litig.*,
     191 F.3d 1090 (9th Cir. 1999) ...........................................................5, 22, 26

*In re Elevator Antitrust Litig.*,
     502 F.3d 47 (2d Cir. 2007)..........................................................................19

*In re Enron Corp.*,
     370 B.R. 583 (Bankr. S.D.N.Y. 2007)..........................................................11

*In re Flash Memory Antitrust Litig.*,
     643 F. Supp. 2d 1133 (N.D. Cal. 2009) ..................................................14, 25

*In re Gilead Scis. Sec. Litig.*,
     536 F.3d 1049 (9th Cir. 2008) .......................................................................3

*In re Graphics Processing Units Antitrust Litig.*,
     527 F. Supp. 2d 1011 (N.D. Cal. 2007) .....................................................4, 26

*In re Graphics Processing Units Antitrust Litig.*,
     540 F. Supp. 2d 1085 (N.D. Cal. 2007) ................................................. *passim*

*In re Late Fee & Over-Limit Litig.*,
     528 F. Supp. 2d 953 (N.D. Cal. 2007) ..........................................................26

*In re Lithium Ion Batteries Antitrust Litig.*,
     No. 13-MD-2420 YGR, 2014 U.S. Dist. LEXIS 7516
     (N.D. Cal. Jan. 21, 2014) ............................................................... *passim*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2                                                                                            **Page**

3

*In re Musical Instruments & Equip. Antitrust Litig,*
    798 F.3d 1186 (9th Cir. 2015) ...............................................................5, 22, 40

*In re Peerless Sys. Corp. Sec. Litig.,*
    182 F. Supp. 2d 982 (S.D. Cal. 2002)...................................................................17

*In re Static Random Access Memory (SRAM) Antitrust Litig.,*
    580 F. Supp. 2d 896 (N.D. Cal. 2008) ......................................................14, 18, 25

*In re Tableware Antitrust Litig.,*
    363 F. Supp. 2d 1203 (N.D. Cal. 2005) ................................................................19

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
    No. M 07-1827 SI, 2012 U.S. Dist. LEXIS 19955
    (N.D. Cal. Feb. 15, 2012).......................................................................................40

*In re Transpacific Passenger Air Transp. Antitrust Litig.,*
    No. C 07-05634 CRB, 2011 U.S. Dist. LEXIS 49853
    (N.D. Cal. May 9, 2011) ........................................................................................26

*In re VisaCheck/MasterMoney Antitrust Litig.,*
    280 F.3d 124 (2d Cir. 2001)...................................................................................10

*In re WellPoint Out-of-Network "UCR" Rates Litig.,*
    865 F. Supp. 2d 1002 (C.D. Cal. 2011) .........................................................25, 38

*InfoStream Grp., Inc. v. PayPal, Inc.,*
    No. C 12-748 SI, 2012 WL 3731517
    (N.D. Cal. Aug. 28, 2012)......................................................................................38

*Kendall v. Visa U.S.A., Inc.,*
    518 F.3d 1042 (9th Cir. 2008) .................................................................................5

*Kendall v. Visa U.S.A., Inc.,*
    No. C 04-04276 JSW, 2005 U.S. Dist. LEXIS 21450
    (N.D. Cal. July 25, 2005), *aff'd*, 518 F.3d 1042 (9th Cir. 008) ................................2, 5, 16, 28

*Knievel v. ESPN,*
    393 F.3d 1068 (9th Cir. 2005) ...............................................................................32

*Lee v. City of Los Angeles,*
    250 F.3d 668 (9th Cir. 2001) .................................................................................31

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)................................................................................................18

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS - 3:16-cv-
01150-WHA                                                                                     - vi

1

2                                                                    **Page**

3

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) ..............................................................40

*Nat'l Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*,
    779 F.2d 592 (11th Cir. 1986) ............................................................16

*Paycom Billing Servs. v. MasterCard Int'l, Inc.*,
    467 F.3d, 283 (2d Cir. 2006)...............................................................36

*Poller v. CBS*,
    368 U.S. 464 (1962)..............................................................................4

*Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*,
    No. 11-CV-02652 JLS (RBB), 2012 WL 3778348
    (S.D. Cal. Aug. 30, 2012) ...................................................................26

*Ross v. Am. Express Co.*,
    35 F. Supp. 3d 407 (S.D.N.Y. 2014),
    *aff'd sub nom. Ross v. Citigroup, Inc.*,
    630 F. App'x 79 (2d Cir. 2015) ...............................................6, 19, 21

*Schroders, Inc. v. Hogan Sys., Inc.*,
    522 N.Y.S.2d 404 (N.Y. Sup. Ct. 1987) .............................................37

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
    No. 14-1746, 2015 U.S. App. LEXIS 18834
    (4th Cir. Oct. 29, 2015), *cert. denied*,
    ___ U.S. ___, 136 S. Ct. 2485 (2016)..................................................15

*Sec. People, Inc. v. Classic Woodworking, LLC*,
    No. C-04-3133 MMC, 2005 U.S. Dist. LEXIS 44641
    (N.D. Cal. Mar. 4, 2005)......................................................................32

*Sidibe v. Sutter Health*,
    No. C12-04854 LB, 2013 U.S. Dist. LEXIS 78521
    (N.D. Cal. June 4, 2013) ......................................................................40

*Silvas v. E*Trade Mortg. Corp.*,
    514 F.3d 1001 (9th Cir. 2008) ..............................................................3

*Sizemore v. Pac. Gas & Elec. Ret. Plan*,
    939 F. Supp. 2d 987 (N.D. Cal. 2013) .................................................33

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Page

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
   No. CV F 09-0560 LJO SMS, 2011 U.S. Dist. LEXIS 72764
   (E.D. Cal. July 7, 2011) ...............................................................................2, 14

*Statler v. Dell, Inc.*,
   775 F. Supp. 2d 474 (E.D.N.Y. 2011) ........................................................37

*United States v. American Express Co.*,
   99 F. Supp. 3d 143 (E.D.N.Y. 2015) ...........................................................18

*United States v. Ritchie*,
   342 F.3d 903 (9th Cir. 2003) ................................................................31, 32

*United States v. Visa U.S.A., Inc.*,
   163 F. Supp. 2d 322 (S.D.N.Y. 2001) .........................................................14

*Universal Grading Serv. v. eBay, Inc.*,
   No. C-09-2755 RMW, 2012 U.S. Dist. LEXIS 2325
   (N.D. Cal. Jan. 9, 2012), *aff'd*, 563 F. App'x 571 (9th Cir. 2014) .........................21

*Ward v. Apple Inc.*,
   791 F.3d 1041 (9th Cir. 2015) .............................................................23, 24

*William Inglis & Sons Baking Co. v. Itt Cont'l Baking Co.*,
   668 F.2d 1014 (9th Cir. 1982) .............................................................23, 24

*William O. Gilley Enters. v. Atl. Richfield Co.*,
   588 F.3d 659 (9th Cir. 2009) ......................................................................5

**STATUTES, RULES AND REGULATIONS**

California Business & Professions Code
   §16700 et seq. ..................................................................................39, 40

Florida Statutes Annotated
   §501.212(4)(b) .................................................................................38, 39

New York General Business Law
   §349........................................................................................................37
   §350 .......................................................................................................37

15 U.S.C.
   §1.................................................................................................. *passim*
   §2.................................................................................................10, 16

**Page**

Federal Rules of Civil Procedure
Rule 8 ................................................................................................................................4, 26
Rule 9(b) ...........................................................................................................................4, 26
Rule 11 ...........................................................................................................................18, 21
Rule 12 ..................................................................................................................................15
Rule 12(b)(6) .....................................................................................................................3, 31
Rule 12(f) ..............................................................................................................................32
Rule 15(a) ..............................................................................................................................41

Federal Rules of Evidence
Rule 201 ................................................................................................................................31

**SECONDARY AUTHORITIES**

Fed. Trade Comm'n & U.S. Dep't of Justice, *Antitrust Guidelines for
Collaborations Among Competitors* (Apr. 2000) .............................................................22, 23

5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure
§1327 (3d ed) .......................................................................................................................33

1  **I.      STATEMENT OF ISSUES TO BE DECIDED**

2         Plaintiffs oppose the motions to dismiss filed by defendants Visa, Inc. and Visa USA, Inc.

3  ("Visa"), MasterCard International Incorporated ("MasterCard"), American Express Company

4  ("American Express"), and Discover Financial Services ("Discover") (collectively, "Network

5  Defendants"), Bank of America, N.A. ("BOA"), Capital One Financial Corporation ("Capital One"),

6  Chase Bank USA, National Association ("Chase"), Citibank (South Dakota), N.A., Citibank, N.A.,

7  PNC Bank, National Association ("PNC"), U.S. Bank National Association ("U.S. Bank") and Wells

8  Fargo Bank, N.A. ("Wells Fargo") (collectively, "Bank Defendants"), and EMVCo, LLC

9  ("EMVCo") (collectively with Network Defendants and Bank Defendants, "Defendants").  Dkt. Nos.

10  301, 303, 305.[1]   The issue to be decided is whether the Amended Complaint (Dkt. No. 291)

11  (hereinafter, "Complaint") satisfies the pleading standards under (i) federal antitrust laws, and (ii)

12  certain state consumer protection and antitrust laws and states a claim for unjust enrichment, by

13  plausibly alleging Defendants unlawfully conspired to impose a Liability Shift for payment-card

14  chargebacks on Plaintiffs and the putative class.

15  **II.      ARGUMENT**

16         **A.      Introduction**

17         Plaintiffs' Complaint provides a detailed and compelling narrative that demonstrates

18  Defendants conspired to implement an unprecedented change in the way certain payment card

19  chargebacks are handled to enrich themselves while saddling U.S. merchants with billions of dollars

20  in new costs.  In the face of this detailed Complaint, that provides everything but a signed agreement

21  to collude, Defendants are resigned to make arguments more suitable for summary judgment or trial.

22  Even through that skewed prism, however, the fact-laden Complaint evidences a detailed and

23  coherent case against all Defendants.

24

25

26  ───────────────
[1]    Dkt. No. 301 refers to Bank Defendants' Motion to Dismiss Amended Complaint ("Bank Defs.'
27  Brf."); Dkt. No. 303 refers to Defendants American Express, MasterCard, Visa, and EMVCo's
Motion to Dismiss Amended Complaint ("Network Defs.' Brf."); Dkt. No. 305 refers to Defendant
28  Discover Financial Services' Motion to Dismiss Amended Complaint ("Discover Brf.").

1    In the Complaint,[2] Plaintiffs have put forward a detailed case that more than answers the

2    Court's questions.  The Court instructed Plaintiffs to "address the arguments raised in the motions to

3    dismiss and add all reliable and well-pled information to support their claims."  Order at 1.  In

4    addition, the Court instructed Plaintiffs to add specific details regarding: (1) The way payment card

5    systems worked before and after the Liability Shift, including the way transactions were authorized;

6    the way money flowed; the way chargebacks flowed; and the specific role of each defendant in each

7    such event, including decision-making; (2) The network rules that existed before and after the

8    Liability Shift, including specific quotations; and (3) The specific law (UCC) and/or network

9    agreements that controlled chargebacks.  Order at 2.

10    The Complaint addresses in detail each of these issues and much more.  Read in total, the

11    Complaint provides compelling evidence of Defendants' collusive conduct that more than meets the

12    standard for overcoming a motion to dismiss.[3]  Defendants speciously suggest that in order to

13    overcome a motion to dismiss Plaintiffs must put on their case for trial.  But this is not the standard

14    and Defendants know it.  "*Twombly* and *Kendall* do not require that plaintiff prove its case or

15    include every factual detail in support of its claims in their complaints."  *Stanislaus Food Prods. Co.

16    v. USS-POSCO Indus.*, No. CV F 09-0560 LJO SMS, 2011 U.S. Dist. LEXIS 72764, at *15 (E.D.

17    Cal. July 7, 2011).  Tellingly, Defendants' arguments regarding their supposedly legitimate reasons

18    for the Liability Shift have constantly shifted as this case has progressed.  Defendants' excuses and

19    purported justifications for offloading billions in costs onto Plaintiffs and the class demonstrate that

20    Plaintiffs have more than met *Twombly*'s requirements.  At the April 21, 2016 status conference,

21    merchant convenience and merchant confusion purportedly explained why Defendants imposed the

22

23    _____

[2]   Defendants argue that this is Plaintiffs' "third attempt" to file a complaint that states a claim for
24    relief.  *See* Network Defs.' Brf. at 1.  This is misleading.  Plaintiffs amended the complaint once
      solely to add additional named plaintiffs to the first-filed complaint.  This was done after conferring
25    with Defendants regarding the addition of parties.  Moreover, the Court has never ruled that
      Plaintiffs' claims are deficient.  Instead, the Court deemed the prior motions to dismiss moot and
26    gave Plaintiffs leave to file a further amended complaint.  *See* Dkt. No. 281 ("Order") at 1.

27    [3]   The Complaint provides the additional allegations the Court sought.  *See* ¶¶54, 58-72 (credit card
      system operations); ¶¶73-81 (operative network rules); ¶¶71 n.6 (governing law).  References to
28    "¶__" or "¶¶__" are to the Complaint, unless otherwise noted.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS - 3:16-cv-
01150-WHA                                                                                    - 2 -

1    Liability Shift on the same day.  4/21/16 Hrg. Tr. at 13:22-14:2 ("if each of the networks had picked

2    different dates, a merchant would be in a state of confusion about which date to do it").  Defendants'

3    reply then claimed the same timetable was needed in order to protect the Networks from becoming

4    more vulnerable to fraud.  Dkt. No. 262 at 11.  Now Defendants claim it is some mishmash of those

5    concerns stating if a Network "failed to implement EMV technology on the timeline chosen by its

6    competitors, its system would be less secure – and therefore more vulnerable to fraud."  Network

7    Defs.' Brf. at 12.  Of course none of these purported justifications jibe with the facts alleged in the

8    Complaint.

9        Since the prior motion to dismiss, and in the face of Plaintiffs' well-pleaded Complaint,

10   Defendants have now jettisoned some of their poorly made prior arguments regarding application of

11   *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), among others.[4]  Instead, in another last-ditch effort

12   to extricate themselves from the case, the Network Defendants try to parse Plaintiffs' case into two

13   separate conspiracies – one among the Networks and one between the Networks and Issuing Banks.

14   Even under this strained view, which is not how the case is pleaded, Plaintiffs' claims succeed.

15       **B.    Legal Standard**

16       "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual

17   allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), only "enough facts to state a

18   claim to relief that is plausible on its face."  *Id.* at 570.  Importantly, the Court must view a

19   complaint's allegations as a whole.  *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp.

20   2d 1011, 1019 (N.D. Cal. 2010) ("courts in this district review specific allegations in the context of

21   the complaint taken as a whole" when analyzing a complaint's sufficiency, and reject attempts to

22   challenge such allegations in isolation).  In doing so, "[a]ll allegations of material fact are taken as

23   true and construed in the light most favorable to the nonmoving party."  *Silvas v. E*Trade Mortg.*

24   *Corp.*, 514 F.3d 1001, 1003 (9th Cir. 2008).  "[S]o long as the plaintiff alleges facts to support a

25   theory that is not facially implausible, the court's skepticism is best reserved for later stages of the

26   proceedings."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).  *Twombly* makes

27   ─────────────────────
     [4]    Discover makes only a passing and inapt reference to *Illinois Brick*.  *See* discussion *infra* at

28   §II.D.3.d.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS - 3:16-cv-
01150-WHA                                                                            - 3 -

1    clear that "[a]sking for plausible grounds to infer an agreement does not impose a probability

2    requirement at the pleading stage; it simply calls for enough fact to raise a ***reasonable expectation***

3    that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556.[5]  And as this

4    Court has recognized, "allegations of antitrust conspiracy are governed by Rule 8, and not the

5    heightened standard of Rule 9(b)." *In re Graphics Processing Units Antitrust Litig.* ("*GPU I*"), 527

6    F. Supp. 2d 1011, 1024 (N.D. Cal. 2007).

7         The plausible conspiracy alleged here is bolstered by numerous plus factors that, as *Twombly*

8    requires, raise "a reasonable expectation that discovery will reveal evidence of illegal agreement."

