**United States District Court**
For the Northern District of California

1

2

3

4

5

6                      IN THE UNITED STATES DISTRICT COURT

7

8                      FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   B & R SUPERMARKET, INC.; GROVE              No. C 16-01150 WHA
     LIQUORS, LLC,
11

12            Plaintiffs,

13      v.                                        **ORDER (1) GRANTING IN PART
                                                  AND DENYING IN PART
14   VISA, INC.; VISA USA, INC.; MASTERCARD       MOTIONS TO DISMISS; (2)
     INTERNATIONAL INCORPORATED;                  GRANTING IN PART AND
15   AMERICAN EXPRESS COMPANY;                     DENYING IN PART MOTION TO
     DISCOVER FINANCIAL SERVICES; BANK            INTERVENE; (3) DENYING AS
16   OF AMERICA, N.A.; CAPITAL ONE                 MOOT MOTION TO COMPEL
     FINANCIAL CORPORATION; CHASE BANK            ARBITRATION**
17   USA, NATIONAL ASSOCIATION; CITIBANK
     (SOUTH DAKOTA), N.A.; CITIBANK, N.A.;
18   PNC BANK, NATIONAL ASSOCIATION; U.S.
     BANK NATIONAL ASSOCIATION; WELLS
19   FARGO BANK, N.A.; and EMVCo, LLC,

20            Defendants.

21   _____/

22                              **INTRODUCTION**

23        In this putative class action for antitrust violations involving credit-card networks,

24   defendants move to dismiss an amended complaint, plaintiffs seek an order allowing new

25   plaintiffs to intervene, and one defendant moves to compel arbitration as to a would-be

26   intervenor. For the reasons stated herein, all of the motions are **GRANTED IN PART AND**

27   **DENIED IN PART** with the exception that the motion to compel arbitration is **DENIED AS MOOT**.

28

**STATEMENT**

Our plaintiffs, two Florida merchants, have sued all of the major credit-card networks and most of the major banks alleging a conspiracy to shift liability for fraudulent charges to merchants who failed to upgrade to EMV chip technology by October 1, 2015 — the so-called "Liability Shift."  The following well-pled facts are assumed to be true for the purposes of the present motions.

A typical credit card transaction can involve as many as four companies:  (1) a merchant; (2) an "acquiring bank," which provides card acceptance services to the merchant; (3) a payment card network; and (4) a card-issuing bank, which issues the card and maintains a line of credit (Amd. Compl. ¶ 61).  American Express Company transactions involve fewer companies as it operates as both a network and an issuer.[1]

Prior to the adoption of EMV chip technology, credit cards relied entirely on magnetic stripes, or "magstripes," which can communicate "static" information such as the card number and expiration date.  An EMV chip more efficiently guards against fraud because it transmits "dynamic" card information by creating a unique electronic signature for each transaction (*id.* ¶ 61).

Prior to October 1, 2015, card-issuing banks typically absorbed liability for fraudulent transactions, known as "chargebacks" (*id.* ¶¶ 3, 84), at least in the United States.  All that changed on October 1, 2015 (*id.* ¶ 2–3).  Starting on that date, if a customer presented an EMV chip card, but the merchant failed to use a certified EMV chip card reader to complete the transaction (and instead used the magstripe), the merchant became liable for any chargeback.[2]  This is the so-called Liability Shift.

In the United States, each of the networks implemented the Liability Shift effective on the same day through changes to their network rules, which govern card transactions within

---

[1] Discover Financial Services issues most (although not all) of its credit cards (*id.* ¶¶ 59, 61), and, as to these cards, it operates as the network and issuer.

[2] This lawsuit involves so-called "card present" transactions, as opposed to "card not present" transactions, like an online purchase (*id.* ¶ 63).

each network (*id.* ¶¶ 71, n.6, 75–76 (MasterCard); ¶¶ 77–78 (Visa); ¶¶ 79–80 (Discover); ¶ 81 (American Express)).

To avoid liability for fraudulent charges, the Liability Shift requires merchants to not only *install* EMV terminals but also *obtain certification* of proper operability of those EMV terminals. This has proven to be no small task (*id.* ¶ 82). Merchants have experienced lengthy waits for certification, and many are still waiting (*id.* ¶ 85–88). In addition, the networks themselves "control when — if ever — a merchant's system will be 'certified'" (*id.* at ¶ 84). "For millions of merchants, it is impossible to process EMV chip cards because their EMV chip-card capable systems, for which they paid $200 to $1000 per terminal, have not been 'certified' by Defendants" (*id.* ¶ 3).

In other words, a merchant could have had its EMV equipment completely installed and ready to go by October 1, 2015, but still be liable under the Liability Shift solely because the networks never got around to certifying the equipment.

Despite the challenges of installing and obtaining certification for EMV terminals, the network defendants did not, unlike in their rollouts elsewhere in the world, offer merchants in the United States any reduction of the interchange fee, the merchant discount fee, or the swipe fee (*id.* at ¶ 108).[3] After the filing of the instant action, Visa, MasterCard, and American Express "offered to forgo chargebacks of $25 or less" (*id.* ¶ 135).

The United States is not the first country to implement EMV technology. Financial institutions in Europe, Latin American, Asia/Pacific and Canada (including the networks sued here) migrated to EMV technology over the past decade (*id.* ¶ 99). The rollout of EMV technology in those countries took years to accomplish and ran into "substantial roadblocks" along the way. "For example, the roll out in Canada began in 2008, and as of 2014, the adoption rate was only at 59.5%, according to statistics provided by EMVCo itself" (*ibid.*).

