# EXHIBIT 2

ROBBINS GELLER RUDMAN
  & DOWD LLP
PATRICK J. COUGHLIN (111070)
DAVID W. MITCHELL (199706)
ALEXANDRA S. BERNAY (211068)
CARMEN A. MEDICI (248417)
ANGEL P. LAU (286196)
LONNIE A. BROWNE (293171)
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
patc@rgrdlaw.com
davidm@rgrdlaw.com
xanb@rgrdlaw.com
cmedici@rgrdlaw.com
alau@rgrdlaw.com
lbrowne@rgrdlaw.com

DEVINE GOODMAN RASCO &
  WATTS-FITZGERALD, LLP
JOHN W. DEVINE
LAWRENCE D. GOODMAN
ROBERT J. KUNTZ, JR.
2800 Ponce De Leon Blvd., Suite 1400
Coral Gables, FL 33134
Telephone: 305/374-8200
305/374-8208 (fax)
jdevine@devinegoodman.com
lgoodman@devinegoodman.com
rkuntz@devinegoodman.com

Attorneys for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| B & R SUPERMARKET, INC., d/b/a MILAM'S MARKET, a Florida corporation, et al., Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiffs,<br><br>     vs.<br><br>VISA, INC., a Delaware corporation, et al.,<br><br>                    Defendants. | Case No. 3:16-cv-01150-WHA<br><br>CLASS ACTION<br><br>PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS DIRECTED TO ALL DEFENDANTS |

1194345_1

TO: DEFENDANTS AND THEIR ATTORNEYS OF RECORD

Plaintiffs, by their counsel, pursuant to Federal Rules of Civil Procedure 26 and 34, request that defendants Visa, Inc. and Visa USA, Inc. (collectively, "Visa"), MasterCard International Incorporated ("MasterCard"), American Express Company ("American Express") and Discover Financial Services ("Discover") (collectively, the "Networks") produce all documents in their possession, custody or control that are responsive to each of the requests enumerated in Section VI, "Documents Requested," pursuant to the "Definitions" and "Instructions" set forth in Sections I-II. All documents responsive to the requests enumerated in Section VI shall be produced to the undersigned counsel, or at such other location as is mutually acceptable to the parties, by the time prescribed, or at such other time and place as the parties mutually agree.

The responding parties are required to produce all requested documents that are in their actual or constructive possession, custody or control, or in the actual or constructive possession, custody or control of their officers, employees, agents, representatives or attorneys. The responding parties shall produce said documents as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request.

Plaintiffs request that such production be made in accordance with the "Definitions" and "Instructions" set forth below.

**I.   DEFINITIONS**

This Section sets forth specific definitions applicable to certain words and terms used herein. Unless words or terms have been given a specific definition in this Section or in a specific request, each word or term shall be given its usual and customary dictionary definition, except where a word or term has a specific customary and usage definition in your trade and industry. In that case, the word or term shall be interpreted in accordance with the specific customary and usage definition.

1. "Acquiring Bank" or "Acquirer" means a member of Visa and/or MasterCard that acquires payment transactions from Merchants and acts as a liaison between the Merchant, the Issuing Bank, and the Payment-Card Network to assist in processing the payment transaction. Visa and MasterCard Rules require that an Acquiring Bank be a party to every Merchant contract.

1   2.      "American Express" means American Express Company, and any of American Express Company's predecessors, successors, parents, subsidiaries, affiliates, segments, divisions, operating units or business lines (foreign and domestic), any of their present or former officers, directors, administrators, agents, employees, investigators, accountants, attorneys and all other persons acting or purporting to act on their behalf.

3.      "And" and "or" are terms of inclusion and not of exclusion, and shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these documents that might otherwise be construed to be outside its scope.

4.      "Any" means one or more.

5.      "BOA" means Bank of America, N.A. , and any of Bank of America, N.A.'s predecessors, successors, parents, subsidiaries, affiliates, segments, divisions, operating units or business lines (foreign and domestic), any of their present or former officers, directors, administrators, agents, employees, investigators, accountants, attorneys and all other persons acting or purporting to act on their behalf.

