ROBBINS GELLER RUDMAN
  & DOWD LLP
PATRICK J. COUGHLIN (111070)
DAVID W. MITCHELL (199706)
ALEXANDRA S. BERNAY (211068)
CARMEN A. MEDICI (248417)
ANGEL P. LAU (286196)
LONNIE A. BROWNE (293171)
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)
patc@rgrdlaw.com
davidm@rgrdlaw.com
xanb@rgrdlaw.com
cmedici@rgrdlaw.com
alau@rgrdlaw.com
lbrowne@rgrdlaw.com

DEVINE GOODMAN RASCO &
  WATTS-FITZGERALD, LLP
JOHN W. DEVINE
LAWRENCE D. GOODMAN
ROBERT J. KUNTZ, JR.
2800 Ponce De Leon Blvd., Suite 1400
Coral Gables, FL 33134
Telephone: 305/374-8200
305/374-8208 (fax)
jdevine@devinegoodman.com
lgoodman@devinegoodman.com
rkuntz@devinegoodman.com

Attorneys for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| B & R SUPERMARKET, INC., d/b/a MILAM'S MARKET, a Florida corporation, et al., Individually and on Behalf of All Others Similarly Situated,<br><br>                Plaintiffs,<br><br>   vs.<br><br>VISA, INC., a Delaware corporation, et al.,<br><br>                Defendants. | Case No. 3:16-cv-01150-WHA<br><br>CLASS ACTION<br><br>PLAINTIFFS' NOTICE OF MOTION FOR CLASS CERTIFICATION, MOTION FOR CLASS CERTIFICATION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF<br><br>DATE:    May 11, 2017<br>TIME:    8:00 a.m.<br>CTRM:  8, 19th Floor<br>JUDGE:  Judge William H. Alsup |

**REDACTED**

1242729_1

# TABLE OF CONTENTS

Page

NOTICE OF MOTION....................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ...............................................1

I.      STATEMENT OF ISSUES TO BE DECIDED .................................................1

II.     INTRODUCTION ................................................................................................2

III.    THE PROPOSED CLASS AND SUBCLASSES TO BE CERTIFIED ............2

IV.     STATEMENT OF COMMON FACTS................................................................3

        A.      The Liability Shift Was a Major Change in Who Pays for Chargebacks ...............4

        B.      Common Evidence Shows Defendants Conspired to Impose the Liability Shift......................................................................................................5

        C.      Common Evidence Shows that the Costs the Networks Imposed on Merchants in the U.S. Differed Significantly from EMV Migration Abroad......................................................................................................8

        D.      Common Evidence Shows that the Networks Knew of and Contributed to the Certification Quagmire ..........................................................................8

V.      PLAINTIFFS MEET EVERY PREREQUISITE FOR CLASS CERTIFICATION...........9

        A.      The Proposed Class Is Sufficiently Numerous .......................................10

        B.      Questions of Law or Fact Common to the Proposed Class Exist .........11

        C.      Plaintiffs' Claims are Typical of the Proposed Class ............................12

        D.      Plaintiffs Will Adequately Represent the Interests of the Proposed Class ............13

        E.      Certification is Appropriate Under Rule 23(b)(3) .................................14

                1.      Common Issues Predominate.........................................................14

                        a.      Common Issues Predominate as to Antitrust Liability .................15

                        b.      Common Issues Predominate as to Antitrust Impact....................16

                                (1)     Common Contemporaneous Documentary Evidence Exists Which Shows Defendants' Wrongdoing.................18

                                (2)     Reliable Expert Analysis Based on Common Evidence Shows the Impact of Defendants' Wrongdoing .......................................................19

                        c.      Common Issues Overwhelmingly Predominate as to Damages...........................................................................................20

**Page**

          2.      A Class Action Is a Superior Method by Which to Determine Plaintiffs' Claims ........................................................................................22

VI.     CONCLUSION.............................................................................................................23

# TABLE OF AUTHORITIES

**CASES**

*Amchem Prods. v. Windsor*,
  521 U.S. 591 (1997)..................................................................14

*Amgen Inc. v. Conn. Ret. Plans and Trust Funds*,
  —— U.S. ——, 133 S. Ct. 1184 (2013)..................................10, 15

*B & R Supermarket, Inc. v. Visa, Inc.*,
  No. C 16-01150 WHA, 2016 U.S. Dist. LEXIS 136204
  (N.D. Cal. Sep. 30, 2016).....................................................3, 15, 18

*Briseno v. ConAgra Foods, Inc.*,
  844 F.3d 1121 (9th Cir. 2017) ...............................................13

*Butler v. Sears, Roebuck & Co.*,
  727 F.3d 791 (7th Cir. 2013) .................................................14

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013).........................................................21

*Davis v. Astrue*,
  250 F.R.D. 476 (N.D. Cal. 2008)............................................11

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  131 S. Ct. 2179 (2011) .........................................................14

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ...........................................12, 14

*Hawaií v. Standard Oil Co.*,
  405 U.S. 251 (1972).............................................................9

*The Apple iPod iTunes Antitrust Litig.*,
  No. C 05-00037 JW, 2011 WL 5864036
  (N.D. Cal. Nov. 22, 2011).....................................................17

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  308 F.R.D. 606 (N.D. Cal. 2015)...................................... *passim*

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
  No. M 02-1486 PJH, 2006 WL 1530166
  (N.D. Cal. June 5, 2006) ..............................................12, 16, 17, 21

*In re Graphics Processing Units Antitrust Litig.*,
  253 F.R.D. 478 (N.D. Cal. 2008).............................................19

*In re High-Tech Emple. Antitrust Litig.*,
  985 F. Supp. 2d 1167 (N.D. Cal. 2013) ............................................................... *passim*

*In re Korean Ramen Antitrust Litig.*,
  No. 13-cv-04115-WHO, 2017 U.S. Dist. LEXIS 7756
  (N.D. Cal. Jan. 19, 2017) ........................................................................................21

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
  522 F.3d 6 (1st Cir. 2008) ......................................................................................17

*In re Online DVD Rental Antitrust Litig.*,
  No. M 09-2029 PJH, 2010 U.S. Dist. LEXIS 138558
  (N.D. Cal. Dec. 23, 2010) *aff'd sub nom*,
  *In re Online DVD-Rental Antitrust Litig.*,
  779 F.3d 934 (9th Cir. 2015) ..................................................................................17

*In re Optical Disc Drive Antitrust Litig.*,
  No. 3:10-md-2143 RS, 2016 U.S. Dist. LEXIS 15899
  (N.D. Cal. Feb. 8, 2016)..........................................................................................19

*In re Rubber Chems. Antitrust Litig.*,
  232 F.R.D. 346 (N.D.Cal. 2005)..............................................................................10

*In re Static Random Access (SRAM) Antitrust Litig.*,
  No. C 07-01819 CW, 2008 U.S. Dist. LEXIS 107523
  (N.D. Cal. Sept. 29, 2008) ......................................................................................13

*In re Tableware Antitrust Litig.*,
  241 F.R.D. 644 (N.D. Cal. 2007)......................................................................10, 13

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  267 F.R.D. 291 (N.D. Cal. 2010)...................................................................*passim*

*In re Yahoo Mail Litig.*,
  308 F.R.D. 577 (N.D. Cal. 2015)............................................................................10

*Larson v. TransUnion, LLC*,
  No. 12-cv-05726-WHO, 2015 WL 3945052
  (N.D. Cal. Jun. 26, 2015)........................................................................................22

*Leyva v. Medline Indus.*,
  716 F.3d 510 (9th Cir. 2013) ..................................................................................21

|  | Page |
|---|---|

*Marsh v. First Bank of Delaware*,
    No. 11-cv-05226-WHO, 2014 WL 554553
    (N.D. Cal. Feb. 7, 2014)................................................................................11, 22