9    *Twombly*, 550 U.S. at 556-57.  And, as this Court held in *In re Graphics Processing Units Antitrust*

10   *Litig.* ("*GPU II*"), 540 F. Supp. 2d 1085, 1092 (N.D. Cal. 2007), "*Twombly* did note that 'complex

11   and historically unprecedented changes in pricing structure made at the very same time by multiple

12   competitors, and made for no other discernible reason would support a plausible inference of

13   conspiracy.'" *Id*. at 1095 (quoting *Twombly*, 550 U.S. at 557 n.4).  The facts alleged here detailing

14   the unprecedented Liability Shift fit squarely into *Twombly*'s logic and Defendants' efforts to

15   counter the plausible conspiracy fail miserably in the face of a factually rich and detailed Complaint.

16        Defendants fault Plaintiffs for not providing at the pleading stage a smoking gun, forgetting

17   that antitrust conspiracies are felonies, conceived in secret by clever and resourceful people who hide

18   their misconduct.  Of course, direct proof is often difficult to come by, especially where, as here,

19   discovery has not begun.  *See, e.g.*, *Poller v. CBS*, 368 U.S. 464, 473 (1962); *GPU II*, 540 F. Supp.

20   2d at 1096 ("[D]irect allegations of conspiracy are not always possible given the secret nature of

21   conspiracies.  Nor are direct allegations necessary.")  Though it is true Plaintiffs do not have the

22   proverbial smoking gun, we certainly have the bullet casings and the body.  And even if the Court

23   views the allegations related to the Liability Shift as coincidental or parallel conduct – a notion

24   unsupported by allegations that show Defendants' scheme was no mere coincidence – Plaintiffs have

25   alleged multiple, compelling plus factors (enumerated *infra* at §§II.C.-D.) that add to the plausibility

26   calculus.  "Plus factors coupled with parallel conduct can take a complaint from merely possible to

27

28   _____

     [5]    Unless otherwise noted, emphasis is added and citations are omitted.

1    plausible." *In re Musical Instruments & Equip. Antitrust Litig*, 798 F.3d 1186, 1194 n.7 (9th Cir.

2    2015) (citing *In re Citric Acid Litig.*, 191 F.3d 1090, 1102 (9th Cir. 1999)). "[P]lausibility is

3    evaluated 'in light of basic economic principles.'" *In re Lithium Ion Batteries Antitrust Litig.*, No.

4    13-MD-2420 YGR, 2014 U.S. Dist. LEXIS 7516, at *65 (N.D. Cal. Jan. 21, 2014) (quoting *William*

5    *O. Gilley Enters. v. Atl. Richfield Co*., 588 F.3d 659, 662 (9th Cir. 2009)).[6]

6         Plaintiffs address in this omnibus opposition the arguments made by all the Defendants,

7    despite the fact that Defendants separately filed motions to dismiss.  These separate motions are a

8    part of Defendants' strategy to atomize the well-pleaded conspiracy.  But, as the Complaint details,

9    these parties worked together to effectuate the scheme alleged.

10        **C.    Relevant Facts**

11        The Complaint, with evidentiary support, sets forth a plausible case of a conspiracy among

12   all Defendants – the Networks as well as the Issuing Banks – puts the Defendants on notice of how

13   they are alleged to have conspired (set forth in the Complaint and explained below), with whom

14   (each other) and for what purpose (to enrich themselves).  Plaintiffs' Complaint sets forth significant

15

16   _____

17   [6]   Defendants' heavy reliance on *Kendall* is off base as the case pleaded only bare-bones
     allegations of conspiracy.  Moreover, the dismissed "first amended complaint represent[ed] the fifth
18   attempt to allege sufficient claims."  *Kendall v. Visa U.S.A., Inc.*, No. C 04-04276 JSW, 2005 U.S.
     Dist. LEXIS 21450, at *17 n.3 (N.D. Cal. July 25, 2005), *aff'd*, 518 F.3d 1042 (9th Cir. 008).  In
19   *Kendall*, plaintiffs' antitrust action charged Visa, MasterCard and several banks of conspiring to set
     the merchant discount fee and interchange fee.  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1046
20   (9th Cir. 2008).  But the operative complaint in *Kendall* was a mere 19 pages, only a few of which
     alleged any facts at all and these were unconnected to the pleaded conspiracy.  First Amended Class
21   Action Antitrust Complaint, *Kendall v. Visa U.S.A. Inc*., No. 3:04-cv-04276-JSW (N.D. Cal. Apr.
     25, 2005), Dkt. No. 64.  Though the district court had allowed plaintiffs to conduct discovery to
22   obtain the facts needed to plead an antitrust violation in their amended complaint (*id*.), plaintiffs
     "failed to plead any evidentiary facts beyond parallel conduct to prove their allegation of a
23   conspiracy." *Kendall*, 518 F.3d at 1048.  Indeed, a review of the operative complaint in *Kendall*
     reveals that plaintiffs only alleged that member banks followed the fees set by Visa and MasterCard.
24   Therefore, like the plaintiffs in *Twombly* who had pled parallel conduct in such general terms as not
     to give defendants the notice required by the Federal Rules, the Ninth Circuit in *Kendall* found that
25   plaintiffs' bare allegation that the bank defendants participated in the alleged scheme to fix
     interchange or merchant discount fees alleged no facts to support that conclusion.  *Kendall*, 518 F.3d
26   at 1048.  In this barren context, the Ninth Circuit stated that "[e]ven after the depositions taken, the
     complaint does not answer the basic questions: who, did what, to whom (or with whom), where, and
27   when?"  *Id.*  Contrast that with the detailed and substantial Complaint here.  Applying the *Kendall*
28   standards, this Complaint stands.

1    and detailed evidentiary facts – far more than required under controlling Ninth Circuit and Supreme

2    Court precedent.

3         Before the Liability Shift merchants were rarely responsible for chargebacks.  ¶71.  Instead,

4    the issuers – the Issuing Banks, in the case of Visa and MasterCard, and American Express or

5    Discover for themselves – were the ones most likely to bear the costs for chargebacks.  *Id.*

6    Importantly, merchants generally paid for those fraud costs through interchange fees deducted by the

7    issuers from their payments to the merchants.  ¶¶71-72, 165-179.  Under the applicable network

8    rules, chargebacks were generally paid by the Issuing Banks or the three-party Networks (American

9    Express or Discover).

10        However, effective October 1, 2015, that all changed.  Although announced at different

11   times, the Liability Shift was not simply conscious parallelism as Defendants contend.  Through

12   circumstantial and near direct evidence, the Complaint sets forth more than a plausible conspiracy

13   between Defendants.  Defendants again harp on the dates they announced their simultaneous

14   Liability Shift.  Yet this is not the relevant inquiry.  Instead, the evidence set forth in the Complaint

15   details how the coordination among Defendants regarding the Liability Shift took place prior to any

16   announcements and the staggered announcements merely provided cover for their collusive activity.[7]

17        As this Court requested, the Complaint spells out in particular detail the new Liability Shift

18   rules for each of the Networks.  *See* ¶74 (reason codes for all networks); ¶¶75-76 (MasterCard);

19   ¶¶77-78 (Visa); ¶¶79-80 (Discover); ¶81 (American Express).[8]  Plaintiffs explain in detail the

20   Defendants' control over the certification process and the Defendants' enormous motives for

21

22   [7]   *See, e.g.*, *Ross v. Am. Express Co.*, 35 F. Supp. 3d 407 (S.D.N.Y. 2014), *aff'd sub nom. Ross v.
     Citigroup, Inc.*, 630 F. App'x 79 (2d Cir. 2015).  In *Ross*, the court rejected defendants' argument
23   that because defendants announced their allegedly collusive arbitration provisions on different dates,
     plaintiffs could not prove agreement.  Judge Pauley reasoned that while an agreement may be
24   difficult to infer from "sequential parallelism" alone "courts have often permitted inferences of
     collusion in response to the familiar fact pattern of a 'price leader' announcing to a roomful of its
25   rivals its 'independent' decision to raise prices as an implicit invitation to follow suit.  *Ross*, 35 F.
     Supp. 3d at 439.  As was the case in *GPU II*, 540 F. Supp. 2d at 1095, even where announcements
26   were not in "absolute lockstep" upon review of the price announcements, "a pattern emerges."

27   [8]   Plaintiffs also explain that the UCC is not implicated in this case, in answer to the Court's query.
     *See* ¶71 n.6.
28

1   dragging their feet over the certification process they control.  ¶¶82-84.  As Plaintiffs allege,

2   "[i]ndeed, there is no incentive at all for the Network's issuing banks or the acquirers to certify these

3   systems."  ¶84.  That's because once certified, "the issuing bank will once again have to start

4   absorbing the costs of the fraudulent transactions – *although, notably, with those costs still defrayed*

5   *by the interchange and merchant discount fees that merchants have never been relieved from*

6   *paying*."  *Id.* (emphasis in original).  Plaintiffs provide evidentiary facts from a number of reputable

7   sources demonstrating that Defendants leveraged their market power and worked together to shift

8   billions in fraud costs onto merchants.  *See, e.g.*, ¶¶139-146.

9        Based upon the history of chip migration and implementation throughout many other regions,

10  Plaintiffs further allege that the Networks, Issuing Banks and EMVCo knew that certification

11  "would take years *after* the October 2015 Liability Shift" deadline imposed at the same time by each

12  Network.  ¶90 (emphasis in original).  In fact, in the history of chip card implementation throughout

13  the world before the United States, "[n]o country has [ever] achieved anywhere near 100 percent

14  EMV readiness at the time of the liability shift."  ¶90(a).[9]  Significantly, MasterCard's own VP of

15  risk, fraud, and identity, Krista Tedder, warned that "[w]hen the EMV liability shift date for fraud

16  takes effect in October [2015], merchants that are not EMV-compliant can expect to immediately get

17  pounded with card-fraud expenses that card issuers, up to now, have been absorbing."  ¶92.  Outside

18  analysts observed that the Liability Shift was done in an effort to "off load billions of dollars in

19  annual fraud costs."  ¶96.  Even more telling, after this lawsuit was filed, the Networks announced

20  that they were aware of the certification problems and were taking steps to speed it up – an

21  admission that they can and do exert control over the certification process, delays in which profit the

22  conspiracy here.  ¶¶135-138.

23              **1.    The Liability Shift Was Historically Unprecedented**

24       The Liability Shift in the United States was historically unprecedented.  While Defendants,

25  through MasterCard's counsel, told this Court that the Networks essentially were acting with

26

---

[9]   *See also* ¶90(b)-(f) (pre-Liability Shift reports and studies related to merchant-readiness
demonstrate low numbers of merchants would be EMV-compliant by the October 2015 deadline);
¶91 (same).

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS - 3:16-cv-01150-WHA

1   conscious parallelism in implementing the Liability Shift to avoid merchant confusion, (4/21/16 Hrg.

2   Tr. at 13:22-24) he failed to inform the Court of what happened in the rest of the world; namely that

3   those representations weren't true in 22 large and small regions that implemented chip card

4   technology.  *See* ¶100 (World Liability Shift Table).  Significantly, in most of these 22 regions, large

5   and small, implementation was staggered (*id.*), unlike the United States, the only example of all four

6   Networks shifting liability on the same date.[10]  The Networks' conscious parallelism argument rings

7   even less true when one considers the other key differences and accommodations in those other

8   regions: ¶108 (offering reductions of interchange fees (UK and Australia)); ¶109 (covering up-front

9   costs of upgrading terminals (UK)); ¶110 (implementing a gradual roll out over years (Australia));

10  and ¶112 (providing additional time to upgrade past the previously announced deadline (Canada)).

11  There, the Networks did not walk in lock-step and did not attempt to cost-fix by shifting millions (in

12  this case, billions) of dollars from the Issuing Banks and Networks to the merchants.  Plaintiffs also

13  cite numerous examples where the historic nature of this change was acknowledged.  *See* ¶97.

14          The Court required Plaintiffs to detail the way that the card systems worked (before and after

15  the Liability Shift), including the way transactions were authorized; the way money flowed; and the

16  way chargebacks flowed.  Order at 2.  The Complaint provides the additional allegations the Court

17  sought.  *See, e.g.*, ¶¶54, 58-72 (credit card system operations); ¶¶73-81 (operative network rules);

18  ¶¶71 n.6 (governing law).  In addition, the Complaint set forth, in painstaking detail, numerous

19  indicia of Defendants' conspiratorial conduct.

20          Defendants brazenly state that there is no evidence of this conspiracy.  But there is.  As but

21  one example, Visa's own CEO stated in his own words how it happened:  Defendants simply got

22  everyone in a room and decided together what to do.  ¶141.  MasterCard's VP of risk, fraud and

23  identity verification stated ***six months*** before the Liability Shift that "the card brands are not going to

24  delay the liability shift date."  ¶120.  And there is significant evidence in the Complaint noting that

25  the shift was a result of prior agreement.  *See* ¶139 (Jason Notte of TheStreet.com wrote that "Back

---

26  [10]   As Plaintiffs detailed, Defendants' claimed need to have the Liability Shift occur on the same
27  date to guard against merchant confusion is mere pretext as it cannot be the case that merchants in
    the United States are less sophisticated than those in regions where liability shifts occurred on
28  different dates.  *See* ¶¶101, 102.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS - 3:16-cv-
01150-WHA                                                                          - 8 -

1   in 2011, Visa, MasterCard, Discover, American Express and their banking partners agreed on a

2   October 1, 2015, 'liability shift' that, for the first time, would make merchants liable for any

3   fraudulent charges that result from using point-of-service readers that can't read chip-enabled

4   cards."); *see also* ¶¶140-146.  Defendants try to downplay this damning evidence, with little success.

5   *See* Network Defs.' Brf. at 9.

6          As alleged in the Complaint, the Issuing Banks and the Networks each got what they wanted:

7   The Issuing Banks (and American Express and Discover) "cost-fixed" billions of dollars of fraud

8   charges by shifting those charges to merchants, many of whom bought new equipment that was

9   supposed to but did not because of Defendants' inaction, prevent them from facing liability for

10  certain fraudulent transactions.  In exchange, the Networks implemented a less secure, but more

11  profitable "chip-and-signature" platform as opposed to "chip-and-PIN."  ¶¶121-134.  It is more than

12  plausible that these Network Defendants agreed to adopt chip-and-signature over chip-and-PIN even

13  though regulators and Visa and MasterCard have all stated that chip-and-PIN provides far greater

14  security than signature authorization.  ¶¶124-131.

15              **2.    An Agreement Between Defendants Was Necessary to
                        Maintain Market Share and Avoid Competitive Concessions
16                      Risked by Steering in the Wake of Antitrust Attacks on the
                        Networks' Anti-Steering Rules**

17          Between the Fall of 2010 and the Summer of 2011, Defendants recognized the likelihood that

18  merchants would be allowed to shepherd or steer cardholders to cheaper forms of payment as a result

19  of governmental and public attacks on Defendants' rules.  ¶¶147-150.  In the past – before the

20  Liability Shift – the Networks had worked to prevent merchants from favoring one payment card

21  over another.  ¶257.  Defendants knew that a merchant's ability to steer customers to cheaper forms

22  of payment meant that any Defendant that offered incentives – *e.g.*, Liability Shift grace periods,

23  terminal upgrade cost coverage, lower interchange or merchant discount fees, etc. – would capture

24  market share.  ¶¶149-150.  Only agreement to implement the Liability Shift at the same time and on

25  the same terms would assure that each Defendant would maintain its respective market position and

26  mitigate the possibility of further merchant gains.  *Id.*; *see also* ¶9.