In other countries, the networks implemented liability shifts related to the transition to EMV technology, but those liability shifts took place at staggered times, not on the same day as

_____

[3] Interchange fees or "swipe fees" are fees charged by the issuing bank to the merchant for accepting payment cards (*id.* ¶ 166, n.25).

United States District Court

For the Northern District of California

here (*id.* ¶ 100).  In addition, in some countries, unlike here, merchants were offered interchange fee concessions to help defray the costs of the liability shift or did not have to pay certain costs for EMV upgrades (*id.* ¶¶ 108, 109).  In Canada, some networks gave merchants a six-month extension for upgrading technology (*id.* at 112).

The gravamen of our amended complaint is a form of price-fixing, specifically that defendants Visa, Inc., Visa USA, Inc. (together "Visa"), MasterCard International Incorporated, American Express Company, and Discover Financial Services entered into an agreement to impose an important price term on all their merchant members by (i) adopting the same policy shift in liability for fraudulent charges; and (ii) making it effective on the same day for all four networks (so as to head off merchants from steering customers to use cards with more lenient terms).

To this end, plaintiffs allege that defendants had opportunities to conspire regarding the Liability Shift through EMVCo, LLC, the Smart Card Alliance, and the EMV Migration Forum:

- EMVCo, which is jointly owned by the network defendants and two other entities, is a company that develops and manages the technical standards by which EMV chip transactions are processed and maintained.  All decisions are made on a consensus basis among the member organizations (*id.* ¶ 38, 39).

- The Smart Card Alliance is an association that represents itself to be the "single industry voice for smart card technology, leading industry discussion on the impact and value of smart cards in the U.S. and Latin America" (*id.* ¶ 154).  Various network and issuing-bank defendants were on the leadership council, or were general or board members, of the Smart Card Alliance (*id.* ¶ 155).  In 2011, just prior to the announcements of the Liability Shift, the Smart Card Alliance hosted a meeting titled, "The Roadmap to EMV Payments and Secure ID."  The meeting included a panel titled, "What Will Trigger the US Payments Industry to Migrate to EMV

and What Model Will Emerge" (*id.* ¶ 156).  Executives from all of
the network defendants and nearly all of the issuing-bank
defendants attended this meeting (*id.* ¶ 156).

•   The Smart Card Alliance created the EMV Migration Forum.  All
of the network defendants and many of the issuing-bank defendants
are members of the EMV Migration Forum (*id.* ¶ 158).  A
September 2012 meeting of the EMV Migration Forum discussed,
among other matters, "What are payment brands doing to prepare
customers for EMV? How will merchants get ready to accept EMV
debit, credit and prepaid cards? What do issuers need to consider
before issuing EMV cards?"

Defendants faced "unique pressures" at the time of the decisions to implement the
Liability Shifts due to earlier litigation regarding former "anti-steering" rules imposed by the
networks, which network rules had prohibited merchants from steering customers to use certain
cards or from adding a surcharge for use of certain cards.  That litigation, which included an
action brought by the United States Department of Justice, left the networks facing an
"imminent threat" of losing their explicit anti-steering rules (*id.* ¶ 149).[4]  Moreover, a federal
law regarding anti-steering rules called the Durbin Amendment was enacted in 2010.  Under the
Durbin Amendment, networks could "no longer prohibit merchants from discounting their
cards," which allegedly translated to allowing merchants to steer customers (*id.* ¶¶ 148, 256).
Thus, at the time of the decisions to implement the Liability Shift, "the Networks knew
merchants would soon be allowed to push cardholder customers from expensive cards to less

---

[4] The networks faced public and private litigation regarding the anti-steering rules.  In one action, the
United States Department of Justice sued Visa, MasterCard, and American Express regarding certain
anti-steering rules.  In July of 2011, Visa and MasterCard entered into a consent decree that prohibited certain
anti-steering rules (*id.* ¶ 257).  American Express continued to litigate the action and the district court found
American Express liable for antitrust violations.  *United States v. American Express Co.*, No.
10-CV-4496-NGG-CLP (E.D.N.Y. Feb 19, 2015) (Judge Nicholas G. Garaufis).  The Second Circuit has since
reversed the decision of the district court.  *United States v. Am. Express Co.*, No. 15-1672, 2016 U.S. App.
LEXIS 17502 (2d Cir. Sept. 26, 2016).  The Second Circuit's reversal does not detract, however, from the
amended complaint's allegations that the anti-steering rules were under attack at the time of the decisions to
implement the Liability Shift.

United States District Court

For the Northern District of California

expensive forms of payment" (*id.* at 149). "Without the protection of the above anti-steering rules, the Networks knew merchants would steer away from their network if they alone implemented a Liability Shift" (*id.* ¶ 150). The easy way to eliminate the merchant incentive to steer was for all four networks to adopt the same liability shift at the same time.

In 2014, Charlie Scharf, the CEO of Visa Inc., made the following statement to analysts about how they worked together to implement the Liability Shift (*id.* ¶ 141):

> Historically, the way we would have done something is we would have decided what should be done, what was best and we would just say, okay, we are going to put a rule out. And literally people would get like the Visa memorandums saying they have decided that you need to move towards EMV by a certain date or else. And the approach that we have taken, and we have done this along with the other networks, is to try and get the – not to try – we have gotten the acquirers in a room, the merchants in a room, the issuers in a room, the trade groups in a room and we are all trying to work together towards getting much more specific about what we all want to get done by when so that we, the industry, define much more broadly than we ever defined it before is actually solving our own problems and making sure that our products are still the best products that exist out there.