6.      "Capital One" means Capital One Financial Corporation, and any of Capital One Financial Corporation's predecessors, successors, parents, subsidiaries, affiliates, segments, divisions, operating units or business lines (foreign and domestic), any of their present or former officers, directors, administrators, agents, employees, investigators, accountants, attorneys and all other persons acting or purporting to act on their behalf.

7.      "Certification" refers to the requirements and process wherein Merchants seek to obtain approval such that EMV equipment, including hardware and software, used to process or accept EMV Chip Cards, e.g., point of sales ("POS") terminal, is deemed to comply with the various standards, specifications or requirements of the EMV payment system, including EMV Specifications, testing requirements, Brand certifications, PIN pad certifications, Acquirer certifications, Retail certifications, as well any other required certifications.

8.      "Chargeback" refers to a fraudulent, faulty or otherwise rejected consumer Credit Card or Charge Card transaction, which historically, was borne by the issuers, and only rarely by the Merchants.

9. "Chargeback Fee" refers to the amount in addition to the actual fraudulent charge, that is charged to a Merchant for fraudulent, faulty or otherwise rejected consumer Credit Card or Charge Card transaction.

10. "Charge Card" means a payment card that enables the holder to purchase goods and services on credit to be paid on behalf of the holder by the Issuer of the Charge Card.  Charge Cards typically do not come with a line of credit or allow the Cardholder to carry a balance.  Instead, Charge Cards typically require payment of the full amount charged each month, for all payments made on behalf of the Cardholder by the issuer during the preceding month.  The issuer typically does not extend credit to the holder beyond the date of the monthly statement, nor does it impose interest charges on the balance due except as a penalty for late payment.  Examples of Charge Cards are the American Express Green, Gold, Platinum, and Centurion cards as well as the Diners Club and Carte Blanche cards issued by Citibank.

11. "Chase" means Chase Bank USA, National Association, and any of Chase Bank USA, National Association's predecessors, successors, parents, subsidiaries, affiliates, segments, divisions, operating units or business lines (foreign and domestic), any of their present or former officers, directors, administrators, agents, employees, investigators, accountants, attorneys and all other persons acting or purporting to act on their behalf.

12. "Citibank (South Dakota), N.A." means Citibank (South Dakota), N.A., and any of Citibank (South Dakota), N.A.'s predecessors, successors, parents, subsidiaries, affiliates, segments, divisions, operating units or business lines (foreign and domestic), any of their present or former officers, directors, administrators, agents, employees, investigators, accountants, attorneys and all other persons acting or purporting to act on their behalf.

13. "Citibank, N.A." means Citibank, N.A., and any of Citibank, N.A.'s predecessors, successors, parents, subsidiaries, affiliates, segments, divisions, operating units or business lines (foreign and domestic), any of their present or former officers, directors, administrators, agents, employees, investigators, accountants, attorneys and all other persons acting or purporting to act on their behalf.

14. "Class Members" mean the members of the class defined in Plaintiffs' Amended Complaint for Violations of the Sherman Antitrust Act, the Clayton Antitrust Act, California's Cartwright Act, New York's Donnelly Act, Florida's Antitrust and Unfair Trade Practices Acts, and Unjust Enrichment, filed on July 15, 2016, in the Northern District of California, San Francisco Division. Dkt. No. 291, Complaint, ¶25.

15. "Communication" or "communications" refers to any exchange of information by any means of transmission. The term "communication" also includes, without limitation, all inquiries, discussions, conversations, correspondence, negotiations, agreements, understandings, meetings, notices, requests, responses, demands, complaints or press, publicity or trade releases.

16. "Concerns," "concerning," "regarding" and "relating to" mean consisting of, discussing, describing, evidencing, referring to, constituting, comprising, containing, setting forth, showing, disclosing, explaining, summarizing, pertaining to, memorializing, reflecting or otherwise having any logical or factual connection to the subject matter of the document request.

17. "Credit Card" means a card has a revolving line of credit enabling cardholders to spend out of the line of credit by using the credit card. Typically, cardholders have to pay a minimum payment – but are not required to pay the full amount owed – each month, and if the cardholder does not pay off the statement balance, he or she pays interest each month on the unpaid balance of the expended line of credit.