*Messner v. Northshore Univ. HealthSystem*,
    669 F.3d 802 (7th Cir. 2012) ..............................................................................10

*Pecover v. Elec. Arts, Inc.*,
    No. 08-2820, 2010 U.S. Dist. LEXIS 140632
    (N.D. Cal. Dec. 21, 2010) ...................................................................................12

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979)..............................................................................................9

*Thomas & Thomas Rodmakers, Inc. v. Newport*
    *Adhesives & Composites, Inc.*,
    209 F.R.D. 159 (C.D. Cal. 2002) .......................................................................15

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338, 131 S. Ct. 2541 (2011)................................................................10

*Walters v. Reno*,
    145 F.3d 1032 (9th Cir. 1998) ............................................................................10

**STATUTES, RULES AND REGULATIONS**

California Business & Professions Code
    §16700, et seq. .......................................................................................................2
    §17200.............................................................................................................2, 11

Florida Statutes Annotated
    §501.201, et seq. ....................................................................................................3
    §501.202...............................................................................................................11
    §542.19, et seq. ......................................................................................................2

New York General Business Law
    Donnelly Act, §340, et seq...................................................................................3

**Page**

Federal Rules of Civil Procedure
    Rule 23 ............................................................................................................10, 14
    Rule 23(a) ............................................................................................................ *passim*
    Rule 23(a)(1) ...................................................................................................10, 11
    Rule 23(a)(2) ...........................................................................................................11
    Rule 23(a)(3) ...........................................................................................................12
    Rule 23(b) ...............................................................................................................10
    Rule 23(b)(2) ................................................................................................1, 2, 10, 13
    Rule 23(b)(3) ........................................................................................................ *passim*

## NOTICE OF MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

Please take notice that on May 11, 2017 or as soon thereafter as the matter may be heard by the Court, at the courtroom of the Honorable William H. Alsup, Courtroom 8, 19th Floor, United States District Court, 450 Golden Gate Avenue, San Francisco, California, plaintiffs B & R Supermarket, Inc. (d/b/a Milam's Market), Grove Liquors LLC, Strouk Group LLC (d/b/a Monsieur Marcel), and Palero Food Corp. and Cagueyes Food Corp. (d/b/a Fine Fare Supermarket) ("Plaintiffs") will and hereby do move to certify a class under Fed. R. Civ. P. 23(a), (b)(2) and (b)(3) as well as three subclasses of merchants from (i) California, (ii) Florida, and (iii) New York.

This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Alexandra S. Bernay, the pleadings on file in this action, and upon such other matters as may be properly presented to the Court at the time of hearing.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    STATEMENT OF ISSUES TO BE DECIDED

1.      Whether Plaintiffs in this antitrust action, alleging Defendants conspired regarding the implementation and maintenance of an unprecedented change in how certain chargebacks for payment card transactions were assessed, demonstrate they meet the prerequisites set forth in Rules 23(a), 23(b)(2) and 23(b)(3).

2.      Whether Plaintiffs B & R Supermarket, Inc. (d/b/a Milam's Market), Grove Liquors LLC, Strouk Group LLC (d/b/a Monsieur Marcel), and Palero Food Corp. and Cagueyes Food Corp. (d/b/a Fine Fare Supermarket) should be appointed class representatives.

3.      Whether Robbins Geller Rudman & Dowd LLP and Devine Goodman & Rasco Watts-FitzGerald LLP should be appointed Co-Lead Class Counsel.

## II. INTRODUCTION

Even with discovery still at an early stage,[1] the evidence is already clear: Defendants conspired to and did implement and maintain an unprecedented shift in the liability for fraudulent payment card transactions, placing on Plaintiffs and the proposed class the liability for billions of dollars' worth of fraudulent transactions. This evidence is overwhelmingly common to the proposed class and subclasses, and accordingly, the Court should certify the proposed classes.

The Amended Complaint, bolstered by the evidence unearthed so far, demonstrates that common issues of law and fact predominate and that common evidence supports Plaintiffs' claims. The elements of Plaintiffs' claims – the existence of the conspiracy, its impact on the proposed class, and the resulting damages – arise from a single course of conduct and will be established through common proof. Plaintiffs support this motion with a report from a qualified and experienced expert that provides a class-wide method for demonstrating damages and impact. The named plaintiffs, all seasoned business owners, are active and engaged in the litigation. Experienced counsel will adequately and vigorously prosecute this action through trial. Because every requirement for class treatment has been demonstrated, certification is warranted.

## III. THE PROPOSED CLASS AND SUBCLASSES TO BE CERTIFIED

Pursuant to Rules 23(a), (b)(2) and (b)(3), Plaintiffs seek to certify a Class of:

> Merchants who have been unlawfully subjected to the so-called Liability Shift for the assessment of MasterCard, Visa, Discover and/or American Express payment card chargebacks, from October 2015 until the anticompetitive conduct ceases.

Additionally, Plaintiffs seek to certify three subclasses of merchants from California, Florida and New York. Each of these three subclasses brings claims under their respective state's antitrust and consumer protection laws. *See* Amd. Cpt., ¶¶293-302 (California's Cartwright Act, Cal. Bus. & Prof. Code §16700, et seq.), ¶¶344-350 (California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200, et seq.), ¶¶303-314 (Florida's Antitrust Act, Fla. Stat. Ann. §542.19, et seq.),

---

[1] Defendants just in the past few weeks have dumped nearly three million new pages into discovery and depositions have only just begun.

¶¶315-322 (Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. Ann. §501.201, et seq.), ¶¶323-336 (New York's Donnelly Act, N.Y. Gen. Bus. Law §340, et seq.).[2]

## IV.    STATEMENT OF COMMON FACTS

Defendants, to enrich themselves and their issuer partners, conspired to implement and maintain an unprecedented change in the way certain payment card chargebacks are handled, while shifting billions of dollars in liability to U.S. merchants.  Through this conspiracy, Defendants saddled merchants with massive costs the Networks and the Networks' issuer clients once bore. Rather than using meaningful methods to encourage adoption of EMV card technology in the United States, as they had in other countries around the world – by, for example, providing interchange concessions or assisting merchants with acquiring chip-enabled terminals – the Networks conspired to impose and maintain a common penalty.  In March 2014, Visa's then CEO, Charlie Scharf, was asked why the Liability Shift was used when incentives like interchange concessions that had been used abroad worked well.  Dkt. No. 326-1 at 7.  He then admitted that Defendants worked together to implement the Liability Shift:

> Historically, the way we would have done something is we would have decided what should be done, what was best and we would just say, okay, we are going to put a rule out.  And literally people would get like the Visa memorandums saying they have decided that you need to move towards EMV by a certain date or else.  And the approach that we have taken, and we have done this along with the other networks, is to try and get the – not to try – we have gotten the acquirers in a room, the merchants in a room, the issuers in a room, the trade groups in a room and we are all trying to work together towards getting much more specific about what we all want to get done by when so that we, the industry, define much more broadly than we ever defined it before is actually solving our own problems and making sure that our products are still the best products that exist out there.