27

28

1    To understand the context of steering, Plaintiffs have set forth the Defendants' long history of

2    antitrust violations, involving cases brought by governments,[11] merchants,[12] and their claims against

3    each other.[13]

4        A commercially reasonable person would have expected competition, including by Discover,

5    who was not subject to the consent decrees or court orders.  One would have expected competitors to

6    have competed against each other, either by offering reductions in interchange fees, breaks or credits

7    on new POS equipment, a grace period, something.  But that competition didn't occur.

8                    **3.    Issuing Banks' Control Over Networks**

9        The Defendants complain that Plaintiffs have not alleged with sufficient plausibility the

10   Issuing Banks' control over Visa and MasterCard.  Like their other conclusory arguments, these too

11   fail. Plaintiffs have set forth the history and import of the Visa and MasterCard IPOs.  ¶¶274-284.

12   These arguments are further addressed at §II.D.2.b.

13       The Complaint alleges that Defendants were motivated to shift billions of dollars in

14   chargeback liability to the Class to enrich themselves and purportedly pay for issuing new chip-

---

[11]   In 1998, the U.S. Department of Justice brought a civil enforcement action against Visa and MasterCard challenging the organizational structure of the two payment networks and the networks' rules. After a bench trial lasting 34 days, the district court found violations of §1 of the Sherman Act. ¶¶248-249.  In 2010, the Department of Justice sued Visa, MasterCard and American Express for anticompetitive conduct.  Visa and MasterCard entered into a consent decree (¶257) while American Express went to trial and lost.  ¶¶258-259.  In 2007, the European Union entered a decision against MasterCard related to its cross-border interchange fees.  ¶252.

[12]   In 2000, large and small merchants brought antitrust claims against Visa and MasterCard alleging that their "honor all cards" policy created a tying arrangement in violation of §1 of the Sherman Act.  *See In re VisaCheck/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001); *see also* ¶250.  The merchants also brought claims under §2 of the Sherman Act.  This case settled for more than $3 billion and resulted in programmatic reforms.  In 2005, large and small merchants sued Visa, MasterCard and various Issuing Banks, challenging the antitrust laws regarding various aspects of the networks' rules, the default interchange rules and numerous anti-steering restraints.  *See In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, No. 05-md-1720 (E.D.N.Y); ¶253.  A settlement in excess of $7 billion and later reduced to more than $5 billion was reached.  The settlement included claims against the issuing banks.  ¶¶253-254.

[13]   American Express's 2004 suit against Visa, MasterCard *and* Member Banks for adopting exclusionary rules which harmed American Express, resulted in settlements of $2.25 billion with Visa and $1.8 billion with MasterCard – settlements which included claims against the member bank defendants.  One would have expected American Express to have peeled away from the Network consortium, but they too acceded to the conspiracy rather than competing.

1  enabled cards.  *See, e.g.*, ¶¶93-94; *see also* ¶84 (Liability Shift and certification delays profit issuing

2  banks millions of dollars monthly).  Analysts recognized the allure of framing the Liability Shift in

3  terms of increased security while "offload[ing] billions of dollars in annual fraud costs."  ¶96.[14]  The

4  billions at stake further support an agreement among Defendants to effectuate and maintain the

5  Liability Shift.  *See* ¶93.  That no Network Defendant or Issuing Bank stepped out of line to provide

6  temporary relief – and thereby also gain some competitive advantage – when they knew the

7  difficulties merchants encountered despite attempting to follow Defendants' edicts renders an

8  agreement plausible.  ¶¶82-92.

9  **4.    The *Quid Pro Quo* Between the Networks and the Issuing Banks Suggests an Agreement to Implement the Liability Shift**

10

11      The Complaint also alleges the *quid pro quo* underlying Defendants' conspiracy:  while the

12  Issuing Banks received the benefits of the Liability Shift during the busiest time of year,[15] the

13  Network Defendants received the higher interchange rates from chip-and-signature cards instead of

14  implementing the more secure and less costly chip-and-PIN cards widely used throughout the world.

15  ¶¶121-123, 131-134.  Instead, the Network Defendants simply abandoned their history in the rest of

16  the world of fighting for PIN authentication.  As noted by Senator Richard Durbin, the "refusal [to

17  implement chip-and PIN] is inexplicable given the well-documented benefits of PIN authentication

18  in reducing lost and stolen card fraud" raising concerns that the Networks are advocating chip-and-

19  signature because the interchange fee on signature transactions is much higher than on PIN

20  transactions.  ¶134.  Because of the Durbin Amendment to the Dodd-Frank Financial Reform Bill,

---

21  [14]    The Network Defendants make a nonsensical argument that changes made in the Complaint

22  amount to "improper pleading."  Networks Defs.' Brf. at 11.  The removal of a handful of paragraphs – which even under the most generous reading are not "admissions" – is not improper

23  and, in any event, even reintroducing those minor explanatory paragraphs does not, as the Network Defendants suggest, provide legitimate reasons to incent retailers to switch to EMV technology.  *See*

24  *In re Enron Corp.*, 370 B.R. 583, 597 (Bankr. S.D.N.Y. 2007) (noting that an "'amended complaint ordinarily supersedes the original, and renders it of no legal effect,' a court may refuse to allow an

25  amendment where, by omitting allegations from the previously filed complaint, the plaintiff seeks to 'erase' admissions that are contained in it").

26

27  [15]    That is, the Holiday Season, October going into December, when the volume of sales would result in merchants bearing a high level of chargebacks, and without any merchant discount

28  concessions or sharing the costs of upgrading terminals as they had done overseas.

1   interchange fees on signature transactions are much higher than on PIN transactions. ¶¶133-134. In

2   Senator Durbin's words, most of "EMVCo's controlling networks . . . have fiercely advocated

3   against PINs because of their financial stake in signature transactions." ¶134.

4       Defendants' decision to opt for a technology that they themselves described as less secure

5   undermines the claim that security considerations motivated the Liability Shift. ¶¶123-124, 126-129.

6   Visa and MasterCard told Australian regulators that: "Requiring the use of a Personal Identification

7   Number rather than permitting signature as a means of customer authentication for all, or almost all

8   transactions . . . is a proven method of reducing card fraud." ¶130. In short, combining Defendants'

9   abandonment of chip-and-PIN in the United States with their bogus "confusion" argument further

10  highlights the plausibility of the conspiracy.

11          **5.    The High-Level of Interfirm Communication Enabled
                    Through EMVCo, the Smart Card Alliance and the EMV
12                  Migration Forum Suggest a Preceding Agreement**

13      Defendants were in constant contact with each other on transitioning to EMV via EMVCo,

14  the Smart Card Alliance and the EMV Migration Forum, thereby adding "some setting suggesting

15  the agreement" alleged. *Twombly*, 550 U.S. at 557. Each fora described the opportunities for

16  attendees to collaborate about EMV smart cards. *See, e.g.*, ¶156 (Smart Card Alliance: "share

17  cutting edge information" in informal breakout sessions); ¶¶162-164 (EMV Migration Forum: in

18  person meetings and "'birds-of-a-feather'" sessions and Testing and Certification Working

19  Committee discussing Liability Shift and certification and other issues requiring "industry

20  cooperation and/or coordination"); and ¶32 (EMVCo: "networking opportunities with EMVCo

21  executives and other Business Associates"). Three months before the first announcement of the

22  Liability Shift, Defendants met with each other at a Smart Card Alliance meeting to discuss

23  transitioning to EMV chip-cards. They attended presentations titled, "The Roadmap to EMV

24  Payments and Secure ID" and "What Will Trigger The US Payments Industry to Migrate to EMV

25  and What Model Will Emerge?" ¶156. Plaintiffs provide a list of attendees that included executives

26  from the Networks and nearly all of the Banks. *Id.*

27      Even more compelling is the Network Defendants' joint ownership of EMVCo which

28  operates on a "consensus bas[i]s," i.e., by agreement. ¶152. Defendants' efforts to paint EMVCo as

1   a mere standard-setting organization fail (Bank Defs.' Brf. at 9-14; Network Defs.' Brf. at 18;

2   Discover Brf. at 5) because the anticompetitive conduct alleged was no part of EMVCo's standard-

3   setting functions.  *See* ¶¶151-154.  Moreover, the Supreme Court has long acknowledged that

4   standard-setting organizations can be "rife with opportunities for anticompetitive activity."  *Am.*

5   *Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 571 (1982).  As detailed below at

6   §§II.D.1., II.D.2.a., and II.D.3.b., Defendants' efforts to downplay their participation in these entities

7   fail.  When viewed in conjunction with Plaintiffs' other allegations, the facts concerning EMVCo,

8   the Smart Card Alliance and the EMV Migration Forum, add further support that Defendants

9   conspired to implement and maintain the Liability Shift.

10          The Complaint also alleges that American Express independently developed its own chip-

11   card technology as early as 1999 outside of EMVCo.  ¶103.  In contrasting its chip-card offering

12   from the cumbersome infrastructure EMVCo requirement, American Express detailed the ease with

13   which merchants could install the mechanical adapters American Express provided to merchants in

14   the United States.  ¶104.  American Express adopted this same technology in at least nine countries

15   outside the United States.  Internationally, American Express also opted to support merchants

16   transitioning to EMV instead of mandating a Liability Shift.  ¶¶106-107.  That American Express

17   has now abandoned its own system and embraced a technology it once criticized as requiring

18   merchants "to redo their whole system" undermines the explanations it now offers for adopting the

19   Liability Shift.  ¶104.  This, coupled with the incentives American Express offered to merchants

20   internationally versus its hands-off approach to the Liability Shift that occurred in Australia,

21   undermines the alternative bases Defendants proffer for adopting the Liability Shift.  ¶105.

22                    **6.      Defendants Are Part of an Industry Conducive to Conspiring**

23          Defendants similarly ignore Plaintiffs' allegations regarding the structure and characteristics

24   of the General Purpose Card Network Services market as well as the General Purpose Card market,

25   allegations which "plausibly support the alleged conspiracy, inasmuch as it has high barriers to entry

26   (which allegedly insulate the cartel from competition by discouraging new entrants who would

27   undercut its supracompetitive prices) and is concentrated."  *Lithium Ion Batteries*, 2014 U.S. Dist.

28   LEXIS 7516, at *68.  The Complaint alleges significant barriers to entry into the General Purpose

1   Card Network Services market.  ¶237.  As the Complaint details, the only successful entrant since

2   the 1960s has been Discover Card.  *Id.*  Entry into this concentrated market has been estimated as

3   costing more than a billion dollars.  *See id.* (citing *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d

4   322, 342 (S.D.N.Y. 2001)).  As alleged, the Bank Defendants dominate the market for General

5   Purpose Cards and account for about 75% of the transactions in this market.  ¶232.  The Complaint

6   also alleges Visa, MasterCard, and American Express, along with EMVCo's owners, possess market

7   power in the U.S. over General Purpose Card Network Services.  ¶234.  Courts recognize that

8   allegations of market concentration along with other characteristics, including the plain economic

9   evidence of supracompetitive prices, support the plausibility of a price-fixing conspiracy.  *See In re*

10  *Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1145 (N.D. Cal. 2009) (citing *In re Static*

11  *Random Access Memory (SRAM) Antitrust Litig.* ("*SRAM*"), 580 F. Supp. 2d 896, 903 (N.D. Cal.

12  2008)).[16]

13                    **7.    Defendants' History of Anticompetitive Conduct Weighs in**
                         **Favor of the Plausibility of a Collusive Agreement**
14

15          Defendants also brush off allegations regarding the history of anticompetitive conduct in the

16  payment card industry.  Dkt. No. 231-1 at 14.  But those allegations, demonstrating a decades-long

17  history of anticompetitive behavior both here and abroad, when coupled with Plaintiffs' other

18  allegations, tend to support a finding of conspiracy.  ¶¶248-259.  *See, e.g.*, *Hosp. Corp. of Am. v.*

19  *FTC*, 807 F.2d 1381, 1388 (7th Cir. 1986) ("The history of successful cooperation establishes a

20  precondition to effective collusion – mutual trust and forbearance, without which an informal

21  collusive arrangement is unlikely to overcome the temptation to steal a march on a fellow colluder

22  by undercutting him slightly."); *see also Horizons Int'l v. Baldridge*, 624 F. Supp. 1560, 1576 (E.D.

23  Penn. 1986) ("This history of anticompetitive practices may be indicative of the likelihood of

24  _____

25  [16]   Defendants claim they could not identify Ninth Circuit authority related to demand elasticity as a
      plus factor, but in upholding a §1 complaint in *Stanislaus Food Prods. Co.*, 2011 U.S. Dist. LEXIS
26    72764, at *23, the court noted the alleged plus factors included "[t]he structure of the Relevant
      Market makes collusion plausible, collusion is possible because of the concentrated supply
27    controlled by defendants, and ***the inelastic demand for tin mill products*** would force customers to
      purchase from defendants."  The court then examined those factors and held "[c]ircumstantial
28    evidence is sufficiently alleged."  *Id.* at *25-*26.

1    ongoing, or future, anticompetitive conduct in the industry."), *rev'd on other grounds*, 811 F.2d 154

2    (3d Cir. 1987).

3            Taken together and viewed as a whole, these allegations are more than sufficient to allege a

4    plausible conspiracy and more than satisfy the requirements of *Twombly*.  Plaintiffs have presented

5    significant "factual enhancement" sufficient to "nudge[] their claims across the line from

6    conceivable to plausible."  *Twombly*, 550 U.S. at 557, 570.

7            **D.      Viewed Together the Complaint's Allegations Are Highly Plausible
              and Defendants' Arguments to the Contrary Fail**

8                    **1.      The Network Defendants' Arguments Are Inapt**

9            The Network Defendants, faced with compelling evidence regarding their collusive conduct,

10   resort to touting the virtues of payment card networks.  *See* Network Defs.' Brf. at 2-4, 22.  Whether

11   the payment card industry is a net positive to the American economy is irrelevant to the Court's

12   consideration of Plaintiffs' claims at the Rule 12 stage.  Additionally, Network Defendants confuse

13   *Twombly*'s requirement to plead something "more" than parallel conduct as imposing a probability

14   standard at the motion-to-dismiss stage.  It does not.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678

15   (2009).  As the Fourth Circuit recently explained, "***[w]hen a court confuses probability and***

16   ***plausibility, it inevitably begins weighing the competing inferences that can be drawn from the***

17   ***complaint. But it is not our task at the motion-to-dismiss stage to determine 'whether a lawful***

18   ***alternative explanation appear[s] more likely' from the facts of the complaint*.**"  *SD3, LLC v. Black*

19   *& Decker (U.S.) Inc*., No. 14-1746, 2015 U.S. App. LEXIS 18834, at *21 (4th Cir. Oct. 29, 2015),

20   *cert. denied*, ___ U.S. ___, 136 S. Ct. 2485 (2016) (quoting *Houck v. Substitute Tr. Servs.*, 791 F.3d

21   473, 484 (4th Cir. 2015)); *see also Hargrave v. Univ. of Wash*., No. C14-0376JLR, 2014 U.S. Dist.

22   LEXIS 80952, at *10 (W.D. Wash. June 12, 2014) ("*Twombly* and *Iqbal* are not meant to be

23   impassible sentinels barring the paths of all who would climb the courthouse steps.  Even under the

24   more stringent 'plausibility' standard, the court is not permitted to weigh competing

25   inferences . . . .")