At a May 2015 Fraud Summit, Krista Tedder of MasterCard made clear to attendees that "the card brands are not going to delay the liability shift date" (*id.* ¶ 120).

*          *          *

Two Florida merchants filed the amended complaint against four payment card networks, seven card-issuing banks, and the standards-setting entity EMVCo. The original named plaintiffs are B & R Supermarket, Inc. (doing business as Milam's Market) and Grove Liquors LLC. In a motion to intervene and amend, plaintiffs now seek to add three new plaintiffs: (1) rue21, a nationwide retailer with 49 stores in California; (2) Strouk Group LLC, doing business as Monsieur Marcel, a California restaurant and retail business; and (3) Fine Fare, which operates two full-service grocery stores in New York (*id.* ¶ 16–23). Plaintiffs seek to represent a class of merchants who have been "unlawfully subjected to the so-called Liability Shift" (*id.* ¶ 238).

The network defendants are Visa, MasterCard, American Express, and Discover. Visa and MasterCard were previously joint ventures of issuing banks. MasterCard completed its IPO in 2006, however, and Visa completed its IPO in 2008 (*id.* ¶¶ 274, 277).

6

Defendant EMVCo develops and manages the technical standards by which EMV chip transactions are processed and maintained.  EMVCo is owned in equal shares by American Express, MasterCard, Discover, Visa, and two nonparties, JCB Co. Ltd and UnionPay.[5]  All of EMVCo's decisions are made on a consensus basis among the member organizations (*id.* ¶¶ 38, 39).

The issuing-bank defendants are Bank of America, N.A.; Capital One Financial Corporation; Chase Bank USA, National Association; Citibank (South Dakota), N.A.; Citibank, N.A.; PNC Bank, National Association; U.S. Bank National Association; and Wells Fargo Bank, N.A.  Chase and U.S. Bank are technical and business Associates of EMVCo.  Bank of America has a joint venture that is a business associate of EMVCo.  All of the issuing-bank defendants are either acquiring banks themselves or their parent company or subsidiary operates an acquiring bank (*id.* ¶¶ 30–37).

\*                    \*                    \*

On March 8, 2016, plaintiffs filed a complaint alleging violations of the Sherman Act and the Cartwright Act, and claims for unjust enrichment.  Plaintiffs subsequently filed a motion to intervene to add rue21 and Monsieur Marcel as plaintiffs.  Defendants moved to dismiss and American Express moved to compel arbitration and to sever and transfer the claims against it to the Southern District of New York.

A hearing was held on defendants' motions on June 23, 2016.  An order gave plaintiffs leave to file an amended complaint, declined to add new plaintiffs at that time, and deemed the motions to dismiss moot (Dkt. No. 281).  A separate order granted American Express's motion to transfer the claims asserted by the named plaintiffs on the basis of a forum-selection clause (Dkt. No. 282).  American Express's motion to transfer with respect to the then-would-be intervening plaintiffs was denied without prejudice.

On July 15, 2016, plaintiffs filed an amended complaint and a motion to intervene seeking to add Monsieur Marcel, rue21, and Fine Fare as plaintiffs.  In addition to the claims

---

[5] The original complaint named JCB and UnionPay as defendants but plaintiffs subsequently voluntarily dismissed them from the action (Dkt. No. 265).

United States District Court

For the Northern District of California

1    under the Sherman Act, under the Cartwright Act, and for unjust enrichment, the amended

2    complaint also asserts claims under the Florida Antitrust Act, the Florida Deceptive and Unfair

3    Trade Practices Act, the New York Donnelly Act, and Sections 349 and 350 of the New York

4    General Business Law as well as a California Unfair Competition Law claim.

5           Defendants now move to dismiss and plaintiffs filed a motion to intervene seeking to

6    add new plaintiffs.  In addition, Discover moves to compel arbitration as to rue21.  This order

7    follows full briefing and oral argument.

**ANALYSIS**

9           **1.    MOTIONS TO DISMISS.**

10          To survive a motion to dismiss, a complaint must contain sufficient factual matter,

11   accepted as true, to state a claim for relief that is plausible on its face.  A claim is facially

12   plausible when there are sufficient factual allegations to draw a reasonable inference that the

13   defendant is liable for the conduct alleged.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

14          **A.    Sherman Act Claims.**

15          To state a claim under Section 1 of the Sherman Act, claimants must plead "not just

16   ultimate facts (such as a conspiracy), but evidentiary facts which, if true, will prove:  (1) a

17   contract, combination or conspiracy among two or more persons or distinct business entities; (2)

18   by which the persons or entities intended to harm or restrain trade or commerce among the

19   several States, or with foreign nations; (3) which actually injures competition."  *Kendall v. Visa*

20   *U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).

21          Under *Twombly*, parallel conduct — without more — "does not suggest conspiracy, and

22   a conclusory allegation of agreement at some unidentified point does not supply facts adequate

23   to show illegality."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007).  This is so even

24   where conduct is *consciously* parallel.  *Id.* at 557.  Rather, "[p]laintiffs must plead 'something

25   more,' 'some further factual enhancement,' a 'further circumstance pointing toward a meeting

26   of the minds' of the alleged conspirators."  *In re Musical Instruments & Equip. Antitrust Litig.*,

27   798 F.3d 1186, 1193 (9th Cir. 2015) (quoting *Twombly*).  Plaintiffs must allege sufficient facts

28

**United States District Court**
For the Northern District of California

8

United States District Court

For the Northern District of California

regarding the context of the parallel conduct to raise a suggestion of outright collusion. *Id.* at 1194.

Factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. 544, 545 (2007). The *Twombly* standard, however, does not impose a *probability* requirement at the pleading stage. Rather, "it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556.