18. "Defendants" means Visa, Inc. and Visa USA, Inc. (collectively, "Visa"), MasterCard, American Express and Discover (also referred to as the "Networks"), and any of Defendants' predecessors, successors, parents, subsidiaries, affiliates, segments, divisions, operating units or business lines (foreign and domestic), any of their present or former officers, directors, administrators, agents, employees, investigators, accountants, attorneys and all other persons acting or purporting to act on their behalf.

19. "Discover" means Discover Financial Services, and any of Discover Financial Services's predecessors, successors, parents, subsidiaries, affiliates, segments, divisions, operating units or business lines (foreign and domestic), any of their present or former officers, directors,

1  administrators, agents, employees, investigators, accountants, attorneys and all other persons acting
2  or purporting to act on their behalf.

3　　　20.　"Document" and "documents" are used in the broadest possible sense and include all
4  "writings" and "recordings" as those terms are defined in Rule 1001 of the Federal Rules of
5  Evidence and Rule 34 of the Federal Rules of Civil Procedure. A draft or non-identical copy is a
6  separate document within the meaning of this term.

7　　　21.　"EMVCo" means EMVCo, LLC, and any of EMVCo, LLC's predecessors,
8  successors, parents, subsidiaries, affiliates, segments, divisions, operating units or business lines
9  (foreign and domestic), any of their present or former officers, directors, administrators, agents,
10  employees, investigators, accountants, attorneys and all other persons acting or purporting to act on
11  their behalf. EMVCo refers to the Delaware limited liability company overseen by, *inter alia*, the
12  Networks.

13　　　22.　"EMV Card" or "Chip Card" means a payment card, including a Credit Card or
14  Charge Card containing an EMV Chip. There are two kinds of EMV Cards: (1) "chip-and-PIN"
15  (personal identification number) cards, where the transaction is authorized by the Merchant
16  processing the Chip Card and the consumer entering a PIN, and (2) "chip-and-signature" cards,
17  where the Merchant processes the chip and the consumer signs an electronic signature pad.

18　　　23.　"EMV Chip" means an electronic chip or micro-processor embedded onto a Credit
19  Card or Charge Card. EMV chips are typically dynamic, typically containing data that can be acted
20  on, altered or updated. An EMV chip may also be used to create unique electronic signatures on a
21  per transaction basis.

22　　　24.　"EMV Standard" refers to the specifications, test procedures and compliance
23  processes managed by EMVCo.

24　　　25.　"General Purchase Cards" refers to Credit Cards and Charge Cards.

25　　　26.　"Governmental Entity" means any governmental, administrative, or regulatory body
26  or agency (or division, committee, or member thereof) in the United States, or any of the states,
27  counties or municipalities that constitute it.

28

27. "Issuing Bank" or "Issuer" means a bank that issues the Credit Card to the customer and which carries the line of credit represented by the Credit Card, including, but not limited to, BOA, Capital One, Chase, Citibank (South Dakota), N.A., Citibank, N.A., PNC, US Bank and Wells Fargo.

28. "JCB" means JCB Co. Ltd, and any of JCB Co. Ltd's predecessors, successors, parents, subsidiaries, affiliates, segments, divisions, operating units or business lines (foreign and domestic), any of their present or former officers, directors, administrators, agents, employees, investigators, accountants, attorneys and all other persons acting or purporting to act on their behalf.

29. "Liability Shift" refers to the change in the system for handling Chargebacks for card present transactions wherein Issuing Banks and Networks decreed that as of October 1, 2015, liability for card present Chargebacks would shift from Issuing Banks to Merchants, unless the Merchants could satisfy certain condition.

30. "MasterCard" means MasterCard International Incorporated, and any of MasterCard International Incorporated's predecessors, successors, parents, subsidiaries, affiliates, segments, divisions, operating units or business lines (foreign and domestic), any of their present or former officers, directors, administrators, agents, employees, investigators, accountants, attorneys and all other persons acting or purporting to act on their behalf.

31. "Meetings" refers to the contemporaneous presence of any natural persons (including by telephone or other electronic means) for any purpose, and whether or not the meeting was formal or informal or occurred in connection with some other activity.

32. "Merchant" means a person or business eligible to accept a Charge Card or Credit Card for goods or services.

33. "Merchant Discount Fee" means the fee or amount of money the Acquiring Bank withholds for its processing services.

34. "Networks" or "Network Defendants" means the networks operated by Visa, MasterCard, American Express and Discover.