¶141; *see also* Dkt. No. 326-1 at 7-8.  Reviewing this statement at the motion to dismiss stage, the Court rightly observed that "[f]rom the statement, a jury could find that defendants 'got in a room' and fixed a common penalty effective on a common date."  *B & R Supermarket, Inc. v. Visa, Inc.*, No. C 16-01150 WHA, 2016 U.S. Dist. LEXIS 136204, at *22 (N.D. Cal. Sep. 30, 2016).  The evidence produced to date corroborates Scharf's admissions that Defendants "got in a room," fixed a

---

[2]    References to "¶_" or "¶¶_-_" herein are to Plaintiffs' Amended Complaint for Violations of the Sherman Antitrust Act, the Clayton Antitrust Act, California's Cartwright Act, New York's Donnelly Act, Florida's Antitrust and Unfair Trade Practices Acts and Unjust Enrichment (Dkt. No. 291).

common penalty effective on a common date, and then continued meeting each other in numerous fora to maintain, support, and implement the Liability Shift. Further, Defendants' ongoing conduct shows they continue to collude on the implementation of the Liability Shift. In one blatant example, Visa, MasterCard, and American Express decided – after this action was filed – to make effectively identical changes to their Liability Shift rules to forego certain chargebacks, including those under $25. ¶¶135-136.[3] As alleged in the Amended Complaint and further detailed below, Defendants conspired together to create, implement and maintain this illicit agreement and the evidence proving this will be overwhelmingly common to the proposed class.

## A. The Liability Shift Was a Major Change in Who Pays for Chargebacks

Before the Liability Shift, merchants rarely incurred chargeback costs from customer disputes stemming from the use of counterfeit, lost or stolen cards. Instead, those costs were borne by issuers (in the case of Visa and MasterCard) and by American Express and Discover (who act as networks and issuers), who were in the best position to monitor and stop this type of fraud. ¶71. However, it was the merchants that paid for such fraud protection as part of the interchange and merchant discount fees they pay. ¶¶71-72, 165-179. But the allocation of liability for chargebacks dramatically changed in October 2015 when the Defendants simultaneously implemented nearly identical changes to their rules, shifting the costs of fraud-related chargebacks onto merchants without a break in the fees charged to merchants who had not purchased and had certified (through the networks) new, EMV-compliant terminals. ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

[3] ████████████████████████████████████████

████████████████████████████████████

**B. Common Evidence Shows Defendants Conspired to Impose the Liability Shift**

Common evidence shows that the Defendants communicated with each other about imposing and maintaining the Liability Shift. They did this directly and indirectly. For example, prior to the Liability Shift announcements, employees from each Defendant attended meetings where they discussed the Liability Shift. *See, e.g.*, ¶151-164. Documents



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25 At a May

26 2015 Fraud Summit, Krista Tedder of MasterCard made clear to attendees that "the card brands are

27 not going to delay the liability shift date." ¶120. MasterCard's representative [Tedder] could speak

28 for the other card brands months before the shift went into effect because these competitors had

1  agreed years earlier that no delays or grace periods would be allowed and continually reinforced this

2  understanding in several different ways, including through statements such as this one.  ¶120.

3  █████████████████████████████████████████████████████████████████

4  █████████████████████████████████████████████████████████████████

5  █████████████████████████████████████████████████████████████████

6  █████████████████████████████████████████████████████████████████

7  █████████████████████████████████████████████████████████████████

8  █████████████████████████████████████████████████████████████████

9  █████████████████████████████████████████████████████████████████

10  █████████████████████████████████████████████████████████████████

11  █████████████████████████████████████████████████████████████████

12  █████████████████████████████████████████████████████████████████

13  █████████████████████████████████████████████████████████████████

14  █████████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████

16  █████████████████████████████████████████████████████████████████

17  █████████████████████████████████████████████████████████████████

18  █████████████████████████████████████████████████████████████████

19  █████████████████████████████████████████████████████████████████

20  █████████████████████████████████████████████████████████████████

21  █████████████████████████████████████████████████████████████████

22  █████████████████████████████████████████████████████████████████

23  █████████████████████████████████████████████████████████████████

24  █████████████████████████████████████████████████████████████████

25  ████████████████████████

26          While the Defendants may claim they announced the October 2015 effective date at different

27  times, common evidence undermines their claim that staggered announcements of the Liability Shift

28  preclude  an  agreement.  █████████████████████████████████████████████

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ████████████████████████████████████████████████

4 ████████████████████████████████████████████████

5 ████████████████████████████████████████████████

6 ████████████████████████████████████████████████

7 ████████████████████████████████████████████████

8 ██████████████████████

9   **C.**   **Common Evidence Shows that the Costs the Networks Imposed on**
          **Merchants in the U.S. Differed Significantly from EMV Migration**
10         **Abroad.**

11        Although they did so abroad, Defendants offered U.S. merchants no alternative to the

12 Liability Shift to incentivize them to upgrade to EMV-chip compliant card readers. ¶80.  Common

13 evidence shows that EMV migration abroad differed significantly from migration in the United

14 States, both in terms of implementation timelines and techniques used to incentivize transition to

15 EMV.

16 ████████████████████████████████████████████

17 ████████████████████████████████████████████████

18 ████████████████████████████████████████████████

19 ████████████████████████████████████████████████

20 ██████████████████████████████

21   **D.**   **Common Evidence Shows that the Networks Knew of and**
          **Contributed to the Certification Quagmire**
22

23        Documents had control over the certification process caused or contributed to the

24 certification quagmire.  ¶¶82-84.  ████████████████████████████

25 ████████████████████████████████████████████████

26 ████████████████████████████████████████████████

27 ████████████████████████████████████████████████

28

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ That the Liability Shift would have serious detrimental effects on Plaintiffs and the proposed class, in the form of enormous fraud liability costs, therefore, came as no surprise to Defendants. As a Mastercard VP explained "[w]hen the EMV liability shift date for fraud takes effect in October [2015], merchants that are not EMV-compliant can expect to immediately get pounded with card-fraud expenses that card issuers, up to now, have been absorbing." ¶92. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

These compelling facts, common to the proposed class and sufficient for its certification, are merely the tip of the iceberg. In just the last few weeks Defendants have produced nearly three million pages – more than had been received during the entire discovery process to date. And Plaintiffs still await privilege logs from many parties for thousands of pages not produced. Such logs are often a rich source of damning information as are, of course, the Defendants' depositions, for which they have only just begun to sit.

## V. PLAINTIFFS MEET EVERY PREREQUISITE FOR CLASS CERTIFICATION

The Supreme Court has long recognized that antitrust class actions are a vital component of antitrust enforcement. *See generally Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979); *Hawaii v.*

Standard Oil Co., 405 U.S. 251, 266 (1972). Accordingly, courts "'resolve doubts in these actions in favor of certifying the class.'" *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 612 (N.D. Cal. 2015) (quoting *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D.Cal. 2005)); *accord In re Tableware Antitrust Litig.*, 241 F.R.D. 644, 648 (N.D. Cal. 2007). To certify a class under Federal Rule of Civil Procedure 23, Plaintiffs must satisfy the prerequisites set forth in Rule 23(a) – numerosity, commonality, typicality and adequacy of representation – as well as at least one of the three subsections of Rule 23(b). *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 298 (N.D. Cal. 2010); *Rubber Chems.*, 232 F.R.D. at 349-50. Because the proposed Class satisfies Rule 23(a) and Rule 23(b)(3), the proposed class should be certified.[4]

While "a court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim,' Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, –– U.S. ––––, 133 S. Ct. 1184, 1194-95 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S. Ct. 2541, 2551 (2011)). "Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 113 S. Ct. at 1195. Courts regularly recognize that class certification in antitrust litigation should not be a "'dress rehearsal for the trial on the merits' and . . . even rigorous application of the class certification standard 'will frequently lead to certification.'" *In re High-Tech Emple. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1185 (N.D. Cal. 2013) (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811, 815 (7th Cir. 2012)).