26           Defendants contend they must have rules in order to function.  Nobody argues with this

27   proposition.  Rather, what they may not do (as the Court noted at the June 23, 2016 hearing) is

28

1   conspire together to make rules "to perpetuate price fixing."  *See* 6/23/16 Hrg. Tr. at 47:24-25; *see*

2   *also* discussion at 46-48.  Defendants' efforts to shift focus away from the well-pleaded allegations

3   to arguments about the necessity for rules simply ignores the claims pleaded in this case and

4   demonstrates the weakness of their position when confronted with the detailed allegations here.  To

5   claim (as they do) that this case is merely one where "each Network separately changed one of the

6   rules governing its operations" is the height of folly.  Network Defs.' Brf. at 3.  *See also id*. at 20-21.

7   And even if this were the case (it is not) the Network Defendants' citations in support of their "just

8   following the rules" argument are inapposite.[17]

9          In *Kendall*, as discussed *supra*, the Ninth Circuit was confronted with a threadbare complaint

10  lacking any allegations regarding any agreement and lacking any plus factors.  The Network

11  Defendants' reliance on *AD/SAT v. AP*, 181 F.3d 216 (2d Cir. 1999) and *Nat'l Bancard Corp.*

12  *(NaBanco) v. Visa U.S.A., Inc. ("NaBanco II")*, 779 F.2d 592 (11th Cir. 1986) (Network Defs.' Brf.

13  at 3, 21), is also misplaced.  *AD/SAT* was a §2 summary judgment case dealing with delivery of

14  advertisements to newspapers.  *NaBanco II* was an Eleventh Circuit affirmance of the trial court's

15  decision after a nine-week bench trial holding that under the rule of reason a fee assessed by Visa did

16  not substantially impede competition after review of "[a]n abundance of evidence." *NaBanco II*, 779

17  F.2d at 605.  And contrary to what the Network Defendants claim, the Complaint in fact alleges that

18  the rule changes were similar in scope and largely identical in effect.  Network Defs.' Brf. at 4.

19  Plaintiffs noted, of course, that the vernacular used in the rule change announcements was not the

20  same as each Network has its own naming and numbering conventions.  *See* ¶¶73-81.  Truly, these

21  are meaningless distinctions.

22         In attempting to come up with their own (ever-shifting) and unavailing reasons to try to show

23  their actions were consistent with non-collusive behavior, Defendants badly misstate Plaintiffs'

24  allegations.  Network Defendants falsely claim Plaintiffs "continue to acknowledge" chip technology

25  reduces fraud.  *See* Network Defs.' Brf. at 12.  Not true.  Instead, the allegation Defendants cite to

---

26  [17]   At the June 23, 2016 hearing, counsel argued that both pre-and post-Liability Shift "nothing
27  changed."  6/23/16 Hrg. Tr. at 38:17.  It appears now that the Network Defendants have dropped that
    ridiculous view and at least admit that rules regarding liability for certain payment card transactions
28  in fact were changed.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS - 3:16-cv-
01150-WHA                                                                      - 16 -

1    states that because of how EMV technology works, it is "purported by the Networks to reduce

2    fraud."  ¶67.  In fact, the allegations in the Complaint detail just the opposite – that Plaintiffs have

3    seen a dramatic increase in fraud since the Liability Shift was instituted.  ¶18; *see also* ¶¶13-17, 22,

4    24, 98, 131.  Other specific arguments also fail:

5         **Supposed Procompetitive Reasons for the Liability Shift Are Nonsense**:  Even more

6    outrageous is Defendants' claim that the Complaint acknowledges "additional procompetitive

7    reasons for Networks to urge a transition to EMV technology – namely that it 'helps to speed up

8    service, cut queues, and reduce lost sales."  Network Defs.' Brf. at 12.  Unfortunately for

9    Defendants, that quotation comes from Visa Europe statements related to chip technology "when

10   combined with PIN," something Defendants significantly did not implement in the U.S.  In fact,

11   EMV cards and the paucity of certified terminals slow service and lengthen lines.  ¶127.  Moreover,

12   as detailed in the Complaint, the universal decision by Visa, MasterCard, American Express and

13   Discover, announced as part of the Liability Shift, that each Network would adopt chip-and-

14   signature rather than the more secure chip-and-PIN verification is indicative of their anticompetitive

15   collusion.  Defendants agreed to this less secure system because implementation of chip-and-

16   signature results in transactions being routed through more costly networks, controlled by

17   Defendants.  ¶123.

18        In any event, the Network Defendants' unsupported claims about how the rule changes are

19   "intended to reduce fraud," as well as their claims regarding "better technology," are not matters for

20   a motion to dismiss, but summary judgment and trial.  Network Defs.' Brf. at 4.  The descriptions in

21   the Complaint regarding the Liability Shift, its genesis in the United States and different application

22   in the rest of the world, the changes in the payment card market as a result of prior government

23   actions and private litigation including the ability to steer merchants to other payment methods all

24   plausibly suggest a conspiracy sufficient to withstand a motion to dismiss.[18]  Defendants' citation to

25   _____

26   [18]   In seeking to blunt the force of Plaintiffs' allegations of the conspiracy, evidenced by numerous
     statements in the Complaint that detail collusive conduct (*see, e.g.*, ¶¶92, 139-141), the Network
     Defendants rely on an old and irrelevant securities fraud case.  Under the PSLRA, a heighted level of
27   pleading is required and thus Defendants' authority is misplaced.  *See* Network Defs.' Brf. at 9
     (citing *In re Peerless Sys. Corp. Sec. Litig.*, 182 F. Supp. 2d 982, 995 (S.D. Cal. 2002)).
28   Additionally, the pages of the opinion cited to by the Network Defendants deal with the requirement

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS - 3:16-cv-
01150-WHA                                                                                    - 17 -

1    *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) in support of their

2    plausibility arguments is puzzling. *Matsushita* is a summary judgment case and, as Network

3    Defendants well know, the standard at the motion to dismiss stage is not the same.[19]

4    **Arguments Regarding Market Characteristics Are Inapt**: Network Defendants'

5    arguments regarding market share characteristics also fail. *See* Network Defs.' Brf. at 20. The

6    Network Defendants blithely claim that Plaintiffs' allegations regarding the structure of the market

7    and barriers to entry "cannot support an inference of conspiracy." Network Defs.' Brf. at 20. This is

8    false. In *GPU II*, the Court found relevant plaintiffs' updated allegations about the GPU market in

9    denying the motion to dismiss. Like Defendants here, defendants in *GPU II* tried to argue that in

10   some concentrated markets, competitors' incentives to undercut one another's prices are decreased.

11   *GPU II*, 540 F. Supp. 2d at 1095. In *GPU II*, as Plaintiffs have done here, the amended complaint

12   provided facts regarding the pre-conspiracy state of the market. Here, Plaintiffs have provided

13   similar facts regarding how fraud liability charges had previously been handled, how Defendants had

14   previously imposed Liability Shifts in different areas of the world and added "more allegations about

15   the . . . market itself." *Id*. These enhanced allegations add to the plausibility analysis and "lend

16   more support to plaintiffs' complaint." *Id.*; *see also SRAM*, 580 F. Supp. 2d at 903.

17   The Network Defendants also quibble with Plaintiffs' argument that Defendants' claimed

18   need to implement the Liability Shift on the same day was mere pretext since, as the Complaint

19   details, everywhere else a Liability Shift was implemented, simultaneous transition wasn't

20   necessary. But, this fact, coupled with the other allegations in the Complaint, tends to demonstrate

21   that the conspiracy alleged is plausible.

22   **Defendants' History of Anticompetitive Conduct**: In the same vein, Defendants seek to

23   minimize the import of the decades-long history of anticompetitive behavior both here and abroad by

24   ─────────────────────

25   under the PSLRA to identify the specific contents of documents relied upon – an issue plainly not
     germane here.

26   [19]   The authority cited by the Network Defendants all throughout their brief is extremely
27   questionable. In nearly every instance, the cases either do not stand for the proposition cited, are
     cases in a different procedural posture (summary judgment or trial) or are from different areas of the
28   law with different applicable standards (securities law, RICO, criminal law, Rule 11 sanctions, etc.).

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS - 3:16-cv-
01150-WHA                                                                          - 18 -

1   principal members of the conspiracy.  As Judge Garaufis put it, the payment card market is "highly

2   concentrated and distorted by a history of antitrust violations."  *United States v. American Express*

3   *Co.*, 99 F. Supp. 3d 143, 150 (E.D.N.Y. 2015) (heightening the plausibility of an agreement in light

4   of past practices); ¶¶248-259; *see, e.g.*, *Horizons*, 624 F. Supp. at 1576 ("This history of

5   anticompetitive practices may be indicative of the likelihood of ongoing, or future, anticompetitive

6   conduct in the industry."); *In re Tableware Antitrust Litig.*, 363 F. Supp. 2d 1203, 1205 (N.D. Cal.

7   2005) ("plaintiff may surely rely on governmental investigations" to allege a complaint but may not

8   do so exclusively).

9          The Network Defendants' reliance on *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir.

10   2007), to show that past violations have no bearing on Defendants' propensity to collude is

11   misplaced.  Unlike the Complaint, the *Elevator* complaint merely listed "'theoretical possibilities,

12   which one could postulate without knowing any facts whatever.'"  *Id.* at 50-51.  Moreover, while

13   plaintiffs there pointed to alleged misconduct in the European market, they failed to allege any

14   evidence of linkage between the foreign and domestic conduct.  *Id.* at 52.  Here, the Complaint

15   details the logical linkages between Defendants' history of anticompetitive acts and their agreement

16   to implement the Liability Shift.  ¶¶248-259; *see also Ross*, 35 F. Supp. 3d at 449 ("Evidence of

17   '[p]rior antitrust violations and the history of competition in a market' may be used to show the

18   'intent, motive and method of a conspiracy under Section 1' so long as there is a 'direct, logical

19   relationship' between the collateral conspiracy and the instant conspiracy.")  Not only do these past

20   transgressions further the plausibility of yet another agreement harming merchants, the past cases

21   inform and underlie Defendants' ability to steer, which, as the Complaint alleges, is economic

22   evidence of Defendants' anticompetitive conduct.  ¶¶257-258.[20]

23          **Arguments Related to Steering Are Weak**:  As to Plaintiffs' allegations that various

24   lawsuits and regulatory changes prompted merchants' ability to steer customers to lower cost

25   payment options, the Network Defendants make two weak arguments.  First, they argue – with no

26   support – that Plaintiffs have not alleged facts indicating that the possibility of steering "loomed so

27   ────────────────────────

[20]   Defendants ignore completely that in addition to the agreement regarding the Liability Shift, the

28   Networks all agreed to impose the same deadline related to gas pumps.  *See* ¶¶114-118.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS - 3:16-cv-
01150-WHA                                                                                    - 19 -

1   large" as to have rendered a Network's decision to adopt the Liability Shift "uneconomic in the

2   absence of collusion."  Network Defs.' Brf. at 14.  Leaving aside the fact that the Complaint in fact

3   details that steering was more than a "possibility" (*see* ¶¶9-10, 147-150), the Network Defendants

4   argue that in order to make this allegation, Plaintiffs would need to show that steering took place in

5   other markets where liability shifts were implemented on different dates.  But this simply ignores the

6   allegations in the Complaint.  Plaintiffs have provided economic evidence undercutting Defendants'

7   arguments about hypothetical other markets not at issue here.

8         The Network Defendants' second argument regarding steering fares no better.  They make a

9   purely semantic argument regarding the party that "captures chargebacks" instead of addressing the

10   central issue – that with steering available, each Network knew merchants would steer away from its

11   network if it alone implemented a Liability Shift.

12         Regardless of the entity that captures chargebacks, as the Complaint details, all of the

13   Networks decided not to compete in an area of natural competition, thus acting against their

14   economic interests.  There's also no basis to believe the Networks' contention that innocent conduct

15   would lead to the same result – *i.e.*, with the Networks all acting in lock-step.  But here, Plaintiffs

16   have set forth, in detail, plus factors all tending to show ***no*** innocent explanation exists to explain

17   Defendants' actions.

18         **The Networks' Claimed Reasons for Not Competing Are Unpersuasive in the Face of**

19   **Plaintiffs' Plausible Conspiracy**:  The Network Defendants contend they had independent reasons

20   not to offer purportedly costly incentives while also claiming that the Complaint merely speculates

21   that the benefits of such incentives would outweigh their costs.  Network Defs.' Brf. at 15.  But these

22   arguments ignore the concessions the Networks offered merchants abroad – *e.g.*, interchange

23   reductions, implementation delays and cost-sharing – strong evidence that the benefits of

24   incentivizing the Liability Shift through carrots, not sticks, would outweigh costs in the U.S. much

25   like it must have in overseas.

26         Plaintiffs have also provided a cogent explanation on the need for an agreement.  As alleged,

27   the Liability Shift placed crushing costs on merchants far above what they previously paid.  A

28   Network imposing the Liability Shift (without offsetting benefits for merchants) is sure to lose

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS - 3:16-cv-
01150-WHA

1   business to a rival offering meaningful incentives.  Indeed, given the crippling costs merchants

2   began incurring from the Liability Shift (the chargebacks, the lost merchandise and chargeback fees),

3   the Complaint alleges that merchants would favor networks or banks offering such incentives over

4   those that did not.  That no Defendant competed by offering such incentives reinforces the

5   plausibility of an underlying agreement to impose and maintain the Liability Shift.[21]  Plaintiffs'

6   allegation that merchants continued to pay for the fraud protection embedded into interchange rates

7   provides further support to Plaintiffs' position.

8        **The Networks' Purported Reasons for Choosing Chip-and-Signature over Chip-and-**

9   **PIN Ring Hollow**:  The Network Defendants' claim that the chip-and-signature for Liability Shift

10  *quid pro quo* alleged does not make economic sense because the Network Defendants do not earn

11  interchange fees.  Network Defs.' Brf. at 15-16.  But this simply ignores Plaintiffs' allegations that

12  adopting chip-and-signature resulted into routing transaction onto the Network Defendants'

13  signature networks, instead of alternative PIN networks.  ¶¶123, 131-133.  Nor does it implicate the

14  Issuing Banks as well as Discover and American Express.  Network Defs.' Brf. at 16.

15       The Network Defendants argue they had independent reasons to choose chip-and-signature.

16  Network Defs.' Brf. at 16.  But choosing chip-and-signature despite Defendants' and experts'

17  acknowledgement of its shortcomings undercuts Defendants' claim that security considerations

18  prompted the Liability Shift.  *Id.*  Moreover, acknowledging chip-and-PIN's prevalence abroad

19  underscores the feasibility of using the technology in the U.S.  A point driven home by large retailers

20  clamoring for its greater security and affordability.  *See, e.g.*, ¶95.