Our court of appeals has provided guidance as to post-*Twombly* pleading standards for antitrust violations in *Kendall v. Visa U.S.A., Inc.* and *In re Musical Instruments*. In *Kendall*, our court of appeals made clear that under *Twombly*, a plaintiff must plead "not just ultimate facts (such as a conspiracy), but evidentiary facts." *Kendall,* 518 F.3d at 1047. In that case, the plaintiffs had alleged that card-issuing banks had "knowingly, intentionally and actively participated" in an alleged scheme to fix interchange and merchant discount fees. *Ibid.* Our court of appeals concluded this allegation was "nothing more than a conclusory statement" and that plaintiffs had not alleged facts to support such a conclusion. "[T]he complaint does not answer the basic questions: who, did what, to whom (or with whom), where, and when?" *Id.* at 1048.

In *In re Musical Instruments*, our court of appeals acknowledged that an antitrust violation can be pled through circumstantial evidence in the form of "certain 'plus factors,'" which help distinguish "permissible parallel conduct from impermissible conspiracy." *In re Musical Instruments,* 798 F.3d at 1194. Our court of appeals explained that "plus factors" are "economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *Ibid.* A court must "consider each purported plus factor in turn and cumulatively to determine whether plaintiffs have alleged nonconclusory facts sufficient to state a [Section 1] claim." *Ibid*.

### *(1)    Visa, MasterCard, and American Express.*

An impermissible conspiracy can be alleged through either direct or circumstantial evidence. *In re Musical Instruments*, 798 F.3d at 1193. Here, plaintiffs plead both direct and circumstantial evidence of a conspiracy as to Visa, MasterCard, and American Express.

United States District Court

For the Northern District of California

1    The statements by Charlie Scharf of Visa and Krista Tedder of MasterCard constitute

2    direct evidence of a conspiracy.  Ms. Tedder, a Vice President of MasterCard, stated:  "the card

3    brands are not going to delay the liability shift date" (Amd. Compl. ¶ 120).  Ms. Tedder could

4    not speak so confidently on behalf of *all* networks save and except for her knowledge of

5    collusion, for true competition would have driven one or more networks to break ranks and

6    offer more competitive terms.[6]

7    Charlie Scharf, CEO of Visa, began his statement (quoted above) with an explanation of

8    how decisions as to network rules are normally made:  "[h]istorically, the way we would have

9    done something is we would have decided what should be done, what was best and we would

10   just say, okay, we are going to put a rule out" (*id.* ¶ 141).  Mr. Scharf then explained that a

11   different approach — getting everyone "in a room" to "work together" — occurred with respect

12   to the Liability Shift:

> And the approach that we have taken, and we have done this along
> with the other networks, is to try and get the — not to try — we
> have gotten the acquirers in a room, the merchants in a room, the
> issuers in a room, the trade groups in a room and we are all trying
> to work together towards getting much more specific about what
> we all want to get done by when so that we, the industry, define
> much more broadly than we ever defined it before is actually
> solving our own problems and making sure that our products are
> still the best products that exist out there.

18   At our hearing, counsel for Visa pointed out that the context of the statement suggests

19   Mr. Scharf may have been referring to conduct that occurred *after* defendants had allegedly

20   entered into a conspiracy in 2011.  This timing argument ignores the value of the statement as to

21

───────────────

22   [6] At the hearing, counsel for MasterCard asserted that the statement was never made and that this point
could be proven by reference to the original statement. This point was not raised in the briefs but came up only
on the fly at oral argument.  Nevertheless, the Court allowed counsel to submit the original statement after the
hearing.  Counsel then filed a 46-page submission.  The amended complaint apparently bases its allegations on a
blog maintained by a financial services journalist who said "the card brands are not going to delay the liability
shift date, MasterCard's Tedder stressed."  This is very close to what was alleged in the amended complaint and
the Court finds no wrongdoing by plaintiffs in relying on this source.  In addition, the submission by
MasterCard asserts that a transcript of the panel discussion does not support the conclusory statement by the
blogger.  It is true that the transcript submitted suggests it is not as clear cut as the submitted statement suggests.
But it is a matter for evidence as to whether or not the transcript is the only source of information relied upon by
the blogger.  It is possible that the blogger could have spoken with Ms. Tedder before or after the panel
discussion.  The Court cannot simply take the network lawyer's word for the assertion that the transcript is the
sole source of the statement, at least at the Rule 12 stage.  Therefore, this entire follow-up has become an
exercise in futility, and the Court will not take judicial notice of the submitted evidentiary materials.

United States District Court

For the Northern District of California

1    establishing, at the very least, a *continuing* conspiracy.  From the statement, a jury could find

2    that defendants "got in a room" and fixed a common penalty effective on a common date.  More

3    to the point, his statement in 2014 looks like a CEO repeating what his reports said they had

4    done back in 2011 — get in a room and work together.  The timing difference hardly rescues

5    defendants, for all after-the-fact admissions involve such timing differences.

6        Defendants also argue that the presence of merchants "in the room" renders the alleged

7    conspiracy implausible.  Not really.  We would expect the giant retail chains to be involved in

8    the planning, for they would be the first to get certified.  Run-of-the-mill merchants, like our

9    plaintiffs, are the ones to suffer under the Liability Shift.

10        In addition, plaintiffs have also alleged certain "plus factors" that, when considered

11   cumulatively, nudge the alleged conspiracy from conceivable to plausible as to Visa,

12   MasterCard, and American Express.

13        *First*, the implementation of the Liability Shift in the United States departed from the

14   preexisting pattern elsewhere in the world.  When the networks had implemented liability shifts

15   in other countries, they unfolded quite differently from what later occurred in the United States.