35. "Parties" as well as a party's full or abbreviated name or a pronoun referring to a party mean the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries or affiliates.

36. "Person" or "persons" means natural persons, proprietorships, governmental agencies, corporations, partnerships, trusts, joint ventures, groups, associations, organizations and all other entities or agencies.

37. "Plaintiffs" means B&R Supermarket, Inc., Grove Liquors LLC, Strouk Group LLC, Palero Food Corp., and Cagueyes Food Corp., individually and on behalf of all others similarly situated (collectively, the "Class").

38. "PNC" means PNC Bank, National Association, and any of PNC Bank, National Association's predecessors, successors, parents, subsidiaries, affiliates, segments, divisions, operating units or business lines (foreign and domestic), any of their present or former officers, directors, administrators, agents, employees, investigators, accountants, attorneys and all other persons acting or purporting to act on their behalf.

39. "Practice or Procedure" as used herein means any rule, policy, directive, program, custom or course of conduct, whether formal or informal, written or unwritten, recorded or unrecorded.

40. "Third-Party Processor" is a service provider or firm, other than a Network Defendant, that performs the authorization, clearing, and settlement functions of Charge Card transaction on behalf of Merchants or other entities. Examples of Third-Party Processors include First Data.

41. "UnionPay" means UnionPay, and any of UnionPay's predecessors, successors, parents, subsidiaries, affiliates, segments, divisions, operating units or business lines (foreign and domestic), any of their present or former officers, directors, administrators, agents, employees, investigators, accountants, attorneys and all other persons acting or purporting to act on their behalf.

42. "USAA" means USAA Savings Bank, and any of USAA Savings Bank's predecessors, successors, parents, subsidiaries, affiliates, segments, divisions, operating units or business lines (foreign and domestic), any of their present or former officers, directors,

administrators, agents, employees, investigators, accountants, attorneys and all other persons acting or purporting to act on their behalf.

43. "US Bank" means U.S. Bancorp National Association, and any of U.S. Bancorp National Association 's predecessors, successors, parents, subsidiaries, affiliates, segments, divisions, operating units or business lines (foreign and domestic), any of their present or former officers, directors, administrators, agents, employees, investigators, accountants, attorneys and all other persons acting or purporting to act on their behalf.

44. "Visa" or "Defendant" means Visa, Inc. and Visa USA, Inc.

45. "Visa, Inc." means Visa, Inc. and any of Visa, Inc.'s predecessors, successors, parents, subsidiaries, affiliates, segments, divisions, operating units or business lines (foreign and domestic), any of their present or former officers, directors, administrators, agents, employees, investigators, accountants, attorneys and all other persons acting or purporting to act on their behalf.

46. "Visa USA, Inc." means Visa USA, Inc. and any of Visa USA, Inc.'s predecessors, successors, parents, subsidiaries, affiliates, segments, divisions, operating units or business lines (foreign and domestic), any of their present or former officers, directors, administrators, agents, employees, investigators, accountants, attorneys and all other persons acting or purporting to act on their behalf.

47. "Wells Fargo" means Wells Fargo Bank, N.A., and any of Wells Fargo Bank, N.A. 's predecessors, successors, parents, subsidiaries, affiliates, segments, divisions, operating units or business lines (foreign and domestic), any of their present or former officers, directors, administrators, agents, employees, investigators, accountants, attorneys and all other persons acting or purporting to act on their behalf.

48. "You" and "your" refer to the person responding to these Requests.

## II. INSTRUCTIONS

1. All documents shall be produced as they are maintained in the ordinary course of business, and shall be produced in their original folders, binders, covers or containers, or facsimile thereof, *i.e.*, documents maintained electronically shall be produced in the manner in which such documents are stored and retrieved.

2.  In responding to these Requests, you shall produce all responsive documents (including those stored electronically), which are in your possession, custody or control, or in the possession, custody or control of your predecessors, successors, parents, subsidiaries, divisions or affiliates, or any of your respective directors, officers, managing agents, agents, employees, attorneys, accountants or other representatives. A document shall be deemed to be within your control if you have the right to secure the document or a copy of the document from another person having possession or custody of the document.