## A. The Proposed Class Is Sufficiently Numerous

Plaintiffs meet the first requirement of Rule 23(a) because the proposed class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "'As a general

---

[4] Plaintiffs also meet the requirements of Rule 23(b)(2). For the purposes of Rule 23(b)(2), "[i]t is sufficient if class members complain of a pattern or practice that is generally applicable to the class as a whole." *In re Yahoo Mail Litig.*, 308 F.R.D. 577, 598 (N.D. Cal. 2015) (citing *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998)). Here, Defendants enacted a common policy that applies generally to Plaintiffs and the proposed class and that is redressable in a uniform manner, and thus, the Court should certify Plaintiffs' proposed injunctive relief class under Rule 23(b)(2).

1   rule, classes numbering greater than 41 individuals satisfy the numerosity requirement.'" *Marsh v.*

2   *First Bank of Delaware*, No. 11-cv-05226-WHO, 2014 WL 554553, at *5 (N.D. Cal. Feb. 7, 2014)

3   (quoting *Davis v. Astrue*, 250 F.R.D. 476, 485 (N.D. Cal. 2008)).  Here, the evidence shows many

4   thousands of merchants who accepted Defendants' payment cards were assessed a qualifying

5   chargeback during the class period. Similarly thousands of merchants in California, Florida and New

6   York were affected by the Liability Shift. *See* Ex. 29 (Expert Report of Micah S. Officer in Support

7   of Plaintiffs' Motion for Class Certification attached to the Declaration of Alexandra S. Bernay),

8   ¶14.  Accordingly, the proposed class and subclasses meet Rule 23(a)(1).

9           **B.      Questions of Law or Fact Common to the Proposed Class Exist**

10          Plaintiffs meet the second requirement of Rule 23(a) because "there are questions of law or

11  fact common to the class."  Fed. R. Civ. P. 23(a)(2).  "Where an antitrust conspiracy has been

12  alleged, courts have consistently held that the 'very nature of a conspiracy antitrust action compels a

13  finding that common questions of law and fact exist.'"  *High-Tech*, 985 F. Supp. 2d at 1180 (quoting

14  *TFT-LCD*, 267 F.R.D. at 593); *Cathode Ray*, 308 F.R.D. at 617 (same).

15          Here, Plaintiffs have alleged, and common evidence will support, that Defendants agreed and

16  conspired to shift the liability for fraudulent payment card transactions onto Plaintiffs and the

17  proposed class – *i.e.*, Defendants entered into and kept afloat an antitrust conspiracy.  This

18  "constitutes a common question that 'will resolve an issue that is central to the validity' of each class

19  member's claim 'in one stroke,'" and thus, Plaintiffs have established commonality.[5]  *See High-*

20  *Tech*, 985 F. Supp. 2d at 1180 (quoting *TFT-LCD*, 267 F.R.D. at 310).

21

22

23

24  [5]     Common questions of law or fact abound as to each proposed subclass.  For each of the
    subclasses brought under state antitrust law, the question of "antitrust liability alone constitutes a
25  common question" sufficient to meet the requirements of Rule 23(a)(2).  *See High-Tech*, 985 F.
    Supp. 2d at 1180.  Similarly, claims under the California UCL and Florida FDUTPA raise common
26  questions and involve evidence about Defendants' agreement and conspiracy to shift the liability for
    fraudulent payment card transactions to Plaintiffs and the class.  *See* FDUTPA, Fla. Stat. Ann.
27  §501.202 (prohibiting "[u]nfair methods of competition, unconscionable acts or practices, and unfair
    or deceptive acts or practices in the conduct of any trade or commerce"); UCL, Cal. Bus. & Prof.
28  Code §§17200 (prohibiting "any unlawful, unfair or fraudulent business act or practice").

1

### C. Plaintiffs' Claims are Typical of the Proposed Class

2          A named plaintiff's claim is typical under Rule 23(a)(3) if it "'arise[s] from the same event,

3     practice or course of conduct that gives rise to the claims of the absent class members'" and is

4     "'based on the same legal or remedial theory.'" *In re Dynamic Random Access Memory (DRAM)*

5     *Antitrust Litig.*, No. M 02-1486 PJH, 2006 WL 1530166, at *4 (N.D. Cal. June 5, 2006) (alteration in

6     original) (citation omitted). "Under the rule's permissive standards, representative claims are

7     'typical' if they are reasonably co-extensive with those of absent class members; they need not be

8     substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). "In

9     antitrust cases, typicality usually 'will be established by plaintiffs and all class members alleging the

10    same antitrust violations by defendants.'" *High-Tech*, 985 F. Supp. 2d at 1181 (citing *Pecover v.*

11    *Elec. Arts, Inc.*, No. 08-2820, 2010 U.S. Dist. LEXIS 140632, at *32 (N.D. Cal. Dec. 21, 2010)).

12    Such is the case here. Plaintiffs and the proposed class allege the same antitrust violations

13    predicated upon the same course of conduct by Defendants: Defendants agreed to an unprecedented

14    change in payment card fraud liability, shifting onto Plaintiffs and the proposed class, in violation of

15    state and federal antitrust laws and state consumer protection laws, billions of dollars of fraud

16    liability previously borne by other parties. Defendants' course of conduct in agreeing to,

17    implementing and maintaining this Liability Shift is at the heart of Plaintiffs' and the proposed

18    class's claims. Defendant's scheme boils down to an agreement to artificially raise – or fix – the

19    price paid by Plaintiffs and the proposed class for Defendants' services. *See* MTD Order, Dkt. No.

20    346 at 4 ("The gravamen of our amended complaint is a form of price-fixing."). And like other

21    price-fixing schemes, Plaintiffs' claims are typical even if differences exist in how class members

22    prepared for the Liability Shift or the number and value of the chargebacks they incurred. *See*

23    *Cathode Ray*, 308 F.R.D. at 613 ("This [strong assumption that the claims of the representative

24    parties will be typical of the absent class members] is true even where 'the plaintiff followed

25    different purchasing procedures, purchased in different quantities or at different prices, or purchased

26    a different mix of products than did the members of the class.'") (quoting *TFT-LCD*, 267 F.R.D. at

27    300). Accordingly, the requirement of Rule 23(a)(3) is met.

28

D. **Plaintiffs Will Adequately Represent the Interests of the Proposed Class**

Adequacy requires that plaintiffs "(1) have no interests that are antagonistic to or in conflict with the interests of the class; and (2) be represented by counsel able to vigorously prosecute their interests." *Cathode Ray*, 308 F.R.D. at 618 (citing *In re Static Random Access (SRAM) Antitrust Litig.*, No. C 07-01819 CW, 2008 U.S. Dist. LEXIS 107523, at *40 (N.D. Cal. Sept. 29, 2008)). Plaintiffs have no interests antagonistic to or in conflict with the interests of the proposed class. Plaintiffs and the proposed class suffered the same type of harm as a result of the same conspiracy: they are all merchants that accepted one or more of Defendants' payment cards and paid chargebacks as a result of Defendants' collusive imposition of the Liability Shift. Thus, Plaintiffs and the proposed class have a unity of interest in: (i) proving Defendants' liability for agreeing to the Liability Shift; and (ii) seeking relief for the chargebacks that they paid as a result. *See In re Tableware Antitrust Litig.*, 241 F.R.D. 644, 649 (N.D. Cal. 2007) (adequacy met where class representatives and the class "were allegedly overcharged for tableware and [had] a mutual and coterminous interest in establishing defendants' liability and in recovering damages"). To further these shared interests, Plaintiffs have actively participated in the litigation and will continue to do so. Among other things, Plaintiffs have reviewed pleadings, attended the motion to dismiss hearing, responded to discovery, searched for, collected and produced documents, and sat (or will soon sit) for day-long depositions.