21       **The Networks' Argument Regarding the Historically Unprecedented Liability Shift Is**

22  **Unsupportable**:  Defendants are unable to counter Plaintiffs' well-pleaded allegations that show the

23  ───────────────

    [21]  Defendants argue that their business judgments shouldn't be second-guessed, but the case they
24  rely on acknowledges that the justification for such judgments must be reasonable.  Network Defs.'
    Brf. at 15-16 (citing *Universal Grading Serv. v. eBay, Inc.*, No. C-09-2755 RMW, 2012 U.S. Dist.
25  LEXIS 2325, at *17-*18 (N.D. Cal. Jan. 9, 2012), *aff'd*, 563 F. App'x 571 (9th Cir. 2014)).  The
    Complaint demonstrates that refusing to provide concessions to merchants – saddled with Liability
26  Shift costs from fraud and choosing a less secure chip-and-signature technology – was not
    reasonable.  The Network Defendants also cite *Golden Eagle Distrib. Corp. v. Burroughs Corp*, 801
27  F.2d 1531, 1539 (9th Cir. 1986), but that decision, regarding attorney conduct under Rule 11, must
    be in error as it says nothing about the claimed point of law.  Network Defs.' Brf. at 16.
28

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS - 3:16-cv-
01150-WHA                                                                    - 21 -

1   Liability Shift in the United States was historically unprecedented and highly indicative of collusive

2   conduct.  Instead, the Network Defendants lamely argue that because versions of a Liability Shift

3   were conducted in other countries, the Liability Shift in the U.S. was not unprecedented.  *See*

4   Network Defs.' Brf. at 17.  It is undisputed however, that the Liability Shift in the U.S. which

5   upended decades of established practice regarding responsibility for chargebacks, was unique.  As

6   Plaintiffs demonstrated, in other areas of the world, the shifts were staggered and came with various

7   incentives none of which existed in America.

8       **Network Defendants' Arguments About Trade Organizations Are Inapt**:  The Network

9   Defendants, like the Banks and Discover, try unsuccessfully to distance themselves from allegations

10   related to their common membership in EMVCo and other trade groups. As Plaintiffs show below,

11   Discover and the Banks' arguments are misguided.  *See* §§II.D.2.a., II.D.3.c.  The Network

12   Defendants are also wrong.  As with the other Defendants, the cases the Network Defendants cite

13   hold that mere membership in trade associations alone does not suffice to infer agreement.  Network

14   Defs.' Brf. at 18.  *See Citric Acid*, 191 F.3d at 1093 (inference from trade associations "alone"

15   insufficient); *Musical Instruments*, 798 F.3d at 1196 ("mere participation").  The Complaint alleges

16   far more than a mere opportunity to collude.  In any event, none of these cases involve organizations

17   advertising behind closed doors opportunities to coordinate and cooperate on the alleged conspiracy.

18   *Musical Instruments* is also distinguishable because Defendants had for years advocated for the

19   adoption of minimum advertised pricing, thereby undermining Plaintiffs' claim that Defendants used

20   a trade association to secure agreement on such pricing terms.  798 F.3d at 1197.  The Complaint

21   alleges specific meetings at conferences attended by all Defendants' employees.  Notably, Visa's

22   CEO admitted that "along with the other networks" they have "gotten . . . the issuers in a room, the

23   trade groups in a room" to try "to work together towards getting much more specific about what we

24   all want to get done by when."  ¶141.  Moreover, neither the Smart Card Alliance nor the EMV

25   Migration Forum are standard setting organizations.  The Network Defendants' citation to the

26   Department of Justice's Antitrust Guidelines for Collaborations Among Competitors does little to

27   advance their cause as the very page cited by them also notes that "[c]ompetitor collaborations may

28   harm competition and consumers by increasing the ability or incentive profitably to raise price above

1   or reduce output, quality, service, or innovation below what likely would prevail in the absence of

2   the relevant agreement." Fed. Trade Comm'n & U.S. Dep't of Justice, *Antitrust Guidelines for*

3   *Collaborations Among Competitors* at 6 (Apr. 2000); *see also id.* (noting such agreements "also may

4   facilitate explicit or tacit collusion through facilitating practices such as the exchange or disclosure

5   of competitively sensitive information or through increased market concentration"); Network Defs.'

6   Brf. at 18.

### 2.   Allegations Against the Bank Defendants Are More than Sufficient

#### a.   The Banks' Arguments Regarding Membership in EMVCo and Trade Associations Are Unpersuasive

10          As detailed above, the allegations related to all Defendants demonstrate a plausible

11  conspiracy.  The Bank Defendants raise certain additional – and unpersuasive – arguments in an

12  effort to extricate themselves from the litigation.   The Bank Defendants cobble together a

13  hodgepodge of reasons on why Plaintiffs' allegations fail – none of which supports granting their

14  motion to dismiss. First, the Bank Defendants fail to provide any case law supporting their baseless

15  proposition that the existence of unnamed co-conspirator defendants is a factor contributing to

16  implausibility.  *See* Bank Defs.' Brf. at 13.  On the contrary, the "settled principles" in the Ninth

17  Circuit are that plaintiffs are not "required to name all of the coconspirators in its complaint" and

18  "not required to sue all of the alleged conspirators inasmuch as antitrust coconspirators are jointly

19  and severally liable for all damages caused by the conspiracy."[22] *William Inglis & Sons Baking Co.*

20  *v. Itt Cont'l Baking Co.*, 668 F.2d 1014, 1053 (9th Cir. 1982); *Ward v. Apple Inc.*, 791 F.3d 1041,

21  1048 (9th Cir. 2015) (holding that "'[i]t has long been the rule that it is not necessary for all joint

22  tortfeasors to be named as defendants in a single lawsuit'").[23]

23

---

24  [22]   Any claim that Plaintiffs were required to name all owners of EMVCo misapprehends relevant
25  law.  Plaintiffs need not name every tortfeasor and has affirmatively alleged that others not named in
    the Complaint are also responsible as co-conspirators.  ¶40.

26  [23]   Defendants are also well aware that the length of time required to serve certain previously named
27  defendants impacted the decision regarding whether to include certain joint tortfeasors.  *See* 4/21/16
    Hrg. Tr. at 27 (noting length of time necessary to serve certain previously named defendants and the
28  Court's statement that "[w]e're not going to wait six to eight months").

1    The card-issuing Defendants named in this litigation collectively represent 75% of the

2    transactions in the General Purpose Card Market.   ¶232.   Furthermore, Plaintiffs alleged the

3    existence of other co-conspirators whose identities are presently unknown at this early pre-discovery

4    stage of litigation.   ¶40.   "The federal rules contemplate that the process of defining and narrowing

5    the issues raised in the pleadings will be accomplished through discovery and other pretrial

6    procedures."   *See William Inglis & Sons Baking Co.*, 791 F.3d at 1052-53 (noting the "complaint did

7    raise the possibility of a conspiracy between one or more of the named defendants and unnamed

8    third parties").   As such, the fact that Plaintiffs do not currently name other co-conspirators does not

9    suggest or highlight implausibility of the allegations.

10    Also, in a further attempt to argue implausibility, the Bank Defendants contend that some

11    banks belong to some industry associations but not others.   *See* Bank Defs.' Brf. 9.   "Defendants'

12    atomizing approach is inconsistent with the principle that 'the "character and effect of a conspiracy

13    are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a

14    whole."'"   *Lithium Ion Batteries*, 2014 U.S. Dist LEXIS 7516, at *71.   By taking such an approach,

15    the Bank Defendants seek to obscure: (1) that their common membership in, and control of, Visa and

16    MasterCard with ownership interest, veto power and ability to select board members – "an

17    institutionalised form of coordination of the conduct of the banks"; (2) that Visa and MasterCard, in

18    turn, own EMVCo along with other co-conspirators, and together, mandated the switch to EMV and

19    the Liability Shift; (3) their common role as Visa and MasterCard issuers who earn interchange fees

20    as insurance for fraud and yet shift fraud liabilities back to the same merchants who pay the fees –

21    resulting in billions of dollars that stay on the bottom line; and (4) their dominance as the top seven

22    largest acquirers in the U.S. earning processing fees from the merchants while simultaneously taking

23    advantage of the lengthy certification process to benefit their issuing arm by extending the Liability

24    Shift.   ¶¶30-39, 84, 90-93, 97-102, 113, 274-284.

25    The Bank Defendants also weakly argue that Plaintiffs' claims regarding their participation

26    in EMVCo fail because Plaintiffs do not allege the date each Bank Defendant became a member.

27    Bank Defs.' Brf. at 6.   This level of detail is not required and the Bank Defendants are grasping at

28    straws.   Neither does the Complaint allege at what hotel the Bank Defendant representatives stayed

1   when they attended EMVCo-related meetings – because Plaintiffs need not plead trial-level evidence

2   at this stage.  And the Complaint does in fact provide evidence of a meeting of the Smart Card

3   Alliance in Chicago in May 2011 – just prior to the first announcement of the Liability Shift – where

4   nearly all of the Defendants attended.  On the agenda there was a panel titled, "What Will Trigger

5   The US Payments Industry to Migrate to EMV and What Model Will Emerge?"  *See* ¶156.

6   Defendants acknowledge this meeting, but fault Plaintiffs, who were not invited, for not providing

7   information regarding what exactly was discussed there – again evidence that is uniquely in

8   Defendants' hands at this stage.

9         Despite having their tentacles in every part of the scheme, the Bank Defendants make much

10   of the fact that some banks are in some organizations and not in others.  *See* Bank Defs.' Brf. 9.  This

11   is irrelevant.  As Plaintiffs detail, all of the Bank Defendants control EMVCo through their

12   membership and ownership of Visa and MasterCard and three of the seven Bank Defendants exert

13   additional influence as EMVCo Business and/or Technical Associates.  Moreover, all but one Bank

14   Defendant are members of the Smart Card Alliance's EMV Migration Forum.  ¶¶30, 32, 36, 38, 158.

15   The reality is – whether through membership and control of the Networks, industry associations, or

16   because they are the dominant issuers and acquirers – the Networks and their "banking partners"

17   admittedly have gotten together in a room to agree to implement the liability shift and "solving

18   [their] own problems."  ¶¶97, 139, 141.

19         The Supreme Court and the Ninth Circuit have long acknowledged that standard-setting

20   organizations "can be rife with opportunities for anticompetitive activity."  *Am. Soc'y of Mech.*

21   *Eng'rs*, 456 U.S. at 571; *Allied Tube & Conduit Corp. v. Indian Head*, 486 U.S. 492, 495, 500

22   (1988) (finding "[t]here is no doubt that the members of such [standard making] associations often

23   have economic incentives to restrain competition and that the product standards set by such

24   associations have a serious potential for anticompetitive harm").  Allegations of industry event

25   attendance and association affiliations show "'***how and when*** Defendants had opportunities to

26   exchange information or make agreements," even when such allegations alone cannot support

27   Plaintiffs' claims.  *See Flash Memory*, 643 F. Supp. 2d at 1148 (emphasis in original); *SRAM*, 580 F.

28

1    Supp. 2d at 903.[24]   Moreover, the pleading standard is not meant to be overly burdensome as this

2    Court stated that "[t]his is not to say that to survive a motion to dismiss, plaintiffs must plead

3    specific back-room meetings between specific actors at which specific decisions were made. . . .

4    The *Twombly* decision reiterated that allegations of antitrust conspiracy are governed by Rule 8, and

5    not the heightened standard of Rule 9(b)."   *GPU I*, 527 F. Supp. 2d at 1024.

6           This Court found that in the initial complaint, the *GPU* plaintiffs did "not plead[ ] that

7    defendants ever met and agreed to fix prices."   *Id.*   Plaintiffs here, however, actually plead that the

8    Defendants admittedly got into a room to implement the liability shift and "solving [their] own

9    problems."   *See id.* at 1024; ¶¶97, 139, 141.   In addition, like the *GPU* plaintiffs, Plaintiffs'

10   Complaint amply pleads, among other factors, "'complex and historically unprecedented'" changes

11   in behavior, Defendants' behavior change after the commencement of litigation, the structure of the

12   Liability Shift chargebacks and the economics of the scheme.   *See GPU II*, 540 F. Supp. 2d at 1091-

13   96; ¶¶93-113; 135-138; 165-197.   As such, "plaintiffs have pleaded allegations that if true would

14   make an antitrust conspiracy plausible."   *GPU II*, 540 F. Supp. 2d at 1096.   Defendants cite *GPU I*

15   at length in their motions, but completely ignore that after amendment, adding precisely the type of

16   detailed facts Plaintiffs here have added, this Court held the *GPU* plaintiffs properly stated a claim.

17   *See GPU II*, 540 F. Supp. 2d at 1091-96.[25]

18   _____

19   [24]   *See also In re WellPoint Out-of-Network "UCR" Rates Litig.*, 865 F. Supp. 2d 1002, 1026 (C.D.
     Cal. 2011) (participation in trade associations and conferences demonstrates how and when
20   defendants had opportunity to conspire); *In re Transpacific Passenger Air Transp. Antitrust Litig.*,
     No. C 07-05634 CRB, 2011 U.S. Dist. LEXIS 49853, at *42-*46, *50-*51 (N.D. Cal. May 9, 2011)
21   (allegations that defendants participated in industry groups that by their nature facilitated
     information exchange and provided a venue for discussions support the inference of a conspiracy).

22   [25]   Bank Defendants' other authorities fare no better.   *See Citric Acid Litig.*, 191 F.3d 1090 (in a
     case affirming summary judgment; review of uncontroverted testimony resulted in allegations
23   related to trade group meetings to be insufficient circumstantial evidence of conspiracy); *Prime
     Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*, No. 11-CV-02652 JLS (RBB), 2012 WL
24   3778348, at *5 (S.D. Cal. Aug. 30, 2012) (in a case regarding healthcare providers, with no
     indication of any allegations related to trade groups, dismissal with leave to amend warranted where
25   "mostly unrelated allegations" in the complaint provide no basis to infer agreement); *In re Cal. Title
     Ins. Antitrust Litig.*, No. C 08-01341 JSW, 2009 WL 1458025, at *5, *7 (N.D. Cal. May 21, 2009)
26   (granting leave to amend finding "opportunity, without more, is not a plausible basis to suggest a
     conspiracy" especially where there were no allegations suggesting an "'unprecedented change'" in
27   defendants' behavior); *In re Late Fee & Over-Limit Litig.*, 528 F. Supp. 2d 953, 961-62 (N.D. Cal.
     2007) (dismissal of complaint with leave to amend appropriate where plaintiffs "do not identify any

28

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS - 3:16-cv-
     01150-WHA                                                                                - 26 -

1    Contrary then, to the Bank Defendants' arguments, Plaintiffs' claims as to these Defendants

2    do not rely solely on allegations regarding membership in various trade associations. Rather, those

3    allegations support and enhance the detailed averments in the Complaint regarding all Defendants,

4    including the Bank Defendants.

5              **b.    Allegations of Continued Control of the Networks by
                       the Banks Are Sufficient**

6    Only by ignoring and miscasting the majority of this section of the Complaint can the Issuing

7    Banks make the argument that they don't control the Networks.  In support of their argument, they

8    cite 20 paragraphs,[26] only nine of which[27] discuss the Issuing Banks' control over Visa's and

9    MasterCard's rules.  Notably, they ignore and gloss over how the Complaint details the ways in

10   which the Issuing Banks have had and continue to have control over Visa and MasterCard's rules.

11   Historically, Visa and MasterCard were joint ventures owned by the Issuing Banks and were

12   responsible for jointly setting all Visa and MasterCard rules.  ¶271.  After facing antitrust lawsuit

13   after antitrust lawsuit (¶¶248-259), and seeking to avoid further antitrust liability, Visa and

14   MasterCard went public.  ¶272.  But this only changed the corporate form; it did not change the way

15   that rules were made and applied by the Issuing Banks through the Networks.  ¶273.  The Issuing

16   Banks maintained this control through complex shareholding agreements that maintained the status

17   quo.  ¶¶274-278.  This included re-adopting all of the old Visa and MasterCard rules once the

18   companies went public.  ¶279.  The Complaint discusses what should have happened if the Banks

19   were no longer controlling Visa and MasterCard – *i.e.*, competition between the Issuing Banks to

20   gain merchant acceptance – and what actually happened: maintenance of the status quo.  *Id.*  And

21   government antitrust enforcers agreed: the IPOs were "changes merely in corporate form, not

22   substantive conduct."  ¶¶280, 282.  The European Commission found "[e]ven after the IPO, the

23   'decisions of [MasterCard's] management bodies are still binding upon [its] members and no bank

24

---

25   actual agreement among the defendants" and primary antitrust allegations are detailed in a single
     paragraph showing late-fee levels that are "not even roughly in parallel").