16   Implementation was largely staggered in other countries, meaning no common effective date

17   (*id*. ¶ 100).[7]  Moreover, some of the networks offered certain accommodations in other

18   countries, by reducing interchange fees (*id.* ¶ 108), implementing gradual rollouts (*id.* ¶ 110),

19   and providing additional time within which to install EMV terminals (*id.* ¶ 112).  In the rest of

20   the world, the networks did not march in lockstep as they did here.  This order concludes that

21   the deviation from prior rollouts points a finger of plausible suspicion, and tends to show that

22   the lock-step rollout in the United States flowed from conspiracy, not parallel conduct.

23

24        *Second*, because of the then-impending demise of the networks' anti-steering rules, the

25   network defendants "knew merchants would steer away from their network if they alone

26   ────────────────

27        [7] Defendants point out that in the Asia/Pacific region and in the Middle East/Africa region Visa and
     MasterCard implemented a liability shift on the same days (*id.* ¶ 100).  The amended complaint, however,
28   alleges that "American Express implemented its liability shift policies internationally — if at all — on its own
     independent schedule and means" (*id.* ¶ 107).  Discover only implemented a liability shift in Mexico and
     Canada, and then on different dates than the other networks.  The four networks did not move uniformly abroad.

implemented a Liability Shift" (*id.* ¶ 150).  That is, if a single network went first with a Liability Shift, then merchants would simply steer customers to use cards unencumbered by the Liability Shift.  There was a clear common motive to conspire as to a uniform implementation of the Liability Shift, especially in light of the networks' pre-existing sensitivity to steering.

This order recognizes that common motive alone does not suggest an illegal agreement. *In re Musical Instruments*, 798 F.3d at 1194–5.  Our court of appeals has noted:  "[a]ny firm that believes that it could increase profits by raising prices has a motive to reach an advance agreement with its competitors."  The common motive alleged here, however, has been alleged in combination with other plus factors.  Moreover, the common motive alleged here is not akin to a garden-variety motive to increase profits.  The then-impending demise of the anti-steering rules threatened to introduce competition where none had existed.  The networks faced an altered economic landscape.  Colluding on a lock-step Liability Shift supplied an alternative attack on steering by eliminating any possible competition among the cards based on the Liability Shift.

Defendants argue that more benign reasons motivated imposition of the Liability Shift on the same timetable — promoting merchant convenience and avoiding merchant confusion and network vulnerability (Dkt. No. 321 at 4).  These arguments may convince a jury but they do not undo the plausibility of plaintiffs' proposition that the networks expressly agreed among themselves to impose the same penalty on the same day to head off steering.

*Third*, the absence of competitive behavior cuts in favor of plausibility.  All of the networks imposed the Liability Shift — despite the fact that any network who broke ranks would have benefitted from competition made possible with the demise of the anti-steering rules.  Moreover, none of the network defendants offered merchants any concession in the form of a reduced interchange fee or a delayed start date (*id.* ¶ 108, 119–120).  Visa, MasterCard, and American Express "offered to forgo chargebacks of $25 or less" only after the filing of the instant action, and even then in lockstep (only Discover declined to offer such a break) (*id.* ¶ 135).  Plaintiffs contend that "at least one of these entities would or should have broken ranks

United States District Court
For the Northern District of California

12

**United States District Court**
For the Northern District of California

and offered merchants a break on any number of terms" in a "truly competitive environment" is plausible (*id.* ¶ 9).  This inference is plausible.

Defendants contend that the amended complaint fails to allege that the benefit of breaking ranks outweighed the benefits of imposing the Liability Shift.  At the pleading stage, a plausible inference can be drawn that in a truly competitive environment one of the networks would have made at least minor concessions such as reductions to the interchange fees or a short delay in implementation of the Liability Shift, as took place in some of the other countries that implemented a liability shift.

*Fourth*, plaintiffs sufficiently allege that the networks had an opportunity to collude through EMVCo and the Smart Card Alliance.  Here, the networks jointly own EMVCo, which operates on a "consensus" basis (*id.* ¶ 152).  Moreover, network employees met with each other at a Smart Card Alliance conference, which was titled, "The Roadmap to EMV Payments and Secure ID" and which included a panel titled, "What Will Trigger the US Payments Industry to Migrate to EMV and What Model Will Emerge" (*id.* ¶ 156).  The amended complaint lists specific employees from each network who attended the conference (*ibid.*).

This order recognizes that mere participation in trade-organization meetings does not alone suggest an illegal agreement.  *In re Musical Instruments*, 798 F.3d at 1196.  The amended complaint here, however, alleges more than mere participation.  Combined with the other plus factors discussed herein, the allegations regarding opportunities to collude support the plausibility of the impermissible conspiracy alleged.

*                    *                    *

Considering these plus factors as a whole, together with the direct evidence, this order concludes that plaintiffs plausibly allege an impermissible conspiracy as to Visa, MasterCard, and American Express.  The amended complaint sufficiently alleges a context that raises a plausible and reasonable suggestion of collusion "in a room" rather than parallel conduct.  *In re Musical Instruments,* 798 F.3d at 1194.