3.  Pursuant to the Federal Rules of Civil Procedure, you are to produce original documents, including those stored electronically, as they are kept in the usual course of business. If the original is not in your custody, then a copy thereof, and all non-identical copies which differ from the original or from the other copies produced for any reason, including, without limitation, the making of notes thereon.

4.  To the extent that there are documents containing information relevant to these Requests that are currently in electronic format, the documents are to be produced in their native format.

5.  Privilege logs shall be promptly provided and must be sufficiently detailed and informative to justify the privilege. No generalized claims of privilege or work-product protection shall be permitted. With respect to each communication for which a claim of privilege or work product is made, the asserting party must at the time of assertion identify:

   (a)   all persons making or receiving the privileged or protected communication;
   (b)   the steps taken to ensure the confidentiality of the communication, including affirmation that no unauthorized persons have received the communication;
   (c)   the date of the communication; and
   (d)   the subject matter of the communication.

6.  The log should also indicate, as stated above, the location where the document was found.

7.    If a portion of any document responsive to these Requests is withheld under claim of privilege pursuant to Instruction No. 5, any non-privileged portion of such document must be produced with the portion claimed to be privileged redacted.

8.    You are to produce each document requested herein in its entirety, without deletion or excision (except as qualified by Instructions Nos. 5 and 6 above), regardless of whether you consider the entire document to be relevant or responsive to the Requests.

9.    Whenever a document is not produced in full or is produced in redacted form, so indicate on the document and state with particularity the reason or reasons it is not being produced in full, and describe to the best of your knowledge, information and belief, and with as much particularity as possible, those portions of the document which are not being produced.

10.    If a document responsive to these Requests was at any time in your possession, custody or control but is no longer available for production, as to each such document state the following information:

    (a)    Whether the document is missing or lost;

    (b)    Whether it has been destroyed;

    (c)    Whether the document has been transferred or delivered to another person, and, if so, at whose request;

    (d)    Whether the document has been otherwise disposed of; and

    (e)    A precise statement of the circumstances surrounding the disposition of the document and the date of its disposition.

11.    If you believe it would be unduly burdensome to respond to any individual request or request subpart, please send a letter to the undersigned counsel specifying the reasons why the request is unduly burdensome and stating all information or knowledge you have of the information or documents sought by the request, and an attempt will be made, if possible, to rephrase or limit the request or request subpart in a reply letter to lessen your burden of compliance. Any such reply letter may be treated by the parties to whom it is addressed as a modification of the request or request subpart addressed by your letter.

1  12. If you believe that any individual request is ambiguous in any way, you may send a letter to the undersigned counsel describing the ambiguity, and a reply letter clarifying the ambiguity will be promptly sent to you. Any such reply letter may be treated by the parties to whom it is addressed as a modification of the request or request subpart addressed by your letter.

13. References to specific paragraphs of plaintiffs' Complaint are denoted by "¶__" or "¶¶__." The references are provided solely as a convenience – to assist you in understanding the relevance or the types of documents sought – and are not intended to, and do not, narrow or otherwise limit the scope of the request.

14. A request to produce "all documents" means you must produce every non-identical document responsive to the subject matter of the request. A request to produce "documents sufficient to" identify or describe certain facts means you may select which documents to produce in response to the request so long as you reasonably believe they include all of the information relating to the subject matter of the request that would be reflected in all of the documents responsive to the request. In lieu of producing "documents sufficient to" identify or describe certain facts, you may produce "all documents" relating to the subject matter of the request. In that event, you should state that you have produced "all documents" relating to the request in your written response to these requests.

15. Provide a source list that clearly identifies who maintained the document and the location from where it was collected.

16. If no document responsive to a request exists, or if the only documents responsive to a request are not within your possession, custody or control, please so state in your written response to the request.

## III. PRODUCTION OF HARD COPY DOCUMENTS

### A. Format

Hardcopy documents should be scanned as single-page, Group IV, 300 DPI TIFF images with an .opt image cross reference file and a delimited database load file (*i.e.*, .dat). The database load file should contain the following fields: "BEGNO", "ENDNO", "PAGES", "VOLUME" and "CUSTODIAN." The documents should be logically unitized (*i.e.*, distinct documents shall not be

1 merged into a single record, and single documents shall not be split into multiple records) and be
2 produced in the order in which they are kept in the usual course of business. If an original document
3 contains color to understand the meaning or content of the document, the document shall be
4 produced as single-page, **300 DPI JPG images with JPG compression and a high quality setting**
5 **as to not degrade the original image**. Multi-page OCR text for each document should also be
6 provided. The OCR software shall maximize text quality over process speed. Settings such as
7 "auto-skewing" and "auto-rotation" should be turned on during the OCR process.