Plaintiffs have chosen highly experienced counsel to vigorously prosecute the interests of the proposed class. *See* Exs. 31 and 32 (firm resumes). Counsel have zealously advocated on behalf of Plaintiffs and the proposed class and will continue to leverage their substantial experience and resources in this action. Plaintiffs and their chosen counsel will adequately represent the proposed class through trial and appeal if necessary to successfully resolve this litigation. Plaintiffs therefore satisfy the requirements of Rule 23(a) and Rule 23(b)(2).[6]

---

[6] Although not an explicit requirement of Rule 23(a) or (b), courts in this District and others throughout the Ninth Circuit used to routinely impose a requirement at class certification that classes be "ascertainable." *See, e.g.*, *Cathode Ray*, 308 F.R.D. at 612. However, as the Ninth Circuit made clear in *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1125 (9th Cir. 2017), ascertainability is not a separate prerequisite to certification. *See also* Ex. 25, *In re Lidoderm Antitrust Litig.*, No. 3:14-

**E.      Certification is Appropriate Under Rule 23(b)(3)**

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Plaintiffs meet both the predominance and superiority prongs of Rule 23(b)(3).

**1.      Common Issues Predominate**

"Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997). "In determining whether the predominance requirement is satisfied, the court must identify the case's issues and determine which are subject to common proof and which are subject to individualized proof." *Cathode Ray*, 308 F.R.D. at 620 (citing *TFT-LCD*, 267 F.R.D. at 600). "[T]he predominance inquiry is not a mechanical inquiry of 'bean counting' to determine whether there are more individual questions than common questions." *High-Tech*, 985 F. Supp. 2d at 1186-87 (quoting *Butler v. Sears, Roebuck & Co.*, 727 F.3d 791, 801 (7th Cir. 2013)). Rather, "[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Cathode Ray*, 308 F.R.D. at 620 (quoting *Hanlon*, 150 F.3d at 1022).

Whether Plaintiffs and the proposed class can establish their antitrust claims will be the overriding issue in this action, and this inquiry will be susceptible to proof on a classwide basis. "[T]o establish an antitrust claim, plaintiffs typically must prove (1) a violation of antitrust laws, (2) an injury they suffered as a result of that violation, and (3) an estimated measure of damages." *High-Tech*, 985 F. Supp. 2d at 1183; *see Cathode Ray*, 308 F.R.D. at 620 (citing *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011). "Plaintiffs are not required to show that each element of the underlying cause of action is susceptible to classwide proof. Rather, they need

md-2521-WHO, Order Granting Motions for Class Certification and Denying Daubert Motions, slip op., at 42 (Dkt. No. 670) ("As the Ninth Circuit recently explained, acertainability . . . is not a requirement under Rule 23. Because Plaintiffs meet the requirements under Rules 23(a) and (b)(3), any ascertainability challenge Defendants may mount will fail.).

only show that common questions will predominate with respect to their case as a whole." *High-Tech*, 985 F. Supp. 2d at 1187 (citing *Amgen*, 133 S. Ct. at 1196). As detailed below, each element raises common questions susceptible to common proof under Rule 23(b)(3).

### a. Common Issues Predominate as to Antitrust Liability

"In 'price-fixing cases, courts repeatedly have held that the existence of the conspiracy is the predominant issue and warrants certification even where significant individual issues are present.'" *Cathode Ray*, 308 F.R.D. at 620 (quoting *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 167 (C.D. Cal. 2002)). Plaintiffs allege that Defendants conspired to impose and maintain the Liability Shift, thereby foisting hundreds of millions in costs to Plaintiffs and the proposed class. The existence of this conspiracy is the overriding common issue for each proposed class member, and is susceptible to proof through evidence common to the proposed class, such that common issues will predominate over any individual issues. Indeed,

penalty effective on a common date" and are considered to be "exactly aligned" – constitute further class-wide proof of conspiracy. *B & R Supermarket*, 2016 U.S. Dist. LEXIS 136204, at *22;

███████████████████████████████████████ Thereafter, Defendants maintained discipline within the conspiracy, through frequent contact and communications, facilitated by trade organizations and often involving senior-level management, so that none of the Defendants broke ranks and offered any meaningful concessions to merchants or agreed to delay the Liability Shift date. *See supra* at IV.B.; █████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████

Defendants made this decision knowing full well that a vast majority of merchants were not going to be ready to process chip card transactions by the deadline. ¶¶90-92; ████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

While Defendants may argue the Liability Shift sought to prevent fraud, such an argument will be made and rebutted based on common proof. And the common evidence available to date supports Plaintiffs' argument that while the Liability Shift offloaded billions in chargebacks onto the shoulders of merchants, it was not a necessary precondition for transitioning to EMV technology.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████ Irrespective of which side prevails, this evidence is common to the proposed class, and the issue will be resolved on a classwide basis.

### b. Common Issues Predominate as to Antitrust Impact

"Antitrust 'impact' – also referred to as antitrust injury – is the 'fact of damage' that results from a violation of the antitrust laws." *High-Tech*, 985 F. Supp. 2d at 1192 (quoting *DRAM*, 2006

WL 1530166, at *7. "It is the causal link between the antitrust violation and the damages sought by plaintiffs." *Id.* (quoting *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 19 n.18 (1st Cir. 2008)). At the class certification stage, antitrust impact does not need to be established as a matter of fact; rather, "Plaintiffs need only advance a plausible methodology to demonstrate that antitrust injury can be proven on a class-wide basis." *See DRAM*, 2006 WL 1530166, at *9; *see also Cathode Ray*, 308 F.R.D. at 635 ("For impact in an antitrust case, the Court must determine whether the [Plaintiffs] have shown a reasonable method for determining, on a classwide basis, the alleged antitrust activity's impact on class members.") (citing *TFT-LCD*, 267 F.R.D. at 601). "This is a question of methodology, not merit." *Cathode Ray*, 308 F.R.D. at 625. "[T]he key question is whether plaintiffs have demonstrated that there is a way to prove a classwide measure of impact through generalized proof." *Id.* (citing *TFT-LCD*, 267 F.R.D. at 313; *In re Online DVD Rental Antitrust Litig.*, No. M 09-2029 PJH, 2010 U.S. Dist. LEXIS 138558, at *62 (N.D. Cal. Dec. 23, 2010) *aff'd sub nom*, *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934 (9th Cir. 2015)).

When analyzing a plaintiff's proffered expert analyses, "[t]he court cannot weigh in on the merits of plaintiffs' substantive arguments, and must avoid engaging in a battle of expert testimony." *The Apple iPod iTunes Antitrust Litig.*, No. C 05-00037 JW, 2011 WL 5864036, at *3 (N.D. Cal. Nov. 22, 2011) (quoting *DRAM*, 2006 WL 1530166, at *9)); *accord Cathode Ray*, 308 F.R.D. at 625; *see also Online DVD Rental*, 2010 U.S. Dist. LEXIS 138558, at *63 ("the issue at class certification is not which expert is the most credible, or the most accurate modeler"); *High-Tech*, 985 F. Supp. 2d at 1192 ("[T]he Court is not tasked at this phase with determining whether Plaintiffs will prevail on these theories."). Here, antitrust impact is established through common evidence showing that Defendants' imposition of the Liability Shift had the effect of substantially increasing the cost of Defendants' network services to Plaintiffs and the proposed class, with few exceptions or limitations. Plaintiffs demonstrate this impact through (i) contemporaneous documentary evidence and (ii) the expert opinions of Professor Micah Officer. Either of these categories of evidence is sufficient in and of itself to establish classwide impact; combined, they easily meet the requirements of Rule 23(b)(3).