26

27   [26]   ¶¶30-32, 34-37, 80, 91, 95, 135, 272, 274, 277, 279-284.

28   [27]   ¶¶272, 274, 277, 279-284.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS - 3:16-cv-
     01150-WHA                                                                          - 27 -

1    can participate in the card activities of [MasterCard] without complying in all respects with

2    [MasterCard's rules]'"").   ¶282.   A similar investigation as to Visa continues.

3           Instead of addressing these allegations head on, the Issuing Banks instead misleadingly play

4    semantic games; argue that the Ninth Circuit has decided this issue (which it hasn't); and argue that

5    because the rule relating to EMV fraud didn't exist in 2013, when the EU's competition enforcer

6    brought charges against MasterCard, that somehow affects its finding that the pre- and post-IPO

7    rules making processes were the same.

8           First, the Issuing Banks argue that this issue of their control over the Networks was somehow

9    already decided at the Court of Appeals, suggesting "the Ninth Circuit has rejected this theory of

10   conspiratorial liability."  Bank Defs.' Brf. at 14.  Two sentences later, the Issuing Banks back off this

11   claim and say that "the Ninth Circuit rejected a *similar* argument about bank control of Visa and

12   MasterCard" in the *Kendall* case.  *Id.*  While that is not what the Ninth Circuit actually held in

13   *Kendall*, more importantly Plaintiffs here have alleged far more than the naked suggestion that

14   participation on Visa or MasterCard's board on its own demonstrates the plausible conspiracy

15   pleaded here.[28]

16          Defendants' semantic games demonstrate the weakness of their defense and damage their

17   credibility.  As an example of misleading wordplay, Defendants say "Plaintiffs fail to explain why

18   the Bank Defendants would cause the networks they supposedly control to implement changes

19   against the interests of entities with which they have a corporate relationship."  Bank Defs.' Brf. at

20   15 (because there is no factual support for this contention, and no allegations in the Complaint that

21   say this, Defendants provide no citation).  But nowhere do Plaintiffs say that the rules the Issuing

22   Banks promulgate through the Networks harm the acquirer – in fact quite the opposite.  Either the

23   Issuing Banks do not understand the dozens of paragraphs that allege that merchants are the ones

24   damaged by the conspiracy, or they are trying to mislead.  *See, e.g.* ¶¶165-230 (detailing how the

25   conspiracy directly affected merchants).  And if Defendants really thought that the acquirers were

---

[28]   The Issuing Banks' citation to *Bona Fide Conglomerate, Inc. v. SourceAmerica*, No. 14CV0751-GPC-DHB, 2014 WL 4162020, at *12 (S.D. Cal. Aug. 20, 2014) is also inapposite as in that case, unlike here, plaintiffs failed to allege "any of the activity alleged to violate section 1 of the Sherman Act."

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS - 3:16-cv-
01150-WHA                                                                                          - 28 -

1    the ones that were damaged by the conspiracy, why did they drop their *Illinois Brick* defense, which

2    was predicated on the acquirers, not the merchants, suffering the harm?[29]

3                    **c.    The Banks Cannot Escape Liability by Arguing Others
                            Were More Involved**

4

5            The Bank Defendants contend they should be dismissed because the Complaint has a greater

6    focus on the Network Defendants.  But this argument is legally suspect because "plaintiffs need only

7    provide a plausible basis for asserting a particular defendant's initial involvement in the

8    conspiracy. . . .  Nothing more is required.  Once a defendant's participation in the conspiracy is

9    adequately alleged, questions about the scope of their participation are better decided on a complete

10   factual record."  *Lithium Ion Batteries*, 2014 U.S. Dist. LEXIS 141358, at *163.  Tellingly, the Bank

11   Defendants ignore numerous allegations that pertain to their role to implement and maintain the

12   Liability Shift, including allegations that apply to all Defendants.

13       •    Contrary to their motion to dismiss, the Bank Defendants are alleged to have a role in
              certifying EMV terminals.  *See* ¶¶3, 95 (National Grocer's CEO stated that, "'It's
14            time for the card networks and banks to stop passing the buck onto the backs of
              merchants, but rather they should work together with merchants to further eliminate
15            fraud by issuing credit cards with PINs and work to speed up the EMV certification
              process.'")  Profits accrued to the Issuing Banks from the Liability Shift, including
16            the millions of dollars in fraud costs, are shifted to merchants each month
              certification is delayed.  ¶84.  Moreover, the Complaint alleges that the Issuing
17            Banks ***knew*** that many merchants would not meet the October 2015 Liability Shift
              deadline.  *See, e.g.*, ¶¶90, 113.

18

19       •    The Complaint alleges a *quid pro quo* between the Networks and the Issuing Banks
              where the Issuing Banks offloaded billions in chargeback costs during the busy
20            holiday period without any concessions or grace periods or any sharing of the costs
              of upgrading terminals, all while the Network Defendants benefitted because chip-
21            and-signature resulted in more transactions being routed through their networks.
              ¶¶121-123, 131-134; *see also* ¶96 ("[C]hargeback losses have been magnified by the
22            issuers' decision to retain the magnetic stripe, which facilitates card fraud.")

23       •    The Complaint alleges that analysts perceived an agreement between the Networks
24            and the Banks regarding the Liability Shift.  ¶139 (Jason Notte of TheStreet.com
              wrote that: "Back in 2011, Visa, MasterCard, Discover, American Express and their
25            banking partners agreed on a October 1, 2015, 'liability shift' that, for the first time,

26

    ─────────────────────
27   [29]   What is more, the Bank Defendants' wordplay conveniently omits the fact that, in many cases,
    the acquirer and the issuer are one and the same bank.  In fact, the Bank Defendants also comprise
28   the largest acquiring banks in the United States.  *See* ¶¶30-37.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS - 3:16-cv-
01150-WHA

1   would make merchants liable for any fraudulent charges that result from using point-
2   of-service readers that can't read chip-enabled cards."); *see also* ¶¶140-146.

3   •   The Complaint alleges that Visa's CEO admitted that Network Defendants worked
       with each other and Issuing Banks to implement the Liability Shift.  ¶141.

4        **3.   Discover's Arguments Are Nonsensical, Duplicative and
             Irrelevant**

5        Discover has filed a separate motion to dismiss.  That motion fundamentally misapprehends
6   relevant antitrust law, misstates Plaintiffs' Complaint and is duplicative of many arguments made by
7   its co-conspirators.  The brief is rife with both legal errors and factual misstatements.  As much of it
8   makes no sense or repeats what the other briefs already said, this section addresses only Discover-
9   specific arguments that are intelligible and unique.[30]

10       **a.   Discover Has Waived Any Right to Compel Arbitration**

11       In its motion to dismiss, Discover contends that proposed plaintiff rue21 and other members
12  of the plaintiff class who have a direct relationship with Discover are subject to a mandatory
13  arbitration agreement.  Discover Brf. at 14.  Discover then claimed that it would "elaborate" on these
14  matters in "a separate motion to compel arbitration of rue21's claims."  *Id*.  Plaintiffs assumed
15  Discover had determined not to file such a motion, but had failed to correct its brief, but Discover
16  then filed this separate motion on August 18, 2016 – two weeks after it was required to file any
17  responses to Plaintiffs' Complaint.  Plaintiffs asked Discover to withdraw their improper brief and
18  Discover refused.  In a letter filed with the Court August 19, 2016, Plaintiffs requested the Court
19  strike the improper motion because it is untimely and improper.  *See* Dkt. No. 312 (August 19, 2016
20  letter).  Discover responded to Plaintiffs' letter on August 22, 2016 (Dkt. No. 315).  As detailed in
21  Plaintiffs' letter, the motion is untimely under the scheduling order and Discover waived its right to
22  bring such a motion by sitting on its rights and prejudicing Plaintiffs.  *Id.*

---

[30]   Discover's brief features nonsensical citations, wholly unsupportive of the claims alleged.  As but one example, Discover claims other merchant suits are cited to in ¶68, but this is a paragraph discussing the two types of EMV cards available with only passing reference to "lawsuits" by merchants in the paragraph, but to claim Plaintiffs' arguments are "contradicted" by those suits makes no sense.  Discover Brf. at 3.

1
          **b.**    **The Court Must Strike Discover's Improper Argument
Regarding Other Complaints Neither Referred to nor
2**                 **Relied upon by Plaintiffs**

3         In a Hail Mary effort to extricate themselves from this action, Discover has improperly

4 sought to "incorporate by reference" three complaints filed in other litigations to have the Court

5 determine hotly contested facts in their favor.  This is improper and the references and associated

6 argument must be stricken.  Pursuant to L.R. 7-3, evidentiary and procedural objections to motions

7 must be contained within the brief or memorandum.  Plaintiffs hereby move to strike Discover's

8 reliance upon and extended references to materials far outside the Complaint.

9         Discover cites extensively to three complaints filed in other jurisdictions against some of the

10 Defendants in this action, claiming that Plaintiffs' single, passing reference in one paragraph to

11 "several lawsuits by large merchants against the card networks in recent months" allows this under

12 the "'incorporation by reference'" rule.  *See* ¶68; *see also* Discover Brf. at 8 n.2.

13         "As a general rule, 'a district court may not consider any material beyond the pleadings in

14 ruling on a Rule 12(b)(6) motion.'"  *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

15 Only under limited circumstances may a court consider matters outside the pleadings under either

16 incorporation by reference or via judicial notice.  *See United States v. Ritchie*, 342 F.3d 903, 907

17 (9th Cir. 2003). [31]  Incorporation by reference is only proper "if the plaintiff refers extensively to the

18 document or the document forms the basis of the plaintiff's claim."  *Ritchie*, 342 F.3d at 908.

19         Because Plaintiffs neither refer extensively to these complaints – in fact they barely mention

20 them and even then not by name – and because the Complaint's allegations in no way depend on the

21 three complaints, incorporation by reference is inappropriate here.

22

23

---

24  [31]    Discover does not explicitly seek judicial notice of the complaints, but judicial notice of such
documents would also be inappropriate.  *See* Fed. R. Evid. 201.  Judicial notice is proper when the
25 material "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be
accurately and readily determined from sources whose accuracy cannot reasonably be questioned."
26 Fed. R. Evid. 201.  "It is improper for a court to take judicial notice of an exhibit for the truth of the
matters asserted therein."  *Illumina, Inc. v. Ariosa Diagnostics, Inc.*, No. C 14-01921 SI, 2014 U.S.
27 Dist. LEXIS 109531, at *20-*21 (N.D. Cal. Aug. 7, 2014); *Lee*, 250 F.3d at 689; *In re Bare
Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1067 (N.D. Cal. 2010).
28

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS - 3:16-cv-
01150-WHA                                          - 31 -

1    Federal Rule of Civil Procedure 12(f) provides that a "court may strike from a pleading an

2    insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." *Sec. People,*

3    *Inc. v. Classic Woodworking, LLC*, No. C-04-3133 MMC, 2005 U.S. Dist. LEXIS 44641, at *5

4    (N.D. Cal. Mar. 4, 2005).

5    In its motion to dismiss Discover quotes and extensively relies upon the allegations made in

6    three lawsuits filed in other jurisdictions against various parties.  *See* Discover Brf. at 3, 8-11.

7    Discover does this in a failed effort to contest the allegations in the Complaint that plausibly

8    demonstrate that Discover, like the other Defendants, engaged in collusive conduct in relation to its

9    decision to implement a Liability Shift for certain payment card chargebacks.[32]

10   Discover claims the Court may consider the contents of these three complaints under the

11   incorporation by reference rule.  *See* Discover Brf. at 8 n.2.  Discover is wrong.  Incorporation by

12   reference is proper only "if the plaintiff refers extensively to the document or the document forms

13   the basis of the plaintiff's claim."  *Ritchie*, 342 F.3d at 908.  Here, Plaintiffs' Complaint made a

14   single reference to "several lawsuits" that were recently filed.  ¶68.  Under no circumstances can it

15   be said that Plaintiff "refer[red] extensively" to those other complaints nor can it be argued that the

16   complaints "form[] the basis" of Plaintiffs' claims.

17   Even under the more permissive standard in the Ninth Circuit, Discover's efforts fail.  The

18   Ninth Circuit has "extended the 'incorporation by reference' doctrine to situations in which the

19   plaintiff's claim depends on the contents of a document, the defendant attaches the document to its

20   motion to dismiss, and the parties do not dispute the authenticity of the document, even though the

21   plaintiff does not explicitly allege the contents of that document in the complaint."  *Knievel v. ESPN*,

22   393 F.3d 1068, 1076 (9th Cir. 2005).

23   In fact, here, the Complaint ***does not even name the entities involved*** in the litigations nor

24   list ***any other details*** regarding the complaints – not even where the actions are pending nor which

25   causes of action they allege.  "Reference to the mere existence of a document usually is not

26   _____

[32]   Oddly, Discover claims the allegations in these other cases are irrelevant, but at the same time

27   argues extensively that allegations in the other complaints somehow demonstrate Discover and other

28   Defendants' innocence.  *See* Discover Brf. at 9.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS - 3:16-cv-
01150-WHA                                                                          - 32 -

1   sufficient." *See* 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §1327

2   (3d ed.).[33]  Discover simply assumed that the three complaints from which it quotes extensively are

3   the ones mentioned in passing by Plaintiffs, further underscoring the impropriety of Discover's

4   actions.  And in no way can it be said that Plaintiffs' claim "depends on the contents" of the

5   improperly incorporated complaints and, additionally, Discover did not attach the disputed materials

6   to its motion.  Discover's efforts to incorporate by reference complaints that are not even named is

7   particularly egregious and deserving of the Court's censure.  Discover's references to, and argument

8   relating to, the three complaints must be stricken.

9               c.      **Discover's Arguments Strain Credulity and Misstate
                        the Facts**

10          Discover's stretching of the truth undermines its credibility.  Not only does Discover

11  completely ignore large swaths of the pleadings, but it creates its own wild "facts" from outside the

12  Complaint.  For instance, Discover claims that it is unimaginable that it "would conspire with its

13  arch rivals to do any of these things" (without citation to anything).  *See* Discover Brf. at 3.  And it

14  claims, again without citation to anything, that "Plaintiffs' own pleadings thus suggest that

15  Discover's adoption of the challenged policies is equally – and in fact far more – consistent with

16  independent action than the unlawful agreement Plaintiffs assert." *Id*.  Noticeably absent from these

17  claims are citations to the Complaint.  Whether these "facts" are true or not (they are not), is

18  immaterial.  They are from outside the four corners of the Complaint and must be ignored.  *See, e.g.*,

19  *Harara v. LandAmerica Fin. Grp., Inc*., No. C 07-03999 WHA, 2007 U.S. Dist. LEXIS 77307, at

20  *10 (N.D. Cal. Oct. 9, 2007) (Alsup, J.) (refusing to consider materials outside the four corners of

21  complaint).  Additionally, while claiming on the one hand that allegations in other matters are

22  "irrelevant here" Discover then delves into the pleadings in other antitrust actions cited by Plaintiffs

23  to argue that the allegations conflict with the plausible conspiracy pleaded.  *See, e.g.*, Discover Brf.

24  at 9-10.  This conduct is subject to a motion to strike, which Plaintiffs detail at §II.D.3.b., *supra*.