Plaintiffs have sufficiently pled the basic evidentiary facts as to involvement in Visa, MasterCard, and American Express in the alleged conspiracy:  the "who, did what, to whom (or

13

United States District Court

For the Northern District of California

with whom), where, and when." *Kendall*, 518 F.3d at 1048.  Plaintiffs allege that the network defendants, through their executives, "got in a room," such as at the 2011 Smart Card Alliance meeting and 2012 EMV Migration Forum, and agreed to a uniform implementation of the Liability Shift (*id.* ¶¶ 139, 150).  The uniform implementation of the Liability Shift included an agreement to:  (1) apply the same penalty (the Liability Shift); (2) on the same date; and (3) with no concessions as to timing or incentives such as reductions to interchange fees (*id.* ¶¶ 108, 120).

For the reasons discussed herein, the motion to dismiss as to Visa, MasterCard, and American Express is **DENIED**.

### *(2)     Discover.*

This order concludes that plaintiffs have also sufficiently pled both direct and circumstantial evidence of a conspiracy as to Discover.

The statements by Charlie Scharf of Visa and Krista Tedder of MasterCard provide direct evidence of a conspiracy involving Discover.  Ms. Tedder stated that the "card brands" would not delay the Liability Shift.  In describing the efforts Visa had taken to get everyone in a room to work together, Mr. Scharf stated "we have done this along with the other networks." For now, these statements are plausibly suggestive of an impermissible conspiracy involving Discover.

All of the plus factors discussed above also apply to Discover except for one:  the comparison to the earlier rollout of liability shifts internationally.  As to that factor, Discover can be distinguished from the other networks.  Internationally, Discover implemented a liability shift in Canada and Mexico only, and in those two countries it implemented the liability shift on the same day as in the United States — October 1, 2015.  This plus factor therefore does not apply to Discover.

The other plus factors, however, also apply to Discover.  *First*, there was a common motive to conspire as to a uniform implementation of the Liability Shift given the impending demise of the anti-steering rules.  *Second*, Discover declined to offer concessions in the form of a reduced interchange fee or a delayed start date to compete for business (*id.* ¶ 108, 119–120).

14

This is so despite the roll-back of the anti-steering rules, which would have permitted merchants to steer customers to Discover had it offered concessions. *Third*, the amended complaint alleges Discover had opportunities to collude (like the other network defendants) through EMVCo, which it jointly owns, and Smart Card Alliance meetings in 2011 (*id.* ¶¶ 152, 156). This order concludes that these plus factors, when viewed cumulatively, and in tandem with the direct evidence of a conspiracy, plausibly allege an impermissible conspiracy involving Discover.

Unlike the other three, Discover claims it never had anti-steering rules and in fact had been a victim of steering. But this underscores all the more the anomaly of Discover marching in lockstep with the big three in implementing the liability shift. Put differently, the Liability Shift should have been a fine opportunity for Discover to delay its implementation of the Liability Shift — especially in light of extensive delays in certifications — and thereby reap a competitive windfall as merchants steered customers to Discover cards. That Discover turned its back on this opportunity is hard to explain and is suggestive of collusion.

Plaintiffs have sufficiently pled the basic evidentiary facts as to involvement by Discover in the alleged conspiracy: the "who, did what, to whom (or with whom), where, and when." *Kendall*, 518 F.3d at 1048. Plaintiffs allege that Discover, along with the other network defendants, through their executives, "got in a room," such as at the 2011 Smart Card Alliance meeting and 2012 EMV Migration Forum, and agreed to a uniform implementation of the Liability Shift (*id.* ¶¶ 139, 150). The uniform implementation of the Liability Shift included an agreement to: (1) apply the same penalty (the Liability Shift); (2) on the same date; and (3) with no concessions as to timing or incentives such as reductions to interchange fees (*id.* ¶¶ 108, 120).

Finally, all defendants but Discover have abandoned the argument that plaintiffs lack standing to seek damages under the indirect purchaser rule of *Illinois Brick*. This order concludes that *Illinois Brick* is not a bar to plaintiffs' claim for damages. The amended complaint alleges that all of the issuing-bank defendants are either acquiring banks themselves or related to an acquiring bank through a parent company or subsidiary (*id.* ¶¶ 30–37). This

United States District Court

For the Northern District of California

1    order concludes that plaintiffs have standing to seek damages because there is "no realistic

2    possibility that the direct purchaser will sue." *Freeman v. San Diego Ass'n of Realtors*, 322

3    F.3d 1133, 1145–46 (9th Cir. 2003).

4         For the reasons discussed herein, the motion to dismiss as to Discover is **DENIED**.

5                          *(3)     The Issuing-Bank Defendants.*

6         An analysis of the allegations against the issuing-bank defendants must begin with the

7    holding of our court of appeals that mere adoption of a network's rules by an issuing bank does

8    not amount to an impermissible conspiracy. *Kendall*, 518 F.3d at 1048. There, plaintiffs sued

9    Visa and MasterCard and various issuing banks alleging a conspiracy to set interchange and

10   merchant discount fees charged to merchants. Our court of appeals concluded that, as to the

11   issuing banks, "merely charging, adopting or following the fees set by a [network] is

12   insufficient as a matter of law to constitute a violation of Section 1 of the Sherman Act." *Ibid.*

13        As pled, the Liability Shift here was implemented through networks rules. Under

14   *Kendall*, plaintiffs must plead something more than mere adoption of network rules by the

15   issuing-bank defendants to plead an impermissible conspiracy. Plaintiffs attempt to do so

16   through two separate theories: (1) that the issuing-bank defendants continue to control Visa and

17   MasterCard post-IPO; and (2) that the network defendants and the issuing-bank defendants

18   expressly agreed to a *quid pro quo* arrangement related to the Liability Shift and the adoption of

19   chip-and-signature cards. For the reasons discussed below, both theories come up short. As a

20   result, the amended complaint fails to plead "the what" of the conspiracy as to the issuing-bank

21   defendants — what they agreed to do. *Kendall,* 518 F.3d at 1048 (holding a complaint

22   insufficient where it failed to plead "who, did what, to whom (or with whom), where, and

23   when").