**IV.  PRODUCTION OF ESI**

   **A.   Format**

10 The parties will produce ESI in single-page, black and white, TIFF Group IV, 300 DPI TIFF
11 images with the exception of spreadsheet type files, source code, audio, and video files, which shall
12 be produced in native format. TIFFS will show any and all text and images which would be visible
13 to the reader using the native software that created the document. For example, TIFFS of email
14 messages should include the BCC line. PowerPoint documents shall be processed with hidden slides
15 and all speaker notes unhidden, and shall be processed to show both the slide and the speaker's notes
16 on the TIFF image. If an original document contains color, the document should be produced as
17 **single-page, 300 DPI JPG images with JPG compression and a high quality setting as to not**
18 **degrade the original image**. Parties are under no obligation to enhance an image beyond how it
19 was kept in the usual course of business.

20 If a document is produced in native, a single page bates stamped image slip-sheet stating the
21 document has been produced in native format will also be provided. Each native file should be
22 named according to the Bates number it has been assigned, and should be linked directly to its
23 corresponding record in the load file using the NATIVELINK field. To the extent that either party
24 believes that specific documents or classes of documents, not already identified within this protocol,
25 should be produced in native format, the parties agree to meet and confer in good faith.

   **B.   De-Duplication**

27 Each party shall remove exact duplicate documents based on MD5 or SHA-1 hash values, at
28 the family level. Attachments should not be eliminated as duplicates for purposes of production,

unless the parent email and all attachments are also duplicates. Parties agree that an email that includes content in the BCC or other blind copy field shall not be treated as a duplicate of an email that does not include content in the content in those fields, even if all remaining content in the email is identical. Removal of near-duplicate documents and email thread suppression are not acceptable. De-duplication will be done across the entire collection (global de-duplication) and the Custodian field will list each Custodian, separated by a semi-colon, who was a source of that document. Should the custodian metadata field produced become outdated due to rolling productions, an overlay file providing all the custodians for the affected documents will be produced prior to substantial completion of the document production.

### C. Technology Assisted Review

No party shall use predictive coding or technology-assisted-review for the purpose of culling the documents to be reviewed or produced without written consent of the opposing party or an order from the Court. If written consent of the opposing party or a Court Order permitting the use of predictive coding or technology-assisted-review is obtained, the parties agree to negotiate a separate mutually agreeable protocol for the use of such technologies.

### D. Metadata

All ESI will be produced with a delimited, database load file that contains the metadata fields listed in Table 1, attached hereto. The metadata produced should have the correct encoding to enable preservation of the documents' original language.

### E. Embedded Objects

The parties agree to meet and confer over the inclusion or exclusion of embedded files from the production.

### F. Compressed Files Types

Compressed file types (*i.e.*, .ZIP, .RAR, .CAB, .Z) should be decompressed so that the lowest level document or file is extracted.

### G. Structured Data

To the extent a response to discovery requires production of electronic information stored in a database, the parties will discuss methods of production best providing all relevant information,

1  including but not limited to duplication of databases or limited access for the purpose of generating
2  reports.  Parties will consider whether all relevant information may be provided by querying the
3  database for discoverable information and generating a report in a reasonably usable and exportable
4  electronic file.  A document reference sheet shall be provided to describe the purpose of the database
5  and meaning of all tables and column headers produced.

### H.   Exception Report

The producing party shall compile an exception report enumerating any unprocessed or unprocessable documents, their file type and the file location.

### I.   Encryption

To maximize the security of information in transit, any media on which documents are produced may be encrypted.  In such cases, the producing party shall transmit the encryption key or password to the receiving party, under separate cover, contemporaneously with sending the encrypted media.

### J.   Redactions

If documents that the parties have agreed to produce in native format need to be redacted, the parties will meet and confer regarding how to implement redactions while ensuring that proper formatting and usability are maintained.