**(1) Common Contemporaneous Documentary Evidence Exists Which Shows Defendants' Wrongdoing**

As detailed above, the evidence is clear: through nearly identical rule changes to the terms of the services offered by them, Defendants simultaneously shifted the liability for fraudulent payment card transactions onto Plaintiffs and the proposed class. ██████████████

████████████████████████████████████████████████████████████████

████████████████████ Just as the Networks' antitrust conspiracy is susceptible to classwide proof, so too is the effect – or antitrust impact – of this conspiracy. Here, Plaintiffs' expert uses evidence common to the class to demonstrate that "but for" the Liability Shift, Plaintiff and the proposed class would not have incurred chargeback costs that issuers, Discover and American Express once bore. Ex. 29, ¶¶12-13, 18-21, 23, 30, 33, 35.

In implementing the Liability Shift, Defendants essentially agreed to artificially inflate the price of their services to Plaintiffs and the proposed class. *B & R Supermarket*, 2016 U.S. Dist. LEXIS 136204, at *22 ("The gravamen of our amended complaint is a form of price-fixing . . . .") In many ways, the fact of impact – and classwide impact at that – is more obvious here than in other price-fixing cases. Here, Plaintiffs and the proposed class were simultaneously subjected to a new and substantial cost of accepting payment cards on Defendants' networks. Amended Complaint, ¶71 n.6; ¶72; ¶96; Ex. 29, ¶¶14, 21-22, 29-30, 103, 105. Defendants created whole new categories of chargebacks for the Liability Shift that before were not borne by Plaintiffs and the proposed class and that were simultaneously shifted onto Plaintiffs and the proposed class. Amended Complaint, ¶¶73-81 (detailing chargeback code changes by Defendants). The Court need not look any further than the Defendants' newly adopted rules, which applied to any merchant that accepted one or more of Defendants' payment cards, and the reason codes describing the new chargebacks to find evidence of the intended effect and classwide impact of the Liability Shift. *Id.* Indeed, Defendants maintain detailed records tracking chargebacks incurred by each and every merchant, including those incurred by Plaintiffs and the proposed class as a result of the Liability Shift.[7] Ex. 29, ¶¶24, 36-41, 50-53, 64-

---

[7] Defendants have provided data about transactions on their networks, including the number and value of any transactions that were charged back to merchants. With the notable exception of

67, 81-85, 87-88.  As for those few merchants or transactions excepted from the Liability Shift, the class as defined does not include these classes of merchants or transactions.  *See id.*, ¶25; *supra* §III. All of this evidence is common to the proposed class and provides a reliable methodology of proving classwide antitrust impact.

**(2)     Reliable Expert Analysis Based on Common Evidence Shows the Impact of Defendants' Wrongdoing**

In recent years courts have "trended toward presenting an econometric formula or other statistical analysis to show class-wide impact . . . ."  And "such analysis has often been accepted at the certification stage."  *In re Optical Disc Drive Antitrust Litig.*, No. 3:10-md-2143 RS, 2016 U.S. Dist. LEXIS 15899, at *56-*57 (N.D. Cal. Feb. 8, 2016) (quoting *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 491 (N.D. Cal. 2008) ("*GPU*")).  The *GPU* Court concluded that "such methods, where plausibly reliable, should be allowed as a means of common proof.  To rule otherwise would allow antitrust violators a free pass in many industries."  Like in *Optical Disc Drive*, "it is clear that statistical and economic methodologies of the sort advanced here ***may*** be employed to establish class-wide impact."  2016 U.S. Dist. LEXIS 15899, at *57 (emphasis in original).  Any arguments regarding the credibility or accuracy of Professor Officer's model should not be resolved at this stage of the litigation.

Moreover, the methodology utilized by Plaintiffs to determine classwide impact and damages, and otherwise identify members of the proposed class and qualifying chargebacks, is reliable.  Any unreliability that Defendants may point to, can be accounted for and controlled so that common issues continue to predominate over any individualized issues that might affect the analysis of impact or damages.

---

American Express, *see infra* note 8, Defendants have provided data about the number and value of all chargebacks incurred by merchants both before and after the Liability Shift.  Ex. 29, ¶¶37-41. And for the post-Liability Shift period, Defendants are able to segregate the total number and value of all chargebacks incurred by Plaintiffs and the class as a result of the Liability Shift.  *Id.*  It is this data which forms the basis of Professor Officer's analysis and allows for a common proof methodology to determine antitrust impact and damages.  *See infra* §§V.E.1.b.(1)-(2).  We note securing this data from Defendants has been an uphill battle. Production deficiencies and technical errors with the data are detailed in Professor Officer's Report.  *See* Ex. 29, ¶¶106-112.

Professor Officer has provided two ways of analyzing the effect of the Liability Shift. Ex. 29, ¶¶42-49. First, he has analyzed the Defendants' service rules and chargebacks reason codes, determined which reason codes are used to identify a chargeback resulting from the Liability Shift, and isolated the Liability Shift-related reason codes and chargebacks. *Id.*, ¶¶42-45, 50-55 (Visa), 64-69 (MasterCard), 81-86(American Express), 87-92 (Discover). But for the Liability Shift, these codes would not have existed and, likewise, chargebacks related to these codes would not have existed. *Id.*, ¶42. He opines that this formulation is applicable on a classwide basis. *Id.*, ¶¶42-45. He also compared pre- and post-Liability Shift aggregate data regarding chargebacks and gross sales volume. *Id.*, ¶¶46-49. Controlling for other possible explanations, he has extrapolated from this data an estimated percentage of chargebacks attributed to the Liability Shift that likely would have been incurred by Plaintiffs and the proposed class even in the absence of the Liability Shift. *Id.*, ¶¶46-49, 56-63 (Visa), 70-80 (MasterCard), 93-102 (Discover).[8] These essentially are the chargebacks for those transactions that, while they may have run afoul of the new rules governing chip card transactions after the Liability Shift, could have been charged back to Plaintiffs and the proposed class based on some other mistake in processing applicable before the Liability Shift, like, for example, failing to get a signature on a transaction which proved to be fraudulent. *Id.*, ¶¶46-49. This methodology relies on evidence common to the proposed class and is sufficiently reliable. *See* Ex. 25, *Lidoderm*, at 30-32 (approving of the use of a "common proof methodology" to approximate and ferret out from any impact and damage analysis uninjured and unidentifiable "Brand Loyalist" transactions).

### c. Common Issues Overwhelmingly Predominate as to Damages

Professor Officer's model is appropriately and directly tied to Plaintiffs' theory of liability. The Liability Shift and the chargebacks the proposed class incurred as a result are at the heart of

---

[8] For Visa and Discover, Professor Officer determines the data does not support controlling for any potential "substitution" effect in this way. Ex. 29, ¶¶46-49, 103-04. Therefore, Professor Officer only provides an "Excess Measure of Damages" that differs from his "Direct Measure of Damages" for Defendant MasterCard. *Id.*, ¶¶49, 105. The problems with American Express's data productions to date are manifold. *See id.*, ¶¶43, 81-86. With the appropriate data, Professor Officer will be able to provide, using the same methodology as that used for the other Defendants, a measure of damages (*i.e.*, "total FLS chargebacks") for American Express as well. *See id.*, ¶¶43, 109.

Plaintiffs' alleged antitrust conspiracy. These same chargebacks form the basis of Professor Officer's damages calculation. Professor Officer's damages model is otherwise reliable, and accordingly, common issues predominate as to damages.

Plaintiffs' theory of liability revolves around Defendants' entering into and maintaining a conspiratorial agreement to shift the liability for fraudulent payment card transactions to Plaintiffs and the proposed class. Amended Complaint, ¶¶1-4.