25

26  ---
    [33]   *See also Sizemore v. Pac. Gas & Elec. Ret. Plan*, 939 F. Supp. 2d 987 (N.D. Cal. 2013) (Alsup,
27  J.) (denying request to consider collective bargaining agreement defendants sought to incorporate by
    reference where claim did not rely on the agreement).  *See also GPU II*, 540 F. Supp. 2d at 1091
28  (Alsup, J.) (denying defendants' request for judicial notice in antitrust action).

1    Discover's failure to address the actual claims pleaded against it and instead venture into factual

2    matters far outside the ambit of the Complaint is bizarre.

3            Other misstatements abound.  For example:

4        •   Discover falsely claims Plaintiffs do not allege that non-named owners of EMVCo
             are co-conspirators, but Plaintiffs plainly allege various unnamed co-conspirators
5            performed acts in furtherance of the conspiracy.  ¶40.

6        •   Discover falsely claims Plaintiffs "concede" various trade organizations named as
7            fertile ground for the conspiratorial conduct to flourish are "legitimate trade
             organizations."  Discover Brf. at 5.  In fact, the paragraphs cited by Discover detail
8            the mailing address of EMVCo and note that it is a Delaware company (¶38);
             explains who the owners of EMVCo are (¶151) and explains that the entity is
9            managed by a Board of Managers comprised of the owners of EMVCo and that
             EMVCo makes decisions "on a consensus bas[i]s" (¶152).  At no point do Plaintiffs
10           concede that any trade groups or specifically EMVCo is legitimate.  In fact, Plaintiffs
             plead EMVCo and other groups were being used for illegitimate purposes.  ¶¶151-
11           164 (detailing opportunities for collusion through EMVCo, the EMV Migration
12           Forum and the Smart Card Alliance).

13       •   Discover falsely claims that Plaintiffs concede chip technology deters fraud.  *See*
14           Discover Brf. at 7.  In fact, in neither of the paragraphs referenced is there any such
             concession.  Instead, the Complaint pleads that Plaintiffs have suffered tremendous
15           increases in fraud costs since the imposition of EMV-ready cards.  *See* ¶¶12-15
             (detailing increased fraud costs suffered by Milam's Market and Grove Liquors);
16           ¶¶16-20 (detailing increased fraud costs to rue21); ¶¶21-22 (Monsuier Marcel's
             increased fraud costs); ¶¶23-24 (Fine Fare's increased fraud costs).
17
18       •   Discover misunderstands – either innocently or otherwise – the claims pleaded
             regarding the anti-steering rules.  Regardless of whether other litigations where
19           merchants won the right to steer customers were against Discover, Discover as a
             payment card brand would be and was affected by these changes.  Thus Discover's
20           role as a defendant in those other cases says nothing about the economic incentives
             that were then existing as to Discover and other networks which inured as a result of
21           the steering rules being changed.

22       •   Discover states: "The Amended Complaint does not – because it cannot – allege that
23           the different networks adopted identical liability shifts of precisely the same scope or
             identical certification requirements."  Plaintiffs of course never said each Network
24           adopted word for word identical language and as the Complaint states, the different
             Network rules use different numbering and vernacular.  Discover Brf. at 4-5.  In
25           practice and in fact, despite differing number conventions, the Liability Shift rules
             are the same, and that's what the Complaint alleges.  ¶¶73-81.
26
27       •   Discover makes a claim that there are no facts to support the argument that
             Discover's participation in various groups (such as EMVCo and the Smart Card
28           Alliance) was a vehicle for unlawfully adopting the challenged policies here.

1
2
3
4

Discover Brf. at 11.  But Plaintiffs indeed present facts to support the idea that Discover (and other defendants) had numerous opportunities to collude through organizations that admitted they operated on "a consensus bas[i]s" and had meetings prior to the Liability Shift being announced that Defendants attended directly related to how to get the U.S. payments industry to move to EMV technology.  ¶¶151-164. And contrary to Discover's claim Discover's association activities are nowhere alleged to be proper.

5
6
7

Discover's entire brief is riddled with these demonstrably false assertions and as such should be given little, if any, weight.

8

### d.   Discover's Antitrust Injury and Causation Arguments are Bizarre and Incorrect

9

Discover's further arguments that Plaintiffs failed to allege antitrust injury or causation have

10

no basis in law or in fact.  It is a "fundamental principle of conspiracy law" that "coconspirators are

11

'liable for the acts of all members of the conspiracy in furtherance of the conspiracy, regardless of

12

the nature of [the coconspirators'] own actions.'"  *In re Animation Workers Antitrust Litig.*, 123 F.

13

Supp. 3d 1175, 1207 (N.D. Cal. 2015) (citing *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n.*, 620

14

F.2d 1360, 1367 (9th Cir. 1980)).  As such, Discover's contention that even when Plaintiffs prove

15

the conspiracy element of the §1 claims, it would nevertheless be relieved of its joint and several

16

liabilities simply because one of the five named plaintiffs does not accept Discover cards contradicts

17

the "well-established body of antitrust and conspiracy law" as the "'action of any of the conspirators

18

to restrain or monopolize trade is, in law, the action of all.'"  *Animation Workers*, 123 F. Supp. 3d at

19

1207.

20

Furthermore, whether the Discover transactions are affected via a three-party system or – as

21

similar to Visa and MasterCard transactions – involved an acquirer, Discover has directly caused

22

Plaintiffs' antitrust injuries.  ¶¶174, 180-184.

23

Discover relies on inapposite case laws that found no competition-reducing activities with

24

unascertainable damages to support its contention that Plaintiffs here suffered no antitrust injury.[34]

25

26
27
28

[34]   *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (finding no violation of §7 anti-merger provision as defendants' merger activities actually preserved competition by saving defaulting bowling centers from closing and deprived plaintiffs of "windfall profits"); *Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 539-41 (1983) (finding no antitrust injury as union plaintiff "will frequently not be part of the class the Sherman

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS - 3:16-cv-01150-WHA

1    On the contrary, here, Discover faced imminent threat from the elimination of anti-steering rules –

2    the elimination of which was to stimulate increased competition among the Networks for the benefit

3    of merchants and cardholders – agreed with other Network Defendants to pursue a scheme of

4    coordinated liability shift.  ¶¶149-150  In doing so, Discover acted against its own competitive self-

5    interest by forsaking an opportunity to take market share from other networks, but profited by

6    simultaneously shifting billions of fraud costs to the Class members while keeping ongoing fraud

7    protection fees paid by the merchants.  ¶¶2, 4, 8-9, 11, 71, 84, 93, 96-98, 113, 149-150.

8            Similarly, given that Discover's conduct has directly caused harm to the Class members, its

9    reliance on several of *Illinois Brick*'s progeny is also inapt.  In *Paycom Billing Servs. v. MasterCard*

10   *Int'l, Inc.*, the plaintiffs there conceded that the decision to assess chargebacks was left to each bank

11   and the penalties for excessive chargebacks were assessed against the acquirers and not the

12   merchants.  467 F.3d, 283, 291-92 (2d Cir. 2006).  For the purpose of liability shift, Discover's own

13   rule code establishes "immediate Chargeback[s]" via automated procedures, and acquirers (if

14   involved in Discover's transactions) do not account for chargebacks in their own books and records

15   as income or expenses.  ¶¶79, 93-96, 179-184.  Likewise, in *In re ATM Fee Antitrust Litig.*, plaintiffs

16   conceded that they did not directly pay the interchange fees that were alleged to be unlawfully

17   inflated, but only paid the ATM fee that they did not allege defendants conspired to fix.  686 F.3d

18   741, 750-51 (9th Cir. 2012).  Here, by contrast, Plaintiffs have unequivocally alleged that Discover

19   and its co-conspirators have conspired to implement the Liability Shift directly on merchants.  ¶¶6,

20   9, 97, 139-141, 149-150.

21

22

23

24   Act was designed to protect" given "unions were regarded as a form of conspiracy in restraint of
     trade" with only "unspecified injuries in its 'business activities'" while actual losses were suffered
25   by its members); *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 337-38 (1990) (finding
     "[w]hen a firm, or even a group of firms adhering to a vertical agreement, lowers prices but
26   maintains them above predatory levels, the business lost by rivals cannot be viewed as an
     'anticompetitive' consequence of the claimed violation.  A firm complaining about the harm it
27   suffers from nonpredatory price competition 'is really claiming that it [is] unable to raise prices.'
     This is not antitrust injury . . . .")
28

1

### E.     Plaintiffs Adequately Allege State Law Claims

2        As Defendants tacitly concede, Plaintiffs' state antitrust and consumer protection law claims

3    rise or fall with the plausibility of Plaintiffs' alleged antitrust conspiracy.  *See* Bank Defs.' Brf. at

4    18-19 ("Because . . . Plaintiffs do not plausibly allege that the Bank Defendants participated in the

5    purported conspiracy, these [state law antitrust and consumer protection] claims – which Plaintiffs

6    base on such participation – should be dismissed."); Network Defs.' Brf. at 22-23 (same as it applies

7    to the Network Defendants); Discover Brf. at 16 (same as it applies to Discover).  As detailed above,

8    Plaintiffs have adequately pled an antitrust violation and therefore, the Court should allow Plaintiffs'

9    state law antitrust and consumer protection claims to proceed.  Defendants' various other arguments

10   for dismissing Plaintiffs' claims under state antitrust and consumer protection laws similarly fail.

11
#### 1.     Plaintiffs' New York Deceptive Acts and Practices Claim Falls Within the Scope of N.Y. Gen. Bus. L. §§349-350

12

13       Defendants argue that Plaintiffs' New York Deceptive Acts and Practices claim should be

14   dismissed because the alleged misconduct is not "consumer-oriented."  Network Defs.' Brf. at 23;

     Discover Brf. at 16-17; Bank Defs.' Brf. at 19.  While it is true that N.Y. Gen. Bus. L. §§349-350
15
     only governs behavior that is consumer-oriented, it is equally true that "[this] requirement does not
16
     preclude businesses from acting as plaintiffs in lawsuits pursuant to Section 349."  *Statler v. Dell,*
17
     *Inc.*, 775 F. Supp. 2d 474, 484 (E.D.N.Y. 2011); *accord Schroders, Inc. v. Hogan Sys., Inc.*, 522
18
     N.Y.S.2d 404, 406 (N.Y. Sup. Ct. 1987).  Just like the plaintiffs in *Statler* and *Schroders*, Plaintiffs
19
     here are business consumers in a market subject to Defendants' deceptive behavior.  *See Statler*, 775
20
     F. Supp. 2d at 478 (small business owner purchasing Optiplex computers for his office); *Schroders*,
21
     522 N.Y.S. 2d at 740-41 (bank purchasing computer software system).  And just as in *Schroders*, the
22
     Court here should find that "the relevant legislative history indicates that an expansive reading of the
23
     statute [N.Y. Gen. Bus. L. §349] is preferred, and a corporate consumer may utilize the statute to
24
     provide a private right of action."  522 N.Y.S.2d at742.
25
#### 2.     Plaintiffs Have Adequately Pled a Claim Under California's Unfair Competition Law
26

27       Despite Defendants' arguments to the contrary (Network Defs.' Brf. at 23; Discover Brf. at

28   17; Bank Defs.' Brf. at 19), Plaintiffs have stated a claim under California's UCL.  "[A]n 'unlawful'

1  business act under §17200 is any business practice that is prohibited by law, whether 'civil or

2  criminal, statutory or judicially made . . . , federal, state or local.'"  *WellPoint*, 865 F. Supp. 2d at

3  1048-49.  Like the plaintiffs in *WellPoint*, "[b]ecause Plaintiffs [here] have adequately stated a claim

4  under the Sherman Act, Plaintiffs have also stated a claim under the UCL's unfair and unlawful

5  prongs."  *Id.* at 1049.  This alone is sufficient to establish Plaintiffs' UCL claim.  *See InfoStream*

6  *Grp., Inc. v. PayPal, Inc.*, No. C 12-748 SI, 2012 WL 3731517, at *12 (N.D. Cal. Aug. 28, 2012)

7  (noting that plaintiff need only plead a claim under one of the three prongs to state a claim under the

8  UCL).[35]

9            **3.    Plaintiffs' Claim Against the Bank Defendants and Discover**
                     **Under the Florida Deceptive and Unfair Trade Practices Act Is**
10                    **Valid**

11           Bank Defendants argue that "Plaintiffs' Florida Deceptive and Unfair Trade Practices Act

12  ("FDUTPA") claim should be dismissed for the additional, independent reason that, '[b]y its express

13  terms, FDUTPA does not apply to banks or savings and loan associations regulated by federal

14  agencies,' and each Bank Defendant is regulated by a federal agency."  Bank Defs.' Brf. at 19.

15  Discover makes a similar argument.  Discover Brf. at 17.  These arguments oversimplify the issues

16  and should be rejected by the Court at this stage of the litigation.

---

17  [35]  This is not meant to concede that Plaintiffs have failed to state a claim under either the unfair or
18  fraudulent prongs of the UCL – they have and either provides an additional basis for this Court to
    deny Defendants' motions to dismiss Plaintiffs' UCL claim.  For one, even if Plaintiffs have failed to
19  establish a violation of federal or state antitrust laws, they have still adequately pled a violation
    under the unfair prong of the UCL because Defendants' agreement to shift liability for fraudulent
20  credit card transactions from issuing banks to merchants "'violate[s] the spirit of the antitrust laws.'"
    *See Imperial Irrigation Dist. v. Cal. Indep. Sys. Operator Corp.*, No. 15-CV-1576-AJB-RBB, 2016
21  WL 4087302, at *12 (S.D. Cal. Aug. 1, 2016).  Moreover, the cases cited by Defendants in support
    of their argument to dismiss Plaintiffs' UCL claim are inapposite.  *See* Network Defs.' Brf. at 23
22  (citing *Athena Feminine Techs. Inc. v. Wilkes*, No. C 10-04868 SBA, 2011 WL 4079927, at *9 (N.D.
    Cal. Sept. 13, 2011); *Coburn v. Bank of New York Mellon, N.A.*, No. 2:10-CV-03080 JAM-KJN,
23  2011 WL 1103470, at *5 (E.D. Cal. Mar. 22, 2011)).  Unlike in *Athena Feminine Techs.*, 2011 WL
    4079927, at *9, where plaintiff "fail[ed] to allege which prong or prongs of the UCL form[] the basis
24  of its claim," Plaintiffs here have specifically alleged an agreement in violation of all three prongs of
    the UCL.  ¶350.  And unlike in *Coburn*, where plaintiff only alleged "a conclusory statement devoid
25  of facts" and otherwise predicated her UCL claims on causes of action which were insufficiently
    pled, Plaintiffs here have adequately pled that Defendants conspired to the Liability Shift in violation
26  of federal and state antitrust laws, and otherwise provide sufficient detail about this conspiracy in
    Count VII to support a claim under California's UCL.  *See* ¶¶344-350; *Coburn*, 2011 WL 1103470,
27  at *5.

28

1    Plaintiffs cannot, nor do they, argue with the fact that by its express terms the FDUTPA does

2    not apply to "[b]anks or savings and loan associations regulated by federal agencies." Fla. Stat. Ann.

3    §501.212(4)(b) (West).  However, Defendants fail to inform the Court that this is not an absolute bar

4    to bringing FDUTPA claims against federally regulated banks if the activity in question falls outside

5    of the scope of the banks' regulated banking activities.  *See Christie v. Bank of Am., N.A.*, No. 8:13-

6    cv-1371-T-23TBM, 2014 WL 5285987, at *4 n.2 (M.D. Fla. Oct. 15, 2014) ("'Florida courts resolve

7    questions about the applicability of section 501.212(4) by looking to the activity that is the subject of

8    the lawsuit and determining whether the activity is subject to the regulatory authority of the

9    [governing agency].'").  Plaintiffs here have alleged facts supporting the conclusion that Defendants'

10   anticompetitive conduct is not regulated banking activity, and this further counsels against

11   dismissing Plaintiffs' FDUTPA claims.  *See* ¶71 n.6 ("[O]ther than contract law, there is virtually

12   nothing to regulate the relation between a merchant and an issuer, or a merchant card user and an

13   issuer.")[36]

14          **4.      Plaintiffs Have Adequately Pled Claims Under State Antitrust**
                       **Laws**
15

16          Defendants do not seriously contend that Plaintiffs' state antitrust law claims are

17   insufficiently pled, except to argue that these claims should fail if Plaintiffs have failed to plead a

18   claim under the Sherman Act; instead, Defendants try to whittle these claims away at the margins.