24        *First*, plaintiffs' allegations that the issuing-bank defendants continue to control Visa

25   and MasterCard are vague and conclusory. As to MasterCard, plaintiffs concede that

26   MasterCard had an IPO in 2006, but allege that "the member banks each received a single

27   'Class M' share that allowed them to elect up to 25% of the post-IPO MasterCard board and

28   gave them veto power over certain of post-IPO MasterCard's decisions." Plaintiffs fail to

describe the specific veto power maintained by the member banks.  Moreover, as pled, this allegation pertains to ownership rights as of 2006, not at the time of the decisions related to the Liability Shift.  Even assuming this arrangement continued into 2011, this allegation fails to demonstrate control over MasterCard's decisions.

The allegations as to Visa are even more vague:

> On March 19, 2008, Visa completed its own IPO.  Under a series of transactions that culminated in the IPO, Visa U.S.A., Visa International, Visa Canada, and Inovant became subsidiaries of a Delaware corporation known as Visa Inc.  After the subsidiaries were unified in Visa Inc., the stock was acquired in the former members of each subsidiary.  Once the restructuring was completed, Visa Inc. conducted an IPO of over 400,000,000 shares of Class A common stock.  This process was essentially the acquisition by Visa Inc. of certain member banks' ownership rights in Visa through the redemption and reclassification of approximately 270 million shares of Visa stock previously held by the member banks in the form of Class B and Class C common stock.  Members of Visa U.S.A. acquired Class B common stock; other banks received Class C common stock.

From these allegations, it is not possible to determine exactly what kind of stake the member banks continued to maintain in Visa, or how they allegedly continued to exert control over Visa. This order concludes that the allegations do not support the inference that the issuing-bank defendants controlled Visa and MasterCard at the time of the decisions regarding the Liability Shift.

*Second*, plaintiffs' speculative assertion of a *quid pro quo* arrangement between the networks and banks also fails.  Plaintiffs allege that the issuing banks and the networks agreed to a *quid pro quo* arrangement wherein the banks received the benefit of the Liability Shift and the networks received the benefit of chip-and-signature cards, from which they accrued higher fees than chip-and-pin cards.  Such a quid-pro-quo arrangement assumes that the issuing-bank defendants controlled adoption of chip-and-signature cards.  But the complaint lacks details about the process for adopting one version of EMV cards over the other — and whether the issuing-bank defendants were in a position to control the adoption process.  This order concludes that the allegations do not support the inference of a *quid pro quo* arrangement.

Because the allegations fail to show that the issuing-bank defendants controlled the networks, most (although not all) of the plus factors either do not apply to the issuing-bank

United States District Court

For the Northern District of California

defendants or apply to a lesser extent.  Viewed as a whole, these plus factors fail to nudge the allegations as to the issuing-bank defendants from possible to plausible.

- *Departure from Rollouts Abroad.*  The amended complaint attributes the rollouts of the liability shifts here and abroad to the networks (*id.* ¶¶ 71, n.6, 75–81, 100).  Because the amended complaint fails to sufficiently allege the issuing-bank defendants controlled the networks, the departure from the pattern of rollouts abroad is not suggestive of a conspiracy as to the issuing-bank defendants.

- *Anti-Steering Rules.*  The anti-steering plus factor is present to some degree as to the issuing-bank defendants.  None of them issue American Express cards (*id.* ¶¶ 58, 59), and only a few issue Discover cards (*id.* ¶ 58).  The possibility of steering by merchants to American Express or Discover cards therefore arguably posed a threat to the issuing-bank defendants as well.  But this plus factor is not as strong against the banks as against the networks, who had more to lose from steering.

- *The Absence of Competitive Behavior.*  The amended complaint alleges that the Liability Shift was implemented through the network rules.  Thus, the amended complaint fails to allege sufficient facts to attribute the absence of competitive behavior to the issuing-bank defendants.

This order recognizes that the issuing-bank defendants benefitted from the Liability Shift since liability for chargebacks shifted away from them and onto the merchants.  This consideration cuts against the issuing-bank defendants.  Nevertheless, the amended complaint requires too much speculation to meet the *Twombly* test as to the issuing-bank defendants.  This order concludes that plaintiffs have not sufficiently alleged a conspiracy on the part of the

1    issuing-bank defendants.  The motion to dismiss as to the issuing-bank defendants is therefore

2    **GRANTED**.

3          Given, however, that the case will go forward against the network defendants, and given

4    that the issuing banks will be required to provide discovery (as nonparties), the possibility

5    remains that evidence will be developed to show complicity by the issuing banks such that a

6    motion to amend based on newly discovered evidence will be allowed.  Consequently, the

7    issuing-bank defendants must preserve evidence.

8                    *(4)    EMVCo.*

9          The allegations as to EMVCo are also sparse.  While the amended complaint includes

10   allegations that EMVCo was the means through which the conspiracy was accomplished, it

11   contains no specific allegations as to acts taken by EMVco, other than to allege that on its

12   website EMVCo denied participating in the Liability Shift after plaintiffs filed the instant action

13   (*id.* ¶ 153).  The other allegations describe EMVCo's role as a standard-setting entity.  The

14   Supreme Court has recognized, however, that trade associations often serve legitimate

15   functions.  *See Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563, 567 (1925).  The

16   allegations as to EMVCo fail to meet the *Twombly* test.  The motion to dismiss with respect to

17   EMVCo is therefore **GRANTED**.

18         Given that the case will go forward against the other defendants, and given that EMVCo

19   will be required to provide discovery (as a nonparty), the possibility remains that evidence will

20   be developed to show complicity by it such that a motion to amend based on newly discovered

21   evidence will be allowed.  Consequently, EMVCo must preserve evidence.