## V.   RELEVANT TIME PERIOD

Except as otherwise specified, each document request concerns the time period from January 1, 2011 through the present (the "Relevant Time Period").  In responding to the Requests, you must produce all documents created, dated, prepared, drafted, generated, modified, sent, provided, obtained, used, or received during the Relevant Time Period, or the time period otherwise specified by the request, that are responsive, in whole or in part, to the subject matter of the request, and all responsive documents created before or after the Relevant Time Period, or the time period otherwise specified by the request, that relate, in whole or in part, to facts, transactions, events, or occurrence taking place, or anticipated to take place, during the Relevant Time Period or the time period otherwise specified by the request.

## VI. DOCUMENTS REQUESTED

REQUEST FOR PRODUCTION NO. 12:

Transaction-level data reflecting each Chargeback incurred from October 1, 2012 to the present. This information includes data sufficient to show the Merchant's name, address, unique identifier (if applicable), tax ID, date and time of Chargeback, the amount of any Chargeback, any fees assessed in conjunction with the Chargeback, the type of card used, the Issuing Bank of the card, the Acquiring Bank who acquired the Merchant's transactions, and any codes that identify the type and nature of the Chargeback.

REQUEST FOR PRODUCTION NO. 13:

Weekly data regarding payment card volume by Merchant from October 1, 2012 to the present. This information includes data sufficient to show the Merchant's name, address, unique identifier (if applicable) and tax ID.

DATED: October 7, 2016

ROBBINS GELLER RUDMAN
  & DOWD LLP
PATRICK J. COUGHLIN
DAVID W. MITCHELL
ALEXANDRA S. BERNAY
CARMEN A. MEDICI
ANGEL P. LAU
LONNIE A. BROWNE

s/ Carmen A. Medici
CARMEN A. MEDICI

655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
ARMEN ZOHRABIAN
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

| | |
|---|---|
| 1 | |
| 2 | ROBBINS GELLER RUDMAN<br>  & DOWD LLP<br>RANDI D. BANDMAN |
| 3 | 120 East Palmetto Park Road, Suite 500<br>Boca Raton, FL  33432 |
| 4 | Telephone:  561/750-3000<br>561/750-3364 (fax) |
| 5 | |
| 6 | DEVINE GOODMAN RASCO &<br>  WATTS-FITZGERALD, LLP |
| 7 | JOHN W. DEVINE<br>LAWRENCE D. GOODMAN<br>ROBERT J. KUNTZ, JR. |
| 8 | 2800 Ponce De Leon Blvd., Suite 1400<br>Coral Gables, FL  33134 |
| 9 | Telephone:  305/374-8200<br>305/374-8208 (fax) |
| 10 | |
| 11 | Attorneys for Plaintiffs |

1194345_1

PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS DIRECTED TO ALL DEFENDANTS - 3:16-cv-01150-WHA

- 16 -

## TABLE 1: METADATA FIELDS

| Field Name | Example / Format | Description |
|---|---|---|
| BEGNO | ABC0000001  (Unique ID) | The Document ID number associated with the first page of a document. |
| ENDNO | ABC0000003  (Unique ID) | The Document ID number associated with the last page of a document. |
| BEGATTACH | ABC0000001  (Unique ID Parent-Child Relationships) | The Document ID number associated with the first page of the parent document. |
| ENDATTACH | ABC0000008  (Unique ID Parent-Child Relationships) | The Document associated with the last page of the last attachment. |
| VOLUME | VOL001 | The name of CD, DVD or Hard Drive. |
| RECORDTYPE | Options: eMail, Attachment, Scanned Doc, eFile | The record type of a document. |
| SENTDATE | MM/DD/YYYY | The date the e-mail or calendar entry was sent. |
| SENTTIME | HH:MM | The time the e-mail or calendar entry was sent. |
| RECEIVEDDATE | MM/DD/YYYY | The date the document was received. |
| RECEIVEDTIME | HH:MM | The time the document was received. |
| CREATEDATE | MM/DD/YYYY | The date the document was created. |
| CREATETIME | HH:MM | The time the document was created. |
| LASTMODDATE | MM/DD/YYYY | The date the document was last modified. |
| LASTMODTIME | HH:MM | The time the document was last modified. |
| MEETING START DATE | MM/DD/YYYY | Start date of calendar entry |
| MEETING START TIME | HH:MM | Start time of calendar entry |
| MEETING END DATE | MM/DD/YYYY | End date of calendar entry |
| MEETING END TIME | HH:MM | End time of calendar entry |
| FILEPATH | i.e. /JsmithPC/Users/Jsmith/Desktop | The file path from the location in which the document was stored in the usual course of business.  This field should be populated for both e-mail and e-files and separated by semicolons. |
| FILEPATH-DUP | i.e.  /JSmith.pst/Inbox /Network Share/Accounting/… /TJohnsonPC/Users/TJohnson/My Documents/… | The file paths from the locations in which the duplicate documents were stored in the usual course of business.  This field should be populated for both e-mail and e-files and separated by semicolons. |
| AUTHOR | jsmith | The author of a document from extracted metadata. |
| LASTEDITEDBY | jsmith | The name of the last person to edit the document from extracted metadata. |
| FROM | Joe Smith <jsmith@email.com> | The display name and e-mail address of the author of an e-mail/calendar item. An e-mail address should always be provided. |
| TO | Joe Smith <jsmith@email.com>; tjones@email.com | The display name and e-mail address of the recipient(s) of an e-mail/calendar item.  An e-mail address should always be provided for every e-mail if a recipient existed. |
| CC | Joe Smith <jsmith@email.com>; tjones@email.com | The display name and e-mail of the copyee(s) of an e-mail/calendar item.  An e-mail address should always be provided for every e-mail if a copyee existed. |
| BCC | Joe Smith <jsmith@email.com>; tjones@email.com | The display name and e-mail of the blind copyee(s) of an e-mail or calendar item. An e-mail address should always be provided for every e-mail if a blind copyee existed. |
| SUBJECT | | The subject line of the e-mail/calendar item. |
| MESSAGE TYPE | Appointment, Contact, Task, Distribution List, Message, etc. | An indication of the email system message type. |
| IMPORTANCE | Normal, Low, High | E-mail Importance Flag |
| TITLE | | The extracted document title of a document. |
| CUSTODIAN-ALL | Smith, Joe; Doe, Jane | All of the custodians of a document from which the document originated, separated by semicolons. |
| SOURCE | Computer, Mobile Phone, Email, Network Share, Database Name, etc. | The source from which the document was collected. |
| ATTACH COUNT | Numeric | The number of attachments to a document. |
| FILEEXT | XLS | The file extension of a document. |
| FILENAME | Document Name.xls | The file name of a document. |
| FILESIZE | Numeric | The file size of a document (including embedded attachments). |
| HASH | | The MD5 or SHA-1 Hash value or "de-duplication key" assigned to a document.  The same hash method (MD5 or SHA-1) should be used throughout production. |
| LANGUAGE | Korean; Japanese; English | Specifies all languages found in the document to the best of the processing software's ability. |
| CONVERSATION INDEX | | ID used to tie together e-mail threads. |
| REDACTED | YES or Blank | If a document contains a redaction, this field will display 'YES'. |
| TIMEZONE PROCESSED | PST, CST, EST, etc | The time zone the document was processed in. **NOTE**: This should be the time zone where the documents were located at time of collection. |
| NATIVELINK | D:\NATIVES\ABC000001.xls | The full path to a native copy of a document. |
| FULLTEXT | D:\TEXT\ABC000001.txt | The path to the full extracted text of the document.  There should be a folder on the deliverable, containing a separate text file per document.  These text files should be named with their corresponding bates numbers.  **Note**: E-mails should include header information: author, recipient, cc, bcc, date, subject, etc.  If the attachment or e-file does not extract any text, then OCR for the document should be provided. |

<u>CERTIFICATION OF SERVICE BY ELECTRONIC MAIL</u>

I, Carmen A. Medici, attorney at Robbins Geller Rudman & Dowd LLP, hereby certify that, on October 7, 2016, a copy of PLAINTIFFS' SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS DIRECTED TO ALL DEFENDANTS was served on all the parties in the *B & R Supermarket, Inc. v. Visa, Inc.*, No. 3:16-cv-01150-WHA action via the e-mail distribution list CCNonECFFilings@rgrdlaw.com.

s/ Carmen A. Medici
CARMEN A. MEDICI

1194345_1