This shift resulted in new categories of fraudulent transactions being charged back to Plaintiffs and the proposed class, and it is these chargebacks under those reason codes for which individual class members ultimately will seek damages and on which Professor Officer's aggregate damages model is based. *See* Amended Complaint, ¶¶73-81; *see also* Ex. 29, ¶¶42-45, 50-55 (Visa), 64-69 (MasterCard), 81-86(American Express), 87-92 (Discover). Consequently, *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), poses no problem to certification here. Plaintiffs' proposed model measures only those damages directly attributable to the proposed theory of antitrust liability, which Plaintiffs have shown above is amenable to proof through evidence common to the proposed class. *See Leyva v. Medline Indus.*, 716 F.3d 510, 514 (9th Cir. 2013) (citing *Comcast*, 133 S. Ct. at 1433). This model likewise uses common evidence and establishes a measure of aggregate, classwide damages

What is important at the class certification stage is that damages and any model purporting to establish damages are appropriately tied to a plaintiff's theory of liability. *See id.* (discussing *Comcast*, 133 S. Ct. 1426). "[I]n the antitrust context, aggregate damages calculations 'need not be exact' at class-certification stage." *In re Korean Ramen Antitrust Litig.*, No. 13-cv-04115-WHO, 2017 U.S. Dist. LEXIS 7756, at *51 (N.D. Cal. Jan. 19, 2017). It is only necessary that a plaintiff's method for calculating damages not be "'so insubstantial as to amount to no method at all.'" *TFT-LCD*, 267 F.R.D at 606 (quoting *DRAM*, 2006 WL 1530166, at *10). Plaintiffs easily meet this burden here. They provide a measure of aggregate damages based on a reliable methodology that utilizes evidence common to the proposed class and is appropriately tied to Plaintiffs' theory of

liability. This is sufficient at this juncture to show that common issues predominate with regard to damages, and certification is thus appropriate under Rule 23(b)(3).[9]

### 2. A Class Action Is a Superior Method by Which to Determine Plaintiffs' Claims

Rule 23(b)(3) requires that a class action be "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). "[I]f common questions are found to predominate in an antitrust action, . . . courts generally have ruled that the superiority prerequisite of Rule 23(b)(3) is satisfied." *TFT-LCD*, 267 F.R.D. at 314. As detailed above, common issues predominate over individual issues. Resolving these issues in individual cases would be inefficient and may result in inconsistent or incoherent rulings and prejudice to both Plaintiffs and Defendants. Moreover, this putative class action has been proceeding in this Court for over a year now, and no other related or individual actions have sprung up elsewhere. These facts further counsel in favor of a finding that a class action is superior here. *See Larson v. TransUnion, LLC*, No. 12-cv-05726-WHO, 2015 WL 3945052, at *14 (N.D. Cal. Jun. 26, 2015) ("[T]here is no litigation underway elsewhere that weighs against proceeding as a class."); *Marsh*, 2014 WL 554553, at *15 ("[T]here is no evidence before the Court of any other private actions against any of the defendants alleging the same misconduct or that any likely class member has an interest in prosecuting a separate action."); *id.* ("The fact that the named plaintiffs have filed this action in this Court and have litigated it for over two years also weighs in favor of maintaining a class action here."). "[C]ertification in this case would be far superior to, and more manageable than, any other procedure available for the treatment of the factual and legal issues raised by Plaintiffs' claims." *Id.* Accordingly, certification is appropriate.

---

[9] A final model would not be possible given that American Express was ordered only to produce a sample of its chargeback data following a discovery dispute. Dkt. No. 384 at 9. Similarly, Mastercard produced data that later turned out to contain errors and reproduced the data on March 8, 2017, two days before Plaintiffs' expert report was due. *See* Ex. 30.

# VI. CONCLUSION

Because every requirement for class certification has been met, the Court should grant Plaintiffs' motion to certify the class, appoint Fine Fare, Monsieur Marcel and B & R Supermarket and Grove Liquors as class representatives, and appoint Robbins Geller Rudman & Dowd LLP and Devine Goodman Rasco & Watts-FitzGerald LLP as Co-Lead Class Counsel.

DATED:  March 10, 2017                     Respectfully submitted,

                                            ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                            PATRICK J. COUGHLIN
                                            DAVID W. MITCHELL
                                            ALEXANDRA S. BERNAY
                                            CARMEN A. MEDICI
                                            ANGEL P. LAU
                                            LONNIE A. BROWNE


                                                  s/ Alexandra S. Bernay
                                            ALEXANDRA S. BERNAY

                                            655 West Broadway, Suite 1900
                                            San Diego, CA  92101-8498
                                            Telephone:  619/231-1058
                                            619/231-7423 (fax)

                                            ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                            ARMEN ZOHRABIAN
                                            Post Montgomery Center
                                            One Montgomery Street, Suite 1800
                                            San Francisco, CA  94104
                                            Telephone:  415/288-4545
                                            415/288-4534 (fax)

                                            ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                            RANDI D. BANDMAN
                                            120 East Palmetto Park Road, Suite 500
                                            Boca Raton, FL  33432
                                            Telephone:  561/750-3000
                                            561/750-3364 (fax)

DEVINE GOODMAN RASCO &
   WATTS-FITZGERALD, LLP
JOHN W. DEVINE
LAWRENCE D. GOODMAN
ROBERT J. KUNTZ, JR.
2800 Ponce De Leon Blvd., Suite 1400
Coral Gables, FL  33134
Telephone:  305/374-8200
305/374-8208 (fax)

Attorneys for Plaintiffs

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2017, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Service List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 10, 2017.

s/ Alexandra S. Bernay
ALEXANDRA S. BERNAY

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
E-mail:  xanb@rgrdlaw.com

## Mailing Information for a Case 3:16-cv-01150-WHA B & R Supermarket, Inc., et al v. Visa, Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Courtney Bedell Averbach**
  caverbach@reedsmith.com,courtney-averbach-3429@ecf.pacerpro.com,reed-smith-2312@ecf.pacerpro.com

- **Scott D. Baker**
  sbaker@reedsmith.com,cmosqueda@reedsmith.com,cshanahan@reedsmith.com,scott-baker-8371@ecf.pacerpro.com,reed-smith-2312@ecf.pacerpro.com,cristi-shanahan-4367@ecf.pacerpro.com,drothschild@reedsmith.com

- **Randi D. Bandman**
  randib@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Peter T. Barbur**
  pbarbur@cravath.com,mao@cravath.com,cgessner@cravath.com

- **John Eliot Beerbower**
  jbeerbower@hunton.com

- **Paul Belonick**
  pbelonick@sidley.com,sfefilingnotice@sidley.com,jhiwa@sidley.com,sfdocket@sidley.com,paul-belonick-5747@ecf.pacerpro.com

- **Craig A Benson**
  CBenson@paulweiss.com,mao_fednational@paulweiss.com

- **Jane Petersen Bentrott**
  jbentrott@mofo.com

- **Alexandra Senya Bernay**
  xanb@rgrdlaw.com,E_File_SD@rgrdlaw.com,jkusy@rgrdlaw.com,AZohrabian@rgrdlaw.com,schateauneuf@rgrdlaw.com

- **Boris Bershteyn**
  boris.bershteyn@skadden.com

- **Daniel I Booker**
  dbooker@reedsmith.com,dalioto@reedsmith.com

- **Andrew Baldwin Brantingham**
  brantingham.andrew@dorsey.com,roadfeldt.christi@dorsey.com

- **Lonnie Anthony Browne**
  LBrowne@rgrdlaw.com

- **Cheryl Ann Cauley**
  ccauley@taylorpatchen.com,schow@taylorpatchen.com

- **Isaac Daniel Chaput**
  ichaput@cravath.com

- **Eva W. Cole**
  ewcole@winston.com,cfernandez@winston.com,docketsf@winston.com,docketny@winston.com

- **Melissa Colon-Bosolet**
  mcolon-bosolet@sidley.com,nyefiling@sidley.com,melissa-colon-bosolet-1976@ecf.pacerpro.com

- **Dana Lynn Cook-Milligan**
  dlcook@winston.com

- **Patrick J. Coughlin**
  PatC@rgrdlaw.com,SusanM@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **John William Devine**
  jdevine@devinegoodman.com

- **Kelsie A Docherty**
  kdocherty@cravath.com

- **Matthew A Eisenstein**
  matthew.eisenstein@aporter.com,Jessica.Caterina@aporter.com,Mitchell.Stern@aporter.com

- **Howard Feller**
  hfeller@mcguirewoods.com

- **Tiffani B Figueroa**
  TFigueroa@mofo.com

- **Stephanie Ilana Fine**
  stephanie.fine@aporter.com

- **Natalie Anne Fleming Nolen**
  nflemingnolen@mofo.com

- **Kenneth A. Gallo**
  kgallo@paulweiss.com,mlaramie@paulweiss.com

- **Lawrence Dean Goodman**
  lgoodman@devinegoodman.com,alopez@devinegoodman.com,smallet@devinegoodman.com

- **David F. Graham**
  dgraham@sidley.com,efilingnotice@sidley.com,david-graham-9409@ecf.pacerpro.com

- **Peter E Greene**
  peter.greene@skadden.com

- **Alexander Guney**
  alexander.guney@sedgwicklaw.com

- **James Franklin Herbison**
  jherbiso@winston.com

- **Damaris Hernandez**
  dhernandez@cravath.com,mao@cravath.com

- **D. Bruce Hoffman**
  bhoffman@hunton.com,acordero@hunton.com

- **Peter K. Huston**
  phuston@sidley.com,jhiwa@sidley.com,sfdocket@sidley.com,hebalogi@sidley.com,peter-huston-4120@ecf.pacerpro.com

- **Susan S. Joo**
  sjoo@hunton.com,jocampo@hunton.com

- **J. Brent Justus**
  bjustus@mcguirewoods.com

- **Raoul Dion Kennedy**
  raoul.kennedy@skadden.com,alissa.turnipseed@skadden.com,james.schaefer@skadden.com,sarah.wood@skadden.com

- **Jeffrey L. Kessler**
  jkessler@winston.com,pacercourtfile@winston.com,docketsf@winston.com,docketny@winston.com

- **Ali Klein**
  aklein@cravath.com

- **Leslie Kostyshak**
  lkostyshak@hunton.com,jbeerbower@hunton.com

- **Harry P Koulos**
  harry.koulos@skadden.com

- **Evan R Kreiner**
  evan.kreiner@skadden.com

- **Robert J Kuntz , Jr**
  rkuntz@devinegoodman.com,vcerra@devinegoodman.com

- **Mark P. Ladner**
  mladner@mofo.com,nflemingnolen@mofo.com,stice@mofo.com,docketny@mofo.com,mark-ladner-4922@ecf.pacerpro.com

- **Alexandra Eve Laks**
  alaks@mofo.com,gina-gerrish-5550@ecf.pacerpro.com,ggerrish@mofo.com,alexandra-laks-0787@ecf.pacerpro.com

- **Angel Puimei Lau**
  alau@rgrdlaw.com,tdevries@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Adrienne J Lighten**
  alighten@paulweiss.com

- **Casey Erin Lucier**
  clucier@mcguirewoods.com

- **Martha Corcoran Luemers**
  eFilingPA@dorsey.com,luemers.martha@dorsey.com,evans.elyssa@dorsey.com

- **Michelle Ann Mantine**
  mmantine@reedsmith.com,michelle-mantine-7250@ecf.pacerpro.com,dsharp@reedsmith.com,docketingecf@reedsmith.com,reed-smith-2312@ecf.pacerpro.com,jeremy.feinstein@pnc.com,sament@reedsmith.com

- **Sharon D. Mayo**
  sharon.mayo@apks.com,robert.culhane@aporter.com,Joanna.Lee@aporter.com,Emily.Clark@aporter.com,sfcalendar@aporter.com,Jill.Hernandez@aporter.com

- **Carmen Anthony Medici**
  cmedici@rgrdlaw.com,slandry@rgrdlaw.com,E_File_SD@rgrdlaw.com,ckopko@rgrdlaw.com

- **Sean D. Meenan**
  smeenan@winston.com,recordssf@winston.com,pacercourtfile@winston.com,mcourtney@winston.com,docketsf@winston.com

- **Mark R Merley**
  Mark.Merley@APORTER.COM

- **Michael B. Miller**
  mbmiller@mofo.com,mike-miller-9381@ecf.pacerpro.com,docketny@mofo.com

- **David W. Mitchell**
  davidm@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Joseph Laurence Motto**
  JMotto@winston.com,ahodgson@winston.com

- **Dennis Francis Murphy**
  dennis.murphy@sedgwicklaw.com

- **Benjamin Robert Nagin**
  bnagin@sidley.com,nyefiling@sidley.com,benjamin-nagin-5091@ecf.pacerpro.com

- **Karen C Otto**
  karen.otto@aporter.com

- **Elizabeth P Papez**
  epapez@winston.com

- **Michelle Parikh**
  MParikh@paulweiss.com,JNoonan@paulweiss.com,mao_fednational@paulweiss.com

- **Jeanifer Ellen Parsigian**
  jparsigian@winston.com,hhammon@winston.com,docketsf@winston.com

- **Angela Maryssa Porter**
  porter.angela@dorsey.com,vallant.tammy@dorsey.com

- **David Carlyle Powell**
  dpowell@mcguirewoods.com,usdocket@mcguirewoods.com,jtabisaura@mcguirewoods.com,mdylak@mcguirewoods.com,DQuinonez@mcguirewoods.com

- **Penelope Athene Preovolos**
  ppreovolos@mofo.com,lroiz@mofo.com,linda-roiz-3645@ecf.pacerpro.com,penny-preovolos-9506@ecf.pacerpro.com

- **Frederick Matthew Ralph**
  ralph.matthew@dorsey.com,fairbairn.mary@dorsey.com

- **Paul Jeffrey Riehle**
  paul.riehle@sedgwicklaw.com,SDMAcalendaring@sedgwicklaw.com,phyllis.flynn@sedgwicklaw.com,dennis.murphy@sedgwicklaw.com

- **Lauren Kelley Ross**
  lross@cravath.com,mao@cravath.com

- **Michael Adam Rubin**
  michael.rubin@apks.com

- **Conor Michael Shaffer**
  cshaffer@reedsmith.com

- **Ashley Lynn Shively**
  ashively@reedsmith.com,dkelley@reedsmith.com,ashley-shively-0536@ecf.pacerpro.com,david-kelley-8209@ecf.pacerpro.com,reed-smith-2312@ecf.pacerpro.com

- **Ryan A Shores**
  rshores@hunton.com,gjenkins@hunton.com

- **Robert Yale Sperling**
  rsperling@winston.com

- **Christopher James Steskal**
  csteskal@fenwick.com,kayoung@fenwick.com,jtosches@fenwick.com

- **Stephen E. Taylor**
  staylor@taylorpatchen.com,schow@taylorpatchen.com,cdunbar@taylorpatchen.com

- **Diana Viggiano Valdivia**
  dvaldivia@paulweiss.com

- **Robert John Vizas**
  robert.vizas@aporter.com,marie.zambrano@aporter.com,SFCalendar@aporter.com

- **Jamie Danielle Wells**
  jwells@mcguirewoods.com,ladocket@mcguirewoods.com,dmolakides@mcguirewoods.com

- **Jennifer Michelle Wong**
  jennifer.wong@sidley.com,nyefiling@sidley.com,jennifer-wong-7703@ecf.pacerpro.com

- **Catherine M Yang**
  CYang@paulweiss.com,mao_fednational@paulweiss.com

- **Armen Zohrabian**
  AZohrabian@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)