19   For example, Discover argues that "Plaintiffs' Cartwright Act claim against Discover . . . fails for the

20   independent reason that the only two named Plaintiffs associated with this claim – Monsieur Marcel

21   and rue21 – cannot proceed with claims against Discover in this Court."  Discover Brf. at 17-18.

22   Similarly, the Network Defendants argue that Plaintiffs cannot bring their California and New York

23   state law claims on behalf of a nationwide class.  Network Defs.' Brf. at 24.

24          Regarding the former, Discover is incorrect to say that only Monsieur Marcel and rue21 are

25   associated with Plaintiffs' Cartwright Act claim – on the contrary, Plaintiffs' Cartwright Act claim is

26   brought on behalf of all Plaintiffs.  *See* ¶¶293-302 (only referring to Plaintiffs generally, except to

---

[36]   Plaintiffs' FDUTPA claims against Discover should be upheld on the additional, independent
27   basis that Discover cannot claim that it is exempted from the statute because one of its subsidiaries
     may be.  *See Bowe v. Pub. Storage*, 106 F. Supp. 3d 1252, 1267 (S.D. Fla. 2015).
28

1    say that "[i]t is appropriate to bring this action under the Cartwright Act because . . . named plaintiff

2    Monsieur Marcel resides in California and named plaintiff rue21 has significant business operations

3    in the state").  Furthermore, Discover has not even tried to explain why the other named plaintiffs

4    could bring claims against it for violation of the Cartwright Act.  Accordingly, the Court should

5    allow Plaintiffs' Cartwright Act claim against Discover to proceed.

6         Regarding the latter, Defendants' reliance on *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581

7    (9th Cir. 2012), is misplaced.  *See* Network Defs.' Brf. at 24.  In *Mazza*, the court waited until class

8    certification to determine whether plaintiff could maintain a nationwide class under state consumer

9    protection laws.  666 F.3d at 587.  And the Court here should do the same.  *See Fenerjian v. Nong*

10   *Shim Co.*, No. 13-cv-04115-WHO, 2015 U.S. Dist. LEXIS 43258, at *17-*18 (N.D. Cal. Mar. 30,

11   2015) ("[w]hile it is sometimes appropriate to determine at the pleadings stage whether a plaintiff

12   can maintain a nationwide class under California law, this question is more appropriately addressed

13   here in connection with the class certification process").

14        **F.**     **The Complaint States a Claim for Unjust Enrichment**

15        Nothing has changed since Plaintiffs last opposed Defendants' motions to dismiss; just as

16   then, Plaintiffs now bring a claim for unjust enrichment under California law, which is proper under

17   the circumstances.  *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2012 U.S.

18   Dist. LEXIS 19955 (N.D. Cal. Feb. 15, 2012); *Sidibe v. Sutter Health*, No. C12-04854 LB, 2013

19   U.S. Dist. LEXIS 78521 (N.D. Cal. June 4, 2013); *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753

20   (9th Cir. 2015).

21        **G.**     **Leave to Amend and/or Discovery Should be Allowed**

22        Plaintiffs are mindful of the Court's admonition to plead their "best case."  Order at 1.

23   Plaintiffs fully believe they have done so – the Complaint is chock-full of facts all tending to

24   plausibly suggest Defendants have violated §1 of the Sherman Act and various state antitrust and

25   consumer protection statutes as well as being unjustly enriched at the expense of Plaintiffs.

26   However, as the Court has never held Plaintiffs have failed to state a claim, should the Court do so,

27   Plaintiffs here request leave to amend and to conduct limited discovery.  *Musical Instruments*, 798

28   F.3d at 1190 (noting discovery allowed at district court after the court granted leave to amend); *see*

1   *also AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006) ("Rule 15(a)

2   is very liberal and leave to amend 'shall be freely given when justice so requires.'") (quoting Fed. R.

3   Civ. P. 15(a)).

4   **III.   CONCLUSION**

5        This is not a Complaint void of specifics.  Rather, the Complaint is replete with details as to

6   all Defendants and provides compelling facts regarding relationships, motive, means, opportunity

7   and more than a plausible explanation of how these Defendants committed violations of the Sherman

8   Act and the state law claims pleaded in the Complaint.

9   DATED:  August 23, 2016           Respectfully submitted,

10            ROBBINS GELLER RUDMAN
               & DOWD LLP

11            PATRICK J. COUGHLIN
              DAVID W. MITCHELL

12            ALEXANDRA S. BERNAY
              CARMEN A. MEDICI

13            ANGEL P. LAU
              LONNIE A. BROWNE

14

15

16                s/ Patrick J. Coughlin
              PATRICK J. COUGHLIN

17            655 West Broadway, Suite 1900
              San Diego, CA  92101-8498

18            Telephone:  619/231-1058
              619/231-7423 (fax)

19

20            ROBBINS GELLER RUDMAN
               & DOWD LLP

21            ARMEN ZOHRABIAN
              Post Montgomery Center

22            One Montgomery Street, Suite 1800
              San Francisco, CA  94104

23            Telephone:  415/288-4545
              415/288-4534 (fax)

24            ROBBINS GELLER RUDMAN
               & DOWD LLP

25            RANDI D. BANDMAN
              120 East Palmetto Park Road, Suite 500

26            Boca Raton, FL  33432
              Telephone:  561/750-3000

27            561/750-3364 (fax)

28

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS - 3:16-cv-
01150-WHA                                                   - 41 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEVINE GOODMAN RASCO &
    WATTS-FITZGERALD, LLP
JOHN W. DEVINE
LAWRENCE D. GOODMAN
ROBERT J. KUNTZ, JR.
2800 Ponce De Leon Blvd., Suite 1400
Coral Gables, FL  33134
Telephone:  305/374-8200
305/374-8208 (fax)

Attorneys for Plaintiffs

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS - 3:16-cv-
01150-WHA                                                                                      - 42 -

1

<u>CERTIFICATE OF SERVICE</u>

2

    I hereby certify that on August 23, 2016, I authorized the electronic filing of the foregoing

3

with the Clerk of the Court using the CM/ECF system which will send notification of such filing to

4

the e-mail addresses denoted on the attached Electronic Mail Notice List.

5

    I certify under penalty of perjury under the laws of the United States of America that the

6

foregoing is true and correct.  Executed on August 23, 2016.

7

                              <u>s/ Patrick J. Coughlin</u>

8

                            PATRICK J. COUGHLIN

9

                            ROBBINS GELLER RUDMAN
                               & DOWD LLP

10

                            655 West Broadway, Suite 1900
                            San Diego, CA  92101-8498
                            Telephone:  619/231-1058

11

                            619/231-7423 (fax)
                            E-mail:  patc@rgrdlaw.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Mailing Information for a Case 3:16-cv-01150-WHA B & R Supermarket, Inc., et al v. Visa, Inc. et al**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Courtney Bedell Averbach**
  caverbach@reedsmith.com,courtney-averbach-3429@ecf.pacerpro.com,reed-smith-2312@ecf.pacerpro.com

- **Scott D. Baker**
  sbaker@reedsmith.com,cmosqueda@reedsmith.com,etaglang@reedsmith.com,cshanahan@reedsmith.com,scott-baker-8371@ecf.pacerpro.com,drothschild@reedsmith.com,cristi-shanahan-4367@ecf.pacerpro.com,reed-smith-2312@ecf.pacerpro.com

- **Randi D. Bandman**
  randib@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **John Eliot Beerbower**
  jbeerbower@hunton.com

- **Paul Belonick**
  pbelonick@sidley.com,sfefilingnotice@sidley.com,jhiwa@sidley.com,sfdocket@sidley.com

- **Craig A Benson**
  CBenson@paulweiss.com,wmcauliffe@paulweiss.com,mao_fednational@paulweiss.com

- **Jane Petersen Bentrott**
  jbentrott@mofo.com

- **Alexandra Senya Bernay**
  xanb@rgrdlaw.com,E_File_SD@rgrdlaw.com,jkusy@rgrdlaw.com,AZohrabian@rgrdlaw.com

- **Boris Bershteyn**
  boris.bershteyn@skadden.com

- **Daniel I Booker**
  dbooker@reedsmith.com,dalioto@reedsmith.com

- **Andrew Baldwin Brantingham**
  brantingham.andrew@dorsey.com,hanson.katheryn@dorsey.com

- **Lonnie Anthony Browne**
  LBrowne@rgrdlaw.com

- **Melissa Colon-Bosolet**
  mcolon-bosolet@sidley.com,nyefiling@sidley.com

- **Erica M Connolly**
  erica.connolly@aporter.com,terry.metasavage@aporter.com,sfcalendar@aporter.com

- **Dana Lynn Cook-Milligan**
  dlcook@winston.com

- **Patrick J. Coughlin**
  PatC@rgrdlaw.com,SusanM@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **John William Devine**
  jdevine@devinegoodman.com

- **William Yates Durbin**
  WDurbin@paulweiss.com,fvella@paulweiss.com,cyang@paulweiss.com,abaniel-stark@paulweiss.com

- **Howard Feller**
  hfeller@mcguirewoods.com

- **Tiffani B Figueroa**
  TFigueroa@mofo.com

- **Natalie Anne Fleming Nolen**
  nflemingnolen@mofo.com

- **Kenneth A. Gallo**
  kgallo@paulweiss.com,mlaramie@paulweiss.com

- **Cheryl Ann Galvin**
  cgalvin@tcolaw.com

- **Lawrence Dean Goodman**
  lgoodman@devinegoodman.com,alopez@devinegoodman.com,smallet@devinegoodman.com

- **David F. Graham**
  dgraham@sidley.com,efilingnotice@sidley.com

- **Peter E Greene**
  peter.greene@skadden.com

- **Alexander Guney**
  alexander.guney@sedgwicklaw.com

- **D. Bruce Hoffman**
  bhoffman@hunton.com,acordero@hunton.com

- **Peter K. Huston**
  phuston@sidley.com,jhiwa@sidley.com,sfdocket@sidley.com,hebalogi@sidley.com

- **Susan S. Joo**
  sjoo@hunton.com,jocampo@hunton.com

- **J. Brent Justus**
  bjustus@mcguirewoods.com

- **Raoul Dion Kennedy**
  raoul.kennedy@skadden.com,alissa.turnipseed@skadden.com,james.schaefer@skadden.com,sarah.wood@skadden.com

- **Leslie Kostyshak**
  lkostyshak@hunton.com,jbeerbower@hunton.com

- **Harry P Koulos**
  harry.koulos@skadden.com

- **Evan R Kreiner**
  evan.kreiner@skadden.com

- **Robert J Kuntz , Jr**
  rkuntz@devinegoodman.com,vcerra@devinegoodman.com

- **Mark P. Ladner**
  mladner@mofo.com,nflemingnolen@mofo.com,stice@mofo.com,docketny@mofo.com

- **Alexandra Eve Laks**
  alaks@mofo.com,ggerrish@mofo.com

- **Angel Puimei Lau**
  alau@rgrdlaw.com,tdevries@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Adrienne J Lighten**
  alighten@paulweiss.com

- **Richard Qiguang Liu**
  liu.richard@dorsey.com,buresh.cassie@dorsey.com

- **Casey Erin Lucier**
  clucier@mcguirewoods.com

- **Martha Corcoran Luemers**
  eFilingPA@dorsey.com,luemers.martha@dorsey.com,hobbs.wendy@dorsey.com

- **Michelle Ann Mantine**
  mmantine@reedsmith.com,michelle-mantine-7250@ecf.pacerpro.com,dsharp@reedsmith.com,docketingecf@reedsmith.com,reed-smith-2312@ecf.pacerpro.com,jeremy.feinstein@pnc.com,sament@reedsmith.com

- **Sharon D. Mayo**
  sharon.mayo@aporter.com,robert.culhane@aporter.com,Joanna.Lee@aporter.com,Emily.Clark@aporter.com,sfcalendar@aporter.com,Jill.Hernandez@aporter.com

- **Carmen Anthony Medici**
  cmedici@rgrdlaw.com,slandry@rgrdlaw.com,E_File_SD@rgrdlaw.com,ckopko@rgrdlaw.com

- **Sean D. Meenan**
  smeenan@winston.com,recordssf@winston.com,pacercourtfile@winston.com,mcourtney@winston.com,docketsf@winston.com

- **Mark R Merley**
  Mark.Merley@APORTER.COM

- **Michael B. Miller**
  mbmiller@mofo.com,docketny@mofo.com

- **David W. Mitchell**
  davidm@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Joseph Laurence Motto**
  JMotto@winston.com,ahodgson@winston.com

- **Dennis Francis Murphy**
  dennis.murphy@sedgwicklaw.com

- **Benjamin Robert Nagin**
  bnagin@sidley.com,nyefiling@sidley.com

- **Karen C Otto**
  karen.otto@aporter.com

- **Elizabeth P Papez**
  epapez@winston.com

- **Jeanifer Ellen Parsigian**
  jparsigian@winston.com,hhammon@winston.com,docketsf@winston.com

- **Angela Maryssa Porter**
  porter.angela@dorsey.com,vallant.tammy@dorsey.com

- **David Carlyle Powell**
  dpowell@mcguirewoods.com,ladocket@mcguirewoods.com,usdocket@mcguirewoods.com,shorne@mcguirewoods.com,izabala@mcguirewoods.com,mbetti@mcguirewoods.com,mdylak@mcguirewo

- **Penelope Athene Preovolos**
  ppreovolos@mofo.com,lroiz@mofo.com

- **Frederick Matthew Ralph**
  ralph.matthew@dorsey.com,fairbairn.mary@dorsey.com

- **Paul Jeffrey Riehle**
  paul.riehle@sedgwicklaw.com,SDMAcalendaring@sedgwicklaw.com,phyllis.flynn@sedgwicklaw.com

- **Lauren Kelley Ross**
  lross@cravath.com,mao@cravath.com

- **Conor Michael Shaffer**
  cshaffer@reedsmith.com

- **Ashley Lynn Shively**
  ashively@reedsmith.com,dkelley@reedsmith.com,ashley-shively-0536@ecf.pacerpro.com,david-kelley-8209@ecf.pacerpro.com,reed-smith-2312@ecf.pacerpro.com

- **Ryan A Shores**
  rshores@hunton.com,gjenkins@hunton.com

- **Robert Yale Sperling**
  rsperling@winston.com

- **Stephen E. Taylor**
  staylor@tcolaw.com,cdunbar@tcolaw.com

- **Robert John Vizas**
  robert.vizas@aporter.com,marie.zambrano@aporter.com,SFCalendar@aporter.com

- **Jamie Danielle Wells**
  jwells@mcguirewoods.com,ladocket@mcguirewoods.com,dmolakides@mcguirewoods.com

- **Rowan D. Wilson**
  rwilson@cravath.com,mao@cravath.com,kkaplan@cravath.com

- **Jennifer Michelle Wong**
  jennifer.wong@sidley.com,nyefiling@sidley.com

- **Catherine M Yang**
  CYang@paulweiss.com,mao_fednational@paulweiss.com

- **Armen Zohrabian**
  AZohrabian@rgrdlaw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)