22             **B.    State Law Claims.**

23                 **1.    Cartwright Act Claims.**

24          Plaintiffs' second claim for relief arises under California's Cartwright Act, Cal. Bus. &

25   Prof. Code §§ 16700-16760.  The Cartwright Act was patterned after Section 1 of the Sherman

26   Act, and the pleading requirements under the two statutes are similar.  *See Dimidowich v. Bell

27   & Howell*, 803 F.2d 1473, 1476-77 (9th Cir.1986).  A "high degree of particularity" in the

28

United States District Court

For the Northern District of California

1  pleadings is required of a Cartwright claim.  *G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d 256, 265,

2  195 Cal. Rptr. 211 (Ct. App. 1983).

3        For the same reasons that plaintiffs' complaint sufficiently pleads an inference of

4  conspiracy under Section 1 as to the network defendants, plaintiffs' complaint pleads sufficient

5  facts to support a claim under the Cartwright Act.  The motions to dismiss plaintiffs' Cartwright

6  claim are therefore **DENIED**.

7                    **2.        Claim for Unjust Enrichment.**

8        Unjust enrichment is not a cause of action or even a remedy "but rather a general

9  principle, underlying various legal doctrines and remedies.  It is synonymous with restitution."

10  *McBride v. Boughton*, 123 Cal. App. 4th 379, 387 (2004).  At the remedy stage, restitution

11  would be a possible form of relief.  With the understanding that unjust enrichment is not a

12  standalone cause of action, the motions to dismiss the claim for unjust enrichment are **DENIED**.

13                    **3.        California's Unfair Competition Law.**

14        Plaintiffs allege violation of the unfair and unlawful prongs of Section 17200 of

15  California's Unfair Competition Law (UCL).  Because plaintiffs have sufficiently stated a claim

16  under the Sherman Act as to the network defendants, plaintiffs have also stated a claim under

17  the UCL's unfair and unlawful prongs.  The motions to dismiss plaintiffs' UCL claim are

18  **DENIED**.

19                    **4.        Florida State Law Claims.**

20        Because plaintiffs have sufficiently stated a claim under the Sherman Act as to the

21  network defendants, plaintiffs have also stated claims under the Florida Deceptive and Unfair

22  Trade Practices Act and the Florida Antitrust Act.  The motions to dismiss as to the Florida state

23  law claims are therefore **DENIED**.

24                    **5.        New York State Claims.**

25        Because plaintiffs have sufficiently stated a claim under the Sherman Act as to the

26  network defendants, plaintiffs have also stated a claim for violation of New York's Donnelly

27  Act.  The motions to dismiss as to the Donnelly Act claim are therefore **DENIED**.

28

United States District Court

For the Northern District of California

1    In contrast, the claims under Sections 349 and 350 of the New York General Business

2    Law fail because plaintiffs are businesses not consumers.  *In re Digital Music Antitrust Litig.*,

3    812 F. Supp. 2d 390, 410 (S.D.N.Y. 2011) ("[A]nticompetitive conduct that is not premised on

4    consumer deception is not within the ambit of the statute"); *see also Spirit Locker, Inc. v. EVO*

5    *Direct, LLC*, 696 F. Supp. 2d 296, 303 (E.D.N.Y. 2010) (dismissing claims where the plaintiff

6    failed "to meet the threshold requirement of consumer orientation").  The motions to dismiss as

7    to the claims under Sections 349 and 350 of the New York General Business Law are therefore

8    **GRANTED**.

9         **2.    MOTION TO INTERVENE.**

10   This order concludes that intervening plaintiffs are not entitled to intervention as a

11   matter of right because the named plaintiffs adequately represent the interests of the intervening

12   plaintiffs.  Therefore, intervening plaintiffs may be permitted to intervene — if at all — only

13   through Rule 24(b)'s provision for permissive intervention.

14   This order concludes that intervention as to Monsieur Marcel and Fine Fare is

15   appropriate but that intervention as to rue21 is duplicative and unduly complicated.  The motion

16   to intervene is **GRANTED** as to Monsieur Marcel and Fine Fare but **DENIED** as to rue21.[8]

17        **3.    MOTION TO COMPEL ARBITRATION.**

18   Discover moves to compel arbitration as to rue21.  Because the motion to intervene with

19   respect to rue21 is denied, the motion to compel arbitration as to rue21 is **DENIED AS MOOT**.

20                              **CONCLUSION**

21   For the reasons stated herein, all of the motions are **GRANTED IN PART AND DENIED IN**

22   **PART** with the exception that the motion to compel arbitration is **DENIED AS MOOT**.

23   Further, leave to amend will not be granted unless discovery shows liability by the

24   issuing-bank defendants or someone else.  The issuing-bank defendants and EMVCo, though

25

26

27

28   _____

[8] American Express objects to intervention by Monsieur Marcel on the basis of a forum-selection clause and arbitration agreement.  A prior order noted that any claims by Monsieur Marcel against American Express will likely be susceptible to a motion to transfer (Dkt. No. 282).

out of the case for now, are ordered to retain all emails, memorandums, text messages, or any other potential evidence relevant to the Liability Shift and the circumstances that led up to it.

**IT IS SO ORDERED.**

Dated:  September 30, 2016.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE